JUDGE HELLERSTEIN

15 CV 03849

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1 and JANE DOE 2, on behalf of
themselves and all similarly situated women,

        Plaintiffs,

-against-

THE CITY OF NEW YORK and BENNY
SANTIAGO,

        Defendants.

**COMPLAINT**

**CIVIL ACTION NO.**

Jury Trial Demanded



RECEIVED

MAY 19 2015

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Jane Doe 1 and Jane Doe 2, on behalf of themselves and a class of similarly situated women (together, "Plaintiffs"), by their undersigned counsel, based on personal knowledge and upon information and belief, allege as and for their Complaint as follows:

## NATURE OF THE ACTION

1. Correction officers at Rikers Island exploit the authority of their position to rape and sexually abuse the women in their custody. This abuse is only possible because, in the face of repeated warnings, the City of New York has enabled a culture of complacency to perpetuate at Rikers Island and thereby consented to the abuse of women in its custody.

2. Jane Doe 1 and Jane Doe 2 were repeatedly raped and sexually abused by Correction Officer Benny Santiago ("Santiago"), who threatened to, and did, punish them if they resisted or reported his abuse. Now, Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 against Santiago and the City of New York (the "City" and, collectively, "Defendants") to obtain declaratory judgment, injunctive relief, and compensatory and punitive damages for deprivation of their constitutional rights.

3. New York State has recognized the coercive power correction officers wield over incarcerated women, and the related risk of rape and other sexual abuse, by criminalizing all sexual activity between incarcerated individuals and correctional staff in New York Penal Law § 130.05(3)(f), New York Penal Law § 130.25(1), and New York Penal Law § 130.40(1). The City is aware that New York State has identified a significant risk of sexual coercion of women in custody, but it nonetheless permits a culture of systemic rape and other sexual abuse of women by correction officers to exist at Rose M. Singer Center ("RMSC"), the all-female jail on Rikers Island, New York.

-2-

4.    The pervasive culture of rape and other sexual abuse at RMSC is common knowledge within and without the facility. Correction officers and other staff know not only that women are regularly abused, but also which officers abuse which women, and when and where the abuse occurs.

5.    Supervisory officers and staff facilitate this rape and other sexual abuse by making predictable rounds and otherwise failing meaningfully to oversee correction officers.

6.    The City facilitates this rape and other sexual abuse by permitting supervisory officers and staff to operate in the manner alleged herein, by failing to monitor (through cameras or otherwise) known at-risk areas and even by failing to post signs throughout RMSC stating it is a crime pursuant to New York Penal Law § 130.05(3)(f), New York Penal Law § 130.25(1) and New York Penal Law § 130.40(1) for any New York City Department of Correction ("DOC") employee to rape or sexually abuse any inmate.

7.    Correction officers use threats, punishment, and other measures to keep women, including Plaintiffs, from reporting abuse. Here, Santiago intimidated and coerced Jane Doe 1 and Jane Doe 2 by physically restraining Jane Doe 1 and threatening her family and warning Jane Doe 2 that he would file disciplinary charges against her and have her beaten up by other inmates if she resisted or reported his abuse.

8.    The City fails to protect from retaliation women who report rape and sexual abuse by correction officers, giving correction officers an actual and perceived free hand to retaliate against these women. This retaliation includes threats and other verbal abuse, deprivation of food for extended periods of time, refusing to permit women to bathe, and placing them in punitive segregation based on false disciplinary charges. For example, when Santiago suspected Jane Doe 2 of reporting him, he and other correction officers threatened and

-3-

harassed her, twice refused to feed her for over twenty-four hours, prohibited her from

bathing for days at a time, and confined her to her cell and placed her in punitive segregation

without justification—all as retaliation for reporting Santiago's criminal acts.

9.   Despite being on notice of the widespread sexual misconduct perpetrated by correction

officers at RMSC, the City acted with deliberate indifference to the substantial risk of harm

to Jane Doe 1, Jane Doe 2, and other women in its custody.  The City's customs, policies,

practices, acts, and omissions allowed Santiago to rape and sexually abuse Jane Doe 1 and

Jane Doe 2, and allowed Santiago and other correction officers to retaliate against Jane Doe 2

after she reported Santiago's abuse.

10.   The City remained indifferent to the culture of rape and other sexual abuse at Rikers even

after Jane Doe 2 reported Santiago's sexual misconduct.  Rather than taking prompt steps to

investigate and punish Santiago, the City instead both continued to employ Santiago at

Rikers and treated Jane Doe 2 as an adversary, refusing all requests for information about its

investigation of her allegations, first on the ground that the investigation found no

wrongdoing, and later on the mutually exclusive ground that the investigation that

purportedly had "found" no wrongdoing was nevertheless still ongoing.  The City has also

withheld records of Jane Doe 2's own statements to City investigators—statements made in a

coercive environment and without the presence of counsel—and refused to return the

personal property Jane Doe 2 provided the City to assist its purported investigation.

11.   The City claims to recognize that Rikers is a "dehumanizing environment," from which

inmates are released "more broken than when they came in," but, to date, neither the policies

and practices promulgated and permitted by the City, nor the City's approach to the women

who brave retaliation from correction officers to complain of rape and other sexual abuse, demonstrate any intent to electively change the status quo.

## JURISDICTION AND VENUE

12.   This court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

13.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## PARTIES

14.   Jane Doe 1 is a pre-trial detainee at RMSC who is currently detained at Rikers and has been there since approximately September 13, 2011.  She was previously detained at RMSC for periods of time between 2006 and 2011.

15.   Jane Doe 2 was a pre-trial detainee at RMSC from December 1, 2012 to May 14, 2013.  Jane Doe 2 was again incarcerated at RMSC from March 26, 2014 to April 3, 2014.  Jane Doe 2 is no longer incarcerated; she was released early on parole.

16.   At all times referred to herein, Santiago was a Correction Officer employed by DOC and assigned to work at RMSC.  Jane Doe 1 and Jane Doe 2 sue Santiago in his individual capacity.  Upon information and belief, Santiago is a resident of the State of New York.

17.   Defendant the City is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a correction department which acts as its agent in the area of corrections and for which it is ultimately responsible.  The City maintains DOC, which is a municipal entity created and authorized under the laws of the State of New York.  DOC is authorized by law to carry out all correction functions for the City and assumes responsibility for the care, custody, and control of persons held by the City in correctional facilities.

## STATEMENT OF FACTS

### *Santiago Rapes and Sexually Abuses Jane Doe 1*

18.  During Jane Doe 1's detention at RMSC, Santiago regularly raped her, at times as many as

four times a week.  When Jane Doe 1 tried to resist, Santiago would often roughly grab her

and tell her that she "knew better."  On several occasions, when Jane Doe 1 disobeyed

Santiago, or when Santiago was displeased by something Jane Doe 1 had done, he would

punish her by anally raping her.  Santiago knew where Jane Doe 1's mother lived, and would

park his car outside of her home, observe Jane Doe 1's family, and later report his

observations to Jane Doe 1—reminding her to "make the right decision," and implicitly

threatening her family.  Santiago also kept Jane Doe 1 from resisting or reporting his sexual

abuse by threatening that after she was released, she would live with him, keep his house

clean, and "never go anywhere."

### *Santiago's Pre-2011 Abuse of Jane Doe 1*

19.  Jane Doe 1 first encountered Santiago in late 2006, while she was incarcerated at RMSC.

Jane Doe 1 was released in early 2007.

20.  Santiago's sexual abuse of Jane Doe 1 began in late 2008, roughly a week after Jane Doe 1

returned to RMSC on a new detention.  While Santiago is a serial abuser, his abuse of Jane

Doe 1 also took advantage of her limited intellectual capacity.  In school she was placed in

special education classes and was held back twice, once in elementary school and once in

high school.  She also dropped out of school in the tenth grade and has tested in the lowest

0.5 percentile on the Verbal Comprehension Index of the Wechsler Adult Intelligence Scale.

21.  During this period of incarceration, Jane Doe 1 was housed in Dormitory 8, where Santiago

was the "steady" officer during the 7 a.m. to 3 p.m. shift.

22.  While Jane Doe 1 was working a janitorial shift at RMSC (commonly known as "house detail"), Santiago approached her and instructed her to mop the floor.  Jane Doe 1 was uncomfortable because she noticed that Santiago was staring at her buttocks while she mopped.

23.  A pattern developed:  early each morning, Santiago would ask Jane Doe 1 to clean various areas of Dormitory 8 and would watch her as she cleaned.  Other correction officers on duty at that time were usually asleep.  Sometimes Santiago would talk to Jane Doe 1 while she worked and share inappropriate personal information with her, including discussing his relationship with his wife and providing Jane Doe 1 with what he said was his home address.

24.  Approximately one week later, Santiago instructed Jane Doe 1 to come to his desk in the Dormitory 8 dayroom, the dormitory's common area.  Jane Doe 1 assumed that Santiago would ask her to clean, as he typically did.  Instead, Santiago unzipped his pants, exposed himself, and began masturbating.  Jane Doe 1 was shocked and extremely uncomfortable, but she did not feel that she could walk away because Santiago was a correction officer and he had ordered her to come to the desk.

25.  After Santiago ejaculated, he zipped up his pants and instructed Jane Doe 1 to keep quiet about the incident.

26.  Although Santiago masturbated in an open area of Dormitory 8, upon information and belief, there were no functional cameras monitoring the area.

27.  About a week after this incident, Santiago told Jane Doe 1 that he "wanted her to be his." Jane Doe 1 attempted to walk away but Santiago forcibly restrained her by grabbing her arm, hurting her, and telling her, "I am not done talking to you." When Jane Doe 1 told Santiago that he was hurting her arm, Santiago tightened his grip.  Santiago informed Jane Doe 1 that

-7-

he would be working an overnight shift that evening and instructed her to meet him in the
dayroom after the captain's rounds. She obeyed because she believed that she would be
subject to physical and other retaliation if she did not acquiesce to Santiago's demands. That
night, Santiago raped Jane Doe 1 for the first time.

28. From this time until Jane Doe 1's release from RMSC in the summer of 2009, Santiago
regularly and repeatedly raped Jane Doe 1.

29. During this period, Santiago regularly instructed Jane Doe 1 to meet him in the dayroom on
evenings when he was working overtime. There are windows on one side of the dayroom,
but people sitting or lying down beneath the windows cannot be seen from the adjoining
dormitory. Upon information and belief, the dayroom was not monitored by security
cameras.

30. RMSC captains made their rounds at the same time every evening, and only one correction
officer—Santiago—was on duty in Dormitory 8 at night. This inadequate supervision made
it easy for Santiago to rape Jane Doe 1 without being observed.

31. Jane Doe 1 met Santiago in the dayroom when instructed, believing she had no choice.
Santiago frequently demanded that Jane Doe 1 perform oral sex on him and would then rape
her. While raping Jane Doe 1, Santiago would often pull at her hair, grab her shoulders, and
choke her. Often, Santiago tried to prevent Jane Doe 1 from getting to her feet after he raped
her. Santiago regularly reiterated that Jane Doe 1 should not tell anyone about his abuse. As
a result, Jane Doe 1 felt trapped and under constant threat of physical and other retaliation by
Santiago.

32. From August 2009 to August 2011, Jane Doe 1 was incarcerated at RMSC for various
periods of time. Because she was not assigned to his housing area, she had limited

-8-

interaction with Santiago, although he would approach Jane Doe 1 nearly every day during her recreation period and tell her that they should "hook up." Jane Doe 1 attempted to avoid Santiago, but to little avail. Once, another inmate confronted Santiago about what he was doing to Jane Doe 1, and Santiago asked if Jane Doe 1 had told other inmates about him. Even though she had, Jane Doe 1 said she had not, because she was afraid that Santiago would retaliate against her for doing so.

### Jane Doe 1 Returns to RMSC, and Santiago's Abuse Resumes

33.   When Jane Doe 1 returned to RMSC in September 2011, Santiago was angry with Jane Doe 1, telling her it was because she had not come to visit him while she was outside of Rikers, as he had instructed her to. Soon after Jane Doe 1's return to RMSC, Santiago's pattern of raping and sexually abusing Jane Doe 1 resumed.

34.   Beginning in September 2011, Santiago repeatedly located Jane Doe 1 during her recreation period and instructed her to meet him. Santiago frequently instructed Jane Doe 1 to complain of chest pains, so that she would be sent to the medical clinic. He ordered Jane Doe 1 to tell the clinic staff that her chest pains had stopped once she arrived at the clinic. Santiago would arrange to be near the clinic at the time Jane Doe 1 arrived, and would offer to escort her back to her housing area. Instead of returning Jane Doe 1 to her cell, however, Santiago would take her to the "sprungs," an area near the commissary in the visitors area, or a room located near the sprungs, and rape her.

35.   The sprungs are outside the main RMSC building, and Santiago was able to rape Jane Doe 1 without detection in this area because he had a key to the gate to access the sprungs and knew when and where the captains would do their rounds.

-9-

36. Jane Doe 1 was afraid that Santiago would retaliate against her if she resisted.  She knew that, as a correction officer, he could easily find her at RMSC, and she would be unable to avoid him.

37. Santiago regularly and repeatedly raped Jane Doe 1 in this manner until late 2012.  As before, Santiago was rough with Jane Doe 1, forcibly maneuvering her and hurting her as he raped her.

38. Frequently, when Jane Doe 1 started to walk away from him, Santiago would grab her arm and pull her back.  When Santiago was aware that she spoke to, or even made eye contact with, other correction officers, he would get angry and tell her that she would live at his house after being released from Rikers.

39. On several occasions, when Santiago was displeased by something Jane Doe 1 had done, he would punish her by anally raping her.

40. On at least one occasion, Santiago punished Jane Doe 1 for ceasing to perform oral sex on him by anally raping her.

41. In addition, Jane Doe 1 was concerned about sexually transmitted diseases and asked Santiago to use a condom.  He refused, and continued to have sexual intercourse with her without a condom.  After Jane Doe 1 requested that he use condom the first time, Santiago anally raped Jane Doe 1 as punishment.  On at least one additional occasion, Santiago anally raped Jane Doe 1 again to punish her for requesting that he use a condom.

42. Following the incident described in the third sentence of paragraph 40, Santiago also said that he did not have time for condoms if Jane Doe 1 asked him to use one.

   ***Santiago Threatens Jane Doe 1's Family***

43.   Santiago also forced Jane Doe 1 to give him her mother's address by telling Jane Doe 1 that he knew Jane Doe 1 needed money and that he would go and give her mother money to put in Jane Doe 1's commissary account.  Jane Doe 1 eventually gave Santiago her mother's address because she was afraid he would retaliate against her if she did not.  She also believed Santiago could obtain the address on his own in any event.  Jane Doe 1 never asked Santiago for money.

44.   In fact, Santiago then went to Jane Doe 1's mother's house and gave Jane Doe 1's mother money.  He stated that he was a friend of Jane Doe 1's, and did not disclose his real name or that he was a correction officer.

45.   Jane Doe 1 feared for her nieces and her mother because she knew that Santiago had returned to her mother's house after his initial visit.  On multiple occasions, Santiago implicitly threatened Jane Doe 1's family in order to coerce Jane Doe 1 into obeying him.  Santiago frequently told Jane Doe 1 that he had been "in the neighborhood," and would then describe to Jane Doe 1 how he had observed her family from his parked car.  Santiago also told Jane Doe 1, "You know I know everything about you, right?  So make sure you make the right decision."

46.   Since being raped and sexually abused by Santiago, Jane Doe 1 has suffered and continues to suffer severe psychological and emotional distress.

### *Santiago Rapes and Sexually Abuses Jane Doe 2*

47.   Santiago repeatedly raped and sexually abused Jane Doe 2 while she was detained at RMSC.  As explained more fully below, to keep Jane Doe 2 from resisting or reporting him, Santiago threatened to charge her with false disciplinary infractions and to cause other inmates to attack her.

-11-

### *Santiago Starts Raping Jane Doe 2*

48.  Jane Doe 2 first entered detention at RMSC on December 1, 2012.

49.  On or about February 13, 2013, Jane Doe 2 began working as a Suicide Prevention Aid ("SPA") in Building 9, a building housing women with mental health issues. As an SPA, Jane Doe 2 was responsible for patrolling the housing area and monitoring inmates who were placed on suicide watch.

50.  On or about the morning of February 14, 2013, Jane Doe 2 encountered Santiago for the first time as she was returning to Building 11 after her SPA duty in Building 9. At that time, Santiago was the steady officer assigned to the 11 p.m. to 7 a.m. shift in Building 11. He was usually on post four nights in a row, then off for two nights.

51.  A few days after Jane Doe 2's initial encounter with Santiago, he began making inappropriate, lewd sexual comments, including that he liked her lips and would like to see them around his penis. Santiago then told Jane Doe 2 he would pay her for oral sex and arranged to meet her during an upcoming shift.

52.  The next time Jane Doe 2 saw Santiago he asked her not to "tell on" him for soliciting oral sex. Jane Doe 2 confirmed she would not report Santiago because she believed that if she reported him nobody at RMSC or DOC would keep Santiago and other correction officers from retaliating against her.

### *The February 18 or 19, 2013 Sexual Abuse*

53.  On or about the evening of February 18 or 19, Santiago instructed Jane Doe 2 to leave her SPA post and meet him in the pantry area connecting RMSC Buildings 9 and 11 after the 3:00 a.m. captain's rounds.

54.  When Jane Doe 2 went to the pantry area as instructed, Santiago was waiting for her. He gave her several contraband items and then led her to a nearby empty cell with an inoperative

-12-

security camera. Santiago gave Jane Doe 2 some money, and told her to perform oral sex on him. Jane Doe 2 did so until he ejaculated. Afterwards, Santiago gave Jane Doe 2 a Bible study paper with his home address, home phone number, and e-mail address.

55.   After this initial incident of abuse, Santiago repeatedly, and with impunity, raped and sexually abused Jane Doe 2.

56.   From the end of February to the beginning of April, Santiago instructed Jane Doe 2 to meet him in the pantry between Buildings 9 and 11 on numerous occasions—in fact, nearly every night that he was on duty—where he would subject her to inappropriate sexual touching and other sexual abuse. Although Jane Doe 2 was assigned to work as an SPA from 2:00 p.m. to 10:00 p.m., Santiago instructed her to switch to his shift (11:00 p.m. to 7:00 a.m.). Later in March, Jane Doe 2 began working both her assigned shift and Santiago's shift.

57.   The officers assigned to supervise the Building 9 SPAs, Correction Officer Rodriguez ("Rodriguez") and Correction Officer Harris ("Harris"), were aware of Santiago's abuse of Jane Doe 2. Although she was required to do her SPA rounds every fifteen minutes, Jane Doe 2 stopped doing her rounds almost entirely because she was spending most of her time with Santiago.

58.   Rodriguez and Harris began to lock the pantry to try to prevent her from going to Building 11 to see Santiago. However, Santiago would simply unlock the pantry from the other side. On one occasion, Rodriguez told Jane Doe 2, "What you're doing isn't right," but on information and belief neither he nor Harris said anything to Santiago or reported Santiago's behavior to their supervisors. If they did say or do something, it was wholly ineffective.

*The March 20, 2013 Rape and Sexual Abuse*

59.  On or about March 20, 2013, Santiago instructed Jane Doe 2 to meet him in the pantry area between Buildings 9 and 11.  After moving Jane Doe 2 to the area near the slop sink, which was not monitored by cameras, Santiago began to kiss Jane Doe 2's neck and chest.  Jane Doe 2 told him to stop, but Santiago forced her to the nearby janitor's closet—yet another area in RMSC not monitored by security cameras.

60.  After leading her inside the closet, Santiago unzipped his pants, exposed his penis, and ordered Jane Doe 2 to perform oral sex on him.  After a few minutes, Santiago moved Jane Doe 2 into a position in which he could have intercourse with her and raped her.  Jane Doe 2 was scared that if she tried to escape, Santiago would retaliate by reporting her for harassment, planting contraband in her room, or ordering other inmates to beat her up.

61.  On or about March 30, 2013, Santiago gave Jane Doe 2 contraband items, including a pair of pink headphones and a pink Moleskine notebook.  Jane Doe 2 transcribed Santiago's personal contact information into the notebook.

62.  Other inmates and correction officers at RMSC, including Correction Officer 5, saw the contraband items Santiago gave Jane Doe 2.  Because inmates at RMSC are not permitted to have headphones or other contraband, it is common knowledge among staff and inmates alike that inmates who have contraband and openly retain these items within the facility are being sexually abused by correction officers.

*The April 20, 2013 Rape and Sexual Abuse*

63.  On or about April 20, 2013, Santiago instructed Jane Doe 2 to meet him in the pantry.  When Jane Doe 2 arrived, Santiago opened the door of the janitor's closet and motioned for her to enter.  Jane Doe 2 refused, but Santiago continued to demand that she enter the janitor's

-14-

closet, telling her that they were "together" and that she was "supposed to have sex with [him] whenever [he] want[ed]." Santiago then physically pulled Jane Doe 2 into the closet.

64. Once inside the closet, Santiago forced Jane Doe 2 to perform oral sex on him. After a few minutes, Santiago again lifted Jane Doe 2 onto her feet and raped her.

### *The April 30, 2013 Rape and Sexual Abuse*

65. On or about April 30, 2013, Santiago flashed his light through the pantry that connected Buildings 9 and 11 while both he and Jane Doe 2 were on duty, signaling that Jane Doe 2 was to meet him in the pantry. He gave Jane Doe 2 tobacco and an ecstasy pill and told her to go into the janitor's closet.

66. Jane Doe 2 refused, but Santiago threatened to report her for harassment and stalking if she did not comply, telling her, "I can get you set up. I can get you fucked up," and warning her that no one would believe her if she tried to report him.

67. Fearful that Santiago would follow through on his threats, Jane Doe 2 followed Santiago into the closet where he demanded that she perform oral sex on him. After a few minutes, Santiago again raped Jane Doe 2.

### *The May 1, 2013 Sexual Abuse*

68. On or about May 1, 2013, during Jane Doe 2's SPA rounds, Santiago again called her into the janitor's closet and ordered Jane Doe 2 to perform oral sex on him.

69. Jane Doe 2 refused, but Santiago said, "Just do it. You know you want to anyway," and threatened to report her for harassment if she did not comply. Crying, Jane Doe 2 followed Santiago into the closet, where he forced her to perform oral sex on him.

### *Correction Officers Retaliate Against Jane Doe 2*

70. On or about May 7, 2013, Jane Doe 2 was caught with contraband items provided to her by Santiago. Another inmate alerted Correction Officer Tyson that Jane Doe 2 had contraband

during one of Jane Doe 2's shifts as an SPA worker, and when Tyson asked Jane Doe 2 if the contraband belonged to her, Jane Doe 2 admitted that it did.

71.   Jane Doe 2 did not disclose that Santiago had given her the contraband because she was afraid that he would follow through on his threats to retaliate against her if she reported him. Significantly, Tyson, who was likely aware that Jane Doe 2 was being abused by Santiago, told Jane Doe 2 that "all she [Jane Doe 2] had to do was say the contraband belonged to her [the inmate who had reported Jane Doe 2]" and Tyson would not write Jane Doe 2 up for this infraction. Jane Doe 2 did not blame the other inmate, and was sentenced to fifteen days in punitive segregation for this infraction.

72.   Although Jane Doe 2 did not tell anyone how she obtained the contraband, Santiago and other correction officers encouraged inmates to threaten and bully Jane Doe 2 because, on information and belief, they assumed Jane Doe 2 had reported Santiago.

73.   For example, Santiago let certain inmates out of their cells one night when all inmates are supposed to be "locked in." The inmates then stood outside Jane Doe 2's cell and cursed at her and yelled at her for "snitching" on Santiago. Jane Doe 2 also learned female inmates and correction officers who were "close" to Santiago planned to physically attack Jane Doe 2. Jane Doe 2 was afraid for her life.

74.   Staff and inmates openly ostracized and threatened to harm Jane Doe 2 for "snitching" on Santiago, even though she had not yet reported him. The correction officers and inmates in Building 11 refused to allow Jane Doe 2 out of her cell to perform basic functions such as eating or taking a shower. Despite Jane Doe 2's repeated pleas, Building 11 staff did not feed Jane Doe 2 for over twenty-four hours.

75. The next day, on May 9, 2013, Jane Doe 2 told Correction Officer Anderson that she was suicidal, and DOC Captain Bristen escorted her to the Mental Health Department. When Captain Bristen let Jane Doe 2 out of her cell, seven or eight other inmates surrounded her, screaming obscenities and threatening to "fuck [her] up." A captain and several other correction officers were present while Jane Doe 2 was confronted by the other inmates, but did nothing in response.

76. At Mental Health, Jane Doe 2 broke down crying and told Linda Moro, a Mental Health clinician, about Santiago's sexual abuse. Ms. Moro told Jane Doe 2 that there was nothing she could do, and Jane Doe 2 was escorted back to Building 11 approximately two hours after she went to Mental Health. On the way back, an inmate friendly with Santiago approached and threatened Jane Doe 2.

77. Back in Building 11, a correction officer immediately locked Jane Doe 2 in her cell. Staff continued to deny her food and the opportunity to shower for the remainder of the day.

78. On May 10, 2013, after approximately forty-eight hours without food, and after being subjected to continued harassment by the Building 11 inmates, Jane Doe 2 told Captain Cox that she was suicidal, and again, she was escorted to Mental Health.

79. This time, Linda Moro, the Mental Health clinician Jane Doe 2 had seen the previous day, called the New York City Department of Investigation ("DOI"), Office of the Inspector General (the "IG's Office"). Jane Doe 2 tearfully told a medical doctor, Marie Devezin, about Santiago's rapes and sexual abuse. Dr. Devezin examined her, but told her that she could not do anything about Santiago's sexual abuse.

80. Two inspectors from the IG's Office came to Mental Health to speak with Jane Doe 2. She told the agents about the rape and other sexual abuse that she had suffered at the hands of

Santiago over the previous months.  Nevertheless, now, two years later, Jane Doe 2 has still

not received a written determination of her complaint to DOI.

*The May 2013 Retaliation Against Jane Doe 2*

81.  Shortly after speaking with the inspectors, Jane Doe 2 was moved from Building 11 into

Protective Custody in Building 8.  Upon arriving in Building 8, Jane Doe 2 discovered that

the correction officers there already knew she had reported Santiago's repeated rapes and

other sexual abuse.

82.  Correction officers called her a "snitch," and, although she was finally given a meal after

more than forty-eight hours without food, they routinely refused to open her cell door to

allow her out to eat.  On several occasions, correction officers stood outside Jane Doe 2's cell

and berated her, and multiple officers told Jane Doe 2 that she was "wrong" for reporting

Santiago's abuse.  Correction Officer Smalls asked Jane Doe 2 why she reported Santiago,

and told her that all of the correction officers were angry with her.  To her knowledge, The

door to Jane Doe 2's cell was not monitored by security cameras.

83.  The City failed to take any action to protect Jane Doe 2 from continued retaliation by Rikers

correction officers.

84.  On or about May 14, 2013, the IG's Office moved Jane Doe 2 to a facility in Orange County,

New York.  Inspectors Crystal and Young told her she was moved for her own protection.

*The March and April 2014 Retaliation Against Jane Doe 2*

85.  On or about March 26, 2014, Jane Doe 2 returned to Rikers for a Sex Offender Registration

Act ("SORA") hearing.  Jane Doe 2 was originally placed in general population facilities;

however, several days later, she was moved to punitive segregation, although she had not

engaged in any wrongdoing.

86. When Jane Doe 2 requested an explanation for her removal to punitive segregation, the escorting officer told her in a threatening tone that she should not have told anyone about Santiago's misconduct.

87. Jane Doe 2's attorneys at The Legal Aid Society ("Legal Aid") reported this incident to the IG's Office and the DOC General Counsel's Office. Jane Doe 2 also told her father, who reported the incident to the IG's Office as well. The IG's Office has never informed Jane Doe 2 of the action, if any, it took with respect to these reports.

88. On or about March 31, 2014, several correction officers standing outside her punitive segregation cell further harassed Jane Doe 2. These officers jeered at Jane Doe 2 and called her a "bitch" and a "snitch" for reporting Santiago. They also told Jane Doe 2 that she was "famous" among the correction officers at RMSC.

89. On or about April 1, 2014, Legal Aid reported the continued retaliation against Jane Doe 2. A captain was sent to investigate and questioned Jane Doe 2 about her report. The captain's superficial investigation was limited to a series of questions about what Jane Doe 2 had told her lawyer about the retaliation. The captain also forced Jane Doe 2 to sign a statement representing that she had not been harassed by any Rikers correction officers. Jane Doe 2 signed the statement out of fear of further mistreatment and retaliation, but because it was not true she did not sign her real name.

90. On or about April 2, 2014, Jane Doe 2 was twice denied access to legal calls that she requested in order to communicate with her Legal Aid attorney about the retaliation she was experiencing. Jane Doe 2 was denied legal calls by the same captain who had forced her to sign the statement the previous day.

91.  The City also failed to provide Jane Doe 2 mental health treatment during this time period, including denying her the prescription medication she should have been receiving.

**_Santiago Causes Jane Doe 2 to Develop Post-Traumatic Stress Disorder and Contract a Sexually Transmitted Disease_**

92.  A psychiatrist at Bedford Hills Correctional Facility diagnosed Jane Doe 2 with post-traumatic stress disorder ("PTSD") stemming from Santiago's rape and sexual abuse and the retaliation she suffered at the hands of Santiago and other correction officers. Jane Doe 2 continued to receive treatment for PTSD while she was detained at Albion Correctional Facility, where she was incarcerated to serve her sentence, and continues to receive therapy while on parole, following her early release from prison.

93.  In addition to the physical harms she suffered from Santiago's rape and sexual abuse, including difficult sleeping, Jane Doe 2 has experienced symptoms of PTSD, depression, and anxiety, and has had flashbacks of the abuse and retaliation.

94.  Prior to the first incident of Santiago's sexual abuse, Jane Doe 2 was concerned about contracting a sexually transmitted disease and asked Santiago to use a condom. He refused. Her fears were well-founded. Santiago gave Jane Doe 2 trichomoniasis, a sexually transmitted infection that causes greenish-yellow vaginal discharge with a strong odor, painful urination, and vaginal itching and irritation. Trichomoniasis may increase the risk of contracting or spreading other sexually transmitted infections, including HIV.

95.  Jane Doe 2 did not test positive for STDs during her initial intake to RMSC, and she did not report any symptoms associated with trichomoniasis to doctors until June 3, 2013. Jane Doe 2's medical records reflect that she told doctors at RMSC and Orange County Jail that she was raped on or around May 2, 2013, which is consistent with the up to twenty-eight-day incubation period of trichomoniasis.

-20-

### *There is a Culture of Rape and Other Sexual Abuse of Women Incarcerated at Rikers*

96.   Rape and other sexual abuse of women is endemic at RMSC.  Upon information and belief, Jane Doe 1 and Jane Doe 2 are just two of the many women at RMSC who have been victimized by correction officers.

97.   According to a survey conducted by the U.S. Department of Justice ("DOJ"), RMSC is one of the twelve worst jails in the country regarding staff sexual misconduct.[1]  Nationwide, 3.2% of jail inmates reported sexual victimization, but at RMSC the rate was 8.6%, and sexual victimization rates were higher at RMSC than at the other Rikers jails in the survey.[2] RMSC also has the country's highest rate of non-violent staff sexual coercion of inmates.[3]

98.   According to the DOJ Survey, approximately 5.9% of RMSC inmates reported sexual abuse by staff.[4]

99.   The City operates ten jails on Rikers Island, four houses of detention, court pens in the five boroughs, and two hospital wards and, in the past year, City facilities have held over 80,000 inmates, with an average daily population of over 11,000.[5]  The RMSC population is approximately 1,000 women at any given time.[6]

---

[1] Allen J. Beck et al., Bureau of Justice Statistics, U.S. Dep't of Justice, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, at 13 (2013) (hereinafter the "DOJ Survey"), *available at* http://www.bjs.gov/ content/ pub/pdf/svpjri1112.pdf.

[2] *Id.* at 71.

[3] *Id.* at 14.

[4] *Id.* at 13.

[5] *See* New York City Department of Correction Facilities Overview, http://www.nyc.gov/html/doc/html/about/ facilities-overview.shtml (last visited May 15, 2015).

[6] *See* DOJ Survey, at 71.

100.  The vast majority of inmates are pretrial detainees, who remain in City custody for an
      average of fifty-four days, and only are incarcerated at Rikers because they are indigent and
      cannot afford modest or low bail.

101.  Sexual abuse by staff in prisons and jails is a vastly unreported crime.[7]  A report by the
      United States Attorney's Office for the Southern District of New York detailing the results of
      a recent Rikers investigation conducted pursuant to the Civil Rights of Institutionalized
      Persons Act, furthermore, expressed "concern that DOC may be under-reporting sexual
      assault allegations."[8]  This under-reporting of staff-on-inmate sexual assault suggests that the
      numerous instances in which correctional staff at Rikers have been investigated and
      convicted of criminal sexual misconduct against inmates represent only a small fraction of
      the actionable sexual abuse that occurs at Rikers.

102.  One reason sexual assault is rarely reported is due to the trauma and stigma associated with
      it.  The fear and trauma is exacerbated for the more than 80% of women in custody who
      experienced sexual or physical assault before incarceration.[9]  Because childhood abuse is
      often perpetrated by a friend or family member, many women experience intense confusion
      about abusive treatment.  As a result, they may have problems setting appropriate boundaries

---

[7] U.S. Dep't of Justice, *Regulatory Impact Assessment for PREA Final Rule*, at 17-18 (May 17, 2012), *available at*
http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf (concluding, based upon the DOJ Survey, that between 69
percent and 82 percent of inmates who reported sexual abuse in response to the survey stated that they had never
reported an incident to corrections staff).

[8] The U.S. Attorney's Office for the S.D.N.Y., *CRIPA Investigation of the New York Department of Correction Jails
on Rikers Island* (2014), *available at* http://genius.com/Preet-bharara-rikers-report-i-chaos-at-rikers-annotated (last
visited May 15, 2015).

[9] *See, e.g.*, Angela Browne et al., *Prevalence and Severity of Lifetime Physical and Sexual Victimization Among
Incarcerated Women*, 22 Int'l J.L. & Psychiatry 301, 310-22 (1999) (study of women in New York State's  Bedford
Hills Correctional Facility finding that a majority of the women studied had experienced physical or sexual abuse in
their lifetime, 82% had been severely physically or sexually abused during childhood, and 75% had suffered serious
physical violence by an intimate partner during adulthood).

and are more vulnerable to abuse, particularly by men in authority.  Their apprehension about
reporting sexual assault is heightened because their prior reports may have been ignored or
caused the destruction of their families.

103.   People who experienced prior abuse are more likely to be subject to abuse[10] and less likely to
complain.  Women may also mistakenly feel complicit in their sexual abuse, if, for example,
they engaged in sexual conduct with an officer in exchange for protection or some other *quid
pro quo*.  In reality, however, an incarcerated woman has no practical way of saying "no."

104.   In addition, victims of abuse do not come forward because they do not think they will be
believed.  They are correct.[11]  Without physical proof, which is difficult to obtain, the reality
is that the word of a correction officer will almost always be credited over that of an
incarcerated woman.  Repeated credible complaints lodged against an officer and indicia of
misconduct are frequently ignored without physical proof.  Even if the incarcerated woman
has physical proof of the abuse, the officer may be permitted to continue guarding female
inmates, often alone and at night.

105.   Victims of sexual abuse are afraid of being disciplined for admitting to the sexual contact or
for lying about it if they are not believed.  Retaliation is a risk for all incarcerated individuals

---

[10] *See, e.g.*, Cindy L. Rich et al., *Child Sexual Abuse and Adult Sexual Revictimization, in From Child Sexual Abuse
to Adult Sexual Risk: Trauma, Revictimization, and Intervention* 49 (Linda J. Koenig et al. eds., 2004) (review of
nine studies investigating the relationship between childhood sexual abuse and subsequent sexual assault revealed
consistent support for phenomenon of revictimization, with each study finding women with a history of childhood
abuse two to three times more likely to experience adult sexual abuse compare with women who did not experience
earlier abuse).

[11] *Survey of Sexual Violence in Adult Correctional Facilities, 2009-11 – Statistical Tables*, at 7-8 (2014),
http://www.bjs.gov/content/pub/pdf/ssvacf0911st.pdf (In 2011 New York State, with a population of approximately
55,000, had 184 allegations of staff sexual misconduct and substantiated four.  As to staff sexual harassment (which
is defined as verbal harassment) New York had 24 allegations and substantiated two. With respect to inmate-on-
inmate sexual abuse, of 60 allegations of nonconsensual sexual acts, five were substantiated, while three of fourteen
allegations of abusive sexual contact were substantiated.).

who complain about their treatment, but the likelihood of retaliation or intimidation is
especially great in response to complaints about staff sexual abuse.

106. The sexual abuse experienced by Jane Doe 1 and Jane Doe 2 was a common occurrence at
RMSC. Santiago himself has made sexual advances toward other women, and, upon
information and belief, has abused multiple other women incarcerated at RMSC. Upon
information and belief, Santiago targets vulnerable women who have a history of sexual
abuse. Before raping Jane Doe 1 and Jane Doe 2, Santiago knew that each had a history of
sexual exploitation.

107. Santiago's illegal and abusive behavior is common knowledge among the supervisors,
officers, and inmates at RMSC, in part because his conduct is open and notorious. Santiago
approached women during meals and free time, walked with them to sick call, and gave them
contraband with which they were seen by Rikers staff and other inmates.

108. Upon information and belief, the City took no action in response to Santiago's abuse of Jane
Doe 1, Jane Doe 2 or other women. Upon information and belief, Santiago is still employed
by the City, works at Rikers, is still receiving his benefits and entitled to a pension, and has
contact with Rikers inmates. Upon information and belief, no disciplinary action has been
taken against him and he has not been prosecuted for his criminal conduct, even though the
City has been on notice of this conduct since May 2013.

109. Nor is Santiago the only RMSC correction officer who has raped or otherwise sexually
abused the women in his care.

110. Upon information and belief, at least seven other correction officers at RMSC, besides
Santiago, have sexually abused incarcerated women.

111. Upon information and belief, Correction Officer 1 was caught abusing women multiple times and also impregnated a female detainee. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

112. Correction Officer 2 raped at least two women at RMSC and may have impregnated one of these women. He also touched multiple inmates in an unwelcome and inappropriate sexual manner in front of other inmates and officers. Upon information and belief, Correction Officer 2 was not disciplined for raping women in his custody and was employed by the City until he was terminated for smuggling marijuana into Rikers. Upon information and belief, Correction Officer 2 is currently serving a three-year sentence for this crime.

113. Correction Officer 3 raped at least one woman at RMSC and may have impregnated her. Upon information and belief, Correction Officer 3 abused numerous women by subjecting them to unwelcome sexual touching. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

114. Upon information and belief, Correction Officer 4 abused women through unwanted sexual touching. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

115. Upon information and belief, Correction Officer 5 had sexual intercourse with at least one incarcerated woman. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

116. Upon information and belief, Correction Officer 6 has sexually abused several women. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

117. Upon information and belief, Correction Officer 7 masturbated while watching a woman sleep in her cell and ejaculated on the sheets of her bed. Upon information and belief, this correction officer is still employed by the City, works at RMSC, and has continuing contact with women in custody.

118. These officers' conduct was open and notorious—on at least one occasion, women in custody overheard a correction officer raping a woman in her cell. Another correction officer routinely raped women in the officers' station.

119. Correction Officers 2 and 3 each raped a woman in their custody, who became pregnant as a result and later suffered a miscarriage while in custody. That woman was subjected to retaliation and harassment by correction officers, including false reports of misbehavior and verbal harassment, such as being called "whore." Even though the inmate and her family complained to both the IG's Office and DOC, nothing was done to punish the officers who mistreated her or to protect her from further abuse and retaliation.

120. Correction officers retaliate against women who resist their unwelcome sexual advances or who the officers believe may report their sexual misconduct in various ways. At least one correction officer retaliated by imposing a term of punitive segregation on a woman and physically abusing her. Upon information and belief, correction officers have also paid inmates to beat up other inmates in retaliation for reporting officer misconduct.

*The City Is Deliberately Indifferent to Correction Officers' Sexual Abuse of Women in DOC Custody*

121.  The City, which, through DOC, is responsible for the care, custody, and control of female detainees and City-sentenced inmates, has, through its acts and omissions, facilitated the rape and sexual abuse of the women committed to its custody.

122.  The City's failure to institute adequate safeguards in its hiring practices for correction officers demonstrates its deliberate indifference to the safety and well-being of women in its custody.  In a January 2015 report, DOI found that over one-third of recently hired correction officers had significant warning signs in their backgrounds—including criminal histories of domestic violence and improper preexisting relationships with incarcerated individuals.

123.  The City knows that correction officers subject women at RMSC to recurrent and ongoing acts of rape and other sexual abuse.  These include forced sexual intercourse, oral sexual acts, sexual touching, public masturbation, demeaning sexual comments, and physical and verbal intimidation to deter women in custody from reporting such sexual abuse.

124.  The City assigns male correction officers to guard women without adequate safeguards to prevent rape and other sexual abuse.  Male correction officers are assigned to posts in which they have unmonitored contact and complete discretion and control over incarcerated women.  For example, a single male correction officer is often assigned to dormitory areas during nighttime hours.

125.  Correction officers who rape and sexually abuse incarcerated women routinely leave their assigned posts, allow the women into areas where they are not permitted, and engage in open and public behavior that is obviously suggestive of inappropriate personal relationships and sexual abuse.  Officers provide certain women with contraband items, are seen walking arm-in-arm throughout the jail with certain women, and grant some women special privileges,

such as allowing them out of their cells when they should be locked in or permitting them to speak to those in punitive segregation. These behaviors are visible to staff and prisoners alike, so that it is known which correction officers are raping and sexually abusing which women. The City has failed to take action despite knowledge of these activities and has not enforced policies intended to identify, address, and prohibit sexual abuse of inmates by correction officers.

126. The City permits correction officers virtually unfettered access to unmonitored areas such as kitchen store rooms, storage closets, and pantries where they can rape and sexually abuse women with minimal risk of detection.

127. The City has failed to ensure that security cameras are installed in these high risk areas and, where cameras are installed, has failed to ensure that they are functional.

128. The City has failed to employ obvious measures to reduce the risk of rape and sexual abuse of incarcerated women by correction officers, such as heightened monitoring of behavior indicative of ongoing sexual abuse, appropriately placed and functional surveillance cameras installed and maintained without staff knowledge, exit interviews of incarcerated women upon transfer or release, random interviews of staff, and more frequent, unannounced rounds by supervisory officials.

129. The City's system for the reporting and investigation of rape and sexual abuse is grossly inadequate. It relies almost entirely on incarcerated women reporting their own rape and sexual abuse and then fails to take appropriate action to protect those who do come forward or to punish their abusers.

130. The City has failed to train staff to take reports of rape and sexual abuse seriously and to give adequate weight to the credibility of inmate witnesses.

131. Pursuant to City policy and practice, incarcerated women who report rape and sexual abuse by correction officers are not protected from retaliation by correction officers and other inmates.

132. The City does not consistently investigate reports of rape or sexual abuse in a prompt or thorough manner, if at all. Once a woman reports that she has been raped or otherwise sexually abused, weeks can pass before an investigation begins. Regardless of what an investigation reveals, officers are rarely disciplined, and women are rarely informed of the outcome.

133. The City treats incarcerated women as adversaries rather than allies. In the case of Jane Doe 2, for example, the City not only failed to investigate her allegations against Santiago in a timely manner, it also stonewalled Jane Doe 2's attempts to obtain evidence that she provided to the City during the course of its investigation.

134. After reporting Santiago's abuse, Jane Doe 2 actively cooperated with the City. Immediately following her report in May 2013, she gave City investigators certain items of personal property as physical evidence of the sexual assault, including a pair of her jeans with Santiago's semen on them. She also made statements to City investigators detailing Santiago's abuse.

135. In September 2014, a year and a half after the City's investigation into Jane Doe 2's abuse began, Jane Doe 2 asked, through her attorneys, that the City provide copies of her statements to its investigators, pursuant to the City's obligations under New York's Freedom of Information Law ("FOIL"). Jane Doe 2 also requested that the City return her personal property. The City refused to provide her a single item or record, even in redacted form.

136. Further, the City failed adequately to explain why it refused Jane Doe 2's request. For example, the City initially stated that it could not provide the requested material because "[DOC] did not substantiate the allegations made by [Jane Doe 2] concerning a sexual relationship with a Correction Officer," indicating that it had concluded that Jane Doe 2's complaints had been fully investigated and rejected, nevertheless, the City inexplicably later claimed that it could not provide the material because the investigation it had previously concluded failed to substantiate abuse was, somehow, still "ongoing."

137. The City has also failed to list the specific records responsive to Jane Doe 2's request and the legal basis for withholding each, as it is obligated to do under FOIL.

138. These and other fundamental failings of City policy directly facilitated the rape and sexual abuse of Jane Doe 1, Jane Doe 2, and other women detained at Rikers. If the City truly intends to transform Rikers into an institution from which inmates do not leave "more broken than when they came in," it must first acknowledge its failure to protect these women and compensate them for the rape and other sexual abuse visited upon them by City employees.

## CLASS ACTION ALLEGATIONS

139. Jane Doe 1 and Jane Doe 2 bring this action on behalf of themselves and, for certain claims, as a class action under Rules 23(a), (b)(1) and b(2) of the Federal Rules of Civil Procedure on behalf of a class consisting of all women who are presently incarcerated and will be incarcerated at RMSC and who have been raped or sexually abused, or will be raped or sexually abused, by staff, while incarcerated there.

140. The class is sufficiently numerous, and the population of women at RMSC continually changes, rendering joinder of all members impracticable. Based on the DOJ Survey statistics, at any given time, upwards of fifty women at RMSC are experiencing or have

recently experienced rape or other sexual abuse by staff, and many more incidents likely go unreported.

141. The questions of law and fact presented by Jane Doe 1 and Jane Doe 2 are common to all members of the class, including, but not limited to, whether the City's policies, practices, acts and omissions cause women in its custody to be subject to a substantial and unreasonable risk and experience of rape and other sexual abuse by correctional facility staff. Questions of law and fact concerning these policies and practices include, but are not limited to:

a. Whether, despite knowledge that correction officers routinely rape and sexually abuse women in the City's custody, the City has failed to take action sufficient to protect the women in its custody from recurrent and ongoing acts of rape and other sexual abuse by correction officers, including forced sexual intercourse, oral sexual acts, sexual touching, public masturbation, and demeaning sexual comments;

b. Whether the City has failed to employ sufficient measures to reduce the risk of rape and other sexual abuse of women in its custody by correction officers, such as adequately heightened monitoring of behavior indicative of ongoing sexual abuse, appropriately placed and functional surveillance cameras installed and maintained without staff knowledge, exit interviews of incarcerated women upon transfer or release, random interviews of staff, and more frequent, unannounced rounds by supervisory officials;

c. Whether the City assigns male correction officers to guard women without adequate safeguards to prevent rape and other sexual abuse and otherwise permits

correction officers inappropriate access to unmonitored areas in jails where they can rape and sexually abuse women with minimal risk of detection;

d.  Whether the City has failed to take action to protect the women in its custody from physical and verbal intimidation by staff that deters incarcerated women from reporting sexual abuse;

e.  Whether the City's hiring practices have failed to provide adequate safeguards to minimize the risk of staff-on-inmate sexual assault;

f.  Whether the City's system for the reporting and investigation of rape and sexual abuse, which relies almost entirely on incarcerated women reporting their own rape and sexual abuse, is adequate;

g.  Whether the City has failed to consistently and adequately investigate reports of rape or sexual abuse in a prompt or thorough manner;

h.  Whether the City has failed to appropriately discipline and terminate correction officers found to have subjected women to rape or other sexual abuse;

i.  Whether the City's policy and practice has failed to protect those who report rape and other sexual abuse by correction officers from retaliation by correction officers and other inmates;

j.  Whether the above-enumerated and other failings of City policy directly facilitated the rape and sexual abuse of women detained at Rikers.

142.  The violations suffered by Jane Doe 1 and Jane Doe 2 as a result of the City's policies and practices are typical of those suffered by the class.  The class will benefit from the injunctive and declaratory relief sought.

143. Jane Doe 1 and Jane Doe 2 will fairly and adequately protect the interests of the class. Jane Doe 1 and Jane Doe 2's interests are aligned with, and not antagonistic to, those of the other members of the class, and Plaintiffs have retained counsel competent and experienced in civil rights and class action litigation.

144. Prosecuting separate actions by individual class members would create a risk of (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the City, and/or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their individual interests.

145. The City has acted, and refused to act, on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as whole.

## CLAIM ON BEHALF OF THE PLAINTIFF CLASS

### COUNT I

### (CLASS DUE PROCESS CLAIM AGAINST THE CITY)

146. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 145 with the same force and effect as if fully set forth herein.

147. By its policies, practices, acts, and omissions, the City has caused the plaintiff class of incarcerated women to be subjected to rape and other sexual abuse, in violation of their due process rights under the Fourteenth Amendment to the United States Constitution.

## CLAIMS ON BEHALF OF NAMED PLAINTIFFS

### COUNT II

### (JANE DOE 1'S DUE PROCESS CLAIM AGAINST SANTIAGO)

148. Jane Doe 1 repeats and realleges each of the allegations contained in paragraphs 1 through 138 with the same force and effect as if fully set forth herein.

149. At all relevant times, Santiago was acting in his capacity as a correction officer employed by the City.

150. At all relevant times, Santiago was acting under color of state law.

151. Santiago raped and sexually abused Jane Doe 1 as detailed herein.

152. As a result of the abuse, Jane Doe 1 suffered severe physical harm and suffered and continues to suffer psychological and emotional distress.

153. By virtue of his rape and sexual abuse, Santiago deprived Jane Doe 1 of her due process rights under the Fourteenth Amendment to the United States Constitution.

### COUNT III

### (JANE DOE 2'S DUE PROCESS CLAIM AGAINST SANTIAGO)

154. Jane Doe 2 repeats and realleges each of the allegations contained in paragraphs 1 through 138 with the same force and effect as if fully set forth herein.

155. At all relevant times, Santiago was acting in his capacity as a correction officer employed by the City.

156. At all relevant times, Santiago was acting under color of state law.

157. Santiago raped and sexually abused Jane Doe 2 by coercing and threatening her to force her to perform sexual acts, including oral sex and intercourse, as detailed herein.

158. As a result of the rape and sexual abuse, Jane Doe 2 suffered severe physical harm and suffered and continues to suffer psychological and emotional distress, including PTSD.  She

continues to experience depression and anxiety, has difficulty sleeping, and has had flashbacks of the rapes and sexual abuse.  Jane Doe 2 also contracted trichomoniasis due to Santiago's rape of her.

159.  By virtue of his rape and sexual abuse of Jane Doe 2, Santiago deprived her of her due process rights under the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (JANE DOE 2'S CLAIM AGAINST SANTIAGO FOR RETALIATION)

160.  Jane Doe 2 repeats and realleges each of the allegations contained in paragraphs 1 through 138 with the same force and effect as if fully set forth herein.

161.  Santiago retaliated against Jane Doe 2 for reporting his rape and sexual abuse.

162.  As a result of the retaliation, Jane Doe 2 suffered severe physical, psychological, and emotional distress, including PTSD.  She contracted trichomoniasis because Santiago raped her, continues to experience depression and anxiety, has difficulty sleeping, and has had flashbacks of the rapes and sexual abuse.

163.  By virtue of his retaliation against Jane Doe 2 for her reports of his sexual abuse, Santiago deprived her of her right to the freedom of speech in violation of her rights under the First and Fourteenth Amendments to the United States Constitution.

## COUNT V

### (JANE DOE 1'S INDIVIDUAL DUE PROCESS CLAIM AGAINST THE CITY)

164.  Jane Doe 1 repeats and realleges each of the allegations contained in paragraphs 1 through 138 with the same force and effect as if fully set forth herein.

165. By its policies, practices, acts, and omissions, the City has caused Jane Doe 1 to be subjected
     to rape and other sexual abuse, in violation of her due process rights under the Fourteenth
     Amendment to the United States Constitution.

**COUNT VI**

**(JANE DOE 2'S INDIVIDUAL DUE PROCESS CLAIM AGAINST THE CITY)**

166. Jane Doe 2 repeats and realleges each of the allegations contained in paragraphs 1 through
     138 with the same force and effect as if fully set forth herein.

167. By its policies, practices, acts, and omissions, the City has caused Jane Doe 2 to be subjected
     to rape and other sexual abuse, in violation of her due process rights under the Fourteenth
     Amendment to the United States Constitution.

**COUNT VII**

**(JANE DOE 2'S CLAIM AGAINST THE CITY FOR RETALIATION)**

168. Jane Doe 2 repeats and realleges each of the allegations contained in paragraphs 1 through
     138 with the same force and effect as if fully set forth herein.

169. The City, through its policies, practices, acts and omissions, caused Jane Doe 2 to be
     subjected to retaliation for reporting rape and sexual abuse, in violation of her rights under
     the First and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A declaration that the policies, practices, actions, and omissions of the City, as described above, violated the class members' rights under the Fourteenth Amendment to the United States Constitution.

B. An injunction requiring the City and its agents and employees to take all steps necessary to prevent women in its custody at RMSC from being unlawfully subjected to rape and sexual abuse and requiring the City to formulate a comprehensive plan to remedy the pattern of sexual abuse at RMSC. Such a plan should include, but not be limited to, the following measures: implementing policies to remedy continuing deficiencies in the assignment, selection, promotion, training, and supervision of correction officers; conducting unannounced supervisory rounds, including rounds at unpredictable and varied times and with additional scrutiny paid to isolated areas; captains making rounds to each housing area that is under his or her supervision at least twice per shift, during day and night shifts; ordering staff to not alert other staff that supervisory rounds are being conducted and serious disciplining of staff who violate such orders; heightened monitoring of officers who are suspected of engaging in sexual abuse; installing and properly maintaining digital cameras that have video and sound recording in isolated locations where sexual abuse is more likely to occur, such as storage closets, laundry rooms, slop sink areas, and loading docks; preserving digital and camera tapes for at least six months, or three years if a complaint is made; developing staff plans that provide adequate levels of staffing to prevent sexual abuse; conducting searches of all correctional staff on entry to RMSC to deter them from taking in condoms, contraband, and other materials used to facilitate the sexual abuse of incarcerated women; remedying continuing deficiencies in the City's

-37-

complaint and investigatory practices, including ordering upper-level management to conduct reviews of sexual abuse incidents within thirty days of every sexual abuse investigation, with input from line supervisors and medical or mental health practitioners; explicitly ordering staff of their duty to report warning signs of abuse; and providing mental health and medical treatment to women who have suffered sexual abuse.

        C.     An order entering judgment for Jane Doe 1 and Jane Doe 2 and against Defendants on each of their claims for relief;

        D.     Awards to Jane Doe 1 and Jane Doe 2 for compensatory damages against all Defendants, jointly and severally, for their violation of the First and Fourteenth Amendment rights of Jane Doe 1 and Jane Doe 2, the amount to be determined at trial;

        E.     Awards to Jane Doe 1 and Jane Doe 2 of punitive damages against Santiago on the basis of his conscious, criminal wrongdoing and callous indifference to the constitutional rights and welfare of Jane Doe 1 and Jane Doe 2, the amount to be determined at trial;

        F.     Awards to all Plaintiffs of the costs of this action, including reasonable attorneys' fees;

        G.     Preclusion of Santiago from serving in the capacity of correction officer; and

H.      Such further relief as this Court deems just and proper.

Dated: New York, New York
       May 19, 2015

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

Mitchell A. Lowenthal
*mlowenthal@cgsh.com*

One Liberty Plaza
New York, New York 10006
Tel:  (212) 225-2000
Fax:  (212) 225-3999

THE LEGAL AID SOCIETY

By: _____

William D. Gibney
*wdgibey@legal-aid.org*
Marlen S. Bodden
*mbodden@legal-aid.org*
Barbara P. Hamilton
*bphamilton@legal-aid.org*

199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3300

*Attorneys for Plaintiffs*