

THE CITY OF NEW YORK

# LAW DEPARTMENT
100 CHURCH STREET, Rm. 3-177
NEW YORK, NY 10007

**ZACHARY W. CARTER**
*Corporation Counsel*

**ARTHUR G. LARKIN**
Senior Counsel
Phone: (212) 356-2641
Fax: (212) 356-3509
alarkin@law.nyc.gov

October 13, 2016

**BY ECF**

Hon. Alvin K. Hellerstein
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

      Re:    <u>Jane Doe 1 v. City of New York, et al.</u>, 15-CV-3849 (AKH)

Your Honor:

      We write jointly pursuant to the Court's individual rules concerning several disputes that have arisen with regard to the site inspection of the Rose M. Singer Center ("RMSC").  In addition, we write to request that the Court modify the scheduling order of Sept. 6, 2016, and allow each side's corrections practices expert to conduct his/her own site inspection of RMSC. In that connection, we agree that both experts should inspect the same areas of the jail, in order to ensure fairness to all parties.

      If the Court does not modify its prior order and directs a joint inspection, then the City also requests that (1) the inspection take place on mutually convenient date within the next three weeks, and (2) the deadline for both sides' corrections' practices reports be extended by two weeks, from Nov. 4, to Nov. 18, for plaintiffs, and from Dec. 9, to Dec. 23, for defendants.  The reason for this request is that the City just retained its expert this week, consistent with the Court-ordered deadline of Oct. 14 (tomorrow), and for scheduling reasons we seek an adjustment of the date.

      Plaintiffs initially agreed with this approach generally, stating in their prior draft of this Joint Letter as follows:  "[T]o the extent the City belatedly represents that—notwithstanding its notice of and non-objection to the inspection dates ordered at the Hearing—its expert is unavailable then and the inspection date will need to be postponed, Plaintiffs remind the Court that their expert reports are due on November 4.  <u>In that event, Plaintiffs respectfully request that the deadline for Plaintiffs to disclose their expert reports be adjourned until two weeks following</u>

the date of the inspection, and, correspondingly, that the City's deadline to disclose their expert reports be adjourned until five weeks thereafter (as in the current schedule)."

Now, however, for unexplained reasons, plaintiffs do not state whether they agree with the City's request to move the date or not, but rather, they misrepresent our position, stating below (*see* footnote 9), that we do not state "herein" that our expert is unavailable on Oct. 19 or 20, 2016. Plaintiffs' shifting positions on this simple scheduling matter are not productive, and we submit that if the Court directs a joint inspection, that the Court also allow a reasonable extension given our expert's schedule and our recent retention of her.

**Defendant City of New York's Position – Site Inspection Issues**.  We respectfully request that the Court enter the attached order (Exhibit A) to govern the site inspection by plaintiffs' counsel and their corrections practices expert.  Although plaintiffs' counsel now indicate that they do not dispute the need for a protective order, during our communications on this subject (prior to our sharing this joint letter with them), they stated, "We don't understand the need for a protective order, but will reserve judgment until when you send us a draft."  (E-mail from Lowenthal to Larkin, 10/10 @ 10:08 a.m.)  Having seen our draft, they apparently agree that an order is appropriate.

The attached order is substantially similar to an order governing a site inspection that Your Honor recently entered in another matter.  Although the parties now agree that an order should be entered, plaintiffs insist on four unworkable conditions for the site inspection, none of which should be incorporated into the order:  (1) they seek to photograph and/or videotape the areas that they inspect; (2) they have demanded to conduct the inspection on the overnight shift, e.g., between the hours of 11:00 p.m., and 7:00 a.m., "so that operation of the facility at night can be observed" (E-mail from Anderson to Larkin 10/6 @ 10:26 a.m.), (3) they seek to inspect the Department of Investigation ("DOI") trailer on Rikers Island, and although they have withdrawn that request (after seeing our joint letter), they do so "without prejudice," which is inappropriate as more fully explained below, and (4) although they have identified the areas they want to inspect, they have purportedly done so "[w]ithout prejudice to [their] right to inspect any of the areas identified in the Rule 34 notice," which is manifestly overbroad and purports to demand access to every single area inside the jail (copy attached as Exhibit B).  None of plaintiffs' conditions are reasonable, and we submit that none of them should be permitted.

The first three paragraphs of the attached order are taken verbatim from Your Honor's order in the matter Brian Mack v. City of New York, 14-CV-3321 (AKH) (*see* Dkt. 36), and provide that plaintiffs may not photograph or create drawings of the inside of the jails or any area that they inspect; that they may not speak to inmates; and that they may not speak with DOC staff.  We submit that these provisions are reasonable, and for the reasons set forth below, that the four conditions plaintiffs seek are not reasonable and should not be incorporated in the order.[1]

---

[1]     The remaining paragraphs of the City's proposed order provide for confidential treatment of any documents related to the inspection, such as notes taken by plaintiffs' expert, which would likely be turned over in discovery prior to cross-examination of the expert.  The reason we include these provisions

Continued…

*Photographs and/or videotaping*.  Plaintiffs assert below that their expert wishes to take photographs, and they distinguish Mack from the instant case by asserting that Mack involved one instance of alleged excessive force, whereas this case purportedly involves "a sustained pattern of sexual abuse enabled by Santiago taking advantage of the physical layout to gain access to Jane Doe 2."  But the witnesses described these areas sufficiently at deposition, and can do so at trial, and the jury will either credit Jane Doe 2's testimony, or not.  And regardless of the claims asserted, the same security concerns that the Court had in Mack are presented here, warranting an order prohibiting photographs.  Plaintiffs also assert that the City somehow "waived" its objections to plaintiffs' demand to take photographs, but in Mack, the Court ruled that photos should not be taken inside the jails, irrespective of whether the City asserted a specific objection to taking photos or not.  We submit that the same result is appropriate here.

*Overnight inspection*.  We submit that the obvious burden and inconvenience of an overnight inspection are not justified here.  Plaintiff's Rule 34 notice of inspection did not specify any date or time that they wished to conduct the inspection, much less that they intended to inspect the jail during the overnight shift, contrary to the requirements of Rule 34.  *See* Fed. R. Civ. P. 34(b)(1)(B) (notice to inspect "*must* specify a reasonable time, place, and manner for the inspection") (emphasis added).  The notice to inspect is therefore invalid on its face.  *Cf. R.F.A.M.S., Inc. v. So*, 271 F.R.D. 13, 42 (S.D.N.Y. 2010) (declining to enforce Rule 34 discovery demand where counsel "did not fill in the blank left in the date field," and noting that "plaintiff has little basis for complaining about the timing … of defendants' production of documents").  In addition, counsel failed to raise this issue at the Sept. 6, 2016, conference; had they done so, the City would have objected.  The first time we learned that plaintiffs wished to conduct an overnight inspection was when they answered our E-mail inquiry about what areas their expert wished to inspect, just last week.  (E-mail from Anderson to Larkin 10/6 @ 10:26 a.m.)

The undersigned has participated in many DOC site inspections and all, without exception, have taken place during business hours, even if the underlying incident (or incidents) occurred at night.  Plaintiffs' vague assertion that they wish to "observe" the operation of the facility at night – now, in 2016, many years after the incidents involving their clients purportedly happened – is not sufficient.  Fewer staff members are available at night to escort the visitors; counsel for DOC or the City does not wish to conduct an overnight inspection; and any inspection overnight is likely to cause disruption in the housing areas to be inspected, where inmates will be sleeping.  The attached order, in paragraph 5, provides that the inspection must take place during normal business hours, on one designated day, and we submit that this provision is reasonable.  To the extent plaintiffs wish to conduct an overnight inspection, we submit that their request is not "reasonable" as Rule 34 requires, and should be denied.  *See generally* Fed. R. Civ. P. 26(c).

---

is that the protective order that currently governs (Dkt. 24) is limited to certain types of information and documents, and could be read not to include documents specifically related to the site inspection. Accordingly, we request that the Court enter the proposed order, so as to ensure appropriate confidential treatment for these documents.

3

Plaintiffs assert below that their expert tells them that "observation of the overnight shift would be relevant in forming his opinion, given potential differences between the day and overnight shifts in personnel, staffing, oversight, lighting and other jail conditions." But the personnel present in 2016, are not the same personnel present in 2006-13, when the incidents that Jane Doe 1 and Jane Doe 2 complain about supposedly happened. In addition, the City has since implemented a new directive entitled, "Elimination of Sexual Abuse and Sexual Harassment" (available on the DOC website), reflecting policy changes that render the environment in the women's housing areas different today than they were many years ago. An inspection overnight in 2016, will not reveal what the conditions were during 2006, or even 2013. Plaintiffs cite no authorities suggesting a contrary result in the circumstances presented here.

*DOI Trailer.* Plaintiffs have withdrawn their request to inspect the DOI trailer without prejudice, but we submit that an order prohibiting any inspection of the trailer should be entered, with prejudice. Their purported Rule 34 notice to inspect (*see* Exhibit B) does not list the DOI trailer as one of the areas to be inspected, and for this reason alone the request should be denied. *See generally* Fed. R. Civ. P. 34(b)(1)(A) (notice to inspect "must describe with reasonable particularity each item or category of items to be inspected"). Apart from the foregoing, the trailer is where DOI conducts interviews of inmates and conducts work related to its ongoing investigations. Privileged, confidential law enforcement related materials are kept there. Confidential informants are interviewed there. Other witness interviews – privileged because they are part of DOI's investigations into corruption and criminal activity – are conducted there. *See, e.g., Dinler v. City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) (law enforcement privilege protects "information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation" if disclosed) (internal quotes and brackets omitted). For these reasons, we submit that plaintiffs' purported demand to inspection the DOI trailer be denied with prejudice.

*"Reservation of right" to inspect any area inside the jail.* Plaintiffs' purported reservation of rights to inspect any area inside the jail – which they now state would be at some unspecified, later time – should be rejected. At the outset of discovery, plaintiffs served their Rule 34 notice to inspect, which listed every conceivable area inside RMSC. (Exhibit B (purporting to demand inspection of "[a]ll areas where inmates sleep, eat, shower, exercise, attend programs, and receive medical and mental health treatment, and adjacent corridors, entrances/exits and stairwells," and fifteen other, similarly described areas)) Because the notice was plainly overbroad, we raised this issue at the Sept. 6, 2016, status conference (9/6 Conf. Tr., at 31-32). After we did so, plaintiffs' counsel agreed that "[a]s long as we agree on a date, we will tell them in advance where we want, where the expert wants to look." (*Id.*, at 32:9-11)

At the conference, the Court scheduled the inspection for either Oct. 19, or 20, 2016. (*Id.* at 32:16-17 ("What I would like to do is to schedule this for October 19 or October 20th with an expert from each side")) Although counsel represented that they would tell us in advance "where the expert wants to look," we heard nothing from plaintiffs until last week, and only after we again requested that they tell us what areas they wanted to inspect. At that time, plaintiffs e-mailed a list of specific areas, but again purported to reserve the right "to inspect any of the areas

4

identified in the Rule 34 notice." Despite their representations at the Sept. 6, conference, plaintiffs asserted that the City supposedly "waived" its objections to the overbroad notice.

The proposed order, in paragraph 5, eliminates this reservation of rights and, in accordance with plaintiffs' representations at the conference, lists the areas where plaintiffs may conduct their inspection. The Court's earlier order in the Mack matter, likewise, set forth the areas to be inspected. (Mack v. City of New York, 14-CV-3321 (AKH), Dkt. 36 (order states, "The New York City Department of Corrections is hereby ordered to provide the named individuals access for purposes of inspecting the 3 Upper Dorm, intake area, and medical clinic in AMKC")). We submit that it would be appropriate to do the same here, especially given plaintiffs' purported reservation of the right to inspect any area inside the jail.

In order to address the City's concerns, plaintiffs state below that they do not intend to inspect other areas on the *date* of the inspection, but that they reserve the right to seek an order allowing them to inspect other areas on another date. Counsel never made that position clear to us, but their having done so does not change our position. In no event should plaintiffs, their lawyers and their expert be permitted to disrupt the jail twice for purposes of this case. Plaintiffs cite no authority that would allow two site inspections in one lawsuit – particularly when the site to be inspected is a secure facility holding pre-trial detainees. Plaintiffs' representation below that this matter is not in dispute is incorrect, and we submit that the Court should decide it now.

At the Sept. 6, conference, the Court was dubious about the relevance of the inspection that plaintiffs have demanded, stating, "I am not sure there is anything relevant that will come out of a visit in 2016 to conditions that existed in 2013" (9/6 Conf. Tr., at 34:21-23). Nevertheless, the Court ruled that plaintiffs could conduct the site inspection. In light of the Court's ruling and its observation about the limited value of the site inspection to begin with, we submit that the attached order should be entered, at this time. The proposed order is consistent with this Court's order in Mack, and is otherwise reasonable and appropriate.

**Defendant City of New York's Position – Separate Inspections**. At the Sept. 6, 2016, conference, the Court ordered that both experts conduct the site inspection at the same time. The Court explained that "rather than disturb the prison with two sets of visitations, you should do it on one day" (9/6 Conf. Tr., at 31:13-14), and added that during a joint inspection, "they'll both have equal exposure to look and see" the jail (*id*. at 34:2-3). The Court expressed concerns about fairness and equal access to the jail. (*Id*. at 32-34 & 32:25 ("I would like to be fair")).

Since the Court's order, we have retained our corrections practices expert, Theresa Lantz (whose CV is attached hereto as Exhibit C). Ms. Lantz has approximately forty (40) years of experience in the corrections field, including most recently as Commissioner of the Connecticut Department of Correction. Ms. Lantz has expressed some concerns to us about conducting a joint site inspection. She recently conducted one joint site inspection, and advises that frank communications with counsel were difficult, and that arguments between the lawyers hindered the inspection. Ms. Lantz strongly prefers to conduct a separate site inspection, limited to the same areas that plaintiffs will inspect, in order to ensure fairness.

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "A finding of good cause depends on the diligence of the moving

party." *Grochowski v. Phoenix Construction Corp.*, 318 F.3d 80, 86 (2d Cir. 2003) (citations omitted); *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (same). "[T]he 'good cause' inquiry is primarily focused upon the diligence of the movant in attempting to comply with the existing scheduling order and the reasons advanced as justifying that order's amendment." *Soroof Trading Development Co. v. GE Fuel Cell Systems, LLC*, 10-CV-1391 (LTS) (JCF), 2012 U.S. Dist. LEXIS 178205, *5-6 (S.D.N.Y. Dec. 13, 2012) (citing *Ritchie Risk-Linked Strategies Trading (Ireland) Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79-80 (S.D.N.Y. 2012)). "This, in turn, depends on whether 'the proposed amendment rests on information that the party knew or should have known in advance of the deadline.'" *Id*. at *6 (quoting *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 735 (S.D.N.Y. 2012)).

At the time the Court ordered the joint inspection, the City objected. Among other things, the Court's order appeared to be unprecedented. However, we had not yet retained our own corrections practices expert at that time, and had no input from an expert on whether the joint inspection was feasible or not. We have now conferred with our proposed expert – who has substantial experience in the field. She has voiced concerns about a joint inspection and prefers to conduct a separate site inspection. Her chief concern – the need for frank discussions with counsel – raises the key problem with regard to the joint inspection, viz., preservation of the privilege that covers communications between counsel and their experts. Rule 26(b)(4)(C), amended in 2010, provides that the work-product privilege extends to "communications between the party's attorney and any [expert] witness, … regardless of the form of the communications," with three specific exceptions. Fed. R. Civ. P. 26(b)(4). For example, communications about "the potential relevance of facts or data" that the expert does not rely on, and communications about "hypotheticals, or exploring possibilities based on hypothetical facts," are covered by the privilege. Advisory Committee Note, Rule 26, subdivision (b)(4) (West 2016). We submit that the City's expert should be permitted to conduct her own inspection of the same areas plaintiffs' expert inspects, and should have the ability to communicate with counsel during the inspection freely, as the Rules contemplate.

Plaintiffs assert below that their counsel should be permitted to accompany the City's expert in the event the Court allows separate inspections – solely because City representatives will have to accompany their expert on his site inspection. We disagree. Plaintiffs' counsel and their expert may not roam the jails freely, any more than the City's attorneys may not visit the plaintiffs' homes and communicate directly with them. If plaintiffs perceive an imbalance by this outcome, that is simply a consequence of the lawsuit they have brought. They cite no authority whatsoever that would allow them to accompany the City's attorneys and their expert on a site inspection.

Plaintiffs disagree with the City because the Court's ruling "was based on fundamental fairness to both sides, and was the basis for requiring plaintiffs to turn over test results from our DNA expert in advance of her report, which [they] did." (E-mail from Lowenthal to Larkin, 10/11 @ 2:57 p.m.) We submit that the Court's concerns about fundamental fairness are addressed by our agreement that the expert will inspect the same areas that plaintiffs' expert inspects. We do not understand how the Court's ruling related, in any way, to the Court's entirely separate ruling – made after two motions by the City – directing plaintiffs' DNA expert to disclose her test results.

Plaintiffs also object because, according to counsel, "[t]here should not be disputes about the physical layout, structure and basis for observations about the jail.  And, both sides should conduct their inspection under the same conditions and at the same time, so neither has some kind of advantage."  (*Id*.)  There are not going to be any disputes about the physical layout of the jail, which is an objective fact, and which is not going to change between the date plaintiffs' expert visits the site and the date the City's expert does so.  We do not understand how an inspection on different days would somehow give one side "some kind of advantage," and plaintiffs appear unable to articulate any basis for this concern.

Finally, plaintiffs argue that the instant motion really seeks reconsideration, rather than a modification of the scheduling order, and that for this reason the motion is untimely.  We submit that plaintiffs are incorrect, but in any event, in light of the considerations set forth above, reconsideration should be granted in the Court's discretion, and in the interests of justice.  *See, e.g., Newton v. City of New York*, 07-CV-6211 (SAS), 2010 U.S. Dist. LEXIS 6935 (S.D.N.Y. Jan. 27, 2010) (granting motion for reconsideration filed more than fourteen (14) days after underlying decision).

In light of the foregoing, we respectfully request that pursuant to Rule 16(b)(4), the Court modify its prior order, and allow each side's expert to conduct separate site inspections.  However, if the Court is inclined to require one joint inspection, then we respectfully request that (1) the inspection take place on mutually convenient date within the next three weeks, and (2) the deadline for both sides' corrections' practices reports be extended by two weeks, from Nov. 4, to Nov. 18, for plaintiffs, and from Dec. 9, to Dec. 23, for defendants.  Plaintiffs agree generally with this approach (*see* footnote 6, below).

### **Plaintiffs' Position – Site Inspection Issues**.

The City's position in the joint letter initially sent to Plaintiffs puzzlingly raised several issues about which there is, in fact, no disagreement between the Parties and preempts the meet and confer process—which Plaintiffs had invited, and to which the City responded by simply sending Plaintiffs their draft portion of this letter.  On October 6, 2016, Plaintiffs set out the areas—all previously outlined in their Rule 34 Request, served July 31, 2015 ("Rule 34 Request")—that their expert wishes to inspect.  Because the Rule 34 Request (to which the City never objected) is broader than the areas that Plaintiffs expert wishes now to inspect, Plaintiffs stated that the list of areas for inspection was without prejudice to their right to inspect other areas identified in the Rule 34 Request.  Contrary to the City's characterization, and as Plaintiffs would have explained if the City had met and conferred, Plaintiffs are simply reserving their rights, <u>at a later time</u>, should there be good cause to do so, to seek to conduct a further inspection of other areas identified in the Rule 34 Request; they are not seeking to 'tack on' additional areas during the middle of <u>this</u> inspection.  (After receiving Plaintiffs' draft of their position, the City revised its portion, obscuring the positions that it initially expressed.  Those positions are accurately described in this paragraph.)  Furthermore, on the afternoon of Friday, October 7, the City sent an email stating—without explanation—that it would "not consent to any inspection of the DOI trailer" (one of the areas that Plaintiffs' expert asked to inspect, because DOI interrogated certain witnesses there and because the pants that were seized from Jane Doe 2 were said to be have been kept there, and which was set out in Plaintiffs' October 6 email).  The City did not raise any question or concern about Plaintiffs' entirely ordinary-course reservation of

7

rights.   Plaintiffs responded Monday morning, October 10, asking for more information concerning the City's unexplained refusal to allow inspection of the DOI trailer (as well as to permit an overnight inspection, as discussed below).  The City did not respond, but instead sent Plaintiffs their initial portion of this joint letter.   Based on the City's current explanation, Plaintiffs will withdraw their request to inspect the DOI trailer without prejudice.  Accordingly, two of the issues that the City raises above, are moot.

There are, however, two issues about which the Parties actually have a disagreement.  To that end, and to the extent an amended protective order is required (which Plaintiffs believe is not necessary—see footnote 4, below), Plaintiffs respectfully request that the Court enter the attached proposed order (Exhibit D),[2] which preserves Plaintiffs' right to:  (i) photograph any area that is inspected within RMSC; and (ii) conduct an overnight inspection of certain relevant RMSC facilities—i.e., during the time of night when Jane Doe 1 and Jane Doe 2 were sexually assaulted by Santiago.

*First*, Plaintiffs should be permitted to take photographs during their inspection of RMSC (the City mistakenly claims that Plaintiffs now seek to take videotapes; we do not).  As an initial matter, the City's objections to Plaintiffs photographing RMSC—which Plaintiffs were made aware for the first time in this joint letter and proposed order—are untimely by over a year. Plaintiffs served their Rule 34 Request on July 31, 2015, when the Court's Civil Case Management Plan, ECF No. 25, required.  The Rule 34 Request plainly and unambiguously demanded "access to [RMSC] for . . . photographing." (Exhibit B).  If the City had an objection to this aspect of the Request, it should have raised it in 2015—not over a year later and a week before the scheduled inspection—and certainly no later than the September 6, 2016 status conference when the Rule 34 Request was extensively discussed without so much as a reference by the City to Plaintiffs' demand for photography.  For this reason alone the City's objection should be denied.

Even if the City had raised a timely objection, the attempt to prohibit photographing of RMSC is without merit and should be rejected.  Photographs taken by Plaintiffs' retained Rule 26(a) jail conditions expert may be necessary to substantiate—and explain to the jury—the rationale for certain of his opinions.  Plaintiffs' expert, Timothy Ryan (whose CV is annexed as Exhibit F), is a professional with forty-four years' experience, including running the Miami/Dade jail—one of the largest jails in the United States.  The ability to take photographs and present them to the jury is relevant, for example, in expressing any opinion concerning the City's lack of proper procedures and controls, given the physical configuration of RMSC, for preventing defendant Santiago from gaining access to and raping Plaintiffs.  In addition, documenting the portions of the housing area covered by cameras—and whether, as Santiago's deposition suggests, DOI investigators reviewing the video tapes would have seen evidence that Jane Doe 2 travelled freely between Building 9 (where she worked) and Building 11 (where Santiago was stationed and raped her) each night—is highly relevant to the integrity of DOI's investigation of Jane Doe 2's allegation.  Finally, having a photographic depiction of the relevant area will not

---

[2]    For the Court's convenience, Plaintiffs also provide Exhibit E, which is a marked-up version of the City's proposed order (Exhibit A), highlighting Plaintiffs' proposed revisions.

only make our expert's testimony more understandable to the jury, but will enable the jury to understand better the testimony of other witnesses, like Jane Doe 2 and Santiago, with respect to the contours of the pantry room (the room through which Jane Doe 2 moved each night from Building 9 to Building 11), how Santiago walked with Jane Doe 2 from the pantry (regularly, in the middle of the night – which he concedes he did) to other parts of Building 11, the proximity of the pantry to the janitor's closet, where Jane Doe 2 was raped, and its proximity to other relevant areas, like the inmate cells and the day room.  We disagree with the City's unsupported assertion above that witnesses' characterizations of the area are sufficient.  And, in any event, there is no denying that photographs or drawings will make the crime scene more readily underlinable than testimony about an abstract space that the jury will never have seen anything like.

The City has yet to explain the basis for its objection to the taking of photographs.[3]  The areas that Plaintiffs wish to photograph are openly visible to inmates incarcerated therein, and covered by surveillance footage that (if it had been properly preserved by the City) would have been discoverable in this action.  Furthermore, Plaintiffs are willing to consent to the entry of an order that treats any photographs or other depictions of the physical layout of RMSC "confidential" within the meaning of the Protective Order Concerning Confidential Information ("Existing Protective Order"), dated July 30, 2015, ECF No. 24, with the added protection (should the Court think it necessary) that any such material be treated on an "attorneys' eyes" and "expert's eyes" only basis (see Exhibit D).[4]  As such, the purported security issue raised by the City is makeweight – any photographs will be governed by a protective order.  Moreover, the City has identified no area that will be inspected that is not already known to the dozens of detainees currently confined to RMSC, and the thousands who have been confined there and are now released.  For those reasons, and for the City's failure to timely raise any argument to justify its position, Plaintiffs respectfully request that the Court enter a form of order that permits Plaintiffs to photograph RMSC, subject to appropriate confidentiality protections, during their upcoming inspection.

---

[3]   Although the City purports to justify the photography prohibition by bare citation to an order entered in Mack v. City of New York, 14-CV-3321 (AKH), ECF No. 36, that case involves a single instance of use of force, not a sustained pattern of sexual abuse enabled by Santiago taking advantage of the physical layout to gain access to Jane Doe 2 (i.e., Santiago directing Jane Doe 2 to meet him in Building 11 by going through the pantry between Buildings 9 and 11) and to evade detection (e.g., raping Jane Doe 2 in a janitor's closet).  We are unaware what, if any, issues were actually contested in Mack, and the City has not proffered any such information.  In any event, this has no bearing on the unique merits—in this case—of obtaining photographs.

[4]   It is entirely unclear, and the City does not explain, why the Court should enter a duplicative protective order that creates a parallel confidentiality regime.  The City's statement above—that Plaintiffs agree that a protective order is required—is a misreading of our position.  Nonetheless, in the interest of compromise, Plaintiffs have agreed that to the extent the Court views an amended protective order to be appropriate, photographs and depictions of the physical layout of the facility should be afforded heightened protection; Plaintiffs' proposed order (Exhibit D) otherwise incorporates the terms of the Existing Protective Order.

*Second*, the Court should enter an order compelling the City to permit an inspection of RMSC during the overnight shift (i.e., between the hours of 11:00 PM and 7:00 AM).  Jane Doe 1 and Jane Doe 2 were each abused by Santiago during the overnight shift, which makes it particularly relevant to observe the functioning of RMSC during that particular shift.  Plaintiffs' retained expert on correctional practices has told Plaintiffs that observation of the overnight shift would be relevant in forming his opinion, given potential differences between the day and overnight shifts in personnel, staffing, oversight, lighting and other jail conditions.  The City's response, that there are different personnel in the jail today than during earlier years, is irrelevant; our expert is not focused on individuals, but on conditions.  Its further statement that the City has since promulgated a directive is, if anything, a reason they will not be prejudiced by an overnight inspection (unless of course conditions have nonetheless deteriorated notwithstanding the directive).

On October 10, in an email Plaintiffs asked the City to explain why conducting an inspection during the overnight hours would be more burdensome to the City as compared to a daytime inspection.  Plaintiffs also offered, solely to avoid burdening the Court, to conduct the inspection during the daytime, without prejudice to Plaintiffs' position.  The City did not acknowledge that email, and instead sent its portion of this joint letter, which for the first time raised three objections to conducting an overnight inspection, each of which should be rejected: (i) the facially baseless argument that the City should not be compelled to conduct a nighttime inspection because its counsel "does not wish to conduct an overnight inspection"; (ii) an alleged disruption caused by an inspection during the overnight shift, which Plaintiffs will of course mitigate by being quiet around any sleeping inmates—as presumably do correction officers that conduct regular course quarter-hourly patrols during the night at RMSC; and (iii) the fact that there are "[f]ewer staff" available at night—the observance of which is precisely why Plaintiffs' expert feels an overnight inspection is relevant to formulating his opinion.  In any event, the City makes no *showing* that there are an inadequate number of staff to escort the inspection during a time when, presumably, the jail is otherwise inactive.  The City also argues that Plaintiffs did not timely request an overnight inspection (a deeply ironic argument coming from the City).  However, as contemplated by the Parties, Plaintiffs served a Rule 34 <u>request</u> in July 2015, but did not then identify a date or time for the inspection—those details were to be resolved later, as the City was fully aware (though in the end, Plaintiffs were forced to raise the issue with the Court to even obtain an inspection date).[5]  In light of the heightened relevance in this case for conducting an inspection during the overnight shift, given that rapes and sexual abuse occurred then, Plaintiffs respectfully request an order that the inspection should be permitted during the overnight shift.

---

[5]     The City's citation to *RFAMAS, Inc. v. So*, 271 FRD 13 (S.D.N.Y. 2010), is inapposite.  In *RFMAS*, the court rejected plaintiffs' motion for spoliation sanctions against defendants for not being sufficiently prompt and forthcoming in providing certain data.  The court held, *inter alia*, that plaintiffs seemingly failed to ever actually request the data about which it was seeking spoliation sanctions.  The quotation provided by the City above is taken entirely out of context and has nothing to do with the point advanced.

For the foregoing reasons,  Plaintiffs request that the Court enter the attached proposed Order (Exhibit D), which allows Plaintiffs to:  (i) photograph any area that is inspected within RMSC; and (ii) conduct an overnight inspection of RMSC.

**<u>Plaintiffs' Position – Joint Site Inspection</u>**.

During the September 6 Hearing, the Court ordered that the Parties' experts should <u>jointly</u> conduct an inspection on October 19 or 20.  Over the City's objection, the Court reasoned "if you want your expert to spend time which will then manifest itself in testimony, the other side has to have enough knowledge of <u>all the impressions and observations</u> that expert makes in order to conduct an intelligent cross-examination."  9/6/2016 Hearing Tr. 33:8-12 (emphasis added).  The Court's order was based on principles of "fair[ness]," *id.* 32:22, 25, and also because a joint inspection would best facilitate the "search for the truth," which would "best be performed by people having equal opportunity to look, see and tell."  *Id.* 34:15-17.

In its position in this letter, the City effectively seeks <u>reconsideration</u> of the Court's ruling.  Nevertheless, the City frames this dispute as a "scheduling issue" governed by Rule 16.  Presumably, this is because the City is aware that its fourteen-day deadline to move the Court for reconsideration under Local Rule 6.3—which is the applicable procedural rule—has long since come and gone.[6]  What the City plainly seeks is a substantive modification of the Court's order: rather than a joint inspection, as the Court thoughtfully and consciously directed, the City now seeks the exact converse—separate inspections.  The City did not take any step to seek reconsideration within the period of time that the rules allow, and the City's objection is therefore waived.

In any event, there is not good cause under any rule that would justify reversing the Court's prior order directing that the inspection be jointly conducted.  The Court made clear at the Hearing that its joint inspection order was an exercise of its discretion.  *Id.* 34:10.  Despite the Court's invitation to the City to bring contrary *authority* to its attention, *id.* 34:6-8, the City does not do so.  Instead, the City proffers its expert's concern—based on a single instance in one other case that is otherwise undescribed—that a joint inspection might be less conducive to her having frank discussion with counsel for the City because counsel for the Parties might argue with one another, and interfere with the experts' ability to talk with their counsel.  On its face, these objections do not address at all the fundamental fairness principles that animated the Court's joint inspection order, but rather are solely grounded in the purported conduct of the <u>particular attorneys involved in single a case</u> from somewhere else.[7]  Tellingly, even the City's

---

[6]   The citation to *Newton v. City of New York*, 2010 U.S. Dist. LEXIS 6935 (S.D.N.Y. Jan. 27, 2010), is also of no help to the City.  There, the court granted the City permission to make the untimely motion for reconsideration because the court overlooked controlling Second Circuit law in reaching its initial decision.  Here, the Court made clear at the Hearing that it was exercising its discretion; it invited the City to bring contrary authority to its attention, and the City never did.

[7]   To the extent these objections raise valid concerns, those concerns would apply whether or not the inspection is jointly conducted.  In the event the inspections are conducted separately, we presume that

Continued…

expert's purported bad experience in a single instance based upon the conduct of the particular counsel in that case, raises no other issue about the efficacy of a joint inspection, any issue about jail safety or operations stemming from a joint inspection, or, most significantly, consider the truth-seeking objective that the Court articulated at the Hearing which, the Court concluded, justified a joint inspection.[8]   A joint inspection is the only way to ensure that each side has the same access, sees the same things, hears the same things, receives the same cooperation from the facility, has the same amount of time, is given access to the same rooms, is given the same demonstrations, and otherwise has "knowledge of all the impressions and observations" that will manifest in expert testimony.  *Id.* 33:10-12.

Accordingly, the City's request for reconsideration should be denied.  The City's position above does not indicate that its expert is unavailable on October 19 and 20,[9] the dates for the

---

nonetheless Mr. Larkin (or another City attorney or employee) would need to escort Plaintiffs and their expert around the jail.  And Plaintiffs would certainly demand the right to similarly accompany the City's expert's inspection; having it any other way would prejudice Plaintiffs by giving the City one-sided access to our work product and leaving Plaintiffs with no way of confirming whether the equal access the Court ordered in fact occurred.  Indeed, that one-sidedness is precisely what the City now *demands*.  City representatives, it asserts, will accompany the Plaintiffs' expert, so that the City will know precisely what our expert did.  But, if the City has its way, Plaintiffs will be barred from accompanying the City's expert on her inspection.  That  is the precise unfairness the Court's September Order precluded.  Accordingly, there is no avoiding that the Parties will need to work together and act professionally during the inspection.  As it has apparently become necessary to do, Plaintiffs represent to the Court that they will behave appropriately during the inspection, including by not initiating arguments with counsel for the City or interfering with communications between counsel for the City and its expert.  (And notably, both versions of the draft proposed order (Exhibits A and D) require Plaintiffs not to speak to any inmates or DOC staff for any reason (*see* ¶¶ 2-3).)  Unless counsel for the City is unwilling to make a similar promise, there is every reason to trust that—in this case—the inspection will be conducted with professionalism on both sides.

[8]   The City also expounds on its expert's purported concern to raise a separate issue about waiving work product.  In fact, as the City's letter concedes, its *expert* raised no new work product concern that would justify reconsideration.  Obviously, the Court was aware at the Hearing that the Federal Rules provide a work product protection, and clearly assumed that the Parties would not be so foolish as to speak loudly enough for their adversaries to overhear their conversations.

[9]   On October 7, Mr. Larkin sent an email stating "[o]ur corrections expert (whom we've not yet decided upon) most likely will not be participating in any inspection that goes forward on Oct. 19th or 20th.  If your side still wishes to conduct a joint inspection, we will have to move the date."  In reply, Plaintiffs asked the City to confirm when it would know whether its expert would be able to participate on the dates ordered by the Court.  The City never replied to this question, but instead, on October 11, sent an email expressing the position—for the first time—that its expert did not want to conduct a joint inspection.  The City did not then indicate, nor has it stated herein, that its expert is unavailable on October 19 and 20.

[NEWYORK 3266613_8]

joint inspection the Court set more than a month ago, and therefore, the Court should enforce its prior order and direct the City to participate in a joint inspection on one of those dates.

Respectfully submitted,


/s/

Arthur G. Larkin
Senior Counsel


AGL/m
cc:      All Counsel (by ECF)

[NEWYORK 3266613_8]

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

Jane Doe 1 and Jane Doe 2,

                                  Plaintiffs,

                           -against-

CITY OF NEW YORK, et al.,

                                Defendants.

**PROTECTIVE ORDER
CONCERNING THE
INSPECTION OF CERTAIN
AREAS OF THE N.Y.C.
DEPT. OF CORRECTION'S
ROSE M. SINGER CENTER
(RMSC)**

15-CV-3849 (AKH)

------------------------------------------------------------------------ x

        **WHEREAS**, Plaintiff's counsel has requested that the City of New York provide

them with access to the New York City Department of Correction's ("DOC" or the

"Department") Rose M. Singer Center ("RMSC" or the "DOC Facility") for the purposes of

inspecting certain specific areas set forth below;

        **WHEREAS,** because of security concerns, the Department deems any

information or document depicting the DOC Facility privileged and/or confidential; and

        **WHEREAS,** the Department objects to granting plaintiffs' counsel access to the

DOC Facility, unless appropriate measures are undertaken for purposes of confidentiality and

security.

        **NOW, THEREFORE, IT IS HEREBY ORDERED**, that:

        1.       Plaintiff's attorneys shall not under any circumstances inspect, photograph or

draw in any fashion the following items and/or locations during the site visit:  Any type of key,

lock, locking mechanism, keyholes, doorknobs, and/or other similar equipment used to secure

the doors, gates, and windows; and any inmate, or police or correction personnel whether in uniform or not, who are observed at the DOC Facility. The attorneys and/or anyone accompanying them may not bring or use a camera, video camera, tape recorder, or cell phone.

2.      Plaintiff's attorneys shall not speak to any inmate for any reason.

3.      Plaintiffs' attorneys shall not interview or question any DOC staff for any reasons.

4.      As used herein, "Confidential Materials"[1] shall mean the areas to be inspected, set forth in paragraph 5, below, and any notes of any kind or other documents concerning the visit to the DOC Facility.  These documents are deemed confidential because of security, law enforcement, governmental and/or privacy interests of the Department of Correction, its employees, contractors and subcontractors, and inmates, except that such documents and information shall not be deemed "Confidential Materials" to the extent, and only to the extent, that they are (a) obtained by the plaintiff from sources other than the Department, or (b) are otherwise publicly available.

5.      The inspection of the DOC Facility shall take place during regular business hours only, on one designated day to be agreed upon by the parties, and shall be limited to the following areas and no others:

a.      Buildings 8, 9 and 11;

b.      Any connections between Building 9 and Building 11 (including, but not limited to, the "A" station commonly known as the "bubble," and the pantry);

c.      The "A" station or "bubble" in Building 8;

---

[1]      By submitting this proposed Order, defendants do not waive any other objections which may exist to the production of documents defined as "Confidential Materials" herein nor do defendants waive any objections to their admissibility.

     d.     The area where the "sprungs" were in 2011-12 and adjacent corridors, entrances/exits, and stairwells;

     e.     The counsel visit/interview area inside RMSC; and

     f.     The RMSC clinic.

6.     The Confidential Materials are for "attorneys' eyes" only. Plaintiffs' attorneys shall not disclose the Confidential Materials to any person not a member of the staff of its law office except that disclosure may be made to a designated Rule 26(a) expert, and only if necessary to the preparation or presentation of Plaintiffs' case herein.

7.     Plaintiff's attorneys shall not use the Confidential Materials for any purpose other than for the preparation for and/or presentation at the trial of the above-entitled case.

8.     Deposition testimony concerning any Confidential Materials which reveals the contents of such materials shall be deemed confidential, and the transcript of such testimony, together with any exhibits referred to therein, shall, upon a request to the court reporter, be separately bound, with a cover page prominently marked "CONFIDENTIAL."  Such portion of the transcript shall be deemed to be Confidential Materials within the meaning of this Protective Order. If any Confidential Material is an exhibit to a deposition, that exhibit shall be deemed confidential and separately bound, with a cover page prominently marked "CONFIDENTIAL."

9.     A party that seeks to file any paper which incorporates any Confidential Materials or reveals the contents thereof with the Court shall so inform the other side prior to filing. The parties shall confer in good faith to resolve the matter; if the parties agree to utilize redacted copies of such documents or if the parties agree that unredacted versions of the papers may be filed publicly, no further order of the Court is necessary. Should the parties not reach a resolution, the party asserting confidentiality (or, if both parties assert confidentiality, the party

seeking to file the papers), shall move the Court within seven (7) days of the date on which notice was provided for permission to file said papers under seal. Such material shall not be publicly filed with the Court until such application is decided. In the interim, to the extent necessary to comply with any deadlines imposed by the Court, Local Rules, or Federal Rules of Civil Procedure, the filing party who seeks to include Confidential Materials in papers to be filed in Court shall provide a complete and un-redacted version thereof directly to the judges' chambers and opposing counsel and not cause them to be publicly filed with the Court until after the motion to seal has been decided or the parties agree that the materials can be publicly filed.

10.    This Protective Order will survive the termination of the Action and will continue to be binding upon all persons to whom Confidential Materials are produced or disclosed.  All documents or information that have been deemed confidential pursuant to this Protective Order, including all copies and non-conforming copies thereof, shall remain confidential.  Once the Action has been resolved, including all appeals, the Confidential Materials, including all copies and non-conforming copies thereof, including exhibits, shall be destroyed within a reasonable time and shall not be used by plaintiff's counsel for any purpose without Court approval.

11.    If at any time it appears to the Department's counsel and/or DOC staff present during the site visit that Plaintiff's attorneys whether inadvertently or not, is inspecting or taking photographs or drawings of any prohibited item, area or individual described above, Plaintiff's attorney will be immediately directed and expected to cease inspecting, photographing or drawing and the site inspection shall be terminated.

12.    Nothing in this Protective Order shall be construed to limit the Department's use of the Confidential Materials in any manner.

Dated:  New York, New York
        _____, 2016


                                        SO ORDERED:


                                        _____
                                        HON. ALVIN K. HELLERSTEIN
                                        UNITED STATES DISTRICT JUDGE

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, on behalf of themselves and all similarly situated women,<br><br>　　　　　Plaintiffs,<br><br>　　-against-<br><br>THE CITY OF NEW YORK and BENNY SANTIAGO,<br><br>　　　　　Defendants. | 15 Civ. 3849 (AKH) |

**PLAINTIFFS** make the following request to Defendant City of New York pursuant to Rule 34(a)(2) of the Federal Rules of Civil Procedure.

## ACCESS TO PROPERTY REQUESTED

You are requested to provide access to the following property for inspection, measuring, photographing, and videotaping: Rose M. Singer Center ("RMSC"), 19-19 Hazen Street, East Elmhurst, New York  11370.

The following parts of the property to which access is sought:

1. All areas where inmates sleep, eat, shower, exercise, attend programs, and receive medical and mental health treatment, and adjacent corridors, entrances/exits, and stairwells;
2. All punitive segregation units, and adjacent corridors, entrances/exits, and stairwells;
3. All janitors' closets, and adjacent corridors, entrances/exits, and stairwells;
4. All slop sink areas, and adjacent corridors, entrances/exits, and stairwells;
5. All protective custody units, and adjacent corridors, entrances/exits, and stairwells;
6. All loading docks, and adjacent corridors, entrances/exits, and stairwells;
7. All bathrooms, including, but not limited to, showers and toilet areas, and adjacent corridors, entrances/exits, and stairwells;
8. All pantries, and adjacent corridors, entrances/exits, and stairwells;
9. All storage areas, including those located within inmate housing areas, and adjacent corridors, entrances/exits, and stairwells;
10. All mental health housing areas, including regular mental observation units and punitive segregation units for mental health inmates including any Clinical Alternative to Punitive Segregation (CAPS) units, and adjacent corridors, entrances/exits, and stairwells;
11. The area where the "sprungs" were in 2011-2012 (an area outside RMSC), and adjacent corridors, entrances/exits, and stairwells;
12. All dormitories, including high classification or other special housing areas, and adjacent corridors, entrances/exits, and stairwells;

13. Each dormitory's common areas, including dayrooms, and adjacent corridors, entrances/exits, and stairwells;

14. All locations where correction officers are posted, including officers' stations in the housing areas such as control areas, and adjacent corridors, entrances/exits, and stairwells;

15. All offices of correction officers, and adjacent corridors, entrances/exits, and stairwells;

16. The area that connects buildings 9 and 11 (as the buildings were numbered in 2013), and adjacent corridors, entrances/exits, and stairwells.

Dated: New York, New York
   July 31, 2015

By: *Marlen S. Bodden*

THE LEGAL AID SOCIETY
William D. Gibney
*wdgibney@legal-aid.org*
Marlen S. Bodden
*mbodden@legal-aid.org*
Barbara P. Hamilton
*bphamilton@legal-aid.org*
199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3287

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Mitchell A. Lowenthal
*mlowenthal@cgsh.com*
Danielle P. Mindlin
*dmindlin@cgsh.com*
Josh E. Anderson
*jeanderson@cgsh.com*
One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000
*Attorneys for Plaintiffs*

**NOTICE GIVEN TO:**
ZACHARY W. CARTER
Corporation Counsel of the
   City of New York
Kimberly M. Joyce
*kjoyce@law.nyc.gov*
100 Church Street
New York, New York 10007
Tel: (212) 356-2650
*Attorneys for the City of New York*

**WITH A COPY TO:**
KOEHLER & ISAACS LLP
Julie A. Ortiz
*jortiz@koehler-isaacs.com*
61 Broadway, 25th Floor
New York, New York 10006
Tel: (917) 551-1317

*Attorneys for Benny Santiago*

## CERTIFICATE OF SERVICE

I certify that on July 31, 2015, I served the within Rule 34(a)(2) Request to Enter Onto Land upon Defendants by electronic and first-class mail at their addresses stated below.

THE LEGAL AID SOCIETY
William D. Gibney
*wdgibney@legal-aid.org*
Marlen S. Bodden
*mbodden@legal-aid.org*
Barbara P. Hamilton
*bphamilton@legal-aid.org*
199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3287

By: *Marlen S. Bodden*

**TO:**

ZACHARY W. CARTER
Corporation Counsel of the
 City of New York
Kimberly M. Joyce
Assistant Corporation Counsel
*kjoyce@law.nyc.gov*
100 Church Street
New York, New York 10007
Tel: (212) 356-2650

*Attorneys for the City of New York*

KOEHLER & ISAACS LLP
Julie A. Ortiz
*jortiz@koehler-isaacs.com*
61 Broadway, 25th Floor
New York, New York 10006
Tel: (917) 551-1317

*Attorneys for Benny Santiago*

# EXHIBIT C

# Theresa Lantz

tlantz@snet.net  Mobile: 978-873-1000

## EMPLOYMENT HISTORY

### CRIMINAL JUSTICE CONSULTANT (July 2009-Present)

Provide expert witness services with agencies to include the U.S. Department of Justice Office of the U.S. Attorney; the Office of the Attorney General for North Carolina; Goldman & Zwillinger, PLLC; Wisconsin Department of Justice; New York State Office of Attorney General; and Washington State Office of Attorney General. Recently served as the Monitor for a Settlement Agreement between the Kansas Department of Corrections (Women's Facility) and the United States Department of Justice. Provide consulting services in corrections and criminal justice areas to include managing men and women's correctional facilities; working with women offenders; use of force; PREA related facility assessments of operations and sexual safety; staff training and development programs; author of publications related to leadership, organizational culture and change management (APEX: Achieving Performance Excellence) with the Department of Justice National Institute of Corrections (NIC); serve as consultant in various initiatives with state, local and private corrections agencies related to correctional operations and administration, strategic planning, culture, and performance improvement. Experience in depositions and court testimony. Contract employers include U.S. Department of Justice, Association of State Correctional Administrators, National Institute of Corrections, The Moss Group, State of Delaware, North Carolina Department of Public Safety, People in Charge Inc., MGT of America, Spitler, Stephens and Associates, and the Criminal Justice Institute, Inc.

### COMMISSIONER (March 2003-June 2009)

#### *Connecticut Department of Correction, 24 Wolcott Hill Road, Wethersfield, CT 06109*

Appointed by Governor John Rowland on March 17, 2003 as the sixth Commissioner of the Connecticut Department of Correction. Reappointed as Commissioner by Governor M. Jodi Rell in 2004 and 2007.  Administered an agency comprised of 18 correctional facilities, 7,000 employees, a budget in excess of $700-million with over 24,000 offenders under supervision in jails, prisons, and in the community. Retired effective June 30, 2009.

## DEPUTY COMMISSIONER (July 2000-March 2003)

*Connecticut Department of Correction, 24 Wolcott Hill Road, Wethersfield, CT 06109*

Served as Division Head for Support Services.  Responsibilities included overall agency management of Affirmative Action Unit, Fiscal Services, Engineering and Facilities Management, Management Information Systems, Nutrition and Food Services, and Correctional Enterprises.  The agency had approximately 7,000 authorized full-time staff, an annual budget of almost $550 million and a capital program of about $44 million.

## WARDEN (February 1999-July 2000)

*Corrigan Correctional Institution, 986 Norwich-New London Turnpike, Uncasville, CT 06382*

Administrator of a high security facility for 830 male inmates in pre-trial and sentenced status.  Managed all operations, to include 300 employees and a budget of over $14 million.

## WARDEN (August 1996-January 1999)

*New Haven Community Correctional Center, 245 Whalley Avenue, New Haven, CT 06530*

Administrator of a high security detention center for 800 male inmates in pre-trial status.  Managed all operations, to include 300 employees and a budget of $13 million.

## WARDEN (September 1993-August 1996)

*York Correctional Institution, 201 West Main Street, Niantic, CT 06357*

Administrator of the newly constructed 550-bed multi-classification institution for women offenders.  Activated the facility; developed all policies, procedures and programs; trained and supervised over 400 staff; and managed all operations with an annual budget of $19 million.

## DEPUTY COMMISSIONER (March 1991-September 1993)

*Connecticut Department of Correction, 340 Capitol Avenue, Hartford, CT 06106*

Served as the Division Head for Administrative Services.  Responsibilities included overall agency management of Human Resources, Fiscal Services, Engineering and Construction, Management Information Systems and Research, Affirmative Action, Employee Assistance and Wellness Programs, and Training and Staff Development.  The agency

2

had over 5,300 full-time staff, an annual budget of $400 million, and a capital program of over $750 million.

## DIRECTOR OF TRAINING AND STAFF DEVELOPMENT (July 1989-March 1991)

*Connecticut Department of Correction, Center for Training and Staff Development, 231 Middle Turnpike, Storrs, CT 06268*

Administrator for the Training and Staff Development Unit for the agency. Responsible for the design, delivery, certification and evaluation of all pre-service, in-service, management and staff development training for over 4,500 employees. Directed the daily operation of the Training Center to include a staff of 47 employees and an annual budget of $2 million. Managed the training orientation of over 1,000 new correctional employees each year, and the diverse refresher and management training for 3500 employees. Reported directly to the Commissioner, and served on the Commissioner's Senior Executive Committee and the Policy Review Committee.

## CORRECTIONAL PROGRAM SPECIALIST (January 1988-June 1989)

*U.S. Department of Justice, National Institute of Corrections Academy, Boulder, Colorado 80130*

Designed, developed, coordinated, delivered and evaluated training programs for executive and management correctional personnel from across the country. Conducted training seminars for the purpose of developing effective correctional leaders and improving the operations of state and local correctional systems.

## TRAINING DEVELOPMENT SPECIALIST (March 1984-January 1988)

*District of Columbia Department of Corrections, Staff Training Academy, Lorton, Virginia 22079*

Designed, developed, delivered, evaluated and managed the in-service training program for approximately 2,000 uniformed personnel and 1,000 non-uniformed personnel. Managed the agency Training Academy at Lorton, Virginia.

## CORRECTIONAL TREATMENT SPECIALIST (January 1979-March 1984)

*District of Columbia Department of Corrections, Youth Center I; Maximum Security Facility, Lorton, Virginia 22079*

Case manager and counselor at the Youth Center I Institution (3/81-3/84), a high security facility for youthful offenders; average caseload of 100 inmates.  Case manager, counselor and correctional officer at the Maximum Security Facility (1/79-3/81; first woman to work inside the cellblocks); average caseload of 100 male inmates comprised of the protective custody and high mental health needs population.

## <u>SENIOR CORRECTIONAL OFFICER</u> (June 1976 – January 1979)

*District of Columbia Department of Corrections, Youth Center II, Lorton Virginia; Women's Detention Center, Washington D.C.*

Responsible for the security and custody of inmates confined to the Youth Center II Institution (1/77-1/79), a medium security facility for male youthful offenders; and security and custody at the Women's Detention Center (6/76-1/77), a pre-trial facility for women.  In addition, served as a weapons instructor at the Staff Training Academy in Lorton, Virginia.

## PROFESSIONAL ACTIVITIES

- Expert Witness activities: Settlement Agreement Monitor: Kansas DOC – US Department of Justice (2014-2016); North Carolina Office of Attorney General (2013-2016); US Department of Justice Federal Bureau of Prisons (2015); Wisconsin Department of Correction (2014); Department of Justice Office of Attorney General (conditions of confinement of ICE Detainees, and Federal Bureau of Prisons use of force 2010-2011); U.S. Federal Bureau of Prisons (Cross Gender Pat Searches, 1999); New York State Department of Corrections (Cross Gender Pat Searches, 2000); Washington State Department of Corrections (Use of Restraints on Pregnant Inmates, 2009)

- President, Association of Women Executives in Corrections (2015-17)

- Member of the Association of State Correctional Administrators (2003-Present), former Chair of Programs and Training Committee; Northeast Association of Correctional Administrators, (2003-2009), Treasurer

- Adjunct Faculty, Tunxis Community College, Criminal Justice Program, Farmington, CT (1992-2012)

- President, Board of Directors, Families in Crisis, Inc., Hartford, CT (1999-2000)

- Member, Advisory Board of Directors, Family ReEntry (2009-14)

- Member, Board of Directors, Justice Education (2009-14)

## EDUCATION

**Princeton University – Woodrow Wilson School of Public & International Affairs**
July, 1991
Public Leadership, Management and Skills Certificate Program

**Coppin State University, Baltimore, Maryland**
Master of Science 1979
Major:  Criminal Justice

**Westfield State University, Westfield, Massachusetts**
Bachelor of Science 1976 Magna Cum Laude
Major:  Criminal Justice

**Prince Georges Community College, Largo Maryland**
Associate of Arts 1974 High Honors
Major:  Law Enforcement

## AWARDS AND RECOGNITION

- Recipient of the Association of State Correctional Administrators Louis Wainwright Award, 2014

- The Joan Warburg Award for Excellence, Family ReEntry Annual Ceremony, Greenwich, CT 2012

- Recognition Award for Leadership, Community Partners in Action, Hartford, CT 2009

- Certificate of Appreciation for Annual Commencement Address, Tunxis Community College, 2007

- Award of Appreciation from Middle Atlantic States Correctional

Association, 2007

- Leadership Service Award, Henry C. Lee Institute of Forensic Science, 2007

- Leadership Award, The Muhammad Islamic Center, CT 2007

- Decade Award for Outstanding Service, Tunxis Community College Foundation and Advisory Board, 2006

- Commencement Speaker, Asnuntuck Community College, 2006

- Correctional Education Association Board Award, 2005

- Outstanding Services to Veterans and the Department of Veterans Affairs, 2004

- Edna Mahon Award for Innovative Leadership, Women and Criminal Justice Conference, 2004

- Visionary Leadership Award, Criminal Justice Command Institute, 2001

- Commissioner's Award, Connecticut Department of Correction, 2000

- Outstanding Managerial Performance, Connecticut Department of Correction, 1990, 1993-1999 (received every year eligible)

- Nomination for Outstanding Woman in D.C. Government, 1983, 1987

- D.C. Women's Program Award for Outstanding Service, 1982, 1988

- Program Employee of the Year, Maximum Security Facility, 1979

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

Jane Doe 1 and Jane Doe 2,

                            Plaintiffs,

                           -against-

CITY OF NEW YORK, et al.,

                           Defendants.

**PROTECTIVE ORDER CONCERNING THE INSPECTION OF CERTAIN AREAS OF THE N.Y.C. DEPT. OF CORRECTION'S ROSE M. SINGER CENTER (RMSC)**

15-CV-3849 (AKH)

------------------------------------------------------------------------ x

     **WHEREAS**, on July 30, 2015, the Court entered its Protective Order Concerning Confidential Information ("Existing Protective Order"), ECF No. 24, which requires certain procedures to protect certain types of information properly designated as "confidential" by one of the Parties;

     **WHEREAS**, on July 31, 2015, Plaintiffs served a Rule 34 request (the "Rule 34 Request") to the City of New York to provide them with access to the New York City Department of Correction's ("DOC" or the "Department") Rose M. Singer Center ("RMSC" or the "DOC Facility") for the purposes of inspecting certain specific areas, and the City served no timely objection to the Rule 34 Request;

     **WHEREAS**, the Court ordered during the September 6, 2016 Hearing, and memorialized in a September 8, 2016 order, that "[o]n Wednesday, Oct. 19 and Thursday, Oct. 20, 2016, expert witness[es] for both plaintiffs and defendant, accompanied by counsel, may inspect relevant areas of the Rose M. Singer Center";

**WHEREAS,** because of security concerns, the Department deems any information or document depicting the DOC Facility confidential, though such information is not within the scope of the Existing Protective Order; and

**WHEREAS,** the Department objects to granting plaintiffs' counsel access to the DOC Facility, unless appropriate measures are undertaken for purposes of confidentiality and security.

**NOW, THEREFORE, IT IS HEREBY ORDERED**, that:

1.       Plaintiff's attorneys and their retained Rule 26(a) expert ("Plaintiffs") shall not under any circumstances photograph the following items and/or locations during the site visit: Any type of key, lock, locking mechanism, keyholes, doorknobs, and/or other similar equipment used to secure the doors, gates, and windows; and any inmate, or police or correction personnel whether in uniform or not, who are observed at the DOC Facility.  This paragraph is not intended to prevent Plaintiffs from inspecting or photographing the doors to the pantry that adjoins Buildings 9 and 11, or from inspecting (but not photographing) the keys that are needed to access these doors.

2.       Plaintiffs' attorneys shall not speak to any inmate for any reason.

3.       Plaintiffs' attorneys shall not interview or question any DOC staff for any reason.

4.       As used herein, "Confidential Materials" shall mean any photographs of the areas to be inspected, set forth in paragraph 5, below, and any notes of any kind or other documents that depict the physical layout of the DOC Facility, except that such documents and information shall not be deemed "Confidential Materials" to the extent, and only to the extent, that they are (a) obtained by the plaintiffs from sources other than the Department, (b) are otherwise publicly

available, or (c) consist purely of Plaintiffs' impressions and opinions but that do not depict the physical layout of RMSC.

5.      The inspection of the DOC Facility shall take place between the hours of 11:00 PM and 7:00 AM, on October 19 or 20, 2016, as previously ordered by the Court, and shall be limited to the following areas and no others:

a.      Buildings 8, 9 and 11;

b.      Any connections between Building 9 and Building 11 (including, but not limited to, the "A" station commonly known as the "bubble," and the pantry);

c.      The "A" station(s) or "bubble(s)" in Building 8;

d.      The area where the "sprungs" were in 2011-12 and adjacent corridors, entrances/exits, and stairwells;

e.      The video monitoring room covering Buildings 8, 9, 11, and the sprungs;

f.      The counsel visit/interview area inside RMSC;

g.      The RMSC clinic; and

h.      Any other areas that the City's expert wishes to visit.

This paragraph is without prejudice to Plaintiffs' right to move the Court, at a later time, for good cause shown, to inspect other areas of RMSC identified in their Rule 34 Request.

6.      The Confidential Materials are for "attorneys' eyes" only.  Plaintiffs' attorneys shall not disclose the Confidential Materials to any person not a member of the staff of its law office except that disclosure may be made to a designated Rule 26(a) expert, and only if necessary to the preparation or presentation of Plaintiffs' case herein.  In all other respects, the

parties shall treat the Confidential Material as confidential within the meaning of the Existing

Protective Order.

Dated: New York, New York

_____, 2016

SO ORDERED:

_____

HON. ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- x
-

Jane Doe 1 and Jane Doe 2,

                             Plaintiffs,

                    -against-

CITY OF NEW YORK, et al.,

                            Defendants.

--------------------------------------------------------------------- x
-

**PROTECTIVE ORDER CONCERNING THE INSPECTION OF CERTAIN AREAS OF THE N.Y.C. DEPT. OF CORRECTION'S ROSE M. SINGER CENTER (RMSC)**

15-CV-3849 (AKH)

       **WHEREAS**, on July 30, 2015, the Court entered its Protective Order Concerning Confidential Information ("Existing Protective Order"), ECF No. 24, which requires certain procedures to protect certain types of information properly designated as "confidential" by one of the Parties;

       **WHEREAS**, on July 31, 2015, Plaintiffs 's counsel has served a Rule 34 requested that (the "Rule 34 Request") to the City of New York to provide them with access to the New York City Department of Correction's ("DOC" or the "Department") Rose M. Singer Center ("RMSC" or the "DOC Facility") for the purposes of inspecting certain specific areas set forth below, and the City served no timely objection to the Rule 34 Request;

       **WHEREAS**, the Court ordered during the September 6, 2016 Hearing, and memorialized in a September 8, 2016 order, that "[o]n Wednesday, Oct. 19 and Thursday, Oct.

20, 2016, expert witness[es] for both plaintiffs and defendant, accompanied by counsel, may inspect relevant areas of the Rose M. Singer Center";

**WHEREAS,** because of security concerns, the Department deems any information or document depicting the DOC Facility ~~privileged and/or~~ confidential, though such information is not within the scope of the Existing Protective Order; and

**WHEREAS,** the Department objects to granting plaintiffs' counsel access to the DOC Facility, unless appropriate measures are undertaken for purposes of confidentiality and security.

**NOW, THEREFORE, IT IS HEREBY ORDERED**, that:

1.      Plaintiff's attorneys and their retained Rule 26(a) expert ("Plaintiffs") shall not under any circumstances ~~inspect,~~ photograph ~~or draw in any fashion~~ the following items and/or locations during the site visit:  Any type of key, lock, locking mechanism, keyholes, doorknobs, and/or other similar equipment used to secure the doors, gates, and windows; and any inmate, or police or correction personnel whether in uniform or not, who are observed at the DOC Facility. ~~The attorneys and/or anyone accompanying them may not bring or use a camera, video camera, tape recorder, or cell phone.~~ This paragraph is not intended to prevent Plaintiffs from inspecting or photographing the doors to the pantry that adjoins Buildings 9 and 11, or from inspecting (but not photographing) the keys that are needed to access these doors.

2.      Plaintiff~~'s~~s' attorneys shall not speak to any inmate for any reason.

3.      Plaintiffs' attorneys shall not interview or question any DOC staff for any reason~~s~~.

---

~~¹     By submitting this proposed Order, defendants do not waive any other objections which may exist to the production of documents defined as "Confidential Materials" herein nor do defendants~~

~~[NEWYORK 3266606_1]~~[NEWYORK 3266606_4]

4.     As used herein, "Confidential Materials" ¹ shall mean any photographs of the areas to be inspected, set forth in paragraph 5, below, and any notes of any kind or other documents concerningthat depict the visit tophysical layout of the DOC Facility.  These documents are deemed confidential because of security, law enforcement, governmental and/or privacy interests of the Department of Correction, its employees, contractors and subcontractors, and inmates, except that such documents and information shall not be deemed "Confidential Materials" to the extent, and only to the extent, that they are (a) obtained by the plaintiffs from sources other than the Department, or (b) are otherwise publicly available, or (c) consist purely of Plaintiffs' impressions and opinions but that do not depict the physical layout of RMSC.

5.     The inspection of the DOC Facility shall take place during regular business hours only, on one designated day to be agreed upon by the partiesbetween the hours of 11:00 PM and 7:00 AM, on October 19 or 20, 2016, as previously ordered by the Court, and shall be limited to the following areas and no others:

    a.     Buildings 8, 9 and 11;

    b.     Any connections between Building 9 and Building 11 (including, but not limited to, the "A" station commonly known as the "bubble," and the pantry);

    c.     The "A" station(s) or "bubble(s)" in Building 8;

---

may exist to the production of documents defined as "Confidential Materials" herein nor do defendants waive any objections to their admissibility.

    ¹     By submitting this proposed Order, defendants do not waive any other objections which may exist to the production of documents defined as "Confidential Materials" herein nor do defendants waive any objections to their admissibility.

[NEWYORK 3266606_1][NEWYORK 3266606_4]

    d.      The area where the "sprungs" were in 2011-12 and adjacent corridors, entrances/exits, and stairwells;

    e.      The video monitoring room covering Buildings 8, 9, 11, and the sprungs;

    f.      The counsel visit/interview area inside RMSC; ~~and~~

    g.      The RMSC clinic~~.~~; and

    h.      Any other areas that the City's expert wishes to visit.

This paragraph is without prejudice to Plaintiffs' right to move the Court, at a later time, for good cause shown, to inspect other areas of RMSC identified in their Rule 34 Request.

6.      The Confidential Materials are for "attorneys' eyes" only.  Plaintiffs' attorneys shall not disclose the Confidential Materials to any person not a member of the staff of its law office except that disclosure may be made to a designated Rule 26(a) expert, and only if necessary to the preparation or presentation of Plaintiffs' case herein.  In all other respects, the parties shall treat the Confidential Material as confidential within the meaning of the Existing Protective Order.

~~7. Plaintiff's attorneys shall not use the Confidential Materials for any purpose other than for the preparation for and/or presentation at the trial of the above-entitled case.~~

~~8. Deposition testimony concerning any Confidential Materials which reveals the contents of such materials shall be deemed confidential, and the transcript of such testimony, together with any exhibits referred to therein, shall, upon a request to the court reporter, be separately bound, with a cover page prominently marked "CONFIDENTIAL."  Such portion of the transcript shall be deemed to be Confidential Materials within the meaning of this Protective Order. If any Confidential Material is an exhibit to a deposition, that exhibit shall be~~

deemed confidential and separately bound, with a cover page prominently marked "CONFIDENTIAL."

9. A party that seeks to file any paper which incorporates any Confidential Materials or reveals the contents thereof with the Court shall so inform the other side prior to filing. The parties shall confer in good faith to resolve the matter; if the parties agree to utilize redacted copies of such documents or if the parties agree that unredacted versions of the papers may be filed publicly, no further order of the Court is necessary. Should the parties not reach a resolution, the party asserting confidentiality (or, if both parties assert confidentiality, the party seeking to file the papers), shall move the Court within seven (7) days of the date on which notice was provided for permission to file said papers under seal. Such material shall not be publicly filed with the Court until such application is decided. In the interim, to the extent necessary to comply with any deadlines imposed by the Court, Local Rules, or Federal Rules of Civil Procedure, the filing party who seeks to include Confidential Materials in papers to be filed in Court shall provide a complete and un-redacted version thereof directly to the judges' chambers and opposing counsel and not cause them to be publicly filed with the Court until after the motion to seal has been decided or the parties agree that the materials can be publicly filed.

10. This Protective Order will survive the termination of the Action and will continue to be binding upon all persons to whom Confidential Materials are produced or disclosed.  All documents or information that have been deemed confidential pursuant to this Protective Order, including all copies and non-conforming copies thereof, shall remain confidential.  Once the Action has been resolved, including all appeals, the Confidential Materials, including all copies and non-conforming copies thereof, including exhibits, shall be destroyed within a

reasonable time and shall not be used by plaintiff's counsel for any purpose without Court approval.

11. If at any time it appears to the Department's counsel and/or DOC staff present during the site visit that Plaintiff's attorneys whether inadvertently or not, is inspecting or taking photographs or drawings of any prohibited item, area or individual described above, Plaintiff's attorney will be immediately directed and expected to cease inspecting, photographing or drawing and the site inspection shall be terminated.

12. Nothing in this Protective Order shall be construed to limit the Department's use of the Confidential Materials in any manner.

Dated: New York, New York
_____, 2016

SO ORDERED:

_____
HON. ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT JUDGE

# EXHIBIT F

**Timothy P. Ryan**
**Ryan Correctional Consulting Services, P.L.L.C.**
**3333 Rice Street #203**
**Miami, FL 33133-5299**

**PRESENT**
**POSITION:**          **Consultant,** serving as a correctional trainer, assessor/auditor, and expert
witness since 3/12/2014;

**SUMMARY:**          Over forty-four years in correctional and law enforcement services with
experience covering administration, command, supervision,
coordination, and duty in county jail and community corrections
(probation) activities, including personnel and budget, internal affairs,
patrol, criminal investigation, court security, recruit academy training,
planning and research, records control and automated systems
operations; and additional experience in legislative analysis, program
development, technology application, criminal justice research,
professional training, and local and national jail operational audits and
assessments.

Serving over the last three plus years as a jail's operational consultant for
NIC regarding 14 jails in America, a Trainer for NIC and AJA, as well as an
expert witness.

**PREVIOUS**
**POSITION:**          **Retired - Director (1/17/2014), Miami-Dade Corrections and**
**Rehabilitation Department (MDCR).**  Appointed to the position of
Director of MDCR on December 4, 2006.  With nearly 5,000 inmates in
custody and 3,000 in community-based programs, the Miami-Dade C&R
Department is the largest jail system in Florida and the 8th largest in the
nation.  The department employs over 2,200 sworn and 600 civilian staff,
with a budget of $300 million, while serving 37 law enforcement
agencies.  It processed nearly 90,000 arrestees in 2013, all within 5 jails,
including a Boot Camp.  It includes court services and inmate
transportation, as well as pre-trial services and juveniles, who are
processed as adults.  The Department developed a Master Plan in 2008
and is pursuing a Mental Health Diversion Facility and a new 2,000-4,000
jail facility, plus infra-structure.

**EDUCATION:**          <u>California State University</u> – East Bay, Hayward, CA, <u>**Masters**</u>, 1976:
<u>**Public Administration.**</u>

<u>University of California</u>, Berkeley, CA, <u>**BS**</u>, 1970:<u> **Business Administration.**</u>

<u>**Harvard University**</u>, John F. Kennedy School of Government, Boston, MA, **Graduate**, 2001: Senior Executives in State and Local Government Program.

<u>**FBI National Academy (175th Session)**</u>, Quantico, VA, **Graduate**, 1993: Executive Leadership, Legal Issues, Media Relations, Terrorism Assessment, Forensics, Major Case Management, and Fitness;

<u>**Florida State Sheriff's Association – Jail Managers Workshops, Trainer/Speaker/Moderator/Sponsor/Attendee**</u> (2002 – 2013);

<u>**Valencia College**</u>, Orlando, FL, **Graduate**, 2003: Corrections Officer Recruit Academy - Modified Program.
<u>**California Standards and Training for Corrections (STC) Programs, Graduate/Attendee Certificates**</u> (1987 – 1998): Jail/Correctional Management, Medical Issues in Jails, Inmate Management, and Others;

<u>**California Peace Officer Standards and Training (POST) Programs, Graduate/Attendee Certificates**</u> (1971-1998):  Executive Development, Long Range/Strategic Planning, Advance Management, Leadership, Jail/Police/Administrative Services/Personnel/Records/Civil/ Emergency Management, and Supervisory/Intermediate/Basic Training.

<u>**Alameda County Sheriff's Academy**</u> (Recruit Training), Pleasanton, CA, **Graduate**, 1971: Valedictorian.

<u>**Chabot College**</u>, Hayward, CA, Law Enforcement Program and Teacher Education Certification, **Supplemental Course Graduate**, 1976-1984.

**ELECTED OFFICIAL:**

<u>**Retired – Trustee, Livermore Valley Joint Unified School District, Board of Education**</u>, Elected 12/1983 – 11/2001, Livermore, CA, overseeing 14,000 students, 1,500 employees, 5 unions, and 70,000 constituents. <u>**Board President:**</u> 1985/86, 1989/90, 1994/95, and 1999/00.

**PAST EXPERIENCE:**

<u>**Chief of Corrections**</u>, Resigned to accept MDCR Director Position, March, 2002 – December, 2006, Orange County Corrections Department, 3723 Vision Blvd., PO Box 4970, Orlando, FL 32802-4970.

**Chief of Correction**, Retired (3/20/2002), February, 1998 – March, 2002, Santa Clara County Department of Correction, 180 West Hedding Street, San Jose, CA 95110-1772.

**Commander, Detention and Corrections Division**, Retired (2/28/1998): September, 1989 – January, 1998, Alameda County Sheriff's Office, 1401 Lakeside Drive, 12th Floor, Oakland, CA, 94612.  Previous ranks:

| | |
|---|---|
| **Captain:** | 1986 - 1989; |
| **Lieutenant:** | 1979 - 1986; |
| **Sergeant:** | 1974 - 1979; |
| **Deputy:** | 1970 - 1974. |

CREDENTIALS:

**American Jail Association (AJA)**, **Past President** (2002 – 2003), **Member** (AJA Board of Directors 1996 – 2004), and **Certified Jail Manager** (1997 – Present)**;**

**American Correctional Association (ACA)**, **Commissioner** (Commission on Accreditation for Corrections (2005 – 2008))**, Delegate** (ACA Delegate Assembly (1998 – 2004))**, Member** (Adult Local Detention Committee (2000 – Present))**, Member** (Task Force on Correctional Affiliations (2002 – 2003)), and **Member** (ACA Standards Committee (2004 – 2008))**;**

**National Institute of Corrections Programs (NIC)**, **Graduate/Attendee** (1987 – 2013): Large Jail Network (1993-2013), Correctional Leadership, Public and Media Relations, HONI/PONI Schools, and Direct Supervision.

**Federal Emergency Management Agency (FEMA)**, **Certified Emergency Manager** (2006);

**Florida Corrections Accreditation Commission (FCAC)**, **Commissioner** (2010 – 2013)**;**

**Florida Department of Law Enforcement (FDLE)**, **Certified Correctional and Law Enforcement Officer** (Dual Certification Standards 2003/05 – Present);

**Florida Criminal Justice Executive Institute (FCJEI)**, **Board of Directors, Gubernatorial Appointee** (2004 – 2013);

**State of California, Community College Life-Time Teaching Credential** (1980):  Police Science.

UNIQUE
CORRECTIONAL
EXPERIENCE:

**AJA Representative/Member, Integrated Justice Information Systems Institute (IJIS),** Grantee from DOJ, Washington, D.C. (2014):  Selected as one of the jail professionals to be involved in the PREA Work Group;

**Director, Miami-Dade County Corrections and Rehabilitation Department,** Miami, FL (2007 -2008):  Administrator overseeing the research, preparation, review, and presentation of the County's Correction's Master Plan;

**Juror, American Institute of Architects, Annual Justice Review Committee** (2012):  One of Seven Nationally Recognized Criminal justice Expert Selectees;

**Selected Advisor, Federal Bureau of Justice Assistance (BJA)** (2007 - 2008), Orlando, FL and Las Vegas, NV:  Jail Leaders "Speak on Current and Future Challenges in Jail Administration and Operations";
**AJA Selected Representative, Federal Commission on the Prison Rape Elimination Act of 2003**, Miami, FL (2006):  Presentation of the "National Position" of American Jails Association regarding the act's implementation;

**Selectee/Member, National Prisoner Re-Entry Roundtable Task Force**, Council of State Governments, Washington, D.C. (2006);

**Commissioner, Commission on Safety and Abuse in America's Prison (and Jails)**, Vera Institute, Washington, D.C. (2005):  Selected as national jail representative;

**Selectee/Member, Prisoner Re-Entry Institute Advisory Committee**, John Jay College, New York City, NY (2005 -2008);

**AJA Selected Representative, Federal Bureau of Justice Statistics (BJS)**, Washington, D.C. (2003) and New Orleans, LA (2004):  Prison Rape Elimination Act of 2003 Implementation Workshop;

**Selectee/Member, American Probation and Parole Association**, Dallas, TX and Washington, D.C. (2003):  Council on Re-Entry Policy;

**Selectee, National Center for Disease Control (CDC)**, San Antonio, TX (2003):  Participant in the Workshop on the "Management of Hepatitis C in Prisons (and Jails)";

4

<u>Selectee/Member</u>, **National Institute of Corrections (NIC)**, Washington, D.C. (2002):  Participant on the Assessment Committee for "Staff Sexual Misconduct with Inmates";

<u>Attendee as President of AJA</u>, **National Highway Traffic Safety Administration**, Washington, D.C. (2002):  DUI Processing Review;

<u>Selectee/Member</u>, **California State Board of Corrections**, Sacramento, CA (1999):  Executive Steering Committee to conduct the 2000 Biennial Review of the Minimum Jail Standards for Local Detention Facilities;

<u>Selectee/Participant</u>, **California State Board of Corrections**, Sacramento, CA (1997):  Executive Committee to assess the "Impact of the Three Strikes on Local Jails";

<u>Gubernatorial Appointee</u>, **Representative for the California State Sheriff's Association,** Sacramento, CA (1987 – 1988):  Senate Bill 550 – Advisory Committee on Pharmacy Standards in Corrections;
<u>Transition Leader</u>, **Captain/Alameda County Sheriff's Office,** Dublin, CA (1986 – 1989):  Coordinated the construction, personnel plan, and policy/procedural development for the $172 million, 3600 bed Santa Rita Rehabilitation Center which opened September 1, 1989;

<u>Transition Team Manager</u>, **Lieutenant/Alameda County Sheriff's Office,** Oakland, CA (1983 – 1984):  Developed operational plan components for the opening of the new North County Pre-Detention Facility (Jail);

<u>Sheriff's Training Officer</u>, **Alameda County Sheriff's Office, Training Academy**, Dublin, CA (1974 – 1991):  Recruit Training Officer, and Intermittent Supervisors and Management Presenter and Trainer;

<u>Law Enforcement Liaison Officer</u>, **Sergeant/Alameda County Sheriff's Office**, Oakland, CA (1974 -1977):  Served as the Sheriff's Representative to the CORPUS Integrated Criminal Justice Information System coordinating the 17 Alameda County Law Enforcement Agencies in the development of the Consolidated Arrest Report and overall technology program implementation;

<u>Research Sergeant</u>, **Alameda County Sheriff's Office,** Oakland, CA (1974 - 1976):  Grantsmanship (Helicopter, Navigable Waters, and Inmate Education Programs); Analyst (Legislative Issues:  Privacy/Security, Criminal Records Release, and Misdemeanor Release Policy); and Federal Jail Planning and Research Assessments.

**OTHER UNIQUE
RECOGNITION/
EXPERIENCE:**

<u>Role Model Honoree for the "5000 Role Models of Excellence"</u>, 19th Annual Dr. Martin Luther King, Jr. Unity Scholarship Breakfast, January 16, 2012, for "guiding minority boys along a carefully chartered path to manhood and sending them to college";

<u>Manager of the Year</u>, Alameda County, CA, (1994):  Selected among 2,000 Alameda County managers for the <u>first</u> annual presentation;

<u>Coordinator</u>, **Commander/Alameda County Sheriff's Office,** Hayward, CA (1997):  Bay Area Mutual Aid Response to the "Rodney King Verdict";

<u>Coordinator</u>, **Commander/Alameda County Sheriff's Office,** Hayward, CA (1991):  Bay Area Mutual Aid Response to the "Oakland Fire Storm";

<u>President</u>, **Alameda County Management Employees Association (ACMEA)**, Oakland, CA (1991 – 1992):  First President of the Association leading it in its inaugural year as the representation organization for managers in the county.

<u>Recognized</u>, **Alameda County Board of Supervisors**, Oakland, CA (1989): Relative to actions subsequent to the "Loma Prieta Earthquake";

<u>Reserve Police Officer and Deputy Sheriff</u>, **Miami-Dade Police Department**, Miami, FL (2007 – 2014) and **Orange County Sheriff's Office**, Orlando, FL (2002 -2006);

<u>Graduate</u>, **Orlando Florida Chamber of Commerce**, Orlando, FL (2004): Leadership Orlando Class #62;

<u>Regional Director</u>, **California School Boards Association (CSBA)**, Sacramento, CA (1997 – 2001):  Representing the Board Members of the School Districts of Alameda County, CA;

<u>Elected Member</u>, **California School Boards Association (CSBA)**, Sacramento, CA (1989 – 2001):  State Delegate Assembly;

<u>Graduate</u>, **California School Boards Association (CSBA), Boardsmanship Academy** (1991 - 1992):  Leadership, Forecasting, Spokesperson, and Other Training;

**Attendee**, American Telephone and Telegraph (AT&T), Corporate Education and Training (1992): Communication about Performance and Development;

**Member**, Joint Powers Board of Directors, Special Education Local Plan Agency, Alameda County, CA (1984 – 1999): President (1991);

**Member**, Joint Powers Board of Directors, Amador Valley Regional Occupational Programs, Alameda County, CA (1986 -1990): President 1986/87 and 1989/90);

**Field Platoon Leader**, Lieutenant/Alameda County Sheriff's Office, Livermore, CA (1982): Response Team Supervisor to the civil demonstrations during the "Livermore National Laboratory Blockade";

**President**, Country Children Count Association (CCC), Livermore, CA (1979 -1983): 300 Community-based Educational Watch Dog Organization;

**Personal General Contractor**, Construction of Home, Livermore, CA (1979 -1980): Twenty-five acre ranch north of city;

**Negotiations Chairman**, Alameda County Deputy Sheriff's Association (DSA), Oakland, CA (1974 -1976): Lead the Association in its first response to employee representation discussions with the county under the newly approved California State Law "Meyers/Millias/Brown Act".

SPECIAL AUDITS/
INVESTIGATIONS/
ACTIONS:

**Expert Witness Case Review, Consultation, and Testimony (2014-2016)**, involving:

1. Inmate homicide;
2. Inmate suicide;
3. Staff/Inmate Use of Excessive Force;
4. Sexual abuse

**Volusia County, FL, Vulnerability Assessor (Jail Expert)**, selected October, 2014: Relative to breach of security concerning the exposure of the Branch Jail Renovation Project's architectural and masonry plans on the Internet and *risk* to present and future jail operations;

**Miami-Dade County Jail**, Miami, FL, Director of the County Response Team, Selected by Office of the Mayor, (2008-2014): Addressing the

County Responses to the Department of Justice (DOJ) Investigation under the Civil Rights for Institutionalized Persons Act (CRIPA);

**Fulton County Jail**, **Atlanta, GA, Investigative Team Member (Jail Expert)**, Selected by NIC, June, 2010:  One of three nationally identified jail professionals to audit/assess physical plant, jail operations, and adequacy of policies/procedures subsequent to a jail/court escape event;

**Prince George County**, **MD, Investigative Team Member (Jail Expert)**, Selected by ACA, July, 2008:  One of four nationally identified jail professionals selected to conduct an administrative inquiry into the internal operations of the jail necessitated by the mysterious death of an inmate.

**Technical Resource Provider (TRP)**, **Auditor/Assessor for NIC,** relative to the following fourteen (15) County Jails:

- Multnomah County (UOF), Portland, Oregon (Pending - 9/23/16);
- Osceola County (Physical Plant), Florida (8/10/2016);
- Lawrence County, Deadwood, SD (4/8/2016);
- Baltimore City Jail (Staffing), MD (3/31/2016);
- Bernalillo County (UOF), Albuquerque, NM (11/2015);
- Franklin County Jail, Pasco, WA (9/2015);
- Philadelphia Prison System (UOF), MD (9/2015);
- Pueblo County, CO (2014);
- Jasper County, IO (2014);
- Baltimore County, MD (2014);
- Snohomish County, WA (2013);
- Baltimore City Jail, MD (2013);
- Westmoreland County, PA (2012);
- Siskiyou County, CA (2012);
- Shelby County, GA (2012).

**Judicial Order Administrator**, **Captain/Alameda County Sheriff's Office**, Santa Rita Rehabilitation Center, Dublin, CA (1986):  Assessment and implementation of the Judicial Jail Capacity Release Order to reduce jail over-crowding.

**Master's Thesis**, **California State University,** Hayward, CA (1976):  The applicability and results of the State Probation Subsidy Act on Alameda County probationers and county costs;

8

SPECIAL
PRESENTATIONS:        <u>Speaker/Presenter</u>, **American Jail Association (AJA), Jail Expo and**
**Training Conferences**, Numerous National Locations (1995 -2014):
Presentations/Workshops including, but not limited to, PREA, Direct
Supervision, Budget Management, RFP Development, Vendor
Understanding, Personnel Scheduling, and Others;

<u>Speaker/Presenter</u>, **American Correctional Association (ACA), Annual**
**Conferences,** Numerous National Locations (2002 – 2014):
Presentations/Workshops including, but not limited to, PREA, Vendor
Understanding, RFP Development, Direct Supervision, and Others;

<u>Speaker/Presenter</u>, **Florida Sheriff's Association (FSA), Annual Jail**
**Administrators Conferences,** Several Florida Locations (2003 -2013):
Speaker on "Jail Deaths and Investigations", plus presentations on "Hot
Topics in Jail Operations" and "Legal Issues";

<u>Speaker/Presenter</u>, **Numerous Civic Groups including Rotary, Lions,**
**Kiwanis, Chambers of Commerce, and Others,** California and Florida
(1983 -2014);
<u>Plenary Speaker</u>, **American Association for Treatment of Opioid**
**Dependency (AATOD),** Atlanta, GA (2006);

<u>Special Speaker</u>, **American Correctional Association (ACA),** Dallas, TX
(1995):  A response to "Overcrowding and Innovative Alternatives to
Incarceration";

<u>Presenter</u>, **Livermore Chamber of Commerce,** Livermore, CA (1991 –
1992):  "Leadership in Education";

<u>Commencement Speaker</u>, **Livermore Valley Joint Unified School District,**
Livermore, CA (1984 – 1999):  High Schools (1984, 85, 86, 91, 92, 93, 95,
98 and 99) and Middle Schools (1985, 87, 88, 89, 90, 96, 97);

<u>Speaker/Presenter</u>, **California Work Furlough Conference**, Concord, CA
(1988):  The "Role of Work Furlough in the Reduction of Jail Over-
Crowding".

PUBLICATIONS:        "The Sensitive John Wayne" (Section: Your Haas Network), <u>Berkeley</u>
<u>Haas Magazine,</u> Page 17, Fall, (2014);

"My Excellent Opportunity: A Personal Reflection" (Retirement Speech),
<u>American Jails Magazine</u>, Page 39, July/August (2014);

"Incarceration Therapy:  Local Approaches", <u>Corrections Today Magazine</u>, February (2006);

"Confronting Confinement", <u>Report of the Commission on the Safety and Abuse in America's Prisons (and Jails)</u>, Vera Institute, Washington, D.C. (2006):  Contributing Commissioner;

"President's Commentary", <u>American Jails Magazine</u>, (May/2002 – April/2003);

"Changes in Sentencing Patterns:  Impact to Jails, Prisons, and Boards", <u>Proceedings from the 1995 ACA Annual Conference</u>, Washington, D.C. (1996);

"Alameda County moves Inmates to New Jail", <u>California State Sheriff's Association Official Publication</u>, Volume 5, Number 3, Fall (1989);

"Working with Illegal Aliens", <u>American Jail Association Bulletin</u>, Volume VI, #12 (1995).

PRESENT PROFESSIONAL ASSOCIATIONS:
<u>American Jail Association (1991 – Present);</u>
<u>American Correctional Associations (1998 – Present);</u>

<u>Florida State Sheriff's Association (2003 – Present);</u>

<u>FBI National Academy Associates, Florida (2002 – Present).</u>

PRESENT COMMUNITY ORGANIZATIONS:
Rotary Club of Miami (2007 – Present):  President 2015-16; Board of Directors;

Plymouth Congregational Church, Coconut Grove, FL (2006 – Present).

PAST PROFESSIONAL/ COMMUNITY ASSOCIATIONS:
NIC Large Jail Network (1991 – 2014);

FBI National Academy Associates, California (1994 – 2002);

Rotary Clubs of Orlando, FL and San Jose and Livermore, CA;

United Way of Miami-Dade and Orange Counties, FL; Board of Directors;

Mothers Against Drunk Driving, Miami (2007 – 2016):  Board of Directors;

Boy Scouts of Central Florida;

California State Sheriff's Association;

California Peace Officers Association (Life member);

Police Management Association;

Alameda County 4-H Association;

University of California Alumni Association (Life Member);

American Cancer Society, Tri-Valley Unit, CA;
Pleasanton-Blairgowrie Sister City Association (Scottish Games);