# CLEARY GOTTLIEB STEEN & HAMILTON LLP

WASHINGTON, D.C.
PARIS
BRUSSELS
LONDON
FRANKFURT
COLOGNE
MOSCOW

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

D: +1 212 225 2760
mlowenthal@cgsh.com

ROME
MILAN
HONG KONG
BEIJING
BUENOS AIRES
SÃO PAULO
ABU DHABI
SEOUL

December 8, 2016

**VIA ECF**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:  *Jane Doe 1., et al. v. The City of New York, et al.,* 15 Civ. 3849 (AKH)

Dear Judge Hellerstein:

      Plaintiffs Jane Doe 1 and Jane Doe 2 ("Plaintiffs") and Defendant the City of New York (the "City") respectfully submit this joint letter regarding Plaintiffs' request for an order compelling the production of:

(i) all documents concerning the chain of custody for a pair of pants owned by Jane Doe 2, between when the pants were collected on May 10, 2013 and when the pants were vouchered with the Office of the Chief Medical Examiner on May 14, 2013, pursuant to Plaintiffs' Request for Production No. 34 and Request for Admissions Nos. 2 and 3;

(ii) a declaration concerning the missing logbook(s) from Rose M. Singer Center ("RMSC") Building 11 covering the period March to May 2013—i.e., where and when Jane Doe 2 says she was sexually abused by CO Santiago—that provides an appropriate explanation of the City's search for the missing logbook(s), pursuant to the Court's Order, ECF No. 211;

(iii) all RMSC inmate "count slips" for Building 9/11 and Building East 3B covering the period of Jane Doe 2's sexual abuse (i.e., February 2013 through May 2013); and

(iv) the New York City Department of Correction ("DOC") evidence handling policy in effect in February 2013.

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

## PLAINTIFFS' POSITION

The four disputes fall in to two categories: (1) the City previously promised, and was ordered, to provide adequate responses to outstanding requests (respectively, the missing chain of custody documentation and a clear explanation for the City's failure to produce critical logbook evidence), and (2) the City failed to produce two categories of documents, called for by Plaintiffs' document requests, whose existence Plaintiffs' only learned of as a result of the Rule 30(b)(6) deposition the Court ordered. Plaintiffs promptly requested those documents, but prior to drafting this portion of our letter the City did not tell us whether it will produce them or, if so, when. After drafting this letter and submitting it to the City, Plaintiffs were informed that one category of the second group of documents had been destroyed (as explained more fully below) and the other category would be, and later were, produced (again, as explained more fully below).

**Chain of Custody Documentation.** As part of its investigation into Jane Doe 2's sexual abuse, the City collected a pair of pants (the "Pants") from Jane Doe 2's cell on May 10, 2013. Jane Doe 2 testified that she placed semen from defendant Santiago on one leg of those pants. Those pants were seized by the City from Jane Doe 2's cell on May 10, 2013, and on May 14, 2013, vouchered by the City with the Office of the Chief Medical Examiner ("OCME") for testing in the City's lab. Despite repeated requests, the City produced no documentation explaining what happened to the Pants between May 10 and May 14. The City's own written procedures establish that such documentation is required. Moreover, the testimony of the relevant witnesses is completely contradictory: the City employee who seized the Pants and the City employee who received them from him disagree about when that occurred, and neither explained what happened to the Pants from May 10 to May 14.[1]

As Plaintiffs' expert, Dr. Heinig, explained in her report: "There is, therefore, no documentary evidence establishing what happened to the [Pants] during the critical time period between when they were seized on May 10 and when they were delivered to the NYPD property clerk four days later, on May 14, by AIG Christo. Similarly, there is no documentary evidence establishing where the [Pants] were kept during that period nor in what condition they were kept. And, there is accordingly no such evidence demonstrating that the [Pants] were not tampered with during that time." Expert Report of Julie A. Heinig, Ph.D. at 8 (Nov. 4, 2016) (emphasis added). Moreover, Dr. Heinig also concluded that her own testing (which revealed the presence of male DNA, from one man associated with RMSC, on the left, right and crotch areas of the Pants, *id.* at 9) was "consistent with the semen having been washed off the [Pants] before [her] and (and OCME's) testing of them." *Id.* at 10 (emphasis added).

Compounding the City's failure to produce any required documentation establishing the

---

[1] *Compare* Christo Dep. 83:2-6 (Mar. 24, 2016) ("Q: Were [the Pants] collected that day [May 10, 2013]? A: I never saw -- when we went to the trailer, [Torres] was not there. I never met Torres on this day or Ortiz. I did not receive the jeans on this day."); 142:3-7 ("Q: What day did Torres give you the jeans? A: I think it was the 14th. He spends most of his time at the trailer, Rikers Island trailer. So he had them secured out there."), *with* Torres Dep. 228:20-229:3 ("Q: When was the last time you remember having the pants in your possession? A: Just before I handed them to Christo. Q: Do you remember what day that was? A: Do not. Q: Do you think it was the same day that you collected them? A: Pretty sure.").

The Honorable Alvin K. Hellerstein, p. 3

chain of custody during this critical four-day period is its utterly inconsistent response to timely served Requests for Admissions ("RFAs"). The City's responses and objections to RFAs Nos. 2 and 3, respectively <u>denied</u> that it (i) did <u>not</u> have documents within its possession, custody or control documenting the chain of custody of the Pants between period May 10 - 14, 2013, and (ii) did <u>not</u> have documents within its possession, custody or control memorializing discussions between Jane Doe 2 and DOI investigators who collected the Pants. With the RFAs, Plaintiffs also timely served a document request (No. 34) demanding: "With respect to any [RFA] for which you did not make an unqualified admission, all documents, not already produced, that support Your response." The City's responses and objections to that request purported to support those RFA denials by reference to "documents stored with, and kept with, the Pants, including the brown paper bag in which investigators placed the Pants after they took them from plaintiff Jane Doe 2's cell."

In short, the City both denies the RFAs *and* fails to produce any document that would justify such denials. As the Court has emphasized, the truth matters, and this litigation is not a game. If there are documents, they must be produced; if there are not, the City should so state and the RFAs must be admitted.

Plaintiffs thought the City's inconsistent positions had been resolved at a court-ordered meet and confer on July 11, 2016, where the parties agreed that the City would re-visit the issue of whether chain of custody documentation exists upon return of the Pants to the OCME by Plaintiffs' expert. But the City has now had the Pants in its possession for over a month, and refuses to honor that agreement, which was twice memorialized in writing, including in a letter to the Court. Letter Mot. For Disc. Related Mot. to be Reinstated at 2 n.4 (July 21, 2016), ECF No. 178.[2] Despite being recently reminded of this open issue, the City appears either to have forgotten its prior agreement or is no longer willing to honor it, first stating in response that: "As to the RFA's, our response served on 7/1 denies RFA's ## 2 and 3. I'm not sure what further information you are looking for, at this point," and then, after another email from Plaintiffs: "I will take a look at the attachment you sent over, with regard to the RFA responses that we served five months ago." Ex. B (Emails from Arthur Larkin to Mitchell Lowenthal on Dec. 1, 2016 at 11:35 am and 1:18 pm).

---

[2] On July 11, the parties participated in a meet and confer at the direction of the Court concerning, *inter alia*, the City's responses and objections to the RFAs and Request for Production No. 34. At that meet and confer, the City represented that it could not resolve disputes related to RFA Nos. 2 and 3 and Request for Production No. 34 at that time, because the Pants had been shipped to Plaintiffs' expert for examination, and that the Pants purportedly contained all responsive documentation (even though Plaintiffs represented to the City that no such documentation was present within the Pants). Plaintiffs memorialized their understanding that the City would address this item upon return of the Pants in an email later that day: "For RFA Nos. 2 and 3, we agreed that after you receive the pants (and any accompanying evidence bag) from Plaintiffs' expert, you will consider whether you need to amend your denial." Exhibit A (Email from Joseph Kay to Arthur Larkin on July 13, 2016). Separately, Plaintiffs noted in a letter to the Court that "[a]t the [July 11] Meet and Confer, the parties resolved . . . RFA Nos. 2 and 3, which the City said it would address at a later date . . . ." ECF No.178, at 2 n.4.

The Honorable Alvin K. Hellerstein, p. 4

To the extent the City still claims that such documentation exists, Plaintiffs respectfully request that the Court enter an order compelling the City to produce it. If the City now admits that there is no such documentation, it should so state and amend its RFA answers.

**Defective Declaration Concerning Building 11 Logbooks**. Over a year ago, Plaintiffs requested production of daily logbooks (also known as housing area logbooks) covering certain buildings, including RMSC Building 11, where Jane Doe 2 was sexually abused and housed. On July 21, 2016, the Court granted Plaintiffs' request for an order compelling production of those logbooks: "The logbooks, containing contemporary records of activities, are relevant." Order, ECF No. 184. However, the City subsequently informed Plaintiffs that it was unable to locate the logbook covering Building 11 from March to May 2013 – i.e., most of the period of Jane Doe 2's abuse. That missing logbook is <u>critical</u>.

As Plaintiffs explained in the parties' joint letter seeking the order to compel, ECF No. 180, the logbook would contain contemporaneous notations by correction officers, including Defendant Santiago. Events during that time period play a major role in this litigation. In specific, there is no dispute that Santiago locked Jane Doe 2 in her cell in May, refusing to let her leave in the morning, which resulted in her not eating for an extended period of time. Plaintiffs assert this was retaliation by Santiago because he thought Jane Doe 2 had reported his sexual abuse to jail officials. During his deposition, Santiago testified that he had locked Jane Doe 2 in her cell not in retaliation but to avoid a "riot," Santiago Tr. 107:5, because as many as nine inmates (including Jane Doe 2) were "yelling back and forth," and that he feared for a "big fight break[ing] out." Santiago Tr. 107:6-17. If Santiago's testimony were true, and he locked Jane Doe 2 in her cell as a response to that incident (notably, he did not discipline any of the other alleged participants in the yelling), then he was required by written policy[3] to log those events in the logbook. The City's Rule 30(b)(6) witness confirmed that any incident of that alleged severity – meriting discipline of that nature—should have been logged.[4]

The logbook is the best evidence of what—if anything—was written in it concerning Santiago's locking Jane Doe 2 in her cell. If it was done in complete accord with prison practices because of misbehavior by Jane Doe 2, then it should contain a clear explanation of what happened and why Jane Doe 2 was locked up. If it was done to retaliate against her, then there is likely no mention of it. Notably, the control room (or "bubble") officer for Buildings 9 and 11, who would have shared responsibility for monitoring Building 11 with Santiago, <u>made no such entry in his logbook,</u> and no officer filed a disciplinary charge against Jane Doe 2 or anyone else for the purported misconduct.

---

[3] *See* Order No. 52-16, Housing Area Logbooks, at DEF_0023945-46 ("Logbook entries shall be made as follows . . . If there is an unusual incident, situation, or condition to report, the officer shall make a logbook entry describing the details of the event and the name of the supervisor who was notified.").

[4] Blenman Dep. 107:18-108:10 ("Q: . . . If the argument made you fear for the safety of a particular inmate, would you log it? . . . . A: Okay. Myself, I would log it because I would have took – tooken [sic] some kind of action. So I would log in saying that I notified my supervisor, and we have to get the inmate out of the area.").

The Honorable Alvin K. Hellerstein, p. 5

The logbook should also have contained regular notations of Jane Doe 2 going back and forth between Building 9 (where she worked as an SPA) and Building 11 (where she was raped and sexually abused by Santiago). She states Santiago pressured her to go to Building 11 during the night; and even Santiago admits that Jane Doe 2 frequently came to building 11 late into the night, Santiago Dep. 137:3-24, but denies that it was at his behest. If her movements at night were appropriate, the missing logbook will have entries describing those movements and the reasons for them. Notably, the officers in Building 9 and the Building 9/11 "bubble," made no notations of Jane Doe 2's middle-of-the-night movements in their logbooks – a practice which seemingly violates DOC policy and correctional practices, and indicates that all of these officers were aware that the reason for these midnight encounters was unlawful, and to be covered up.[5]

These logbooks are not casual documents. They are required to be prepared, and they are required to be maintained, including for security, safety, regulatory, and other purposes.[6]

On September 8, 2016, the Court entered an Order compelling the City to produce an "appropriate explanation by affidavit of a competent witness" explaining why Santiago's Building 11 logbook could not be located. ECF No. 211 (emphasis added). However, the one-page declaration produced by the City is defective in numerous respects and fails to satisfy the Court's Order. Ex. C (Letter from Mitchell Lowenthal to Arthur Larkin and Anthony DiSenso on Oct. 5, 2016, at attach. A). First, the declaration fails even to identify the dates and times that the declarant, or other City personnel, conducted any search for the missing Building 11 logbook. Second, the declaration fails to identify whether all relevant logbook storage locations were even searched. Indeed, the declaration notes that there are at least two locations where the logbook could be, including the "off-site storage facility" referenced in paragraph 3 of the declaration, but never states that the off-site location was ever searched. Third, for the first time, the declarant indicates that there are multiple missing logbooks. *Id.* ¶ 4 ("I could not locate the relevant log books for Building 11.") (emphasis added)  Plaintiffs sent the City a letter on October 5, 2016, objecting to the declaration, and requesting that the City submit one that complies with the Court's order. Ex. C. The City responded on October 7, claiming that the declaration was fully compliant as is, but promising that, "in an abundance of caution, we are in the process of confirming with DOC that the logbook was not sent to the off-site storage facility." Ex. D (Email from Anthony DiSenso to Joseph Kay and Arthur Larkin on Oct. 7, 2016).

Again two months have passed, and the City has still not responded. In light of the importance of the lost evidence, Plaintiffs respectfully request that the City be compelled to

---

[5]   *See* Expert Report of Timothy P. Ryan ¶ 164 (Nov. 3, 2016) ("Per policy and procedure, such movements [by Jane Doe 2] should have been logged – as a normal safety practice, and to ensure that supervisors were aware that this was happening. However, the movements were not logged in any produced logbook, meaning that a half dozen correction officers flaunted policy, and certainly creates the suspicion that their omissions were done knowingly and for improper purposes.").

[6]   S*ee* Directive No. 4515R-A, Housing Area Logbooks (effective Oct. 19, 2007), available at http://www1.nyc.gov/assets/doc/downloads/directives/4514R-A.pdf.  They were also required to be kept because the City was put on notice of Jane Doe 2's sexual abuse in Buildings 9/11 on May 10, 2013 by Jane Doe 2's report to the Department of Investigation, and by Jane Doe 2's Personal Injury Claim Form, filed in July 2013.  *See* Jane doe 2 Personal Injury Claim Form (July 25, 2013) (JANE DOES_00000037-41).

produce a declaration providing information about when, where, and for how long the City searched for the missing logbook, and for confirmation on the number of responsive logbooks that cannot be found. Such evidence is relevant to a variety of issues, including whether adverse inference instructions are warranted for the City's failure to produce these logbooks and a multitude of other missing evidence.[7] The parties will brief that issue along with other *in limine* matters during the time the Court sets for doing so. There is no reason, however, why the underlying facts about why the materials were lost, and what was done to recover them, should be in dispute.

**Count Slips**. Jane Doe 2 was sexually abused by Santiago in Building 11 during her shift as a Suicide Prevention Aide ("SPA") for Building 9. Santiago and Jane Doe 2 each testified that Jane Doe 2 regularly passed, in the middle of the night, between Building 9 and 11 through the pantry area connecting the buildings. Santiago Dep. 137:15-24; 139:10-20; 140:3-9. However, the housing area logbooks produced by the City do not reflect movement by Jane Doe 2 between those buildings, in violation of the City's policies. *See* Blenman Dep. 105:21-106:2. Other items memorializing that movement have likewise not been retained by the City, for example, the GENETEC video footage from cameras in Buildings 9 or 11, which would have shown Jane Doe 2 move between buildings, and be in Santiago's company when, overnight, she was in Building 11.

During the 30(b)(6) deposition of the City on November 23, 2016, the witness, Captain Sabrina Blenman, identified that the City creates and maintains "count slips" that purportedly log the location of each inmate in RMSC multiple times per shift, and which are supposed to be verified by multiple officers, *see, e.g.*, Blenman Dep. 69-81. Prior to the 30(b)(6) deposition, Plaintiffs were not made aware of the existence of those documents, and no count slips were produced to them. According to Captain Blenman's testimony, the count slips were supposed to record movements of detainees, including if a detainee moved between one building and another during the night shift, as both sides concede Jane Doe 2 did. *See* Blenman Tr. 81:10-17.

The count slips for Building 9/11 and for East 3B, where Jane Doe 2 was housed for part of her abuse at RMSC, are thus relevant and should have been produced last year in response to Plaintiffs' Request for Production No. 26, which sought "All documents concerning the Employment of Jane Doe 1 or Jane Doe 2 at RMSC, including but not limited to: . . . (iii) documents concerning travel by Jane Doe 1 or Jane Doe 2 within or outside of RMSC in connection with their Employment." Plaintiffs demanded production of these items a week ago, and have not received either an objection or a commitment to produce these count slips from the City. *See* Ex. E (Emails from Mitchell Lowenthal to Arthur Larkin and Kimberly Joyce on Dec. 1 and Nov. 29, 2016). Particularly since the City claims to have lost the logbooks, the count slips are unique, contemporary evidence.

---

[7] The City claims to have lost a substantial amount of critical evidence related to this litigation – including (i) the Building 11 logbook, (ii) all of the Suicide Prevention Aide logbooks for Building 9, (iii) the inmate files for both Jane Doe 1 and Jane Doe 2 during their abuse, (iv) Jane Doe 2's recorded phone calls that she says would have contained contemporaneous discussions of her sexual abuse and a call with Santiago's cellphone, and (v) the back page of Jane Doe 2's injury to inmate report logging contemporaneous responses to Jane Doe 2's allegation of sexual abuse.

The Honorable Alvin K. Hellerstein, p. 7

**Evidence Policy**.  At the 30(b)(6) deposition of the City, Captain Blenman also testified about an RMSC command level order concerning evidence handling and integrity.  Blenman Dep. 92:3-95:21.  The evidence handling and integrity order was promulgated earlier this year, and produced to Plaintiffs for the first time on November 18, 2016 – the Friday before the 30(b)(6) deposition of the City.  However, Captain Blenman testified that the order was based on a prior order from 2007 – Blenman Tr. 93:14-15 – <u>that was never produced to Plaintiffs and which Plaintiffs were unaware of until the 30(b)(6) deposition</u>.

The prior order, which was in effect during the relevant period when Plaintiffs were being abused, should have been produced long ago.  Accordingly, promptly following the completion of the 30(b)(6) deposition, Plaintiffs emailed the City requesting production of the DOC's evidence handling procedures when the City collected evidence in Jane Doe 2's case pursuant to Plaintiffs' Class Request for Production No. 7, which demands: "All documents concerning DOC and RMSC policies, procedures and practices relating to Sexual Misconduct and allegations of Sexual Misconduct . . . includ[ing], but not limited to, policies and procedures concerning: . . . . the reporting and investigation of Sexual Misconduct at RMSC."  The City has not responded to Plaintiffs' demand.  Ex. E.

## DEFENDANT CITY OF NEW YORK'S POSITION

The first two matters plaintiffs raise, above, are stale, having been brought to the Court's attention long after the close of fact discovery; are based in part on false representations to this Court about what the City supposedly agreed to do, supported by one half of an email thread but not the City's response; and in any event seek relief that is beyond the scope permitted by the Federal Rules of Civil Procedure and court orders.  We submit that all relief requested with regard to these two matters should be denied.  As to the last two matters, the City will use its best efforts to search for and produce the requested materials, or else advise plaintiffs that the materials no longer exist, within two weeks of today, or Dec. 21, 2016.  For these reasons, the Court should deny all requested relief.

**Chain of Custody Documentation**.  The City has already produced all of the relevant chain of custody documents and other materials in its possession, including the paper bag in which the jeans were originally vouchered with the NYPD.  The City's denials of plaintiffs' requests for admission are appropriate and supported by these documents.  But even if the City's denials were not supported by the documents, plaintiffs' remedy is to seek costs after trial, not another discovery order mandating that the City "admit" what it has denied.  *See* Fed. R. Civ. P. 37(c)(2), discussed below.

Plaintiffs' recent motion is another example of their attempts to deny what is undeniable, viz., that Jane Doe 2 falsely reported that she wiped Santiago's semen on the jeans.  Plaintiffs' lawyers went to great lengths to withhold their expert's test results which confirm that no semen is present on the jeans, only disclosing those test results after the Court ordered them to do so twice (*see* Dkt. 184, 209).  At first, in order to explain the absence of semen on the jeans, plaintiffs' counsel attempted in discovery to establish that investigators must have vouchered the wrong pair (Jane Doe 2 claimed to have been in possession of two pairs of jeans at the time she was supposedly "raped" by Santiago).  When the lawyers realized that this theory could not be supported by the evidence, they chose a different tack:  Now they will argue to the jury that

investigators who took the jeans must have washed them sometime between May 10, and May 14, 2013, in order to remove the semen that Jane Doe 2 swore, under oath, was there. They have submitted an expert report that, they believe, supports this new theory.

Plaintiffs' RFA #2 reads as follows: "You have no documents within your possession, custody or control documenting the chain of custody of the Pants from May 10, 2013 through May 14, 2013." The City denied this RFA (see excerpt attached as Exhibit F). Previously, the City had produced chain of custody documents demonstrating that on May 14, 2013, the jeans were submitted to OCME for testing. The City therefore properly denied plaintiffs' RFA which demanded to know whether documents existed regarding chain of custody "through" that date. For this reason alone, plaintiffs' complaints about the City's denial are misplaced. In their reply, below, plaintiffs assert that we never told them that we interpreted the RFA in this manner, and that we cannot do so now. This unusual argument is not supported by any Rules or case law.

In addition, according to the limited testimony that plaintiffs quote, Torres testified that, on May 10, 2013, after Jane Doe 2 reported that she supposedly wiped Santiago's semen on the jeans, he took possession of the jeans. He placed the jeans in a paper bag. Plaintiffs' expert had the paper bag for several months along with the jeans while she conducted testing on them. We assumed and believed that the bag in which the jeans were stored and delivered to plaintiffs' expert was the same bag in which Torres first put the jeans. In our response to plaintiffs' document request, we specifically referred them to the paper bag, as a tangible "thing" that evidences collection of the jeans (*see* City's Response to Plaintiffs' Document Request, Exhibit G hereto). The photo of the jeans, which plaintiffs refer to below, suggests that it contains chain-of-custody information that may require testimony at trial to explain. And Torres' deposition testimony fleshes out when he took custody of the jeans. According to the limited excerpt that plaintiffs quote, Torres recalls that he may have given them to Christo the same day he took them; Christo recalls that he did not get them from Torres until May 14, 2013, four days after Torres collected them.

Plaintiffs already have the relevant facts regarding the City's taking custody of the jeans. The City's denial of the RFA was timely and proper. At trial, plaintiffs can make whatever arguments they wish based on the evidence, including the argument that investigators washed the jeans in order to remove the semen that Jane Doe 2 supposedly wiped on them. Plaintiffs seem to disagree with the City's denial, and demand that the Court direct the City to admit the RFA rather than deny it. But plaintiffs do not cite any authorities holding that the Court can compel a party who timely denies an RFA to change its answer to "admit" simply because the party serving the RFA disagrees with the answer. Rule 37(c)(2) provides that if a party "fails to admit what is requested under Rule 36 and if the requesting party later proves … the matter true, the requesting party may move [for] … reasonable expenses ... incurred in making that proof" unless the Court concludes, among other things, that "the admission sought was of no substantial importance" or the responding party "had a reasonable ground to believe" that it would prevail on the matter at trial. Fed. R. Civ. P. 37(c)(2)(A) – (D). To the extent plaintiffs are entitled to any relief at all, they could obtain such relief only after trial. Plaintiffs' request for further relief at this time should be denied.

In their reply, below, plaintiffs fail completely to address Rule 37(c)(2), and instead complain that trial time should not be "wasted" on this issue. But the matter will be the subject

of testimony at trial regardless of the City's responses to plaintiffs' RFA's. Plaintiffs' arguments are inapposite and ignore the Rules. Their position should be rejected.

One final point bears emphasis. Plaintiffs again attach a self-serving communication to us, transmitted at approximately 8:00 p.m., on July 13, 2016, purportedly memorializing the City's "agreement" to undertake further work with regard to plaintiffs' RFA's. In their initial draft of this letter, plaintiffs neither referred to, nor did they attach, the City's response to their email. But we replied to their message within ten minutes, stating that it "is not accurate in certain respects," and then gave one example where they had mischaracterized the discussion. (*See* Exhibit H, Larkin to Kay, 7/13 @ 8:08 p.m.) Although I did not have time to go through the entire email at that hour and set forth every area where plaintiffs mischaracterized our discussion, the chain-of-custody documents were another area where they were simply wrong. Contrary to plaintiffs' assertions, we did not agree to revisit this issue after the pants were returned. Rather, according to my recollection, we explained that the denials were proper. Although plaintiffs replied angrily to our email – and we will not burden the Court by attaching the full thread here – we did not at any time accept their characterization of the parties' conversations.

Despite our communicating our position to plaintiffs five months ago, plaintiffs' lawyers' decided to resurrect this issue last week, more than three (3) months after the close of fact discovery. As noted above, the Rules provide for an appropriate remedy, if any, at the appropriate time. For these reasons, we submit that the Court should reject plaintiffs' request for relief as set forth in this letter.

**Allegedly "Defective" Declaration**. By order dated Sept. 8, 2016, following an in-person status conference, the Court ordered that "Defendant [City of New York] shall produce information about the whereabouts of missing log books referenced in the record by Friday, Sept. 23, 2016 and, if log books cannot be found, defendant shall provide an appropriate explanation by affidavit of a competent witness." (Dkt. 211, at pages 1-2) We subsequently produced a signed, sworn declaration by the correction officer who conducted the search, explaining that he could not find the missing log book (copy attached as part of Exhibit C). We provided that declaration approximately *two and one-half months ago*.

Predictably, two weeks after we provided the declaration, we received a letter from counsel complaining about it. They raised three complaints, none of which we agreed with. We promptly advised them of our position, but stated that we would double-check "out of an abundance of caution" one minor issue, viz., whether the missing log book was ever sent to the offsite storage facility. We have confirmed that, in fact, the log book was never sent to any offsite storage facility. The declaration makes this clear in any event, stating that at the time the declarant, Correction Officer Chad Ellis, searched for the logbooks, the logbooks for the requested housing areas (Buildings 9 and 11) were maintained at RMSC and had "since been sent" to an offsite storage facility. The logbooks for the relevant time period were sent to the storage facility after the search was conducted. To the extent plaintiffs need further clarification, we provide it here.

As to the other purported complaints about the declaration, which plaintiffs first voiced more than two months ago, none of them have any merit. Plaintiffs' lack of diligence in

pursuing the matter – waiting until now to raise it with the Court – strongly suggests that their complaints either lack substance or are unimportant. One of the complaints – about another missing log book, supposedly – appears to have been addressed at the in-person conference, as counsel acknowledged on the record. (9/6 Conf. Tr., at 13-14 (counsel states, "[W]hen we conducted the inspection, we realized two of the logbooks were missing. I think working with the city, we have figured out what happened to one of those logbooks, and it will be made available for inspection to us ….")) At that same conference, the Court directed the City to provide a declaration by a witness "describ[ing] when it [i.e., the missing log book] was sent [to archives] and describe the person who looked and couldn't find it, that will be satisfactory." (9/6 Conf. Tr., at 14:11-13) The declaration, signed by the officer who conducted the search, is therefore sufficient. Plaintiffs' application should be denied.

In their reply section below, plaintiffs take the position that two logbooks for Building 11 must be missing, not just one. However, plaintiffs are incorrect. The only missing logbook for Building 11 was that for the time period March 15, 2013, through May 15, 2013. The other Building 11 logbook that plaintiffs requested was produced, viz., that for the time period up to March 15, 2013. Plaintiffs know this, yet they persist in suggesting that there must be another missing log book out there, and demand further searches and declarations by City employees to prove them wrong. Their position seeks to create unnecessary make-work wholly out of proportion to the matters at issue. *See generally* Fed. R. Civ. P. 26(b)(1) (all discovery must be "proportional to the needs of the case"). We submit that plaintiffs' arguments regarding the declaration should be rejected.

**Count Slips/Evidence Policy**. The evidence policy was produced on or about Dec. 6, 2016, and the City will conduct a search for the count slips and advise plaintiffs of the results on or before Dec. 21, 2016. We submit that this proposal is reasonable. Accordingly, we request that further relief should be denied, at this time.

## PLAINTIFFS' REPLY

**Chain of Custody Documentation**. The City's opposition avoids the obvious: that it has in fact produced no documentation providing chain of custody for the Pants from May 10 through May 14, 2013. Even the City's own description of the relevant testimony shows that there is not even any coherent testimonial evidence explaining what happened to the Pants from when they were seized on May 10 until they were received by the NYPD on May 14. *See* City description of the conflicting Torres/Christo testimony *supra* at 8. This makes whether or not there is any documentary evidence of that chain of custody even more important. Either there is such evidence or there is not. There is no middle ground, and trial time should not be wasted with this debate. Moreover, the answer is not academic: Dr. Heinig, Plaintiffs' DNA expert, explained that the tests she conducted and the male DNA she found on the Pants is consistent with the Pants having been tampered with.

The City falsely asserts that a bag containing the Pants that was given to Dr. Heinig is "the paper bag in which the jeans were originally vouchered," *see supra* p. 7, and that the bag is the one Mr. Torres put the Pants into when he seized them on May 10. *Id.,* at 8. These assertions are made without any supporting evidence, and the record makes clear they are not true. More importantly, the City's entire discussion of this bag is irrelevant to this motion.

The Honorable Alvin K. Hellerstein, p. 11

First, this exercise demonstrates that trial time should not be wasted by the City's denial of the undeniable. Even if the bag sent to Dr. Heinig had been the one used by Mr. Torres, it still would not be a chain of custody document because nothing on that bag speaks to when the Pants were seized, when the Pants were placed in that bag, where the bag was kept, who had access to it, etc. – the standard required information to establish a chain of custody. The brown paper bag that was sent to Dr. Heinig containing the Pants has no relevant writing on it. Ex. I (photograph of brown paper bag). All of the fields on the bag are blank. The numbers on the bottom of the bag have no known relevance to the chain of custody between May 10 and May 14, 2013. The back of the bag is solely marked with an illegible signature.

Second, the testimonial evidence rejects the suggestion that this bag is the one Mr. Torres used to seize the Pants. The bag is plainly labeled as an "NYPD Biological Evidence Bag." Ex. I. Mr. Torres is an employee of the New York Department of Investigation, and not the NYPD. In fact, Mr. Torres testified that he would have put the Pants in one of either two types of bags: (i) an evidence collection bag, which he testified would say "evidence collection on it" (Torres Dep. 148:6-10), or (ii) a brown paper bag from RMSC that would have been "really long . . . probably 4 feet long" and that he would have to roll the bag closed due to its length (Torres Dep. 221:23-221:2). The bag that was sent by the City to Dr. Heinig neither says "evidence collection," nor is it four feet long.[8] Mr. Torres also testified that he "[p]robably would have written [the] inmate's name and booking [sic] case number" (Torres Dep. 222:3-6), but there is no inmate name or book and case number written on the bag.[9]

Separately, the City's explanation for its RFA answers is equally beside the point. It offers a construction of the RFA No. 2 that, despite multiple communications about that RFA between the parties, it never did previously. And the explanation (*supra*, at 7-8)[10] is nonsensical. The RFA asks the City to admit or deny the following: "You have no documents within your possession, custody, or control documenting the chain of custody of the Pants from May 10, 2013 through May 14, 2013." Exhibit F (emphasis added). The document referenced by the City (*supra*, at 8) shows only that a City agency took custody of the Pants on May 14, 2013,

---

[8] Furthermore, Torres testified that he showed Jane Doe 2 the Pants by "open[ing] the bag like this (indicating) just open the bag, close it, roll it back up," Torres Dep. 225:17-22, implying that he utilized the longer, facility bag.

[9] Plaintiffs, of course, would have had Mr. Torres identify the bag during his deposition on May 11, 2016, if the City had produced the Pants, and the bag, to them prior to the deposition. Unfortunately, the City extensively delayed transmittal of the Pants until after the Torres deposition. The City's failure timely to produce the Pants was twice raised with the Court by Plaintiffs. *See* ECF No. 65; ECF No. 99.

[10] The City makes a number of personal attacks on Plaintiffs' counsel concerning the parties' meet and confer on July 13, 2016. A few hours after the meet and confer, Plaintiffs memorialized their best recollection of parties' discussions. As Plaintiffs explained in their July 2016 letter to the Court, ECF No. 178, the City's response to Plaintiffs' efforts to memorialize the agreement was to criticize the memorialization as being "lengthy" and "not [being] accurate in certain respects." Subsequent efforts by Plaintiffs to have the City clarify the particular aspects of Plaintiffs' memorialization that were purportedly inaccurate were met with hostility and derision. *See generally* ECF No. 178 Ex. C. In the intervening five months, the City has at no time suggested that Plaintiffs' summary of the parties' agreement with respect to RFA Nos. 2 and 3 was incorrect, including when Plaintiffs expressly noted in its letter to the Court, ECF No. 178, that an agreement had been reached and that judicial intervention was therefore unnecessary at that time.

without reference to May 10, 11, 12, or 13, 2013, and is for that reason <u>not</u> a document showing chain of custody "from May 10 through May 14."

Plaintiffs sole motivation in making this motion is to get an answer to the simple question of whether the City has any documentary record of what happened to the Pants between May 10, 2013 (when the Pants were collected by the City) and May 14, 2013 (when the Pants were vouchered).[11]  To the extent that the City continues to argue that documents exist that show chain of custody during that time period, Plaintiffs respectfully request that the Court enter an order compelling production of all such documents.  In the alternative, if, as appears to be the case, there is no chain of custody documentation covering the first four days when the Pants were seized, then the City should so admit in their RFA responses as, if nothing else, good faith would require.

**Defective Declaration Concerning Building 11 Logbooks.**  The City was ordered to produce a declaration that attests to the search conducted for what Plaintiffs had been told was a single missing Building 11 logbook.   What the City produced was a one-page declaration inadequate in numerous respects, including because it implies that more than one logbook may be lost, and fails to specify basic factual information, such as when the search was conducted, the length of the search, and when the logbook was purportedly placed in the relevant storage location.

The City does not deny that the declaration it submitted lacks this factual information that it undoubtedly and uniquely possesses.  Instead, the City asserts that it simply has no obligation to provide the information to Plaintiffs, and will not do so.  The City also goes further, faulting Plaintiffs for waiting for the City to provide a response to at least some portion of Plaintiffs' letter, because the City made a promise that it would do so over <u>two months ago</u>.  Plaintiffs waited what we believed was a reasonable time for the City to fulfill the promise it made, and have no doubt that if Plaintiffs had more promptly raised the City's failure to fulfill that promise would have been criticized by the City for not waiting long enough.

The City's sleight of hand about how many Building 11 logbooks it lost is also extremely troubling.  The City implies (*see supra* at 9) that there is only one missing Building 11 logbook, because a second logbook—<u>not one from Building 11</u>—was at one point lost, but found  prior to the conference before the Court and produced for Plaintiffs' review prior to the declaration. Plaintiffs were told that only a single Building 11 logbook was lost, and the Court ordered the City to produce a declaration describing what it had done to find that logbook.  But the declaration states that "logbooks" – plural – were lost and searched for and could not be found. Given how many different types of relevant evidence the City has not produced on the grounds that such evidence was destroyed or lost (*see supra* n. 7), it is not acceptable for the Court, the jury or the Plaintiffs to be kept in the dark about how many logbooks of the building where the rapes occurred have been lost.

---

[11]  Plaintiffs also disagree with the City's characterization of Plaintiffs' positions, including its unsupported assertion that Plaintiffs "attempted in discovery to establish that investigators must have vouchered the wrong pair," and its mischaracterization of Plaintiffs' expert report (*supra*, at 7 - 8).

The Honorable Alvin K. Hellerstein, p. 13

      The Court ordered that a witness with knowledge clear up what the City did to find the missing Building 11 logbook. Mr. Larkin's assertions in this letter, even if made by a witness with knowledge, do not do that. And, as shown, nor does the declaration. As Plaintiffs have emphasized, the missing Building 11 logbook (or logbooks) likely contains key pieces of evidence, including contemporaneous admissions by the City and Santiago. The City had an obligation to preserve the logbook (or logbooks) under relevant regulations and rules against spoliation, and the City had an obligation to produce the logbook (or logbooks) pursuant to the Court's Order, ECF No. 184. Plaintiffs therefore respectfully request an order compelling the City to produce an appropriate declaration attesting to the dates the logbook searches were conducted, where they were conducted, and the number of relevant Building 11 logbooks that have been lost.

      **Count Slips.** Plaintiffs first learned of the City's proposal concerning production of the RMSC count slips in its opposition to Plaintiffs' draft of the joint letter. Moreover, today we were informed that the requested count slips were destroyed shortly after they were created, and no longer can be produced. Accordingly, this request is now moot.

      **Evidence Policy.** After Plaintiffs sent their draft of this joint letter to the City, the City also informed Plaintiffs that it intended to produce the relevant evidence policies. Those policies were produced to Plaintiffs on December 7, 2016, and so this dispute is therefore also now moot.

      Respectfully submitted,

      /s/ Mitchell A. Lowenthal

      Mitchell A. Lowenthal
      Senior Counsel

Attachments

cc: All Counsel of Record (By Electronic Filing on ECF)