UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE 1 and JANE DOE 2, on behalf of
themselves and all similarly situated women,

        Plaintiffs,

    -against-

THE CITY OF NEW YORK and BENNY
SANTIAGO,

        Defendants.

15 Civ. 3849 (AKH)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO NARROW
THE ISSUES FOR TRIAL AND/OR FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................ 2

ARGUMENT .................................................................................................... 9

    I.   THERE IS NO CHAIN OF CUSTODY FOR THE PANTS FROM MAY 10 THROUGH MAY 14, 2013 .............................................................. 9

        A.   The Existence Of An Adequate Chain Of Custody Is A Material Fact .............. 11

        B.   There Is No Chain Of Custody Evidence For The Pants .................................. 14

    II.  PLAINTIFFS ARE ENTITLED TO COSTS ........................................... 18

CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................ 17

*AT&T Corp. v. Microsoft Corp.*,
    No. 01 Civ. 4872(WHP), 2004 WL 292321 (S.D.N.Y. Feb. 17, 2004) ................ 15

*Battista v. United States*,
    889 F. Supp. 716 (S.D.N.Y. 1995) ........................................................ 15

*Burns v. Bank of Am.*,
    No. 03 Civ. 1685(RMB)(JCF), 2007 WL 1589437 (S.D.N.Y. June 4, 2007) ........ 22, 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................ 13

*Chem. Eng'g Corp. v. Essef Indus., Inc.*,
    795 F.2d 1565 (Fed. Cir. 1986) ........................................................ 21-22

*Goenaga v. March of Dimes Birth Defects Found.*,
    51 F.3d 14 (2d Cir. 1995) ........................................................ 13

*Guadalupe v. City of New York*,
    No. 15 Civ. 0220 (CM), 2016 WL 3570545 (S.D.N.Y. June 24, 2016) ................ 23

*Herrera v. Scully*,
    143 F.R.D. 545 (S.D.N.Y. 1992) ........................................................ 22, 23

*Hersko v. United States*,
    No. 13 CV 3255(MHD), 2015 WL 6437561 (Oct. 20, 2015 S.D.N.Y.) ................ 13, 14

*Horwitt v. Longines Wittnauer Watch Co.*,
    388 F. Supp. 1257 (S.D.N.Y. 1975) ........................................................ 15

*Marchand v. Mercy Med. Ctr.*,
    22 F.3d 933 (9th Cir. 1994) ........................................................ 23

*McCormack v. Cheers*,
    818 F. Supp. 584 (S.D.N.Y. 1993) ........................................................ 19

*Rivera v. Wohlrab*,
    232 F. Supp. 2d 117 (S.D.N.Y. 2002) .................................................................. 19

*Ronis v. Carmine's Broadway Feast, Inc.*,
    No. 10 CIV. 3355 (TPG), 2012 WL 3929818 (S.D.N.Y. Sept. 7, 2012) ............... 22

*Santos v. Murdock*,
    243 F.3d 681 (2d Cir. 2001) ................................................................................. 13

*Shade v. Hous. Auth. of New Haven*,
    251 F.3d 307 (2d Cir. 2001) ................................................................................. 14

*T. Rowe Price Small–Cap Fund, Inc. v. Oppenheimer & Co.*,
    174 F.R.D. 38 (S.D.N.Y. 1997) ........................................................................ 22, 24

*Teahan v. Metro-N. Commuter R.R. Co.*,
    No. 88 CIV. 5376 (BN), 1994 WL 719720 (S.D.N.Y. Dec. 27, 1994), *aff'd*, 80
    F.3d 50 (2d Cir. 1996) .......................................................................................... 15

*Van Cleef & Arpels Logistics, S.A. v. Jewelry*,
    547 F. Supp. 2d 356 (S.D.N.Y.) .......................................................................... 14

## Rules and Statutes

Fed. R. Civ. P. 26(e) ...................................................................................................... 24

Fed. R. Civ. P. 37(c)(2) ...................................................................................... 21-22, 23

Fed. R. Civ. P. 56(a) ...................................................................................................... 13

Fed. R. Civ. P. 56(g) ...................................................................................................... 14

Plaintiffs Jane Doe 1 and Jane Doe 2 ("Plaintiffs") submit this memorandum of law, together with the Declaration of Josh E. Anderson, dated January 13, 2017 ("Anderson Decl."), and Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1, dated January 13, 2017 ("Pls.' 56.1"), in support of Plaintiffs' Motion to Narrow the Issues for Trial and/or for Partial Summary Judgment.

## PRELIMINARY STATEMENT

The Court Ordered that "[a]ny motions for summary judgment, or as to the scope of trial [among other motions]" shall be made by today.  Order Resolving Disc. Issues ¶ 5 (Dec. 16, 2016), ECF No. 247.

By this motion, Plaintiffs seek an adjudication that the City of New York (the "City") has no evidence documenting a chain of custody from when a pair of Jane Doe 2's pants (the "Pants") were seized—on May 10, 2013—until four days later, when (on May 14, 2013) they were vouchered with the New York City Police Department ("NYPD") for testing by the City's lab, the Office of the Chief Medical Examiner ("OCME").  The absence of any chain of custody is a material fact:  the City has argued at every step of this case that Jane Doe 2 was not raped because the OCME did not find semen on her pants.  The testimonial evidence shows that Jane Doe 2 was raped repeatedly by defendant Benny Santiago ("Santiago"), and not just the single instance in which she managed to place his semen on her pants.  But with respect to that instance, in order for the OCME testing to have any value, the Pants had to be preserved intact once they were seized, as only a properly documented chain of custody can attest.  Moreover, testing by Plaintiffs' DNA expert (Dr. Julie Heinig) shows that a single male's DNA was found all over Jane Doe 2's pants—the right leg, the left leg and the crotch.  That man had to be an employee of the Rose M. Singer Center ("RSMC"), and the presence of his DNA on Jane Doe 2's pants, and the absence of semen, is consistent with the Pants having been tampered with prior

to being sent to the OCME for testing—as Dr. Heinig explains.  Tellingly, the City's own DNA expert <u>does not dispute in any way Dr. Heinig's report</u>.

There is also no genuine dispute that there is no chain of custody documentation for this critical four day period.  As the Court knows, Plaintiffs have used every discovery technique available in order to identify any chain of custody documentation during this period, and have found none.  Under the Court's December 16 Order, the City must either come forward and specifically identify the chain of custody documentation covering the period from when the Pants were seized until when they were vouchered by the NYPD on May 14, or admit that there is no such documentation, and stop the charade.  Moreover, trial time should not be wasted with efforts to prove a negative—Plaintiffs have gone through the City's productions, repeatedly, and there is no such chain of custody documentation.  Absent having the jury review every document the City produced in this case, the only way to establish that there is no chain of custody documentation would be to call counsel as witnesses.  Rather than taking that step, the City should simply identify the chain of custody documentation it claims to have made, or admit that there is none.

## **BACKGROUND**

Plaintiffs have brought this action asserting widespread and systematic staff-on-inmate sexual abuse at RMSC, the women-only jail on Rikers Island.  While incarcerated at RMSC, Jane Doe 1 and Jane Doe 2 were repeatedly raped and sexually abused by Santiago.

After one instance of sexual abuse, when she performed oral sex on Santiago, Jane Doe 2 placed semen from Santiago on the thigh and crotch areas of one leg of the pants she was wearing at the time.  Pls.' 56.1 ¶ 2.  After Jane Doe 2 reported to the City that Santiago had raped and sexually abused her and informed the City that she was in possession of a pair of pants on which she had placed semen from Santiago, two City employees—Investigators Ferdinand

Torres and Belarminia Ortiz of the Department of Investigation ("DOI")—were charged with collecting the Pants. Pls.' 56.1 ¶¶ 3-5. On May 10, 2013, Inspector Torres seized the Pants from Jane Doe 2's cell. Pls.' 56.1 ¶ 6. On May 14, 2013, the Pants were vouchered by Assistant Inspector General ("AIG") James Christo with the NYPD for testing by the OCME. Pls.' 56.1 ¶ 12.

      As to what happened to the Pants between the time they were seized from Jane Doe 2's cell until the time they were vouchered with the NYPD, there is neither documentation nor coherent testimony.

      <u>Documentary Evidence</u>. Despite repeated requests from Plaintiffs, the City has failed to produce <u>any</u> documentation evidencing what happened to the Pants between the time they were seized on May 10, 2013 and the time they were vouchered with the NYPD on May 14, 2013. On May 27, 2016, Plaintiffs served a set of requests for admission ("RFAs") on the City, which included the following:

> • You have no documents within your possession, custody or control documenting the chain of custody of the Pants from May 10, 2013 through May 14, 2013.
>
> • You have no document within Your possession, custody or control memorializing any discussions between Jane Doe 2 on the one hand, and Ferdinand Torres or Belarmina [sic] Ortiz on the other hand.

Anderson Decl. Ex. 12 at Nos. 2, 3. On that same day, Plaintiffs also served their Fifth Set of Requests for Production of Documents to the City Relating to Merits Discovery ("RFPs"), including RFP No. 34, which requested the following: "With respect to any Request for Admission for which You did not make an unqualified admission, all documents, not already produced, that support Your response." Anderson Decl. Ex. 13 at No. 34.

On July 1, 2016, in its Responses and Objections ("R&Os") to Plaintiffs' RFAs, the City respectively <u>denied</u> that it (i) did <u>not</u> have documents within its possession, custody or control documenting the chain of custody of the Pants from May 10 through May 14, 2013, and that it (ii) did <u>not</u> have documents within its possession, custody or control memorializing discussions between Jane Doe 2 and the City investigators who seized the Pants.  Anderson Decl. Ex. 14 at Nos. 2, 3.  With respect to Plaintiffs' RFP No. 34, the City responded:  "[s]ubject to the foregoing objections, defendants refer plaintiffs to the documents stored with, and kept with, the Pants, including the brown paper bag in which investigators placed the Pants after they took them from plaintiff Jane Doe 2's cell, and to the documents produced herewith."  Anderson Decl. Ex. 15 at No. 1.

Following a Court-directed meet and confer and numerous correspondence between the Parties, a joint letter was submitted to the Court on December 8, 2016, in which Plaintiffs requested an order compelling the production of "all documents concerning the chain of custody for a pair of pants owned by Jane Doe 2, between when the pants were collected on May 10, 2013 and when the pants were vouchered with the Office of the Chief Medical Examiner on May 14, 2013, pursuant to Plaintiffs' Request for Production No. 34 and Request for Admissions Nos. 2 and 3," Joint Letter Mot. at 1, Dec. 8, 2016, ECF No. 234, or, if the City admitted that no such documentation existed, an amendment to its RFA answers, *id.* at 4.  In response, the City stated that it had "already produced all of the relevant chain of custody documents and other materials in its possession, including the paper bag in which the jeans were originally vouchered with the NYPD."  *Id.* at 7.  This frivolous assertion concerning the paper bag was made even though Plaintiffs had provided the City with photographs of the paper bag the City sent to Plaintiffs' expert along with the Pants for testing, and those photographs plainly

show that the paper bag does not contain chain of custody information.  *See id.*, Ex. I; Pls.' 56.1 ¶¶ 18, 20-21.

The brown paper bag sent by the City to Plaintiffs' expert is labeled as an "NYPD Biological Evidence Bag" and lacks any relevant identifying information.  Pls.' 56.1 ¶¶ 19, 20-21.  According to Investigator Torres, he would have placed the Pants in either (i) an evidence collection bag, which would have read "evidence collection," or (ii) a brown paper bag from RMSC that would have been "really long . . . probably 4 feet long," which he would have had to roll closed due to its length.  Pls.' 56.1 ¶ 7.  Investigator Torres also testified that he showed Jane Doe 2 the Pants by "open[ing] the bag like this (indicating) just open the bag, close it, roll it back up," and that he "[p]robably would have written [the] inmate's name and booking [sic] case number" on it.  Pls.' 56.1 ¶ 8.  The brown paper bag that the City sent to Plaintiffs' expert, which is not four feet long and does not bear Jane Doe 2's name or book and case number, Pls.' 56.1 ¶¶ 21-22, plainly does not conform to Torres' description of the bag in which he placed the seized Pants.

Moreover, in his deposition, Torres was explicit that he has no recollection of writing any chain of custody information on the bag in which he placed the Pants or of creating any separate chain of custody documentation.  Pls.' 56.1 ¶ 9; Anderson Decl. Ex. 4 222:16-21 ("Q:  That paper bag would not have had any markings on it, correct?  A:  Correct.  Q:  It wouldn't have had a chain of custody fill in area?  A:  Correct."); 223:7-9 ("Q:  Do you recall writing anything [other than Jane Doe 2's initials and book and case number] on the bag that day? A:  I do not recall."); 226:14-24 ("Q:  Do you recall preparing any documentation that you collected the pants?  A:  Don't recall.  Q:  Do you remember writing it on the bag that you collected the pants?  A:  Don't recall writing anything down on the bag.  Q:  Do you recall

writing on any piece of paper that you collected the pants from that cell? A: Do not recall, no."); 227:24-228:8 ("Q: Have you ever filled out a chain of custody form for the pants you collected that day? A: I don't recall. Q: Would you have carried a chain of custody form on you? A: No. Q: So when would you have filled it out? A: I don't recall filling it out."). Torres' testimony is entirely consistent with that of Investigator Ortiz and AIG Christo, both of whom testified that they were not aware of Investigator Torres preparing any chain of custody documentation. Pls.' 56.1 ¶ 11; Anderson Decl. Ex. 5 313:17-20 ("Q: Did -- did Ferdinand Torres ever submit any write-ups or notes to you about the chain of custody of the jeans? A: No."); Anderson Decl. Ex. 3 96:25-97:4 ("Q: Did you see Mr. Torres with a chain of custody form? A: I don't recall. I don't know anything he did, so …").

At a conference held on December 13, 2016, the City affirmatively represented to the Court that it had "produced all of the documents and other materials that [it has] relating to the chain of custody," Tr. of Dec. 13, 2016 Court Conf. 2:20-21, ECF No. 248, and that it had no other documents other than what it had already produced, *id.* 3:11-15. In the Court's words, the City had "given [Plaintiffs] everything [it has]." *Id.* 6:21-22. The Court accordingly questioned the City's refusal to admit the RFAs:

> THE COURT: So the request, Mr. Larkin, is this: You have no documents within your possession, custody or control documenting the chain of custody of the pants from May 10, 2013, through May 14, 2013? And your answer is "denied"?
>
> MR. LARKIN: That's correct. We deny that because the voucher for the pants is dated May 14th, so we have documents --
>
> THE COURT: So nothing between May 10, 2013, through -- if it would have said May 13th, you would be correct, right?
>
> MR. LARKIN: I don't know that we'd be correct because the bag that the pants are vouchered in constitutes evidence that they were collected at a certain date and time, when considered with the testimony of the witnesses. And so I don't believe that we should admit that RFA --

> THE COURT:  Listen, Mr. Larkin, you have no documents within
> your possession, custody or control documenting the chain of
> custody of the pants from May 10th, 2013, through May 13th,
> 2013?
>
> MR. LARKIN:  Deny that.
>
> THE COURT:  The answer is, there are no documents?
>
> MR. LARKIN:  I don't admit that request to admit.  I think that --
>
> THE COURT:  There are no documents.
>
> MR. LARKIN:  I disagree with that.
>
> THE COURT:  What is the document?
>
> MR. LARKIN:  The document, your Honor, from May 10th to
> May 13th, <u>is the thing that the pants were put in that may have
> writing on it that is relevant that I have not yet looked at</u>, number
> one, but number two, more importantly, when considered with the
> testimony of the witnesses --

*Id.* 4:20-5:25 (emphasis added).

The underscored statement above is remarkable.  The "thing that the pants were

put in" was a bag, a bag that the City had for more than a month prior to the December 13

conference, and for years prior to Plaintiffs' service of the RFAs.  Despite apparently resting its

denial of the RFA solely on what the "bag" may have had written on it, and knowing that the

issue was part of a joint letter motion put to the Court, the City represented that it "ha[d] not

looked at" the bag to see if it had any "relevant" writing.  (In fact, as explained below, the bag to

which the City was referring when it made that representation to the Court was not the one in

which the Pants were placed when seized on May 10, and in any event has no relevant writing on

it, which the City should have known from photographs of the bag that Plaintiffs provided if not

from their own inspection.)

At bottom, the City refused to admit the RFA—despite the absence of any good

faith basis not to—because it claimed a right to conduct itself in this fashion, subject only to

being forced to pay Plaintiffs' expenses for proving the absence of the fact—no chain of custody

documentation for these four critical days—under Rule 37(c)(2).  Whether the City's position is consistent with its obligations of good faith is moot now, as the Court undoubtedly has the inherent power to address the scope of the trial and under Rule 56 to avoid burden and jury time proving facts that are not genuinely in dispute.

        <u>Testimonial Evidence</u>.  The testimony of the relevant witnesses also does nothing to establish a reliable chain of custody.  Investigator Torres, who seized the Pants, and AIG Christo, who received the Pants from Torres, disagree about when Investigator Torres gave the Pants to AIG Christo.  Pls.' 56.1 ¶ 13.  Torres says he gave Christo the Pants on May 10; Christo says he did not, swearing that he did not receive them until May 14.  *Id.*[1]  Neither can say what happened to the Pants between May 10 and May 14.  Pls.' 56.1 ¶ 14.  And neither explained why something as basic and necessary as a documented chain of custody for this piece of critical physical evidence was never prepared.

        <u>Expert Testing</u>.  More than three years after Torres seized them, on May 17, 2016, the Pants were sent to Plaintiffs' DNA expert, Dr. Julie Heinig, for testing.  Pls.' 56.1 ¶ 17.  On November 4, 2016, Dr. Heinig submitted her report, in which she concluded, in relevant part:

> There is . . . no documentary evidence establishing what happened to the [Pants] during the critical time period between when they were seized on May 10 and when they were delivered to the NYPD property clerk four days later, on May 14, by AIG Christo. Similarly, there is no documentary evidence establishing where the

---

[1]    *Compare* Anderson Decl. Ex. 6 83:2-6 ("Q:  Were [the Pants] collected that day [May 10, 2013]?  A:  I never saw -- when we went to the trailer, [Torres] was not there.  I never met Torres on this day or Ortiz.  I did not receive the jeans on this day."), 142:3-7 ("Q:  What day did Torres give you the jeans?  A:  I think it was the 14th.  He spends most of his time at the trailer, Rikers Island trailer.  So he had them secured out there."); Anderson Decl. Ex. 5 309:25-310:6 ("Q:  And you said [the day Torres and Ortiz spoke with Jane Doe 2 about her allegations] wasn't the same day that [Torres] brought [the Pants] to your office?  A:  No.  Q:  Do you know how many days passed before he brought them to your office?  A:  No."), 314:11-14 ("A:  I didn't receive [the Pants] in -- in my office until midweek of the [week after the allegation]."), *with* Anderson Decl. Ex. 4 228:20-229:3 ("Q:  When was the last time you remember having the pants in your possession?  A:  Just before I handed them to Christo.  Q:  Do you remember what day that was?  A:  Do not.  Q:  Do you think it was the same day that you collected them?  A:  Pretty sure.").

> [Pants] were kept during that period nor in what condition they
> were kept.  And, there is accordingly no such evidence
> demonstrating that the [Pants] were not tampered with during that
> time.

Anderson Decl. Ex. 8 at 8; Pls.' 56.1 ¶ 27.  Moreover, Dr. Heinig concluded that her own testing

(which revealed the presence of male DNA, from <u>one</u> man associated with RMSC, on the left,

right <u>and</u> crotch areas of the Pants, Pls.' 56.1 ¶ 28) was "consistent with the semen having been

washed off the [Pants] before [her] (and OCME's) testing of them."  Anderson Decl. Ex. 8 at 10;

Pls.' 56.1 ¶ 29.  Notably, the City has named its own DNA expert (an OCME employee), and her

report <u>does not deny anything said by Dr. Heinig</u>—about there being evidence of tampering,

about the presence all over the Pants of DNA by a single male RMSC employee, about there

being no chain of custody for the Pants, or otherwise.  Pls.' 56.1 ¶¶ 30-32.

*     *     *

On December 16, 2016, the Court entered an order providing that "[a]ny motions

for summary judgment, or as to the scope of trial, or as to the sequence of legal and equitable

remedies, or as to the class aspects of the class shall be filed by January 13, 2017."  ECF No. 247

¶ 5.  Plaintiffs now so move with respect to the absence of chain of custody documentation from

when the Pants were seized on May 10 until they were vouchered with the NYPD on May 14.

<b><u>ARGUMENT</u></b>

## I.   <u>THERE IS NO CHAIN OF CUSTODY FOR THE PANTS FROM MAY 10 THROUGH MAY 14, 2013</u>

Consistent with the Court's prior ruling, the uncontroverted evidence—the City's

own statements to this Court and to Plaintiffs, the testimony of its employees and its repeated

failure to produce any chain of custody documentation—shows that there is no genuine dispute

that the City has no chain of custody for the Pants from the time they were seized on May 10 to

when they were vouchered with the NYPD on May 14, 2013.  In order to conserve time and cost

9

at trial, and given the impracticality of presenting evidence at trial showing the *non-existence* of chain of custody evidence, this issue should be resolved on this motion.

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). The movant bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "Once a party moving for summary judgment has made the requisite showing that there is no factual dispute, the nonmoving party bears the burden of presenting evidence to show that there is, indeed, a genuine issue for trial." *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). "In doing so, the opposing party may not rest 'merely on allegations or denials' of the factual assertions of the movant, nor may he rely on his pleadings or on merely conclusory factual allegations. He must also 'do more than simply show that there is some metaphysical doubt as to the material facts.' Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts." *Hersko v. United States*, No. 13 CV 3255(MHD), 2015 WL 6437561, at *9 (Oct. 20, 2015 S.D.N.Y.) (citations omitted). "[S]o long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56([a]), is satisfied," summary judgment should be granted. *Celotex Corp.*, 477 U.S. at 323.

Even if the court does not grant summary judgment, it may provide partial relief, including by issuing an "order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); *see also Hersko*, 2015 WL 6437561, at *9; *Van Cleef & Arpels Logistics, S.A. v. Jewelry*, 547 F. Supp. 2d 356, 357 n.1 (S.D.N.Y.), *adhered to on reconsideration*, 583 F. Supp. 2d 461 (S.D.N.Y. 2008) (considering motion for summary judgment to resolve an issue of law relevant to a "certain element of plaintiffs' claim" because of "the potential benefit to narrowing the issues for trial").

### A.    The Existence Of An Adequate Chain Of Custody Is A Material Fact

For purposes of summary adjudication, an issue of fact is "'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 314 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

There can be no dispute that the presence of semen on the Pants—and correspondingly, any tampering with the Pants before DNA tests could be performed—are "material" facts. Jane Doe 2 alleges that after one instance of being sexually abused by Santiago, she spit his semen into her hand and rubbed it on one of her pant legs. Pls.' 56.1 ¶ 2. The existence of Santiago's semen on the Pants would make Santiago's denials of the abuse essentially impossible, and is evidence that would certainly affect the outcome of the suit. Evidence that the Pants were tampered with before they could be tested to confirm the presence of Santiago's semen would suggest a deliberate cover-up, which would clearly also affect the outcome of the case. As such, that the City did not maintain any chain of custody over the Pants from May 10 to May 14 is a crucial issue.

The possibility of tampering with the Pants is no hypothetical matter.  As Dr. Heinig explains in her report, improper tampering with the Pants at some point between May 10 and May 14 would explain the results of her testing.  Pls.' 56.1 ¶ 29.  Specifically, her testing revealed male DNA, from <u>one</u> man associated with RMSC, on the left, right <u>and</u> crotch areas of the Pants.  Pls.' 56.1 ¶ 28.  This, according to Dr. Heinig, would be "<u>consistent with the semen having been washed off the [Pants] before [Dr. Heinig's] (and OCME's) testing of them</u>." Heinig Expert Report at 9 (emphasis added); Pls.' 56.1 ¶ 29.  Indeed, as Dr. Heinig states in her report, the City has failed to maintain a chain of custody and "<u>there is accordingly no such evidence demonstrating that the [Pants] were not tampered with during that time</u>."  Anderson Decl. Ex. 8 at 8 (emphasis added); Pls.' 56.1 ¶ 27.  Although the City was aware of Dr. Heinig's report, and had ample time to contradict her findings if there was a basis for doing so, it is beyond telling that the report submitted by the City's DNA expert does not take issue with anything that Dr. Heinig states in her report.[2]  Pls.' 56.1 ¶¶ 30-32.  Moreover, as the jury will hear (and as will the Court in *in limine* motions) the City has destroyed, or lost, or otherwise failed to produce, numerous <u>categories</u> of relevant evidence that bear directly on the allegations in this case.  For example, Christo (to whom Torres says he gave the Pants) wrote in his investigative report that he had viewed videotape, which showed no incriminatory conduct by Santiago.  But based upon the testimony of Jane Doe 2 <u>and</u> Santiago, that videotape would have shown the two of them, together, outside of her cell, in the middle of the night, repeatedly.  And,

---

[2]      *See AT&T Corp. v. Microsoft Corp.*, No. 01 Civ. 4872(WHP), 2004 WL 292321, at *8 (S.D.N.Y. Feb. 17, 2004) (resolving partial summary judgment motion for, among other reasons, defendant's failure to "cite to expert testimony to refute [plaintiff's] expert's analysis"); *Battista v. United States*, 889 F. Supp. 716, 723 (S.D.N.Y. 1995) (finding "no reason not to credit" one party's expert's testimony when it went un-rebutted by the other party); *Teahan v. Metro-N. Commuter R.R. Co.*, No. 88 CIV. 5376 (BN), 1994 WL 719720, at *6 (S.D.N.Y. Dec. 27, 1994), *aff'd*, 80 F.3d 50 (2d Cir. 1996) (crediting un-rebutted expert testimony); *Horwitt v. Longines Wittnauer Watch Co.*, 388 F. Supp. 1257, 1261 (S.D.N.Y. 1975) (deferring to plaintiff's expert's analysis because "defendants introduced no evidence to rebut the testimony or statements of plaintiff's experts").

despite explicit and clear dictates to preserve all video evidence reviewed by DOI investigators like Christo, that videotape has never been produced to the Plaintiffs; the City has asserted that it was <u>destroyed</u>.  Similarly, tapes of phone calls would have confirmed communications by Jane Doe 2 with Santiago (and with others about him).  E-mail shows that those recordings were put onto a CD and made available to Christo.  But Christo testified that he never bothered to listen to them.  And, as with the videotape, the audio recordings were never produced to the Plaintiffs, and the City claims that they, too, have been destroyed.

In any event, the City can hardly deny the critical nature of the chain of custody issues.  Indeed, its own written policies clearly state that failing to maintain an appropriate chain of custody will raise questions about whether the "evidence might have been fabricated or tampered with."  Anderson Decl. Ex. 10 § 9.3; Pls.' 56.1 ¶ 26.

Finally, summary adjudication of the chain of custody issue is important for trial efficiency, as well to avoid confusing or overwhelming the jury.  As shown here, there is no chain of custody evidence covering the May 10 to May 14 period.  But to prove the <u>absence</u> of such evidence to the jury poses significant evidentiary—and logical—challenges.  Plaintiffs must either:  (i) introduce at trial literally every document produced by the City so that the jury can sift through and make its own judgment about whether there was a chain of custody for the Pants, which would obviously be an enormous waste of time; (ii) call as a witness a member of Plaintiffs' legal team who has reviewed all of the discovery produced by the City and would therefore be competent to testify as to the absence of chain of custody evidence—an option which would unfairly risk compromising privilege, and would raise lawyer/witness rule issues; or (iii) call one of the City's counsel as a witness to testify as to what the City has produced, to which the City presumably would object.

Resolving this issue on this motion, therefore, is the only practical way of addressing this critical factual issue. If the City identifies a specific document that constitutes chain of custody documentation covering the period between when the Pants were seized on May 10 to when they were vouchered with the NYPD on May 14, then the trial can focus on the adequacy of that document to serve those purposes. But if the City cannot, on this motion, identify evidence sufficient to constitute an adequate chain of custody for these critical four days, then Plaintiffs, the Court, and the jury should not be forced to undergo an exercise in proving a negative.

**B.    There Is No Chain Of Custody Evidence For The Pants**

Quite simply, the City has not—because it cannot—set forth any "specific facts" showing that there is a genuine issue over the existence of chain of custody for the Pants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.") (citation omitted). This is not a case where the <u>sufficiency</u> of a chain of custody is in question; it is one where <u>none exists in the first place</u>. In other words, there is no evidence—testimonial or documentary—on the basis of which a jury could even <u>consider</u> finding that there was a chain of custody for the Pants.

<u>First</u>, with respect to testimonial evidence, the relevant witnesses' testimony is completely contradictory and does nothing to establish a reliable chain of custody. Neither Investigator Torres, who seized the Pants, nor AIG Christo, who received the Pants from Torres, is able (or willing) to explain what happened to the Pants from after they were seized on May 10 until they were vouchered with the NYPD on May 14, 2013. Pls.' 56.1 ¶ 14. Even more troubling, Investigator Torres and AIG Christo provided conflicting and uncertain accounts of

when Investigator Torres gave the Pants to AIG Christo. Pls.' 56.1 ¶ 13. Plainly, this testimony does nothing to address the yawning gap in the Pants' chain of custody between May 10 and May 14.

Second, as to documentary evidence, as described above, the City has consistently failed to identify or produce any materials whatsoever that document the Pants' chain of custody during the critical period. It has also represented to this Court that it has "produced all of the documents and other materials that [it has] relating to the chain of custody," Tr. of Dec. 13, 2016 Court Conf. 2:20-21, i.e., "everything [it] ha[s]." *Id.* 6:21-22. Yet Plaintiffs have received nothing from the City that indicates what happened to the Pants from the time they were seized to the time they were vouchered.

Apparently, "everything [it] ha[s]" amounts, at most, to the brown paper bag in which the Pants were sent to Dr. Heinig for testing, and which the City asserts is "the paper bag in which the jeans were originally vouchered," and that the bag is the one Investigator Torres put the Pants into when he seized them on May 10. Joint Letter Mot. at 7-8, ECF No. 234. These assertions are not only made without any supporting evidence, but what evidence there is makes clear they are simply false. Most basically, even if the bag containing the Pants that was sent to Dr. Heinig was in fact the same bag used by Investigator Torres to collect the Pants on May 10 (a highly dubious assumption, as explained below), it still would not be a chain of custody document, because it has no chain of custody information: that bag has no relevant writing on it whatsoever. Pls.' 56.1 ¶¶ 20-21. Indeed, all of the fields on the bag that would have provided any identifying information are blank.[3] Pls.' 56.1 ¶ 20. Accordingly, nothing on that bag

---

[3]     Moreover, the numbers on the bottom of the bag are of no known relevance to the chain of custody of the Pants between May 10 and May 14, 2013, and the reverse side of the bag is marked solely with an illegible signature.

documents when the Pants were seized, when the Pants were placed in that bag, where the bag

was kept and for how long, who had access to it, and so forth—the basic required information to

establish a chain of custody, as the City's own manuals concede.  Pls.' 56.1 ¶ 24; Anderson Decl.

Ex. 10 § 9.2 (a chain of custody is "an unbroken link that begins at the crime scene and

documents that (a) custodial possession, and (b) integrity of evidence has been maintained"); Pls.'

56.1 ¶ 25; Anderson Decl. Ex. 10 § 9.4 at DEF_0002314 ("Each transfer [of evidence] should be

receipted.  It is the responsibility of each transferee to ensure that the evidence is accounted for

during the time that it is in his possession, that it is properly protected, and that there is a record

of the names of the persons from whom he received it and to whom he delivered it, together with

the time and date of such receipt and delivery.") (alteration in original); *see, e.g.*, *Rivera v.

Wohlrab*, 232 F. Supp. 2d 117, 124 (S.D.N.Y. 2002) (chain of custody forms should "indicate

the time and date the samples were taken, the time and date of both tests, and all required

signatures indicating who the testers and handlers were."); *McCormack v. Cheers*, 818 F. Supp.

584, 594 (S.D.N.Y. 1993) ("The chain of custody requirement . . . mandates a continuous,

physical nexus between the source of the substance in issue, the testing or analytical process to

which the substance is subjected, and the proponent of the substance as real evidence.") (citation

omitted).  In fact, Investigator Torres clearly testified that he has <u>no recollection of writing chain

of custody information</u> on the bag into which he placed the Pants after seizing them.  Pls.' 56.1

¶ 9.

        Moreover, the testimony of Investigator Torres himself clearly establishes that the

bag sent to Dr. Heinig is <u>not</u> the one into which Torres put the Pants after seizing them on May

10, 2013.  The bag sent to Dr. Heinig is labeled as an "NYPD Biological Evidence Bag," Pls.'

56.1 ¶ 19, and Torres testified that he would not have put the Pants in an NYPD evidence bag,

but in one of either two other types of bags: (i) an evidence collection bag that would be labeled "evidence collection," or (ii) a brown paper bag from RMSC that would have been "really long . . . probably 4 feet long," which would need to be rolled closed due to its length. Pls.' 56.1 ¶ 7. The bag that was sent by the City to Dr. Heinig neither says "evidence collection," nor is it four feet long. Pls.' 56.1 ¶¶ 21-22. Moreover, Investigator Torres testified that he showed Jane Doe 2 the Pants by "open[ing] the bag like this (indicating) just open the bag, close it, roll it back up," Pls.' 56.1 ¶ 8, suggesting that he used the longer RMSC bag to collect the Pants. Finally, Investigator Torres also testified that he "[p]robably would have written [the] inmate's name and booking [sic] case number," Pls.' 56.1 ¶ 8, but there is no inmate name or book and case number written on the bag,[4] Pls.' 56.1 ¶ 21.

The bag sent to Dr. Heinig therefore cannot constitute chain of custody evidence for the Pants between May 10 and May 14, 2013. As it is the sole piece of "evidence" buttressing the City's insistence that chain of custody exists, there can be no dispute that there is simply no such evidence. The City's statement during the conference held on December 13, that the City "[hadn't] had a chance to actually see the writing that's on the bag as yet," Tr. of Dec. 13, 2016 Court Conf. 3:7-8, was unsupportable at that time and is certainly no grounds to deny relief on this motion. Not only did Plaintiffs attach as an exhibit to the Parties' December 8, 2016 Joint Letter Motion <u>photographs of the bag</u>, *see* Joint Letter Mot. Ex. I, ECF No. 234, but the City had been in possession of this bag since November 8 (when Dr. Heinig sent it back to the City with the Pants, Pls.' 56.1 ¶ 23), and for years before they were sent to Dr. Heinig for

---

[4]    Plaintiffs would have asked Investigator Torres whether he could identify the bag during his deposition on May 11, 2016, if the City had produced the Pants, and the bag, to them prior to the deposition. Unfortunately, the City extensively delayed transmittal of the Pants until after the Torres deposition. The City's failure to timely produce the Pants was twice raised with the Court by Plaintiffs. *See* Letter Mot. (Jan. 29, 2016), ECF No. 65; Letter Mot. (May 9, 2016), ECF No. 99.

testing.[5]  Regardless, the City has now certainly had ample time to inspect the bag, and if it

contends anything on that bag (or on any other document it has produced) constitutes chain of

custody documentation covering the period when the Pants were seized on May 10 until they

were sent to the NYPD on May 14, now is its opportunity for saying so.

## II.    PLAINTIFFS ARE ENTITLED TO COSTS

If in response to this motion the City admits that there is no chain of custody

documentation covering the period from when the Pants were seized on May 10 until they were

sent to the NYPD on May 14, then Plaintiffs will withdraw their request for costs herein.  But if

the City continues to rest on its "right" to deny facts it knows to be true, forcing the Court and

the Plaintiffs to fully brief this motion, then Plaintiffs will ask the Court to award Plaintiffs the

costs they incur for bringing this motion.

Under Federal Rule of Civil Procedure 37(c)(2), "[i]f a party fails to admit what is

requested under Rule 36 and if the requesting party later proves . . . the matter true, the

requesting party may move that the party who failed to admit pay the reasonable expenses,

including attorney's fees, incurred in making that proof."  In its portion of the Parties' December

8, 2016 Joint Letter, the City in fact affirmatively contended that Plaintiffs had a remedy under

Rule 37 (although its purpose in this argument was to avoid being compelled by the Court to

amend its RFA response).[6]  *See* Joint Letter Mot. at 8, ECF No. 234.  The Court "must so order"

---

[5]    The only other "documentation" that the City has identified—the OCME voucher received on May 14, 2013, shows only that a City agency took custody of the Pants on May 14, 2013, without reference to May 10, 11, 12, or 13, as well as earlier in the day on May 14, 2013.  Pls.' 56.1 ¶ 15.  As such, and as the Court has recognized, it is definitively not a document showing a chain of custody from May 10 through May 14.

[6]    In its portion of the Joint Letter, the City contended that Rule 37(c)(2) relief is only available after trial. That assertion is incorrect.  While courts commonly consider Rule 37(c)(2) sanctions after trial, this is most frequently because the truth of the matter in question cannot be proved until presented to a fact finder at trial.  *See Chem. Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1574 (Fed. Cir. 1986) ("[N]o rule specifies the time during which a Rule 37(c) motion must be filed . . . .  As a practical matter, it will often be necessary to complete a proceeding before it can be said that a requester has 'proved' the truth of the matter for which an admission had been

sanctions unless it finds that "(A) the request was held objectionable under Rule 36(a); (B) the admission sought was of no substantial importance; (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or (D) there was other good reason for the failure to admit."  Fed. R. Civ. P. 37(c)(2); *see also Herrera v. Scully*, 143 F.R.D. 545, 548 (S.D.N.Y. 1992) ("[S]anctions are mandatory unless the court finds that one of the four [statutory] exceptions applies.").

       As discussed in Section I.B *supra*, there is no genuine dispute that the City lacks any chain of custody evidence—testimonial or documentary—that establishes what happened to the Pants between their seizure on May 10 and their vouchering on May 14, 2013.  "The purpose of Rule 36(a) is to narrow the issues for trial to those which are genuinely contested."  *Burns v. Bank of Am.*, No. 03 Civ. 1685(RMB)(JCF), 2007 WL 1589437, at *10 (S.D.N.Y. June 4, 2007) (citation omitted); *see also T. Rowe Price Small–Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997) ("The purpose of the rule is to reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact.").  As explained above, there is no need to spend valuable time at trial disputing whether a chain of custody exists; it is difficult to imagine an issue better suited to resolution through an RFA, as the Federal Rules intended.

       Nor can the City rely on any of the four exceptions provided by Rule 37(c)(2) that would justify its failure to admit.  First, while the City's R&Os contained certain boilerplate objections to Plaintiffs' RFAs, the City's response to RFA Nos. 2 and 3 contained no specific

---

requested."); *see, e.g.*, *Ronis v. Carmine's Broadway Feast, Inc.*, No. 10 CIV. 3355 (TPG), 2012 WL 3929818, at *9 (S.D.N.Y. Sept. 7, 2012) (considering Rule 37(c)(2) sanctions at summary judgment).

objections and instead consist of one word: "Deny." Anderson Decl. Ex. 14 at 3. Notably, at

the December 13 conference, the City did not press any purported objection. In any event, the

City's boilerplate objections cannot provide a good faith basis on which to deem the RFA

objectionable. *See Guadalupe v. City of New York*, No. 15 Civ. 0220 (CM) (JCF), 2016 WL

3570545, at *3 n.3 (S.D.N.Y. June 24, 2016) (noting that "the City's interposition of boilerplate

objections to each and every request for admission is troubling"); *Marchand v. Mercy Med. Ctr.*,

22 F.3d 933, 938 (9th Cir. 1994) (affirming certain sanctions for failure to admit because, among

other reasons, "[c]ounsel routinely object to discovery requests," and "[i]t would be unduly

burdensome to require each and every objection to be challenged in order for sanctions to issue").

   <u>Second</u>, as discussed in Section I.A *supra*, the admission Plaintiffs sought was of

definite "substantial importance," Fed. R. Civ. P. 37(c)(2), and there was neither any reasonable

ground for the City to believe that it might prevail on the matter nor any other good reason for its

failure to admit. "The burden of proof is on the [denying party] to show that, at the time [it]

responded to the request, [it] had good faith reason to believe that [it] would succeed in proving

the falsity of the statements it denied . . . ." *Herrera*, 143 F.R.D. at 551. The City denied

Plaintiffs' RFA on July 1, 2016. *See* Anderson Decl. Ex. 14. Also on July 1, 2016, in response

to Plaintiffs' RFP No. 34 requesting any documents supporting such a denial, the City directed

Plaintiffs in its R&Os to "documents stored with, and kept with, the Pants, including the brown

paper bag in which investigators placed the Pants after they took them from plaintiff Jane Doe

2's cell . . . ." *See* Anderson Decl. Ex. 15 at No. 1. Other than the brown paper bag, which—as

discussed in Section I.B *supra*—is definitively <u>not</u> a document evidencing the chain of custody

for the Pants between May 10 and May 14, the City has identified and produced nothing to

support its denial.

Relatedly, the City's assertion at the December 13 conference that it "ha[dn't] had a chance to actually see the writing that's on the bag," Tr. of Dec. 13, 2016 Court Conf. 3:7-8, is no justification for its denial.  That bag had been in the City's possession for years before being sent to Plaintiffs' expert for testing, had been returned to the City a full month before the City reiterated its refusal to admit the RFA in the Parties' December 8, 2016 Joint Letter Motion, and even then, Plaintiffs provided the City with photographs of the bag.  *See T. Rowe Price*, 174 F.R.D. at 42-43 (a party must make "reasonable inquiry" and "may not give lack of information or knowledge as a reason for failure to admit or deny unless he has made such inquiry.").[7]  The City's assertion that it had not had a chance to examine the bag can at best reflect an utter failure to make <u>any</u> kind of inquiry, let alone a reasonable one.  And there is no doubt that the City has now been in uninterrupted possession of the brown paper bag for at least the last two months, yet it has not amended its RFA R&Os, despite its obligation to do so.  *See* Fed. R. Civ. P. 26(e) (obligation to supplement discovery responses applies to requests for admission).

The City has repeatedly represented to the Court and to Plaintiffs that it has produced everything that it has relating to the chain of custody of the Pants.  This amounts to nothing.  Without <u>any</u> possible dispute over the issue Plaintiffs request admission on, any denial is wholly unreasonable, and sanctions should issue.  *See Burns*, 2007 WL 1589437, at *10 (explaining that denial is reasonable only when issues genuinely in dispute are requested to be admitted).

---

[7]    In the City's portion of the Letter Motion, it represented that because the OCME voucher was dated May 14, 2013, it had a reasonable basis on which to deny Plaintiffs' RFA.  As evidenced by its statements at the December 13 conference, this position is nonsensical.  When asked by the Court whether its answer would change if the RFA were phrased to reference the chain of custody from "between May 10, 2013, through -- if it would have said May 13th," Tr. of Dec. 13, 2016 Court Conf. 5:2-4, the City proceeded to reference the brown paper bag as the relevant chain of custody evidence.  Neither the City's deliberate misconstrual of Plaintiffs' RFA nor its incorrect assertion that the brown paper bag provides relevant chain of custody evidence can save the City from sanctions now.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion and determine that the City has no evidence concerning the chain of custody of the Pants from the time they were seized from Jane Doe 2's cell on May 10, 2013 through the time they were vouchered with the NYPD on May 14, 2013, as well as for an award of sanctions pursuant to Rule 37(c)(2).

Dated: New York, New York
      January 13, 2017

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

James L. Bromley
*jbromley@cgsh.com*

One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000
Fax: (212) 225-3999

Of Counsel:
Mitchell A. Lowenthal
*mlowenthal@cgsh.com*
Josh E. Anderson
*jeanderson@cgsh.com*

William D. Gibney
*wdgibney@legal-aid.org*
Marlen S. Bodden
*mbodden@legal-aid.org*
Barbara P. Hamilton
*bphamilton@legal-aid.org*
THE LEGAL AID SOCIETY
199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3300

*Attorneys for Plaintiffs*

22