# EXHIBIT 1
# REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273

1

# ORIGINAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -----------------------------------------------------X
     JANE DOE 1 and JANE DOE 2, on behalf of
3    Themselves and all similarly situated women,

4                                    PLAINTIFFS,

5
          -against-              Case No.:
6                                15 CV 03849

7
     THE CITY OF NEW YORK and BENNY SANTIAGO,
8
                                 DEFENDANTS.
9    -----------------------------------------------------X

10

11                      DATE:   June 28, 2016

12                      TIME:   10:18 a.m.

13                                                    ∎

14                              ·

15          DEPOSITION of the Plaintiff, ████ Jane Doe 2 ████,

16    s/h/a JANE DOE 2, taken by the Defendants, pursuant to an

17    Order and to the Federal Rules of Civil Procedure, held at

18    the offices of the New York City Law Department, 100 Church

19    Street, New York, New York 10007, before ToniAnn Cocca, a

20    Notary Public of the State of New York.

21

22

23

24

25

Jane Doe 2

```
1      after the one you just described?

2          A.       Yes.

3          Q.       Can you just tell me in your own words what

4      happened on that occasion?

5          A.       He made me have sex with him again and I was so

6      pissed off from the last time.  When he came, I took it and

7      smeared it all over my jeans because I wanted -- at that

8      time I was so pissed off like with everything and I was

9      scared as hell too, I'm not even gonna lie to you.  So I

10     was trying to figure out a way to get out of this situation

11     without it being ongoing because I was fed up, I was done

12     like.  So when he came I took it, I took his semen like,

13     and put it on my jeans.  Put it on the pair of jeans that I

14     was wearing.  I thought it was gonna be that easy to just

15     report it and, you know, like to tell somebody about what

16     was going on and just give them like here, here's the proof

17     because I know with certain situations when people,

18     especially with what RMSC Inmate was telling me, like

19     they tried to report what was going on with them and nobody

20     did anything about it.  Like for whatever reason being that

21     they -- oh, we can't just go off your word.  So I knew I

22     had to have some type of proof about what was going on.  So

23     that I was the reason for me doing that, you understand?

24     So, that was that.

25         Q.       When you took the semen and wiped it on the
```

Jane Doe 2

```
 1    jeans, where did he ejaculate?  In his hand, in your hand?

 2         A.     In my mouth.

 3         Q.     Did you spit it out on your hand?

 4         A.     Yes.

 5         Q.     Did you then wipe it on your pants?

 6         A.     Yes.

 7         Q.     Where on your pants did you wipe it?

 8         A.     I can't tell you sitting here today now exactly

 9    which pants leg or whatever it was but it was on the upper

10    part of the jeans, like on my thigh area and in the crotch

11    area.

12         Q.     Do you remember which hand you used?

13         A.     My right hand.  I'm right-handed.

14         Q.     Which pair of jeans did you wipe the semen on?

15         A.     Those Gap jeans.  Those size 12 Gap jeans.  The

16    same jeans I had on when I was arrested.

17         Q.     Those were the darker blue jeans?

18         A.     Yes.

19         Q.     What did you do with the jeans after you wiped

20    the semen on them?

21         A.     When I got back to the housing area, I just

22    folded them up and put them in the bucket, the clothes bin.

23    The bin that they give you to put your stuff in.

24         Q.     Every cell has a clothes bin?

25         A.     I wasn't in a cell at the time, I was in the dorm
```

# EXHIBIT 2
REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273



The City of New York
Department of Investigation

MARK G. PETERS
COMMISSIONER

80 MAIDEN LANE
NEW Y●RK, NY 10038
212-825-5900

**TO:**  **FILE**  **DATE: JUNE 25, 2014**

**FROM:**  **JAMES A. CHRISTO**  **RE: CASE NUMBER: 13-05490**
**ASST. IG**  **CASE NAME:  SANTIAGO**

## CLOSING MEMORANDUM

The following is a summary only of information pertaining to this investigation and does not contain each and every fact learned during the course of the investigation.

## ORIGIN OF CASE:

On May 7, 2013 Correction Officer Investigator (COI) Acosta made a notification to DOC/ IG Captain Vincent Valerio through the complaint line system.

## NATURE OF ALLEGATION:

COI Acosta reported on May 7, 2013 that Rose M. Singer Center (RMSC) inmate ███ Jane Doe 2 ███ (Jane Doe 2), Book and Case number ███ of Jane Doe 2 , stated that a new Correction Officer by the name of Taylor supplied her with contraband, i.e., tobacco and headphones. She further claimed that she can have the officer bring her in anything she wants because he is in love with her.

Subsequently on May 10, 2013 inmate Jane Doe 2 made a second allegation of a sexual nature against an unidentified male officer through the facility.

## RESULTS OF INVESTIGATION:

After receiving the above, DOI commenced the instant investigation wherein investigators interviewed inmate witnesses, submitted jeans for DNA testing, reviewed records of both DOC and Law Enforcement

**CONFIDENTIAL**

Databases and reviewed DOC GENETIC footage.

## SEXUAL ALLEGATION:

On May 10, 2013, DOI interviewed inmate �_Jane Doe 2_▇. Inmate ▇Jane Doe 2▇ entered Department of Correction (DOC) custody on December 2, 2012 on a sex trafficking charge 230.34 of the NYS Penal Law. ▇Jane Doe 2▇ is a mental observation inmate who receives medication and suffers from depression and anxiety. Inmate ▇Jane Doe 2▇ was interviewed regarding the allegation she made earlier that day about engaging in a sexual relationship with a Correction Officer (CO). Because DOI had also been notified of an earlier allegation from inmate ▇Jane Doe 2▇ about misconduct by CO Taylor, DOI inquired whether the sexual allegation concerned the same officer. Inmate ▇Jane Doe 2▇ clarified that both of her allegations (of being supplied with contraband and engaging in a sexual relationship) concerned the same officer. Inmate ▇Jane Doe 2▇ further clarified however that CO Taylor, whom she originally named was not the subject and instead identified CO Bienvenido Santiago as the subject of both allegations.

▇Jane Doe 2▇ stated that she never had problems with DOC staff until she was transferred to Building 11, where she met CO Santiago. ▇Jane Doe 2▇ was unsure of the dates that she and CO Santiago spoke, kissed, and engaged in oral and sexual intercourse. Initially CO Santiago would talk to ▇Jane Doe 2▇ about her case and their personal lives. CO Santiago then went to the Dominican Republic on vacation, (▇Jane Doe 2▇ believes it was sometime in early March 2013) and when he returned to work he wanted to take his relationship with ▇Jane Doe 2▇ to a more intimate level. CO Santiago went to ▇Jane Doe 2▇'s cell, knocked on her cell door and let her out. ▇Jane Doe 2▇ was out of her cell for a long time talking to CO Santiago wherein he told her he couldn't stop thinking of about her, that he missed her pretty smile, and wanted to kiss her. ▇Jane Doe 2▇ explained that she kissed CO Santiago and after doing so, he told her that he liked her lips and wanted to feel them on his penis. ▇Jane Doe 2▇ told CO Santiago that he would have to give her $100.00 for that because "nothing in life is free". CO Santiago agreed, and they both agreed to meet the next day after the Captain "walks" (i.e. tours the housing area).

The next day, ▇Jane Doe 2▇ was working as a suicide prevention aide (SPA) in Building 9 and crossed back to Building 11 when she saw CO Santiago. CO Santiago unlocked the "slop sink" which ▇Jane Doe 2▇ entered with CO Santiago behind her. He gave her a $100.00 bill as per their earlier agreement which she put into her bra. He started to kiss her and rubbed her buttocks on top of her clothing. ▇Jane Doe 2▇ told CO Santiago to take out his penis and ▇Jane Doe 2▇ began to perform oral sex on him. CO Santiago ejaculated inside of ▇Jane Doe 2▇'s mouth. According to ▇Jane Doe 2▇ she had oral sex with CO Santiago on several occasions and also had sexual intercourse with him on less than five occasions. ▇Jane Doe 2▇ could not recall the dates and time of these incidents however did provide a physical description of CO Santiago's intimate parts, noting that his penis was not circumcised.

▇Jane Doe 2▇ believes that May 2, 2013 was the last time that she had oral sex with CO Santiago. ▇Jane Doe 2▇ stated that after performing oral sex on CO Santiago she did not swallow the ejaculate and spread it on her right leg of her jeans.

On May 10, 2013 Investigators Torres and Ortiz recovered the above described jeans for collection.

CONFIDENTIAL

Another DOI team brought the jeans for DNA testing and submission to the Office of the Chief Medical Examiner (OCME).

After receiving the above information, on May 10, 2013 DOI investigators responded to the RMSC to speak to CO Bienvenido Santiago who was scheduled to work the 2300-0700 tour that evening. DOI investigators approached CO Santiago before he entered RMSC and advised him that we wanted to speak to him about an unduly familiar relationship with an inmate at the RMSC. CO Santiago was informed that he was free to leave at any time. DOI investigators explained the allegations that inmate Jane Doe 2 had made against him. CO Santiago admitted he knew the inmate as an SPA in building 9 who at times was housed in building 11. CO Santiago further stated they used to talk, and had a few conversations; but denied any undue familiarity or sexual contact. When confronted with the details inmate Jane Doe 2 knew about his personal life, to wit: his two failed marriages, his 24 year old daughter Jasmine, his telephone numbers and his address, CO Santiago suggested she overheard those details during conversations with other officers. While he admitted he may have provided inmate Jane Doe 2 with a piece of gum, CO Santiago denied providing her with a pair of pink Panasonic ear phones, blistex, lip gloss, mascara, eyeliner or cash. CO Santiago denied ever touching, kissing, requesting or receiving oral sex or sexual intercourse from inmate Jane Doe 2. When asked how inmate Jane Doe 2 would know that he was not circumcised, CO Santiago responded that she had a 50% chance of getting that right. DOI then requested that CO Santiago provide a DNA swab sample and he declined.

On May 14, 2013 DOI vouchered a DNA sample for inmate Jane Doe 2 along with her jeans for evidence and comparisons. The invoice numbers are 6000005082 and 600005083 respectively.

On July 18, 2013 DOI received correspondence (e-mail and phone call) from Special Counsel, Forensic Biology, OCME Legal Department Mimi Mairs who stated that OCME report FB 13-02020 was complete and ready for pick up. Special Counsel Mairs stated no semen was found on the jeans submitted. DOI picked up the OCME report FB 13-02020 (certified copy with the OCME imprinted seal) on July 19, 2013.

On April 2, 2014, DOI Investigators again spoke with inmate Jane Doe 2 about her allegations. DOI explained that the jeans investigators took custody of in May 2013 were sent to the OCME for analysis and results revealed no semen on her jeans, as she had claimed. Jane Doe 2 showed no emotion but insisted that the semen was there.

## UNDUE FAMILIARITY:

Because of the lack of corroboration to inmate Jane Doe 2's allegation, DOI was unable to substantiate criminal sexual conduct, however during the course of this investigation several factors indicate that CO Santiago was in an unduly familiar relationship with inmate Jane Doe 2. Factors include: CO Santiago's home and cellular phone numbers (on record with the DOC) are in Jane Doe 2's diary under the name of "Boo"; a subscription form which Jane Doe 2 had in her possession to "In Touch" Magazine with CO Santiago's name, home address, e-mail address and phone number on it, which Jane Doe 2 stated was given to her by CO Santiago. Jane Doe 2 further stated CO Santiago let her use his I-Phone to update her Facebook account. The dates were consistent with inmate Jane Doe 2's Facebook postings which included that she is tired of jail. Jane Doe 2 gave DOI Investigators her Facebook and Yahoo account passwords. Entries on Jane Doe 2's Facebook account within that specific time period indicated that Jane Doe 2 was updating her

CONFIDENTIAL

account while she was incarcerated. This included her posting "that she is tired of jail" which [Jane Doe 2] stated was done when Santiago let her use his I Phone while incarcerated at RMSC.

DOI investigators interviewed several inmates [RMSC Inmate], [RMSC Inmate], [RMSC Inmate], and [RMSC Inmate]) from [Jane Doe 2]'s housing area who all stated that they have seen [Jane Doe 2] with candy, makeup and pink Panasonic ears phones that [Jane Doe 2] claimed were given to her by CO Santiago. All inmates interviewed denied ever seeing anything sexual between [Jane Doe 2] and CO Santiago but all reported they seemed close and that CO Santiago was infatuated with [Jane Doe 2]. These inmates further stated that CO Santiago never hit on them but only had eyes for [Jane Doe 2].

## CONCLUSIONS AND RECOMMENDATIONS:

The allegation that CO Santiago (15713) and RMSC inmate [Jane Doe 2] engaged in criminal sexual contact and had sexual relations is **INCONCLUSIVE** at this time. Although inmate [Jane Doe 2] reported engaging in oral and sexual intercourse with CO Santiago and was able to provide a physical description of his genital area, parts of her narrative were inconsistent. Specifically, she could not remember dates or other specific details and the OCME report failed to corroborate her representation that CO Santiago's ejaculate would be found on her jeans.

As such, no criminal referral will be made. DOI will however refer the matter to the DOC Investigation Division for action against CO Santiago based on his undue familiarity with inmate [Jane Doe 2]. The DOC Investigation Division should take whatever action they deem appropriate. As such, the writer recommends that this case be **CLOSED**.

Submitted by: _____    Date: 6/25/14
James A. Christo
Assista t IG

Approved by: _____    Date: 6/30/14
Robert A. Gigante
Inspector General

Approved by: _____    Date: 6/30/14
Jennifer Sculco
Inspector General

CONFIDENTIAL

# EXHIBIT 3
REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273

1   IN THE UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    -------------------------------------------X
3   JANE DOE 1 and JANE DOE 2, on behalf
    of themselves and all similarly situated
4   women,

5                       Plaintiffs,

6       -against-

7   THE CITY OF NEW YORK and BENNY SANTIAGO,

8                       Defendants.

9   Civil Action No. 15 CV 03849
    -------------------------------------------X
10

11      * * * C O N F I D E N T I A L * * *

12

13                  One Liberty Plaza
                    New York, New York
14
                    May 2, 2016
15                  10:20 a.m.

16

17      Confidential Videotaped Deposition of

18  Defendant The City of New York by BELARMINIA

19  ORTIZ, before Rita Persichetty, a Notary Public

20  of the State of New York.

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York  10022
                    212-750-6434
25                  REF:  112393

```
 1              ORTIZ - CONFIDENTIAL
 2         Q    Miss Ortiz, do you recognize the name
 3    ████ Jane Doe 2 ████?
 4         A    I recall the name.
 5         Q    When was the first time you remember
 6    hearing ████ Jane Doe 2 ████'s name?
 7         A    When I went to -- like a week or two
 8    ago.
 9         Q    Back in May of 2013, did you have
10    some interaction with ████ Jane Doe 2 ████?
11         A    Yes.
12         Q    And back in May of 2013, do you
13    remember how you first heard ████ Jane Doe 2 ████ --
14    first heard of ████ Jane Doe 2 ████?
15         A    I was doing -- I don't remember --
16    some unrelated matter that we were at Rikers,
17    and I was with Ferd, Captain Ferd Torres.  And
18    I think we were doing something else, and he
19    just told me we got to go pick up something.
20    And then I just follow him.
21         Q    And Captain Ferd Torres, is that
22    Ferdinand Torres?
23         A    Yes.
24         Q    And he's a DOC employee; is that
25    correct?
```

                    ORTIZ - CONFIDENTIAL

1

2       A    Uh-huh.

3            MS. JOYCE:  You have to answer out

4       loud.

5       A    Yes.

6       Q    And what were you doing on Rikers

7  when you heard about this?

8       A    I don't remember what was it that we

9  were doing at Rikers on that day, or in 2013, I

10  don't remember what it was.

11       Q    Do you remember if you were at RMSC

12  or a different facility on Rikers?

13       A    I believe that we were at the

14  trailer, the IG trailer.

15       Q    Is it your understanding that

16  Captain Torres was contacted by somebody and

17  then he told you we need to go pick something

18  up?

19       A    Yes.

20       Q    Do you know who Captain Torres was

21  contacted by?

22       A    I don't remember.

23       Q    Was this in the morning?  Was it in

24  the afternoon?  Was it in the evening, if you

25  can recall?

ORTIZ - CONFIDENTIAL

1

2        A     Maybe in the afternoon.  I'm not

3    100 percent sure, but maybe in the afternoon.

4        Q     And this was on May 10th, if you

5    recall?

6        A     I don't remember.

7        Q     Did Captain Torres tell you what you

8    needed to pick up?

9        A     He said we got to pick up a pair of

10   pants and that there was a sexual allegation,

11   and that we needed to retrieve the pants.  So

12   he was going to go get the evidence.

13       Q     And why did you go with him?

14       A     Because I was already with him, and

15   so I accompanied him.

16       Q     So at that time, did you proceed to

17   RMSC?

18       A     I don't -- I believe we did.  And I

19   remember him walking around.  I'm following

20   him, you know, and spoke to the front desk or

21   something.  We -- and then we went to an area,

22   like, an area that has some, like, benches and

23   stuff.  I don't remember exactly where it was.

24       Q     And the front desk that you spoke to,

25   was that in RMSC?

```
1                ORTIZ - CONFIDENTIAL
2       A    Well, we -- I don't remember exactly.
3   But it was -- I don't know if it was for us to
4   enter.  I don't remember exactly what it was.
5   I know I just follow him until we got, until we
6   got where the black female was.
7       Q    And that black female you understand
8   is Miss  Jane Doe 2 ?
9       A    Yes.
10      Q    And where were -- withdrawn.
11           Where was Miss  Jane Doe 2  when you
12  encountered her?
13      A    I don't -- I know she was in an area
14  by herself, and I don't know if there was a
15  captain there, a female captain, or something.
16  I don't recall.  But I remember that I sat
17  down -- I don't know if it was a bench or a
18  chair -- and she was telling Torres where to
19  search in her cell for the pants or something.
20      Q    All right.  So backing up for just a
21  second.  Do you remember what you were wearing
22  that day?
23      A    Me?
24      Q    Were you in uniform, or were you
25  wearing street clothes?
```

**Confidential**                                        96

```
 1                  ORTIZ - CONFIDENTIAL
 2   you saw?
 3        A    I don't remember.
 4        Q    Where did he get the bag, if you
 5   know?
 6        A    I don't remember that either.
 7        Q    Do you remember if he brought the bag
 8   into the facility with him or if he acquired it
 9   once he was already in the facility?
10        A    I don't know.
11        Q    Was the bag, if you remember, was it
12   rolled up at the top?
13        A    All I remember was just that it was a
14   big paper brown bag, but I don't remember
15   anything else about it.
16        Q    When you collect evidence in other
17   matters, where do you -- where do you get
18   evidence bags from?
19             MS. JOYCE:  Objection.  She's
20        testified she's maybe done it twice.
21        Q    Evidence, not DNA specifically.
22             MS. JOYCE:  Objection.
23             If you know.
24        A    I'm not sure.
25        Q    Did you see Mr. Torres with a chain
```

```
 1                 ORTIZ - CONFIDENTIAL
 2   of custody form?
 3        A    I don't recall.  I don't know
 4   anything he did, so ...
 5        Q    Did Mr. Torres, from what you saw,
 6   show Miss  Jane Doe 2   the pants?
 7        A    I don't remember.  I don't believe
 8   so.
 9        Q    All right.  Did you see him open the
10   bag at any time from the time that he came back
11   to that area or any time thereafter?
12        A    I don't remember him opening the
13   pants -- I mean the bags.  I don't remember.  I
14   never -- I don't even -- I never even saw the
15   jeans.
16        Q    All right.  Did Mr. Torres say
17   anything to Miss  Jane Doe 2   after he came back
18   with the brown bag?
19        A    I don't remember.  I'm sorry.
20        Q    Did Mr. Torres have anything else
21   with him besides the brown bag that you saw?
22        A    Not that I recall.
23        Q    All right.  Do you know if on that
24   day Mr. Torres collected a notebook from
25   Miss  Jane Doe 2   or her cell?
```

```
 1              ORTIZ - CONFIDENTIAL
 2        A    I don't remember, because I didn't
 3   see the contents of the bag.
 4        Q    Did Mr. Torres say anything to you
 5   about what he had collected?
 6        A    No.
 7        Q    Did he saying anything to you about
 8   what he had seen in Miss  [Jane Doe 2] 's cell?
 9        A    No.
10        Q    Did he saying anything to you about
11   any conversations that he had on his way to
12   Miss  [Jane Doe 2] 's cell or on the way back?
13        A    No.
14        Q    Do you have an understanding that any
15   other evidence was seized or collected from
16   Miss  [Jane Doe 2]  on that day either by Mr. Torres
17   or anyone else at DOI?
18        A    I don't know.
19        Q    During the conversation between
20   Mr. Torres and Miss  [Jane Doe 2]  that you testified
21   about earlier, did Miss  [Jane Doe 2]  describe the
22   pants?
23        A    I don't remember.
24        Q    The room where you encountered
25   Miss  [Jane Doe 2] , was it a large room or was it a
```

```
 1                    ORTIZ - CONFIDENTIAL
 2   smaller room?
 3        A    It was maybe an open area.  It wasn't
 4   an enclosed area.  It was, like, an open area.
 5        Q    Do you know was it a foyer or a lobby
 6   or if you know?
 7        A    I don't remember.
 8        Q    After Mr. Torres got back with the
 9   brown bag, did either you or he have any
10   discussions with anybody else before you left
11   the facility?
12        A    I don't remember.
13        Q    Do you remember did you leave the
14   facility immediately after he returned, or did
15   you do something else in the facility before
16   you left?
17        A    I believe we left the facility after
18   that, and I don't even remember where we went
19   after that.  I don't know -- or what he did
20   with the bag, I don't remember that.
21        Q    Were you with Mr. Torres for the rest
22   of the day, or did you part company at some
23   point?
24        A    We parted ways after -- I believe
25   after I came back to the trailer and I
```

```
 1              ORTIZ - CONFIDENTIAL
 2   retrieved my weapon.
 3        Q    And did you proceed to the trailer
 4   right after you left RMSC, or did you have
 5   other duties to attend to before you went to
 6   the trailer?
 7        A    I don't believe we stopped anywhere
 8   else.
 9        Q    So the best of your recollection, you
10   left RMSC, you went to the trailer, and then
11   you parted company with Mr. Torres; is that
12   correct?
13        A    Yes.
14        Q    And Mr. Torres was accompanying you
15   on the walk back to the trailer; is that right?
16        A    It's not a walk.  It's a drive.
17        Q    Well, thank you.  So you drove back
18   to the trailer with Mr. Torres; is that
19   correct?
20        A    Yes, I believe so.
21        Q    And did Mr. Torres have the bag in
22   his possession during that ride?
23        A    I believe so, yes.
24        Q    At any point, did you personally
25   touch the bag?
```

ORTIZ - CONFIDENTIAL

1

2      A      No.

3      Q      Did you see Mr. Torres take the bag

4  into the trailer with him?

5      A      I don't remember, like, we --

6  remembering him doing that, I can't tell you

7  that I remember that.

8      Q      When was the last time you do

9  remember seeing the bag with your own eyes?

10     A      When he came back from the cell with

11  the brown paper bag.

12     Q      Did Mr. Torres tell you anything

13  about how he was going to secure the evidence?

14     A      No.

15     Q      Have you ever collected evidence of

16  any type on Rikers Island and then had it in

17  your possession?

18            MS. JOYCE:  Objection.

19            You can answer.

20     A      I don't remember.  The last time I

21  remember, it was an investigator years ago.  It

22  was a sexual allegation, and she went, and I

23  accompanied her and other investigators.  But I

24  didn't do it myself.  They collected, I think,

25  underwear.

```
 1                    ORTIZ - CONFIDENTIAL
 2              MS. JOYCE:  Well, his question was,
 3         have you personally collected evidence?
 4         A    No, not that I recall, no.
 5         Q    All right.  To the best of your
 6    knowledge, does DOI have a procedure in place
 7    for where evidence should be stored after it's
 8    collected from Rikers Island?
 9              MS. JOYCE:  Objection.
10              You can answer.
11         A    They're very strict with that,
12    because you're supposed to fill out an evidence
13    form where you got it, and as soon as possible,
14    as long as it's locked in -- you know, write
15    down exactly every step it took.  And then as
16    soon as you can do it, whether it's either to
17    the tech room or, like, evidence like that, to
18    be vouchered.
19         Q    And the evidence form you just
20    referred to, is that different than the chain
21    of custody form you testified about earlier?
22         A    That's what I meant.  I did -- just
23    recently did that this week, where I was duty,
24    I did pick up, but it was already collected.
25    The medical -- Bellevue already collected the
```

1                    ORTIZ - CONFIDENTIAL

2       clothing, the evidence.  And then after that,

3       we took it to the precinct to be vouchered.

4            Q    All right.  A moment ago you

5       testified that they're very strict with that

6       because you're supposed to fill out an evidence

7       form where you got it, and as soon as possible,

8       as long as it's locked in?

9            A    Or like safeguarded, like

10      safeguarded.  Like if it's in your cabinet,

11      you're supposed to -- let's say you might

12      collected the evidence, like, at nighttime or

13      something like that, and the tech room is not

14      available.  But, you know, as long as it's

15      locked in a locked cabinet or something like

16      that and you keep a record of it.

17           Q    So should evidence be taken to the

18      tech room or vouchered as soon as possible, or

19      so long as it's locked, you can wait as long as

20      you'd like?

21           A    No.  That's not what I said.  As soon

22      as possible.  I mean, with physical evidence,

23      it's not going to be logged in the tech room,

24      you have to voucher it.  And if it's going to

25      be tested at the lab, voucher it and get that

```
 1                ORTIZ - CONFIDENTIAL
 2   done as soon as possible.
 3        Q    And the records of where it's -- the
 4   evidence is locked, is that also something that
 5   you would note on the evidence form?
 6        A    It's the name of -- I think it's the
 7   name of the person that has possession of the
 8   item at the time, that you write it there.
 9   Like, the chain of custody.  Like, I received
10   it from you, and then from me, I gave it to
11   her, and ...
12        Q    So the evidence form, there's no
13   requirement to note the location that the
14   evidence is being stored, just the person who
15   has custody of it; is that correct?
16        A    Maybe I'm not -- I would have to see
17   the form again, but I think the location maybe.
18   I'm not 100 percent sure.
19        Q    Did you ever have a discussion
20   with -- well, withdrawn.
21             Do you know -- you know who
22   Investigator Christo is; is that right?
23        A    Yes.
24        Q    And you know who Investigator Young
25   is; is that correct?
```

```
 1                  ORTIZ - CONFIDENTIAL

 2        A     Yes.

 3        Q     Did you ever have a conversation with

 4   Investigator Christo or Young in 2013 about the

 5   ███ Jane Doe 2 ███   case?

 6        A     I don't remember.

 7        Q     Do you remember talking to them about

 8   your job duties at RMSC that day in May?

 9        A     No.

10        Q     Do you remember having any discussion

11   with them about picking up the pants or your

12   encounter with Miss  ██ Jane Doe 2 ██ ?

13        A     I don't remember.

14        Q     Do you know if Mr. Torres ever had a

15   discussion with them?

16        A     I'm not sure, because I was -- I

17   don't know.

18        Q     Did you personally create any sort of

19   report based on your duties at RMSC that day?

20        A     I don't remember.  No.  I don't

21   remember what I was there for.  No.

22        Q     Just so the record is clear, did you

23   create any sort of report that related to your

24   collection of the pants or your meeting with

25   Miss  ██ Jane Doe 2 ██ ?
```

```
1                   ORTIZ - CONFIDENTIAL
2         A     No.
3         Q     Did you talk to any other DOI
4    employees about your collection of the pants or
5    your discussion with Miss  Jane Doe 2 ?
6              MS. JOYCE:  Objection.
7              You can answer.  She collected the
8         pants.
9         A    I don't even -- Torres collected the
10   pants.  No, I don't remember.
11        Q    And do you remember any other
12   discussion with any DOI employee about
13   Miss  Jane Doe 2  back in 2013?
14        A     No.
15        Q    Did you perform any investigative
16   tasks in the  Jane Doe 2  investigation other than
17   the ones that you've described?
18        A     No.
19        Q    Were you involved in the collection
20   or review of Genetec video in the  Jane Doe 2
21   investigation?
22        A     No.
23        Q    Did you interview any potential
24   witnesses in the  Jane Doe 2  investigation?
25        A     No.  Who was the case officer on this
```

```
 1                   ORTIZ - CONFIDENTIAL
 2   case?
 3               MR. SILLER:  No.  You don't have to
 4       ask any questions.  He'll ask you
 5       questions.
 6       A    I don't -- no.
 7       Q    Were you involved in the collection
 8   or review of any telephone records as part of
 9   the  Jane Doe 2  investigation?
10       A    No.
11       Q    After the day in which you
12   accompanied Mr. Torres to RMSC, when was the
13   next time you remember hearing the name
14   Miss  Jane Doe 2 ?
15       A    A few weeks ago.
16       Q    And after that day when you
17   accompanied Mr. Torres to collect the pants,
18   when was the next time you heard the name CO
19   Benny Santiago?
20               MS. JOYCE:  Objection.
21               You can answer.
22       A    I don't remember.
23               MR. SILLER:  I don't believe you've
24       established that -- I don't think his name
25       has come up yet.
```

# EXHIBIT 4
REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273

CONFIDENTIAL                                        1

1  IN THE UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   -----------------------------------------X
3  JANE DOE 1 and JANE DOE 2, on behalf
   of themselves and all similarly situated
4  women,

5                      Plaintiffs,

6     - against -

7  THE CITY OF NEW YORK and BENNY
   SANTIAGO,
8
                       Defendants.
9
   Civil Action No. 15 CV 03849
10 -----------------------------------------X

11     * * * C O N F I D E N T I A L * * *
12

13                     One Liberty Plaza
                       New York, New York
14
                       May 11, 2016
15                     10:05 a.m.

16

17        Videotaped Deposition of Defendant The

18 City of New York by FERDINAND TORRES, before

19 Rita Persichetty, a Notary Public of the State

20 of New York.

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24              New York, New York 10022
                       212-750-6434
25                     REF:  112394

```
 1                  TORRES - CONFIDENTIAL
 2     DNA evidence other than rape kits and buccal
 3     swabs?
 4         A    Clothing, items of uniform.  Bed
 5     sheets, linens.
 6         Q    What do you do after you -- well,
 7     withdrawn.
 8              When you collect evidence like the
 9     evidence you just described, what's the next
10     thing that you do?
11         A    Put it --
12              MS. JOYCE:  Objection, you can
13         answer.
14         A    Put it in a paper bag.
15         Q    Where do you get the paper bag from?
16         A    Sometimes we have some, sometimes we
17     get them from DOC because they use paper bags
18     that they issue inmates to store their
19     commissary in.
20         Q    Do you prepare any documentation?
21         A    Occasionally we have a chain of
22     custody form, occasionally it's right on the
23     bags because the bags have a printed chain of
24     custody form right on them.
25         Q    The bag is special in any kind of
```

```
 1              TORRES - CONFIDENTIAL
 2   way?
 3        A    Yeah.
 4             MS. JOYCE:  Objection, you can
 5        answer.
 6        A    Some of the bags are evidence
 7   collection bags and it says evidence collection
 8   on it and there's spaces where you can write in
 9   chain of custody on there, lines where you
10   should seal it, where you should tape it.
11        Q    How often -- withdrawn.
12             Could you describe the chain of
13   custody form, generally what it looks like?
14        A    Generally it has date, time, usually
15   person collecting evidence and a bunch of lines
16   either before or after that; who the evidence
17   is being transferred to and date and time.
18        Q    Does it list the name of the person
19   the evidence was collected from?
20        A    Some of them do, some of them don't
21   list a name. They list a location or it just
22   says where item occurred, it doesn't list an
23   actual name.
24        Q    Is it your standard practice to list
25   the name of the person you recovered evidence
```

```
  1                    TORRES - CONFIDENTIAL

  2         A    I'm sorry?

  3         Q    Do you remember what building the

  4    clinic was in at Rose M. Singer?

  5         A    No, the only buildings that are

  6    identified as being buildings are housing

  7    areas.  The rest of it is just Rose M. Singer.

  8              THE VIDEOGRAPHER:  You have ten

  9         minutes left on the tape.

 10         Q    So after your conversation with

 11    Miss  Jane Doe 2 , what did you do next?

 12         A    Retrieved the pants.

 13         Q    And the pants were in the cell in one

 14    of the buildings?

 15         A    Yes.

 16         Q    Do you recall speaking to anyone on

 17    the way to the cell?

 18         A    No.

 19         Q    You mentioned earlier that you had an

 20    officer open the cell door?

 21         A    May have, yeah.

 22         Q    Where would you have found the

 23    officer?

 24         A    As soon as you walk into the housing

 25    area there's an officer's desk on the side.  He
```

```
 1                  TORRES - CONFIDENTIAL
 2          A     I was.
 3          Q     Is that your standard practice?
 4          A     Yes.
 5          Q     Did you examine the pants at all?
 6                MS. JOYCE:  Objection, you can
 7          answer.
 8          A     I think I mentally compared them to
 9     the description she had given me.
10          Q     Were they inside out?
11          A     I don't recall.
12          Q     Do you remember any markings on them?
13          A     May have been.  She described
14     something very specific because like I said, I
15     didn't have to search for the pants long at all
16     and she was very specific.  So I don't know if
17     it was because there were markings on them or
18     because they were ripped in a certain location,
19     I don't recall, but I knew what I was looking
20     for.
21          Q     How long were you in the cell?
22          A     Less than a minute.
23          Q     What did you do with the pants after
24     you picked them up?
25          A     Put them in a paper bag.
```

TORRES - CONFIDENTIAL

1

2    Q    Where did you get the paper bag from?

3    A    I don't recall.

4    Q    Do you think you brought it with you

5    to the facility?

6    A    May have or I could have gotten it

7    from the facility itself because they have

8    brown paper bags.

9    Q    Do you keep brown paper bags in

10   any--in your car?

11   A    Yes.

12        MS. JOYCE:  Objection.

13   Q    Do you keep them in the DOI trailer?

14   A    I think we have some there.

15   Q    If you got them from the facility,

16   who would you have spoken to?

17   A    It could have been probably an

18   officer from the housing area.

19   Q    Is this the same officer that would

20   have let you into the cell?

21   A    Or the one in the control station,

22   yes.

23   Q    How many officers would there be in

24   the housing area?

25   A    Three.

1                TORRES - CONFIDENTIAL

2        Q    You think there were three officers

3   that day?

4        A    There had to be.

5        Q    Do you remember seeing 3 officers?

6        A    I remember seeing two.  I wouldn't

7   have seen the third because he would have been

8   on the opposite side.

9        Q    Do you recall any of their names?

10       A    No.

11       Q    Would any of the three officers be

12   able to get you a brown paper bag?

13            MS. JOYCE:  Objection, you can

14       answer.

15       A    Yes.

16       Q    That paper bag would not have had any

17   markings on it, correct?

18       A    Correct.

19       Q    It wouldn't have had a chain of

20   custody fill in area?

21       A    Correct.

22       Q    How would you have sealed it?

23       A    The bags are really long, they're

24   probably 4 feet long, so I would have rolled it

25   up, folded it, folded it, folded it, until I

TORRES - CONFIDENTIAL

1

2    got to the bottom.

3         Q    Would you have written anything on

4    the bag?

5         A    Probably would have written inmate's

6    name and booking case number.

7         Q    Do you recall writing anything on the

8    bag that day?

9         A    I do not recall.

10        Q    Do you remember what you did after

11   you put the pants in a bag?

12        A    I gave them to Christo.

13        Q    Where was Christo?

14        A    Don't recall, probably the clinic.

15        Q    Do you remember where you went

16   immediately after leaving the cell?

17        A    Straight to wherever the inmate was.

18        Q    How did you know where the inmate

19   was?

20        A    Because I left her there.

21        Q    In the clinic?

22        A    Uh-huh.

23        Q    And when you -- do you remember

24   getting back to the clinic?

25        A    Do not, no.

```
 1              TORRES - CONFIDENTIAL
 2        Q    Do you remember meeting up with Ortiz
 3   again after you returned from the cell?
 4        A    Yes.
 5        Q    Do you remember speaking with anyone
 6   on the way from the cell to when you next spoke
 7   with Ortiz?
 8        A    No, don't recall.
 9        Q    You don't recall if you spoke to
10   anyone between the time you left the cell and
11   the time you next spoke to Investigator Ortiz?
12        A    I might have thanked the officer for
13   his assistance but that's pretty much it.
14        Q    How long -- withdrawn.
15             When you got back to the clinic, did
16   you speak with anybody?
17        A    Probably my colleagues if they were
18   there and the inmate so she can tell me if
19   these were the right pants.
20        Q    Do you remember showing Miss  Jane Doe 2
21   the pants?
22        A    I don't have any recollection of
23   talking to her about the pants but I remember
24   opening the pants (sic) and letting her look
25   inside.
```

1              TORRES - CONFIDENTIAL

2        Q     When you collected the jeans did you

3   take off the gloves you were wearing?

4        A     Afterwards?

5        Q     After you collected the pants.

6        A     Uh-huh.

7        Q     And you put them in a bag?

8        A     Yeah.

9        Q     You would have taken off the gloves?

10       A     Uh-huh.

11       Q     And where do you get gloves from?

12       A     I usually carry a pair in my pocket,

13  then I replace them when I use that pair.  I

14  could have gotten it from the facility but I

15  definitely would have taken them off before I

16  left the housing area and disposed of them.

17       Q     And then when you got back to the

18  clinic area, do you remember putting gloves on

19  again to show the pants to Miss  Jane Doe 2 ?

20       A     I don't think I did because I opened

21  the bag like this (indicating) just open the

22  bag, close it, roll it back up.

23       Q     It's a big bag though?

24       A     Yeah, it's a big bag.

25       Q     So could you see the pants at the

```
 1                  TORRES - CONFIDENTIAL
 2   bottom of the bag?
 3        A    Oh, yeah.
 4        Q    Do you remember if Miss   Jane Doe 2   --
 5   withdrawn.
 6             Do you remember if Ortiz ever saw the
 7   pants?
 8        A    Don't recall.
 9        Q    Do you remember if you collected any
10   other property at any time that day?
11        A    Don't have individual recollection of
12   that.
13             THE VIDEOGRAPHER:  Five minutes.
14        Q    Do you recall preparing any
15   documentation that you collected the pants?
16        A    Don't recall.
17        Q    Do you remember writing it on the bag
18   that you collected the pants?
19        A    Don't recall writing anything down on
20   the bag.
21        Q    Do you recall writing on any piece of
22   paper that you collected the pants from that
23   cell?
24        A    Do not recall, no.
25        Q    What do you think the importance is
```

```
 1                  TORRES - CONFIDENTIAL
 2   of keeping records of where you collect things?
 3            MS. JOYCE:  Objection, you can
 4        answer.
 5        A    The importance of it?  I think it's
 6   important.
 7        Q    Why do you think it's important?
 8        A    So we can --
 9            MS. JOYCE:  Objection, you can
10        answer.
11        A    So we can identify where we collect
12   something.
13        Q    Because it's difficult sometimes to
14   remember where you collected things?
15            MS. JOYCE:  Is that a statement or a
16        question?
17            MR. KAY:  Correct.
18            MS. JOYCE:  Objection, you can
19        answer.
20        A    Can you ask me again.
21        Q    It's difficult sometimes to remember
22   where you collected things, correct?
23        A    Yes.
24        Q    Have you ever filled out a chain of
25   custody form for the pants you collected that
```

```
 1              TORRES - CONFIDENTIAL
 2   day?
 3        A    I don't recall.
 4        Q    Would you have carried a chain of
 5   custody form on you?
 6        A    No.
 7        Q    So when would you have filled it out?
 8        A    I don't recall filling it out.
 9             MR. KAY:  We should change the tape.
10             THE VIDEOGRAPHER:  Please stand by,
11        we're now off the record.  The time is
12        3:35 p.m.
13                  (Short recess taken.)
14             THE VIDEOGRAPHER:  This is tape five
15        of the deposition.  We are now on the
16        record, the time is 3:42 p.m.
17        Q    So after you returned to the clinic
18   with the pants, do you remember if you left the
19   clinic with them -- withdrawn.
20             When was the last time you remember
21   having the pants in your possession?
22        A    Just before I handed them to Christo.
23        Q    Do you remember what day that was?
24        A    Do not.
25        Q    Do you think it was the same day that
```

CONFIDENTIAL                          229

TORRES - CONFIDENTIAL

1  
2    you collected them?

3        A    Pretty sure.

4        Q    Do you remember where you were when
5    you gave them to Christo?

6        A    I do not.

7        Q    Do you think it was the clinic?

8        A    Could have been.  I mean, if all
9    three of us were there, then it was the clinic.

10       Q    Do you remember if Young was present
11   as well?

12       A    I don't recall.

13       Q    Do you remember if Torres --
14   withdrawn.

15            Do you remember if Ortiz was present?

16       A    Probably, yeah.

17       Q    Do you remember if you left the
18   facility with the bag that had the pants?

19       A    I don't recall.  I don't recall.

20       Q    Is there any possibility that you
21   stored the pants at the IG trailer?

22       A    ID?

23       Q    IG.

24       A    It's possible.  I mean, the only
25   reason -- I mean, there's -- I mean, it's

# EXHIBIT 5
REDACTED PURSUANT TO JAN. 18,
2017 ORDER, ECF No. 273

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    -----------------------------------------X
3   JANE DOE 1 and JANE DOE 2, on behalf of
    themselves and all similarly situated
4   women,

5                        Plaintiffs,

6       - against -

7   THE CITY OF NEW YORK and BENNY SANTIAGO,

8                        Defendants.

9   CASE NO.: 15-CV-3849(AKH)
    -----------------------------------------X
10

11    *  *  *  C O N F I D E N T I A L  *  *  *

12

13                    One Liberty Plaza
                      New York, New York
14
                      July 27, 2016
15                    2:00 p.m.

16

17            Continued Videotaped Deposition of

18  Defendant The City of New York by JAMES CHRISTO,

19  before Rita Persichetty, a Notary Public of the

20  State of New York.

21

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                    REF: 113075B

```
1               CHRISTO - CONFIDENTIAL

2    office and put them there on that day.

3         Q     He left them in your office?

4         A     While I was there, and then we had

5    spoke about getting them to the lab.

6         Q     And do you know if the day that he

7    brought them to your office was the same day

8    that he got them from [ Jane Doe 2 ]?

9         A     No, it was not.

10        Q     What day did he get them from

11   [ Jane Doe 2 ]?

12        A     I'm not sure of the date that he got

13   them.

14        Q     But you know it wasn't the --

15        A     He got them the day of the incident.

16        Q     When you said the day of the

17   incident, do you mean the day of the allegation

18   or the day of the sexual incident?

19        A     The day --

20              MR. LARKIN:  Form objection.

21              Sorry, go ahead.

22        A     -- the day of the allegation where

23   Ortiz and Torres proceeded to speak to

24   [ Jane Doe 2 ].

25        Q     And you said that wasn't the same day
```

```
1                    CHRISTO - CONFIDENTIAL
2     that he brought them to your office?
3          A     No.
4          Q     Do you know how many days passed
5     before he brought them to your office?
6          A     No.
7                (Christo Exhibit 27, E-mail chain
8          Bates stamped NYC-00007057, marked for
9          identification.)
10         Q     So you've been handed Christo Exhibit
11    27, which is an E-mail chain bearing Bates
12    stamps NYC-00007057.
13               Do you recognize this E-mail chain?
14         A     Now I do.
15         Q     So in your E-mail dated May 14, 2013
16    on 8:40 a.m. you write to Rhonda Young --
17         A     That's not to Rhonda Young, the
18    E-mail.  The E-mail was supposed to be to
19    Bella Ortiz and Ferd Torres.
20         Q     And how do you know that?
21         A     Because that's who was the team that
22    received the jeans, and they were the only ones
23    that went to the clinic.
24         Q     So you know that you sent this same
25    E-mail to Bella Ortiz and Ferdinand Torres?
```

```
 1              CHRISTO - CONFIDENTIAL
 2  jeans?
 3            MR. LARKIN:  Objection to form.
 4      A    Like I'm saying, this was primarily
 5  sent to Bella and Ferd because they were the
 6  ones that spoke to  Jane Doe 2  at the clinic.
 7      Q    So did Young submit any write-ups or
 8  notes to you about the chain of custody --
 9      A    Later on --
10      Q    -- of the jeans?
11      A    -- I believe she did.  Not custody,
12  because she never had the jeans.
13      Q    So sorry.  Just to ask this question.
14            Did Rhonda Young submit any write-ups
15  or notes to you about the chain of custody of
16  the jeans?
17            MR. LARKIN:  Objection to form.
18      A    Yes.
19      Q    She did?
20      A    Not regarding the jeans, but her
21  notes when we had spoke to  Jane Doe 2  subsequent
22  to this day.
23      Q    So Rhonda Young did not submit any
24  write-ups or notes to you regarding the chain
25  of custody of the jeans?
```

```
1              CHRISTO - CONFIDENTIAL
2        A    No.
3        Q    Did Belarminia Ortiz submit any notes
4   or write-ups to you regarding the chain of
5   custody of the jeans?
6        A    I never received them.
7             MR. LARKIN:  Okay.  Just for the
8        record, just let her finish her question.
9        I'm sorry.  I don't want to interrupt
10       you --
11            MS. ELLIS:  It's for the court
12       reporter.
13            MR. LARKIN:  Yeah, it's easy for the
14       reporter, and just so we have a clear
15       record.
16            Sorry.  Go ahead.
17       Q    Did -- did Ferdinand Torres ever
18   submit any write-ups or notes to you about the
19   chain of custody of the jeans?
20       A    No.
21       Q    You testified that Ferdinand Torres
22   bought -- brought the jeans to you at your
23   office; is that correct?
24       A    I believe when I ultimately got them,
25   they were in my office.
```

```
 1                 CHRISTO - CONFIDENTIAL
 2         Q    So who handed them off to you at
 3    the --
 4         A    I didn't --
 5         Q    -- RIFO trailer?
 6         A    -- I have to check the date of when
 7    this actually came in.  Is 5/14 the date of the
 8    allegation?
 9         Q    I believe the allegation's dated
10    May 10th.
11         A    Okay.  Because I didn't receive them
12    in -- in my office until midweek of the next
13    week, which was probably this date, so that's
14    incorrect.
15         Q    What's incorrect?
16         A    We never received them in the
17    trailer.
18         Q    So why did you write asking someone
19    to submit write-ups and notes on where the
20    jeans were prior --
21         A    I'm -- I'm not sure.
22         Q    -- to handing them off to you at the
23    RIFO trailer?
24         A    I'm not sure of that, but I think I
25    got them at 80 Maiden Lane.
```

# EXHIBIT 6
# REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273

CONFIDENTIAL                                    1

```
1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    -----------------------------------------X
3   JANE DOE 1 and JANE DOE 2, on behalf of
    themselves and all similarly situated
4   women,

5                        Plaintiffs,

6        - against -

7   THE CITY OF NEW YORK and BENNY SANTIAGO,

8                        Defendants.

9   CASE NO.: 15-CV-3849(AKH)
    -----------------------------------------X
10

11    *  *  *  C O N F I D E N T I A L  *  *  *

12                    One Liberty Plaza
                      New York, New York
13
                      March 24, 2015
14                    10:21 a.m.

15

16          VIDEOTAPED DEPOSITION of JAMES

17  CHRISTO, before Melissa Gilmore, a Shorthand

18  Reporter and Notary Public of the State of New

19  York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF:  112059
```

```
1                    CHRISTO - CONFIDENTIAL

2          Q.    Were they collected that day?

3          A.    I never saw -- when we went to the

4   trailer, Ferd was not there.  I never met

5   Torres on this day or Ortiz.  I did not receive

6   the jeans on this day.

7          Q.    Did they subsequently tell you or

8   did you have any conversation -- withdrawn.

9                On any subsequent day, did you have

10  any conversations with Torres or Ortiz about

11  the  Jane Doe 2  investigation?

12         A.    I didn't.

13         Q.    Do you know whether Torres or Ortiz

14  prepared a memo or notes of their meeting with

15  Ms.  Jane Doe 2 ?

16         A.    I did not receive any of it.

17         Q.    Do you recall if you ever asked them

18  if they prepared notes or reports of their

19  meeting with Ms.  Jane Doe 2 ?

20         A.    I may have asked Jen if she received

21  anything.

22         Q.    And do you remember what she

23  responded?

24         A.    I believe she said no.

25         Q.    Is it your understanding that at
```

```
 1              CHRISTO - CONFIDENTIAL
 2   the package that you got from the OCME; is that
 3   correct?
 4        A.    If it was in that folder, yes.
 5        Q.    At the bottom of the page it says,
 6   "Invoicing officer" and lists you.
 7              Does that mean you were the one who
 8   dropped off the jeans?
 9        A.    I brought the jeans on that date.
10        Q.    And that date meaning May 14?
11        A.    The 14th, correct.
12        Q.    The jeans were originally collected
13   by Ortiz and Torres?
14        A.    Correct.
15        Q.    Do you know, did someone else have
16   them before they came into your possession?
17        A.    Torres had them.
18        Q.    So Torres kept them from the time
19   that she and Ortiz took them from Ms. ▮Jane Doe 2▮
20   to the time that she gave them to you?
21              MS. JOYCE:  Objection.
22              You can answer.
23              THE WITNESS:  I can answer?
24              MS. JOYCE:  Yes.
25        A.    Yes, Ortiz had them -- I mean,
```

```
 1              CHRISTO - CONFIDENTIAL
 2    Torres had them.
 3         Q.    What day did Torres give you the
 4    jeans?
 5         A.    I think it was the 14th.  He spends
 6    most of his time at the trailer, Rikers Island
 7    trailer.  So he had them secured out there.
 8         Q.    When you say he had them secured,
 9    what does that --
10         A.    Whatever he would do to secure them.
11    I don't know what his process was.
12         Q.    So you took them to the OCME the day
13    that you took custody of the jeans?
14         A.    Yeah.  I can't really see the time,
15    if it was late in the afternoon, probably,
16    yeah.  2 o'clock, yeah.
17              They were in a brown bag preserved.
18    There's certain ways you preserve DNA type of
19    items.
20         Q.    What's the method?
21         A.    No plastics are involved.  They
22    smear.  Brown bags are usually the best way to
23    secure them or envelopes.
24         Q.    And in this case, a brown bag was
25    used?
```

# EXHIBIT 7
# REDACTED PURSUANT TO JAN. 18, 2017 ORDER, ECF No. 273



**NYPD PETS** PROPERTY and EVIDENCE TRACKING SYSTEM
**Property Clerk Invoice**
PD 521-141(Rev. 11/09)



Invoice No. **6000005083**

| Invoicing Command | | | | | | | Invoice Status |
|---|---|---|---|---|---|---|---|
| **POLICE LAB** | | | | | | | **OPEN** |

| Invoice Date | Property Type | | | | | Property Category |
|---|---|---|---|---|---|---|
| **05/14/2013** | **GENERAL PROPERTY** | | | | | **DNA INVESTIGATORY** |

| Officers | Rank | Name | Tax No. | Command | | |
|---|---|---|---|---|---|---|
| Invoicing | AIG | CHRISTO, JAMES | 129 | DOIS | | OCME. EU No. |
| Arresting | N/A | | | | | OCME. FB No. |
| Investigating | N/A | | | | | Police Lab Evid. Ctrl. No. |
| Det Squad Supervisor | N/A | | | | | Det Sqd. Case No.    N/A |
| CSU/ECT Processing | N/A | | | | | CSU/ECT Run No.    N/A |

| Item | Total QTY | Article(s) | | | PETS No. | Pkg. QTY | Disposition |
|---|---|---|---|---|---|---|---|
| 1 | 1 | PANTS | | | 1700012734 | 1 | |
| | | COLOR: BLUE | | | | | |
| | | JEANS | | | | | |

**REMARKS:**
896369 05/14/2013 14:38 : ABOVE LISTED PROPERTY RECOVERED IN REGARDS TO A SEXUAL ASSAULT CASE. DOI# 13-05490 PI 13/60 VVALERIO.

| Date Of Incident | Penal Code/Description | Crime Classification | Related To | | | Receipt |
|---|---|---|---|---|---|---|
| **03/01/2013** | **13050/CRIMINAL SEXUAL ACT** | **FELONY** | **SEX OFF.** | | | **REFUSED** |

| Prisoner(s) Name | | D.O.B. | Age | Address | | Arrest No./Summons No.  NYSID No. |
|---|---|---|---|---|---|---|

| | Name | Tax No. | Address | | | Phone. No |
|---|---|---|---|---|---|---|
| Finder(s) | | | | | | |
| Owner(s) | Jane Doe 2 | | Address of Jane Doe 2 | | | |
| Complainant(s) | Jane Doe 2 | | | | | |

| Complaint No. | 2013-041-03130 |
|---|---|
| Related Comp No.(s) | N/A |
| Aided/Accident No.(s) | N/A |
| Related Invoice(s) | N/A |

| Approvals | Rank | Name | Tax No. | Command | Date | Time |
|---|---|---|---|---|---|---|
| Entered By | POM | FERREIRA, RUBEN | 896369 | POLICE LAB | 05/14/2013 | 14:31 |
| Invoicing Officer | AIG | CHRISTO, JAMES | 129 | DOIS | 05/14/2013 | 14:41 |
| Approved By | SGT | WILLIAMS, CHARLES | 907579 | POLICE LAB | 05/14/2013 | 14:41 |



2013-051229
CMD/AGCY 041



Invoice No. **6000005083**

PCD Storage No. --

**Property Clerk Copy**
printed: 05/14/2013 14:42

Page No. **1** of **1**

FB13-02020

CONFIDENTIAL

**DEF_021628**