UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

JANE DOE 1 and JANE DOE 2,

Plaintiffs,

**DEFENDANT CITY OF NEW YORK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS *IN LIMINE***

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

15-CV-3849 (AKH)

------------------------------------------------------------------------ X

## PRELIMINARY STATEMENT

Defendant City of New York respectfully submits this memorandum of law (with attachments) in support of its various motions *in limine*, each addressed separately below.

Plaintiffs are two former Rikers Island inmates who claim to have engaged in sexual relations with the same male correction officer, Benny Santiago, implicitly or explicitly in exchange for cash or contraband. Each plaintiff describes markedly different alleged sexual encounters with Santiago, occurring at different times in different areas of the women's jail, the Rose M. Singer Center ("RMSC"). They seek money damages for their alleged injuries, including what they characterize as post-traumatic stress disorder ("PTSD"), purportedly the result of their relationships with Santiago.

As we have described in other submissions, including our briefs on appeal and in opposition to plaintiffs' motion for an indicative ruling, the City has made inmate sexual safety a priority inside the jails. Substantial reforms are underway, including the installation of more surveillance cameras inside RMSC, and new procedures (together with new training for officers) with regard to sexual safety. The City has retained a well-respected consulting firm, the Moss Group, which specializes in this area, to assist in developing new policies and training. The

Board of Correction – the agency charged with oversight of the Department of Correction – has promulgated new standards that mirror those of federal law, in order to ensure appropriate protections for inmates.  The City recognizes that any sexual contact between officers and inmates is strictly prohibited, and has taken substantial steps within the past three years to minimize the risk of unlawful sexual contact inside the jails.

    A.      **Jane Doe 1 –** REDACTED

Jane Doe 1, whose name is REDACTED (sometimes referred to as "JD-1"), alleges that sometime in 2006, she was arrested and incarcerated on Rikers Island.  Her story is that she met Santiago at that time, and that about a week, or a week and a half later, she started having sexual relations with him.  (Exhibit A REDACTED Dep.] at 34-6)  She claims that one night, while she was housed in Dormitory 8 in the "Sprungs" (temporary housing that no longer exists), Santiago – who was the officer assigned to her housing area – tapped her on the shoulder while she was sleeping.  She "knew what that meant," viz., Santiago wanted her to go to the day room. (Exhibit A, at 36:2-9)  She claims that Santiago led her to the day room and told her to "assume the position."  She states that she knew Santiago meant she should take off her pants and get down on all fours, which she did.  Santiago then had sex with her from behind.  (*Id*. at 43-44) She described the sex as "rough."  Although JD-1 testified that she first had sex with Santiago "about a week, week and a half" after she met him, in 2006, her complaint alleges that she first had sex with him in "late 2008" (Dkt. 1 [Complaint], ¶ 20).

According to JD-1, the second time she and Santiago had sex, he handed her a pink balloon that contained marijuana.  (Exhibit A, at 23-24) REDACTED maintains that she did not ask for the drugs, and did not know that Santiago was going to give them to her, but said that she sold the marijuana to other inmates for "commissary" because she was "smart."  (*Id*. at 24:2-8)

Santiago gave her marijuana on two occasions and tobacco on two other occasions, all after she had sex with him.  (*Id*. at 23-24)  She asserted that between 2006-9, she was arrested and incarcerated on Rikers Island multiple times, and that she was housed in the Sprungs, Dorm 8, on those occasions.  Although she supposedly had sex with Santiago nine times in total during those years (*id*. at 31-32), she also claimed that Santiago had sex with her four times per week during each of her incarcerations.  (*Id*. at 34)  The testimony is difficult to reconcile.

JD-1 also alleges that she resumed her sexual relationship with Santiago sometime after she was arrested in September, 2011.  At that time, she was charged with second degree murder for her participation in the killing of an ex-boyfriend, ██████████.  (Exhibit B [*People v.* ████████, Indictment #████████ ])  She facilitated the murder of Mr. ████ which was committed by a third party, an individual named ██████████, and then she stole Mr. ████'s car after ████ stabbed him to death.  She pleaded guilty to First Degree Robbery, admitting that she "arranged the meeting between [████ and ████] so that Mr. ████ and you could rob Mr. ████ …."  (Exhibit C [guilty plea], at page 4, ll. 21-24)

JD-1 alleges that during 2011-12, Santiago used a specific *modus operandi* to arrange for access to her so they could have sex.  She claims that, at Santiago's direction, she would tell her housing area officer that she wanted to go to the clinic because she had chest pains, and then after she got to the clinic, she would tell the "provider" that she did not have chest pains. Santiago would then escort her from the clinic to the Sprungs, which were unoccupied at the time, where the two would have sexual relations.  (Exhibit A, at 83-84)  At some point during "2011, 2012," she and Santiago "stopped doing it" (e.g., stopped having sex), and at the time they stopped having sex JD-1 was housed either in Building 2, or Building 10, at RMSC.  (*Id*. at 78)  As will be shown at trial, DOC records and JD-1's medical records demonstrate that she did

3

not engage in sexual relations with Santiago at any time during the limitations period, and for this reason all of her claims should be dismissed.

Although JD-1 alleges that she suffers from PTSD, she had a troubled life long before she met Santiago.  She was first committed to a psychiatric ward when she was seventeen (17) years old, at Holliswood Hospital (since closed), and later was institutionalized at four other hospitals – Long Island Jewish Hospital, Gracie Square, Queens General and Jamaica Hospital.  (Exhibit A, at 57-59)  She has been arrested approximately thirty (30) times (*id*. at 16:19-20), and convicted of nineteen (19) crimes including two (2) felonies and seventeen (17) misdemeanors. (Exhibit D [Supplemental Interrogatory Answer])  Four (4) of her convictions were for resisting arrest and one (1) was for violating an order of protection that her mother had obtained.[1]  She has viciously assaulted police officers on multiple occasions, including biting two officers during arrests on two separate occasions, once in 2007, and again in 2011.  (*See* Exhibit A, at 97:22-23)

Her medical records reflect diagnoses of borderline personality disorder (August, 2011), a history of "behavioral problems" and three attempts at suicide, at ages seven (7), ten (10) and thirteen (13) years (February, 2011), and drug and alcohol abuse for many years.  She reported hearing voices since she was seventeen (17) years old and having engaged in multiple self-harm gestures (July, 2011).  Sometimes the voices she hears tell her to "hurt people" (February, 2011). Prior to her conviction on the First Degree Robbery charge, she was examined pursuant to CPL § 730 and found competent to stand trial.  The court-appointed examiners concluded that her responses on the memory test "fell well within the range for notable exaggeration of memory deficits."  (Exhibit E [CPL §730 report])  In addition, the City's expert, a board certified psychiatrist, examined JD-1 at Bedford Hills Correctional Facility and concludes that she does

---

[1] We will submit for the Court's review copies of the certificates of disposition and other relevant documents at the pre-trial conference.

not suffer from PTSD, but is malingering for secondary gains.  A copy of his report is submitted

herewith (Exhibit F).

**B.**    **Jane Doe 2 –** REDACTED

Jane Doe 2, whose name is REDACTED (sometimes referred to as "JD-2"), is herself

a Level One Sex Offender, having pleaded guilty to Sex Trafficking, First Degree (Class B

Felony), on May 28, 2013 (*see* Exhibit G [JD-2 Deposition excerpts], at 62:23-25)  In her plea

allocution, she admitted that she "intentionally advanced and profited from prostitution by means

of instilling fear in a person … that she could be physically harmed" if she did not engage in sex

for money.[2]  JD-2 has also been convicted of multiple other crimes including embezzlement and

larceny.  (*Id*.)

She alleges that she met Santiago in February, 2013, when she was moved into the area

where he was assigned at the time, Building 11 at RMSC.  She alleges that between February,

and May, 2013, she engaged in sexual relations with Santiago on numerous occasions.  Not long

after JD-2 first met Santiago, he told her he wanted her to "suck his dick," and she agreed to do

so for one hundred dollars.  According to JD-2, shortly after that conversation, she performed

oral sex on Santiago in exchange for the money, which Santiago paid her in twenty dollar bills.

She put the money in her commissary account.  (Exhibit G, at 82, 95-96)

In May, 2013, towards the end of JD-2's alleged involvement with Santiago, she

performed oral sex on him and claimed that she wiped his semen on her jeans.  She reported this

fact to City investigators, who collected the jeans from JD-2's cell.  Forensic tests conducted by

the OCME demonstrated conclusively that there was no semen or sperm – not a trace – on the

jeans.  Plaintiffs' own forensic expert Dr. Julie Heinig reached the same conclusion.

---

[2] We will provide a copy of the plea allocution to the Court at the pre-trial conference.

JD-2 kept a diary during the time she was incarcerated at RMSC.  After she claims that her relationship with Santiago ended, she wrote that he was a "bitch ass nigga" and a "trick," and added:  "It's cool because now that I got this ball rolling I'm okay, just waiting for IG to get here.  I'm going to turn into the biggest snitch ever, not playing …. I'm going to use it all to my advantage."  (Exhibit G, at 169)  She wrote that she would "miss the contraband" after the relationship ended and that "money is my main motivation."  (*Id*. at 151)

## ARGUMENT

I.  **Evidence on Each Plaintiffs' Case-in-Chief Should be Limited, and All Available Witnesses Should Testify in Person, not by Deposition**

The Court has ordered that the case be tried in three phases, as follows:  (1) JD-1's claims against Santiago, with a verdict on liability and damages if any, (2) JD-2's claims against Santiago, with a verdict on liability and damages if any, and (3) if necessary, either or both of JD-1's and JD-2's claims against the City.  (Dkt. 307, at page 2, ¶ 4)[3]  We submit that (1) evidence in the first two phases should be limited to what is relevant only to each individual plaintiffs' claims against Santiago, and evidence concerning her claims against the City should be excluded; and (2) during all three phases of the trial, all City witnesses who are available to testify in person should be called as live witnesses and should not testify by deposition, except for Capt. Sabrina Blenman, who was designated as a Rule 30(b)(6) witness, and who may testify by deposition pursuant to Rule 32(a)(3).

A.  **Evidence on Each Plaintiffs' Case-in-Chief Should be Limited, and Should Not Include Evidence Relevant to Plaintiffs' *Monell* Claims**

In their draft of the JPTO, plaintiffs listed twenty-two (22) witnesses on their case-in-chief, undifferentiated as to which phase of the case each witness will testify in.  It appears that

---

[3] The Court indicated that it may revisit this ruling at the final pre-trial conference.  (*Id*.)

the majority of the witnesses are those with knowledge (if any) concerning plaintiffs' <u>Monell</u>

claims.[4]  We submit that plaintiffs should be limited to calling the following witnesses on each

plaintiff's case-in-chief:

- <u>Jane Doe 1 (four witnesses)</u> – (1) herself, (2) Betty Wilson (subject to the City's motion *in limine* to limit her testimony, *see* Point VI below), (3) Santiago, and (4) her damages expert Dr. Karen Rosenbaum.

- <u>Jane Doe 2 (seven (7) witnesses)</u> – (1) herself, (2) Santiago, (3) Dominique Harris (correction officer who was assigned to the same housing area where the incidents allegedly occurred), (4) Carlos Rodriguez (same as Harris), (5) Ferdinand Torres (DOI Investigator who collected JD-2's jeans), (6) James Christo (DOI investigator who vouchered the jeans), and (7) her damages expert Dr. Karen Rosenbaum.

Plaintiff JD-2 also retained a purported "forensics" expert, Julie Heinig, whose testimony, we

submit, should be excluded or limited based on Fed. R. Evid. 403, 702 and *Daubert v. Merrell*

*Dow Pharmaceuticals Inc*., 509 U.S. 579 (1993) (*see* Point II-A, below).

To the extent plaintiffs wish to call other witnesses, they should be directed to make a

proffer at the pre-trial conference, so the Court and defendants can assess the relevance of those

witness' testimony.  All of the remaining witnesses on plaintiffs' witness list appear to have

knowledge – if any – concerning plaintiffs' <u>Monell</u> claims only.  We submit that absent a proffer

setting forth the specific knowledge that any witness has regarding JD-1's or JD-2's claims

against Santiago, none of these witnesses should be called in the first or second phases of the

trial.  The same ruling should apply to any exhibit plaintiff intends to introduce.  *See generally*

Fed. R. Evid. 401, 402, 403.  We have listed in the JPTO our objections to plaintiff's exhibits

and will address them to the extent necessary at the pre-trial conference.

---

[4] As shown in Points III and IV, below, the substance of these witnesses' testimony should be limited to facts concerning City policies or practices that pre-date the incidents at issue.

**B.** **All Available Witnesses, Except Capt. Blenman, Should Testify in Person**

Plaintiffs have designated videotaped depositions in lieu of live testimony for *every single* City witness they intend to call on their case-in-chief, except for one (DOI investigator James Christo) – ten witnesses (10) in all.  While most of these depositions (all except Michael Blake's), are not hearsay under the Rules of Evidence, *see* Fed. R. Evid. 801(d)(2)(D), we submit that the Court should exercise its discretion under Rule 403, and exclude the depositions in favor of live testimony.  We expect that all of these witnesses will be available to testify in person at trial.  Even if the Court allows the depositions to be used, they may only be admitted into evidence against the City, not Santiago.  Finally, if the Court allows the videotaped depositions, then we submit that plaintiffs should be directed to include in any video played for the jury the City's cross-designations, so that the testimony is presented to the jury in logical sequence.

The ten (10) witnesses whose depositions plaintiffs seek to admit are:

- Michael Blake (former DOC Deputy Commissioner, Investigations);

- Sabrina Blenman (DOC captain), designated both in-person and by deposition;

- Dominique Harris (correction officer);

- Gregory Kuczinski (DOC Deputy Commissioner, Investigations), designated both in-person and by deposition;

- Diane Medina (DOI investigator);

- Carlos Rodriguez (correction officer);

- Jennifer Sculco (DOI investigator);

- Ferdinand Torres (DOI investigator);

- Alexandra Wityak (DOC investigator); and

- Rhonda Young (DOI investigator).

Deposition testimony is admissible at trial under Fed. R. Civ. P. 32, or Fed. R. Evid. 804. Rule 32(a)(3) allows the use of a deposition of an adverse party "or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) …." Fed. R. Civ. P. 32(a)(3). None of the witnesses listed qualify as an officer, director or managing agent of the City for these purposes, although Capt. Blenman was produced as a Rule 30(b)(6) witness, so her deposition could be used under this Rule. "The purpose of Rule 32(a)(3) is to provide for use of a deposition of a person designated by a corporation or other organization, which is a party, to testify on its behalf." *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 14-CV-2197 (VM), 2017 U.S. Dist. LEXIS 26534, *22 (S.D.N.Y. Feb. 3, 2017) (citing Advisory Committee Note, Rule 32(a)(3) predecessor). This Rule was not meant to allow one side to use any deposition of any employee of the adverse party. *See id*., *22-23 (disallowing the use of depositions of employees who "were not in positions where they exercised the required judgment or discretion in [defendant's] corporate matters and reported to more senior members of [defendant's] team"); Advisory Committee Note, Fed. R. Civ. P. 32(a) (West 2017) (purpose is to allow use of deposition testimony that is "in substance … that of the corporation or other organization which is a party").

None of the foregoing ten (10) witnesses has authority to bind, or speak for, the City to the extent contemplated by Rule 32(a)(3), except for Capt. Blenman who was designated as a Rule 30(b)(6) witness on limited topics. *See MF Global Holdings*, at *22-23. Accordingly, Rule 32(a)(3) permits the use of Capt. Blenman's deposition but not the others.

Rule 801(d)(2)(D), on the other hand, provides that a statement "offered against an opposing party" – in this case the City – is not hearsay if the statement "was made by the party's … employee on a matter within the scope of that relationship and while it existed." Fed. R.

Evid. 801(d)(2)(D); *MF Global Holdings*, at \*23-24 ("Rule 801(d)(2)(D) provides an independent basis – separate from Rule 32(a)(3) – for admitting deposition testimony").  All of the witnesses except for Michael Blake were City employees at the time of their depositions. Accordingly, all except for Blake's could potentially be admitted under this Rule.

However, the Court has discretion whether to admit the deposition testimony at all.  *E.g.,* *McCallum v. New York Yankees Partnership*, No. 3:04CV01479 (WIG), 2007 U.S. Dist. LEXIS 51272, \*7 (excluding deposition testimony under Rules 401, 402 and 403) (D. Conn. Jun. 28, 2007).  Alternatively, the Court may defer ruling on the issue until trial.  *MF Global Holdings*, at \*24 ("[b]ecause Rule 801(d)(2) requires an individualized inquiry into the admissibility of the evidence and because any evidence would have to be established as relevant in the context of the facts presented at trial, the Court finds that it is premature to exclude all of the deposition testimony at this time.  The parties may raise the admissibility of deposition testimony under Rule 801(d)(2)(D) during the course of trial, as it becomes pertinent").

In *Kolb v. County of Suffolk*, 109 F.R.D. 125, 5 Fed. R. Serv. 3d (Callaghan) 601, 20 Fed. R. Evid. Serv. (Callaghan) 599, 1985 U.S. Dist. LEXIS 23794 (E.D.N.Y. 1985), the court excluded deposition testimony for more fundamental reasons.  Plaintiff sought to present the testimony of eight (8) of the defendant's witnesses by deposition, even though the witnesses were available to testify live.  Rejecting plaintiff's position, the court held:

> If the depositions here were admitted … a precedent would be set for trial by deposition.
> Live testimony is always preferred as it provides the trier of fact the opportunity to
> observe the demeanor of the witness …. Further, when depositions are submitted in place
> of live testimony, the trial judge is denied the opportunity to question the witness.
> Clearly, testimony by deposition is less desirable than oral testimony and should be used
> as a substitute only under very limited circumstances …. This policy is embodied in Fed.
> R. Civ. P. 32(a)(3)(E) which refers to the 'due regard' to be given 'to the importance of
> presenting the testimony of witnesses orally in open court …'

*Id.*, *4-5 (citations omitted) (Scheindlin, M.J.).  As the court noted, Rule 801(d)(2)(D) "is rarely applied to allow admission of whole depositions of witnesses who could easily appear at trial on a party's direct case.  Rather, the Rule is primarily used to admit an out of court statement of a party's employee or agent related by a witness testifying in court."  *Id.*, *8 (citations omitted).[5]

Trial by deposition would be unfair to the City especially since the witnesses are available to testify live, and the City will make them available when required.  Here, as in *Kolb*, "live testimony is … preferred" and testimony by deposition is "less desirable than oral testimony."  The City intends to call as a live witness any current or former City employee whose deposition is read or viewed by the jury, so the witnesses will be testifying live in any event.  In these circumstances, the Court should exercise its discretion under Rule 403, and should allow the City witnesses to testify live, once, on plaintiffs' case-in-chief, at which time the City will question them fully as well.  *See MF Global Holdings*, at *24 (allowing full examination of defense witnesses called on plaintiff's case-in-chief, in order to "avoid wasting time by calling witnesses twice") (citing Fed. R. Evid. 611).  The jury can then hear the witness' full, live testimony uninterrupted by snippets of video or audio.

At a minimum, we request that the Court defer ruling on admission of the wholesale deposition testimony until phase three of the trial (if necessary), so that the particularized inquiry required by Rule 801(d)(2)(D) can be made.  *See MF Global Holdings*, at *24.  Depositions of the City's employees are admissible against the City only, not Santiago.  Fed. R. Evid. 802(d)(2)(D) (out of court statements by party's employees may only be "offered against [that]

---

[5] Other courts have disagreed with *Kolb*'s reasoning, *see, e.g., Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. 157, 163-64 (U.S. Ct. Claims 2004), but we submit that because plaintiff apparently seeks to call every single City witness by deposition rather than live testimony, the reasoning of *Kolb* which excluded entire deposition transcripts of available witnesses should be followed here.

opposing party"), and for this reason, the question whether to admit these depositions will not be presented until phase three of the trial, if at all.

In the event the Court disagrees, we respectfully request an opportunity to cross-designate those portions of the depositions that should be introduced for completeness, and we request an order directing plaintiffs' counsel to create one continuous video for each witness whose deposition will be used so that the testimony is heard in logical sequence by the jury. *See generally* Fed. R. Evid. 403 (court has discretion to avoid juror confusion).

## II.     The Opinions of Plaintiffs' Experts Julie Heinig and Timothy Ryan Should be Excluded or Limited Pursuant to Fed. R. Evid. 702 and 403

Plaintiffs propose to call three experts at trial – Julie Heinig, Ph.D., a DNA/forensic science expert; Timothy Ryan, a corrections practices expert; and Karen Rosenbaum, M.D., a damages expert. As shown below, the opinions of Dr. Heinig and Mr. Ryan should be excluded in their entirety or substantially limited. We do not address Dr. Rosenbaum's opinions in these motions but reserve the right to conduct voir dire and/or object to admission of her opinions at the time of trial.

### A.     Governing Standards

Rule 702 of the Federal Rules of Evidence allows the admission of expert testimony that is relevant and "reliable." *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993). "Faced with a proffer of expert scientific testimony, … [a] trial judge must determine at the outset … whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Major League Baseball Properties, Inc. v. Salvino, Inc*., 542 F.3d 290, 310 (2d Cir. 2008) (citing *Daubert*, 509 U.S. at 592). "The subject of an expert's testimony must be 'scientific … knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of

science." *Id*. (quoting *Daubert*, 509 U.S. at 589-90).  Courts should assess the reliability of scientific expert testimony according to the criteria set forth in *Daubert*, including:  "(1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, [and] (2) whether the technique or theory has been subject to peer review and publication."  Advisory Committee Note, Fed. R. Evid. 702, 2000 Amendments (West 2017) (quoting *Daubert*, *supra*).

"The *Daubert* principles apply not only to testimony based on scientific knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id*. at 310-11 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)); *see* Fed. R. Evid. 702(a). "[E]xpert testimony should be excluded if it is speculative or conjectural," *Boucher v. Suzuki Motor Corp.* 73 F.3d 18, 21 (2d Cir. 1996), and an expert may not merely "tell the jury what result to reach." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  That is, the expert may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," because such an opinion would only "attempt to substitute the expert's judgment for the jury's." *Id*. (citations omitted).

Expert testimony must have "a traceable, analytical basis in objective fact" in order to be admitted. *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998) (rejecting expert opinion that was "based on the absence of contrary evidence, not on positive data").  Moreover, the courts in this circuit typically exclude expert testimony "that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  "An expert's conclusory opinions are … inappropriate." *MLB Properties*, 542 F.3d at 311.

The district court functions as the "gatekeeper" for expert testimony. *Id.* "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. Although the standard for admissibility is liberal, the circuit has consistently held that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely*, 414 F.3d at 396-97 (citations omitted).

Expert testimony is also subject to Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 397 (quoting Fed. R. Evid. 403). "[T]he Supreme Court, echoed by members of [the Second Circuit], has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Id.* (citation omitted). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation and internal quotes omitted).

### B.   Julie Heinig – Plaintiffs' Forensics Expert

As noted above, on or about May 10, 2013, plaintiff JD-2 told investigators that after performing oral sex on Santiago, she wiped Santiago's semen on her jeans. Those jeans were collected as evidence during the post-incident investigation. Dr. Heinig conducted forensic tests on the jeans and submitted an expert report pursuant to Rule 26(a). Her opinions are as follows:

(1) there is no semen or sperm – not a trace – on the jeans, the same finding reached by the Office of the Chief Medical Examiner ("OCME"); (2) there is a "major male contributor" of DNA of unspecified origin (but not semen or sperm) on the jeans; and (3) the absence of semen on the jeans where JD-2 stated she wiped it "is consistent with that area of the jeans having been cleaned" sometime between May 10, and May 14, 2013.  The earliest date that the City has an invoice, or property voucher, for the jeans, is May 14, even though it appears that the jeans were collected four days earlier, viz., on or about May 10, 2013.

Her primary opinion is that the jeans "could" have been "washed" between May 10, and May 14 – the time period for which the City does have an invoice or property voucher for the jeans – and that this supposed "washing" could have "removed" the semen.  (Exhibit H [Heinig Report], at page 9 ("Hand washing the Subject Area [where JD-2 claimed to have wiped semen] could remove the semen from the jeans"))  She concludes:  "The fact that I did not find semen on the Jeans is consistent with the semen having been washed off the Jeans before my (and OCME's) testing of them."  (*Id*. at page 10)

Dr. Heinig did not perform any tests to establish whether or not the jeans were "washed" or "cleaned" – for example, she did not test for the presence of soap or detergent residue on the jeans (Exhibit I [Heinig Dep. excerpts], at 76-77).  Instead, her opinion is based *solely* on the following:  (1) she was instructed to "assume" that "Jane Doe 2 wiped semen on the jeans on or around late April or early May, 2013" (*id*. at page 1); and (2) there is no chain-of-custody documentation concerning the jeans between May 10, the day the jeans were collected, and May 14, the date the jeans were turned over to the OCME for testing (*id*. at pages 3-6).  Although Dr. Heinig purportedly voices concerns about the "integrity" of the jeans and questions whether they were "tampered" with, the chain-of-custody information produced by the City is sufficient in her

opinion to establish that the jeans she tested were, in fact, the jeans collected from JD-2.

(Exhibit I, at 43:13-17 (Q:  Do you have any doubts that the pants you tested were the same pants

that were collected from Jane Doe 2?  A:  Based on the information that was given to me, no.))

Dr. Heinig conceded at deposition that the absence of semen together with the absence of

chain-of-custody documentation does not demonstrate that the jeans were "washed":

Q:     In your view does the absence of chain of custody documentation show that the
       jeans you tested were washed?

A:     Can you rephrase your question?

Q:     What don't you understand about it?

A:     I don't see a connection between the two.  The absence of chain of custody
       showing something.  I don't see how that would be possible.

Q:     The absence of chain of custody documentation in this case doesn't demonstrate
       to you that these jeans were washed?

A:     *It doesn't demonstrate it. It doesn't show it*, but the absence of chain of custody
       could certainly lead to the fact that they could have been washed and it certainly
       could have happened.

(Exhibit I, at 47-48; emphasis added)

Dr. Heinig also conceded that, contrary to the opinion in her report, her test results were

*not* consistent with the jeans having been washed:

Q:     And you conclude that your test results are consistent with the jeans having been
       washed; am I right?

A:     *That is incorrect*.  All along the test results show only whether semen is on the
       jeans or not.

Q:     The test results don't tell you anything else, correct?

A:     That is correct.

(*Id*. at 58:13-20; emphasis added; *see also id*. at 48:15-20 (Q:  Other than the absence of semen,

did your testing of the jeans reveal evidence to you suggesting that the jeans had been washed?

A:  The testing did not reveal that the jeans had been washed other than the fact that a stain was not present.))

Dr. Heinig could not point to any published studies showing that hand washing clothing with soap and water, or just water, could remove all traces of semen or sperm (*id*. at 75-76); nor has she worked on any case where evidence showed that hand washing clothing could remove all traces of semen or sperm.  (*Id*. at 65, 78:12-16)  She claims to have conducted one "validation" study "quite a few years" prior to 2013, in which she washed a cotton t-shirt in her washing machine, at her home, and the wash cycle removed a semen stain on the shirt.  (*Id*. at 51-56)  She does not recall if she examined the entire area where the stain was to see if any traces of sperm remained.  (*Id*. at 56:3-6)  The purported "study" was never published and Dr. Heinig does not have any notes or other documents reflecting the results of the "study."  She has never done a validation study to determine whether handwashing clothing, with or without soap, would have any effect on the preservation of semen.  (*Id*. at 74)

In light of the foregoing, Dr. Heinig should not be permitted to offer any opinions about whether or not the jeans were supposedly "washed" after they were collected by investigators. Her opinion is nothing more than speculation about, supposedly, what "could have" happened to the jeans.  Her opinion that the jeans could have been "washed" is not supported by any test results or specialized scientific knowledge, and therefore is not "ground[ed] in the methods and procedures of science," *see MLB Properties*, 542 F.3d at 310, and lacks "a traceable, analytical basis in objective fact."  *Bragdon*, 524 U.S. at 653.  The conclusion is speculative, *see Boucher*, 73 F.3d at 21, and – unconnected to any facts or data – merely represents her own *ipse dixit*.  *See Amorgianos*, 303 F.3d at 266.  Her purported "validation study" was not documented, and her testimony about the study, if admitted, would constitute only her *ipse dixit*.  *See id*.  Because Dr.

17

Heinig's opinion that the jeans "could" have been washed is "based on data [and] a methodology … that [is] simply inadequate to support the conclusions reached," Rule 702 and controlling authorities "mandate the exclusion" of that opinion.  *See Nimely*, 414 F.3d at 396-97.

Dr. Heinig's opinions should also be excluded under Rule 403.  Plaintiffs have simply cloaked in Dr. Heinig's opinion their own speculative argument that the jeans were supposedly "washed" – an argument they advance in order to explain the undisputed absence of semen. Assuming <u>arguendo</u> that such an argument could be made to the jury at all – and in the absence of direct or circumstantial evidence, it is doubtful that it could be – plaintiffs' counsel could make this same argument without Dr. Heinig's opinions.  Admitting her speculative, unsupported opinions would be "quite misleading" and highly prejudicial.  *See Daubert*, 509 U.S. at 595.

Dr. Heinig also opines that City investigators did not adhere to City "chain of custody" procedures when they took custody of the jeans.  (<u>Exhibit H</u>, at 3-6)  However, she concedes that the jeans she tested were, in fact, the same ones collected from JD-2 (<u>Exhibit I</u>, at 43). Accordingly, no chain of custody issue is presented for trial, and her opinions on whether the City adhered to its own procedures for collecting and vouchering evidence are irrelevant.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589.  Moreover, we submit that Dr. Heinig is not qualified to render opinions on chain-of-custody documentation regarding evidence collected from crime scenes or alleged crime victims.  She has never been qualified as an expert in that field (<u>Exhibit I</u>, at 41 (witness does "not recall" any case where she was qualified as an expert in evidence collection)), and in the past fourteen (14) years she has collected evidence from crime scenes or other primary sources just twice.  (*Id*. at 14)  *See Nimely*, 414 F.3d at 396 ("threshold

question" court must answer is "whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions").

The only relevant opinion Dr. Heinig could possibly offer is that non-specific male "touch" DNA was found on the jeans, which came from a source other than semen.  (Exhibit I, at 2-3)  Dr. Heinig found one major male contributor and one minor contributor who could be either male or female.  The City will stipulate to these facts at trial, obviating the need for Dr. Heinig's testimony.  The Court should exclude the remainder of Dr. Heinig's opinions, therefore, as cumulative, *see* Fed. R. Evid. 403.

## C.    Timothy Ryan – Plaintiffs' Corrections Practices Expert

The opinions of plaintiffs' corrections practices expert Timothy Ryan also should be limited as set forth below.  He offers sweeping conclusions about the City's practices, based on his review of second-hand materials and few primary sources.  His main conclusion, if admitted, would usurp the jury's function and substitute his judgment for the jury's.  Most if not all of his opinions are based on materials created after the incidents involving JD-1 and JD-2 occurred, and as more fully argued in Point III below, all such opinions must be excluded on the additional ground that they are irrelevant to the question whether the City can be liable under Monell.

 Primary opinion:  Ryan opines that "the City's practices show a callous disregard for legal requirements and correctional professionalism and demonstrates deliberate indifference by the City to the sexual safety … of female detainees …."  (Exhibit J [Ryan Report], at 25, ¶ 100) The standard for Monell liability is "deliberate indifference."  *See, e.g., Carter v. Village of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (in order to establish failure to train claim, plaintiff must show "deliberate indifference" by municipality); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (municipality may be liable "where a

policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates") (citation omitted).  Ryan's opinion that the "City's practices show … deliberate indifference" constitutes a legal conclusion that must be excluded.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion").

 Secondary opinion #1:  Ryan opines that the City "has been out of compliance with national correctional standards for years."  (Exhibit J, at 25-28, ¶¶ 101-14)  He states that the City "fails to meet the expected national standards for the operation of RMSC as a sexually safe and secure housing facility for female detainees …. includ[ing] … my opinion that the City … remains out of compliance with the Prison Rape Elimination Act of 2003 (PREA) which was … formally implemented in the summer of 2012 with the promulgation of PREA regulations by the U.S. Department of Justice …."  (*Id.* at 2)  At deposition, Ryan admitted that he is aware of *one* jail in the entire United States that has been PREA audited and found PREA-complaint – Monroe County, south of Miami-Dade.  (Exhibit K [Ryan deposition excerpts], at 23)  Ryan does not know whether there is any published list of jails that have been audited and found PREA compliant.  (*Id.* at 24)

Moreover, as Ryan acknowledges, PREA was not formally implemented until summer, 2012, when the government promulgated regulations.  (Exhibit J, at 2)  Even if Monroe County was PREA-compliant by 2013, when JD-2's claims arose, the "national standard" at that time was not full PREA compliance.  Contrary to Ryan's opinion, and by his own admission, RMSC is no different than any other large metropolitan jail in the United States insofar as it is not PREA-compliant, at this time, nor was it in 2012-13.  His opinion lacks "a traceable, analytical basis in objective fact," *see Bragdon*, 524 U.S. at 653, and should be excluded for this reason.

The remainder of the opinion is based on data or uses a methodology that is inadequate to support his conclusions.  Ryan states that a DOJ Bureau of Justice Statistics report showed that during 2011-12, "RMSC had one of the highest rates among jails of staff-on-inmate sexual misconduct."  (Exhibit J, at 26, citing Allen J. Beck, et al., Sexual Victimization at Prisons and Jails Reported by Inmates, 2011-12 (hereafter "Beck"))  But that report is an anonymous survey that would be inadmissible to prove that fact or any other fact it contains.  The authors expressly include the following cautionary note:

> Since participation in the survey is anonymous and reports are confidential, the survey does not permit any follow-up investigation or substantiation of reported incidents through review.  *Some allegations in the NIS-3 may be untrue*.  At the same time, some inmates may not report sexual victimization experienced in the facility, despite efforts of survey staff to assure inmates that their responses would be kept confidential.  Although the effects may be offsetting, *the relative extent of under reporting and false reporting … is unknown*.

(Beck, at page 8, copy previously submitted in opposition to plaintiffs' motion for class certification, Dkt. 36-5; emphasis added)

The survey is hearsay and inadmissible unless an exception applies.  In this circuit, surveys may be admitted into evidence under the residual exception, Fed. R. Evid. 807, but the test for admission is difficult to meet.  *See Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 231 (2d Cir. 1999).  In order to be admissible, the survey must have "equivalent circumstantial guarantees of trustworthiness" to those of the other hearsay exceptions, *and* the plaintiff must establish that "(A) the [survey] is offered as evidence of a material fact; (B) the [survey] is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the [survey] into evidence."  *Id*. at 231; *see* Fed. R. Evid. 807.  In light of the authors' cautionary notes, the DOJ survey lacks "circumstantial

guarantees of trustworthiness" sufficient to allow admission under Rule 807.  The survey is also

less probative, not more so, than other evidence available to plaintiffs.

We submit that Ryan should not be permitted to circumvent the hearsay rules by

repeating facts set forth in an unreliable, inadmissible survey.

Secondary Opinion # 2:  Ryan opines that the City's "hiring practices are inadequate."

(Exhibit J, at 28)  However, at deposition he acknowledged that he did not see anything in

Santiago's history prior to his joining DOC suggesting that he should not have been hired as a

correction officer.  (Exhibit K, at 77-78)

Under controlling precedent, Ryan's opinion that the City's hiring practices are deficient

is irrelevant to the issue of causation and cannot be admitted.  In *Board of County*

*Commissioners v. Brown*, 520 U.S. 397 (1997), the U.S. Supreme Court held that the decision to

hire an employee, even if attributable to the municipality as a result of its policies, cannot give

rise to municipal liability unless the employee's background suggests that he "was highly likely

to inflict the *particular* injury suffered by the plaintiff."  *Id*. at 412 (emphasis in original).  "Only

where adequate scrutiny of an applicant's background would lead a reasonable policymaker to

conclude that the plainly obvious consequence of the decision to hire the applicant would be the

deprivation of a third party's federally protected right can the official's failure to adequately

scrutinize the applicant's background constitute 'deliberate indifference.'"  *Id*. at 411.  Because

nothing in Santiago's background suggested that he would violate plaintiffs' rights, Ryan's

opinion about hiring practices is irrelevant.

Secondary Opinion #3:  Ryan opines that the City's training of correction officers,

medical staff, supervisors and investigators is "inadequate."  (Exhibit J, at 29-35)  This opinion is

based mainly, if not exclusively, on the report of the Moss Group and underlying documents

related to the report.  The Moss Group ("Moss Group" or "TMG") is a non-party consultant that specializes in PREA compliance and auditing, and was first hired by DOC in 2012.[6]  Between January and March, 2015, TMG visited seven DOC jails, including RMSC, in order to assess inmate sexual safety and to make recommendations regarding PREA compliance.  The site visits involved interviews with DOC personnel and review of relevant documents.

During discovery, the City produced the Moss Group report and some of the underlying documents created by TMG, including notes of interviews with correction officers (who were not identified).  These notes indicated that officers did not recall the specifics of training they had received, a fact on which Ryan relies heavily in his report.  Ryan did not review any DOC Academy training materials as part of his work in the case (Exhibit K, at 81-82), nor did he review any investigator or other training materials, stating that none were "provided" to him. (Exhibit J, at page 34, ¶ 143)

Ryan's failure to review any training materials forecloses any expert opinion he might offer concerning the City's training.  In order to prevail on a failure train theory, plaintiffs must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citing *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).  U.S. Supreme Court precedent "unequivocally requires … that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place … [and requires proof concerning] how the training was conducted [or] how better or different training could have prevented the challenged conduct."  *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citation

---

[6] *See* http://www.mossgroup.us/

omitted).  "A training program is not inadequate merely because a few of its graduates deviate from what they were taught."  *Jenkins*, 478 F.3d at 94.

Because Ryan did not review the City's training materials or attend training sessions, he is unable to "identify a specific deficiency" in the City's training program and his opinions regarding correctional standards for training should be excluded.

Secondary Opinion #5:  Ryan opines that the City "allowed a culture of misbehavior [or] impunity" to develop inside RMSC, exacerbated by "an unwritten code of silence" among officers.  (Exhibit J, at 36-40)  This opinion about a purported officer "culture" is based exclusively on (i) the hearsay statements in the Moss Group report, and (ii) Santiago's failure to record JD-2's movements in log books.  (*Id*. at 36-38)  We submit that (i) Ryan should not be permitted to repeat hearsay on the witness stand as the basis of his opinion, and (ii) Ryan cannot reasonably base an opinion about the City's practices on the behavior of one officer.  *See Nimely*, 414 F.3d at 396-97 (Rule 702 "mandates" exclusion of expert opinion "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached").

In this connection, Ryan states that two other officers did not report Santiago's omissions in the log books or record JD-2's movements themselves, and asserts with regard to the officers' behavior:  "It is unrealistic to assume that this was merely an oversight – the failure to act was and absolutely had to be intentional."  (Exhibit J, at 38, ¶ 165)  Ryan's speculation about the motives of these officers is irrelevant and inadmissible.  *E.g., Lippe v. Bairnco Corp*., 288 B.R. 678, 687 (S.D.N.Y. 2003) (Chin, J.) ("Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties") (citations omitted).

Secondary Opinion #6:  Ryan concludes that "[i]nmates who report sexual abuse are retaliated against."  (Exhibit J, at 40)  This opinion is based exclusively on the anonymous, post-incident hearsay set forth in the Moss Group report, and two other incidents, viz., those involving inmate J.F. and JD-2.  (*Id*. at 40-42, ¶¶ 174-84)  The sweeping conclusion is not supported by the facts or data on which it is based, and Rule 702 therefore "mandates" its exclusion.  *Nimely*, 414 F.3d at 396-97.

Secondary Opinion #7:  Ryan concludes that "[t]he City's investigative units mismanage investigations and thereby encourage sexual abuse."  (Exhibit J, at 42-44)  This opinion is based on the following:  (i) Ryan's conclusion that the City's "substantiation rate" for allegations is one-half to one-third the national average (relying again on the Beck study as proof of the national "average," *see* Dkt. 36-5), and (ii) the conclusions of the Moss Group report, which are hearsay and would be double-hearsay if Ryan testified to them.  Ryan himself only reviewed a handful of investigation files that pre-date the incidents involving JD-1 and JD-2, and does not cite any of those investigation files as evidence supporting his opinions.  (*See* Exhibit J, at 40-42, ¶¶ 185-95)  Because the "data, … methodology, [and] studies" on which Ryan relies "are simply inadequate to support the conclusions reached," this opinion also should be excluded.  *See Nimely*, 414 F.3d at 396-97.

Finally, it bears emphasis that Ryan's report is replete with legal conclusions and comments about the credibility and motives of various individuals.  (*E.g*., Exhibit J, at page 29, ¶ 118 (purportedly inadequate hiring practices "demonstrates yet another facet of the City's indifference"); page 32, ¶ 134 (describing "culture of impunity"); page 33, ¶ 139 (repeating TMG assessment of City's PREA coordinator); page 36, ¶ 158 (stating that "culture of impunity … fosters and allows staff to withhold information intentionally"); page 38, ¶ 166 (noting that

DOI did not question two other officers about JD-2's movements between two buildings, and describing omission as "intentional"); page 40, ¶ 173 (purported failure to have reporting mechanism in place "demonstrate[s] indifference"); page 41, ¶ 182 (alleged failure to investigate "shows tacit approval" of misconduct)).  The foregoing is illustrative, not exhaustive.  All of these conclusions and other, similar conclusions should be excluded.  *See Lippe*, 288 B.R. at 687.

## III.     The Evidence on Plaintiffs' *Monell* Damages Claims Should be Limited to Incidents That Occurred Prior to May, 2013

Only evidence of the City's alleged "policies" or "practices" that pre-dates the incidents at issue here – that is, evidence regarding incidents or other matters that occurred prior to May 10, 2013 – is admissible to prove plaintiffs' Monell claim.  Put another way, only evidence of prior notice is relevant to prove policymakers' alleged deliberate indifference.  In the failure to train context, for example, the U.S. Supreme Court has held that "[w]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf Monell, imposing liability without regard to fault."  *City of Canton v. Harris*, 489 U.S. 378, 395 (1989). Accordingly, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the cit[y] and the opportunity to conform to constitutional dictates …." *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011).

Courts in this circuit routinely apply this bedrock principle.  As one court recently emphasized when discussing municipal liability:

> "…[D]istrict courts in this Circuit directly addressing the specific issue of establishing deliberate indifference for the purpose of proving municipal liability have held that subsequent acts, standing alone or even in conjunction with other prior acts, are not probative of a prior municipal policy because they cannot provide the necessary causal link between a custom or policy and the conduct at issue. For instance, the court held that prior proceedings before the "conduct occurring after the incident at issue lacks the

requisite 'affirmative link' to plaintiffs' injuries - that is, plaintiffs cannot establish causation."

*Dejesus v. Village of Pelham Manor*, 282 F. Supp. 2d 162, 176 (S.D.N.Y. 2003) (quoting *Sango v. New York*, 1989 U.S. Dist. LEXIS 18212, at *20 n2 (E.D.N.Y. Jul. 25, 1989)); *see also Simms v. City of New York*, 480 Fed. Appx. 627, 631 (2d Cir. 2012) (plaintiff could not establish a pattern of violations by introducing evidence of another alleged false arrest that occurred after the underling action in his complaint*); D'Alessandro v. City of New York*, 2016 U.S. Dist. LEXIS 163616, at *29 (E.D.N.Y. Nov. 22, 2016) (dismissing <u>Monell</u> claim, noting that "contemporaneous or subsequent conduct cannot establish a pattern of violations"); *Vasquez v. City of New York*, 2014 U.S. Dist. LEXIS 157259, at *33 (S.D.N.Y. Nov. 6, 2014) (dismissing complaint where plaintiff relied on post-incident police misconduct cases, holding that subsequent conduct after constitutional infraction did not give rise to municipal liability); *Woo v. City of New York*, 1996 U.S. Dist. LEXIS 11689, at *6 (S.D.N.Y. Aug. 14, 1996) (plaintiff could not refer to incidents that occurred after his arrest as evidence of the City's failure to train and discipline officers);  *Anderson v. City of New York*, 657 F. Supp. 1571, 1576 (S.D.N.Y. 1987) (many reasons can prevent a municipality from reacting after one incident and only a pattern of inaction amounts to a policy in the context of <u>Monell</u> liability).

Plaintiffs apparently intend to prove their <u>Monell</u> claim by referring to facts and other alleged incidents that occurred after the incidents involving JD-1 and JD-2.  They intend to use the Moss Group report, for example (PX-104), which sets forth the results of the Moss Group's assessment of DOC for PREA compliance, and is based almost entirely, if not entirely, on information regarding practices after 2013.  For example, the authors of the report visited seven (7) DOC jails during January-March, 2015, and interviewed officers anonymously.  Some of the interview responses are set forth in the report.  But these interviews occurred two years after the

incidents involving JD-2 occurred, and approximately three years after those involving JD-1 occurred.  The Moss Group report post-dates the relevant incidents, and cannot be admitted to prove notice, or any alleged pattern or practice, for purposes of Monell liability (*see also* Point V, below, regarding admission of the Moss Group report).

As *Dejesus* indicates, the legal standard for establishing deliberate indifference is extremely high and the post-incident evidence Plaintiffs have offered simply fail to meet this threshold.  *See O'Neal v. City of New York*, 2016 U.S. Dist. LEXIS 96585, at *30 (S.D.N.Y. July 22, 2016) (citation to 26 court decisions, all but three of which were decided after the underlying incident, does not support a policy or custom of deliberate indifference); *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) ("the litany of other police misconduct cases [Plaintiff cites] are insufficient to make a plausible case for *Monell* liability," as they "involve something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct").  Therefore, the Court should only consider evidence of incidents occurring prior to May 2013 when assessing Plaintiffs' *Monell* damages claims.

**IV.**   **Evidence Concerning the Investigation into** <span style="background-color:black;color:red">REDACTED</span> **Allegations Should be Excluded or Strictly Limited**

The investigation into JD-2's complaints about Santiago cannot be admitted to prove Monell liability because it post-dates the incident, and because the investigation constitutes hearsay except for statements by parties.

**A.      Evidence of the Doe Investigation is not Admissible Regarding the Acts being Investigated.[7]**

Post-incident internal investigations are generally inadmissible.  *See Doe v. Univ. of Conn.*, No. 3:09 CV 1071 (JGM), 2013 U.S. Dist. LEXIS 119251, at *42 (D. Conn. Aug. 22, 2013).  The courts have generally held these investigations' reports to be both too confusing and too prejudicial to be admitted.  *See*, *e.g.*, *Id.*;  *Albert v. New York City School Construction Auth.*, 99 Fed. Appx. 306 (2d Cir. 2004); *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427 (7th Cir. 2009).  Further, some courts have excluded reports "'because they were replete with hearsay statements of witnesses who were not going to be called to testify at trial[, and] contained multiple layers of inadmissible hearsay and improper opinions.'"  *Doe v. Univ. of Conn.*, No. 3:09 CV 1071 (JGM), 2013 U.S. Dist. LEXIS 119251, at *42 (D. Conn. Aug. 22, 2013) (quoting *Hamilton v. Missouri Dept. of Corr.*, No. 08-3277-CV-S-MJW, 2011 U.S. Dist. LEXIS 36358, 2011 WL 1309464 (W.D. Mo. Apr. 4, 2011).

Because the Doe Investigation contains multiple layers of hearsay, including from witnesses who will not be called at trial, it should be excluded at all phases of the damages case. Fed. R. Evid. 802, *et seq.*  During phases two and three, evidence concerning the investigation will likely confuse the jury, and in phase three would constitute unfair prejudice to the City.  *See* Fed. R. Evid. 403.

**B.      Plaintiff May Not Bring any Claim, or Recover any Damages, due to an Allegedly Improper or Deficient Post-incident Investigation**

The Second Circuit has held that there is no constitutional right to an "adequate" investigation, or an investigation that conforms to any particular standard.  *Harrington v. County*

---

[7] Although written as applicable to the entirety of the investigation, Defendants concede that Jane Doe No. 2's jeans are admissible for a very limited purpose, namely, regarding the absence of semen on them related to her allegation that she wiped Benny Santiago's semen thereon.

*of Suffolk*, 607 F.3d 31 (2010) (dismissing 42 U.S.C. § 1983 claims for failing to investigate as not implicating the Due Process Clause, even though investigation was required by state law); *see also*, *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851, 855 (2d Cir. 2014).

In the instant case, Plaintiff alleges that the investigation into her allegation of sexual assault was carried out ineffectively and improperly.  However, even where "entitlement to an investigation of the type [plaintiff] seeks is created by state law… whether it rises to the level of a legitimate claim of entitlement protected by the Due Process Clause' is determined by federal constitutional law." *Stevens v. Webb*, No. 12-CV-2909 (KAM), 2014 U.S. Dist. LEXIS 37874, at *11 (E.D.N.Y. Mar. 21, 2014).  Federal constitutional law requires two things to give rise to such a claim, first, the claimed right at issue must not be discretionary; second, the claimed right must be an individual entitlement and not a guarantee made to the public at large.  *See*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (non-discretionary); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (individualized in nature).

In the investigations context, the Second Circuit has held, "the duty imposed… [to investigate] runs to the public generally, and not to the individual victims of crime." *Harrington*, 607 F.3d, at 35; *see also*, *Stevens*, No. 12-CV-2909 (KAM), at *12.  As a result, there is no independent claim for improper investigation present in this case, and the internal City investigation must be excluded at trial.

## V.     The Moss Group Report Should be Excluded in the Damages Case

Plaintiffs propose to offer as evidence a Sexual Safety Assessment Report ("Moss Group Report") published by the Moss Group, Inc. ("Moss Group") in June 2015 (PX-104).[8]  As noted

---

[8] We anticipate that plaintiffs will bring a copy of the Moss Group report to the pre-trial conference.

above, the Moss Group report post-dates the incidents in question and is therefore not probative

on the question of notice, or Monell liability (*see* Point III, above).

In addition, the report may constitute a "subsequent remedial measure" that should not be

admitted to prove municipal liability.  When the post-incident conduct of a municipality appears

responsive to constitutional violations, courts are careful to avoid interpreting such actions as

tacit awareness of ongoing misconduct.  *Mhany Mgmt. v. Inc. Vill. of Garden City & Garden*

*City Bd. of Trs.*, 985 F. Supp. 2d 390, 415 (E.D.N.Y. 2013) (full consideration of a

municipality's post-incident adoption of an anti-discrimination policy would have a "chilling

effect on any entity's willingness to enact similar guidelines"); *Higginbotham v. City of New*

*York*, 105 F. Supp. 3d 369, 383 (S.D.N.Y. 2015) (declining to consider post-incident

memorandum as probative of culpability); *Boddie v. City of New York*, 2016 U.S. Dist. LEXIS

50248, at *8 (S.D.N.Y. Apr. 13, 2016) (rejecting report on NYPD policies and practices

published six months after plaintiff's alleged constitutional violation as evidence that the City

was on notice of a pattern of misconduct).

The Moss Group Report reviews whether existing DOC policies on sexual harassment

and safety comply with the Prison Rape and Elimination Act.  As a result, it highlights gaps in

existing regulations and provides recommendations for corrective action.  Including this

information would be unfairly prejudicial to the City, as *Mhany* indicates, would likely deter

other municipalities faced with similar circumstances from undertaking corrective action.  This

Circuit expressly prohibits consideration of any conduct that seems corrective as evidence of

culpability.  *Dickerson v. Prison Health Servs.*, 495 Fed. Appx. 154, 157 (2d Cir. 2012) (DOC

policy that postdated filing could not be offered as evidence of culpability); *Hamilton v. City of*

*New York*, 2009 U.S. Dist. LEXIS 85480, at *32 (S.D.N.Y. Sep. 18, 2009) (declining to consider

31

evidence of post-incident changes in City's employment practices pursuant to Rule 407);

*Cerbelli v. City of New York*, 600 F. Supp. 2d 405, 426 n17 (S.D.N.Y. Dec. 17, 2008) (excluding

post-incident report as evidence of municipality's negligence).  Here, the Moss Group surveyed

DOC jails in 2015, two years after the incident underlying this complaint so any findings in the

report cannot serve as evidence of notice to the City.  Instead, the Moss Group Report reflects

the City's proactive remedial efforts since 2013.  Since it clearly lacks probative value on the

issue of municipal liability in this action, the Moss Group Report should be excluded in

Plaintiff's damages case.

## VI.   Non-Party Betty Wilson's Purported Identification of Santiago Should be Excluded

JD-1 claims that sometime prior to 2011, she called her mother, Betty Wilson, to inform

her that a man would visit her at her house in order to give her mother money.  (Exhibit L [B.

Wilson Dep. excerpt], at 34)  Ms. Wilson testified that her daughter never informed her of the

man's name, and upon the man's visit, the man did not give his name to her.  (*Id*.)  Wilson

further testified that the man never returned to her home, and that it was not until years later in

2015, that one of plaintiff JD-1's attorneys informed her that this man was, allegedly, Santiago.

(*Id* at 40-41, 53-54)

At deposition, Wilson testified that a picture shown to her during the deposition was that

of the man who visited her.  (*Id*. at 60)  The photo was one of Santiago.  Upon further

questioning, Wilson revealed that first and only time she had been shown that same picture of

Defendant Santiago was in the days prior in preparation for her deposition.  (*Id* at 62-63)  We

then questioned Wilson as to how she previously came to see the picture, and the circumstances

under which she saw it, but Wilson's attorney instructed her not to answer based on an assertion

of privilege.  (*Id* at 62-63)

In light of counsel's assertion of a privilege over the photo identification procedure used with Wilson, we submit that Wilson should not be permitted to testify to any purported identification of Santiago.  A party cannot use materials as a "sword" in its defense "while using privileges attaching to [materials relied upon for that defense] as a 'shield.'"  *Dinler v. City of N.Y. (In re City of N.Y.)*, 607 F.3d 923, 946-47 (2d Cir. 2010).  Both the attorney-client and work product privileges may be waived if a party puts the privileged communication at issue by relying on it to support a claim or defense.  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 314 F.R.D. 85, 90 (S.D.N.Y. 2016); *see also Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (2d Cir. 1993) (the privilege can be waived when the "privilege holder releases only communications or portions of communications favorable to his litigating position, while withholding any unfavorable ones"); *United States v. Blizerian*, 926 F.2d at 1292 (2d Cir. 1991) (there is an implied waiver of the privilege when a party "asserts a claim that in fairness requires examination of protected communications").

It is well-settled that "the party invoking a privilege bears the burden of establishing its applicability to the case at hand."  *Mercator Corp. v. United States*, 318 F.3d 379, 384 (2d Cir. 2003) (citations omitted).  "The burden is a heavy one, because privileges are neither lightly created nor expansively construed."  *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 710 (1974)).  Courts make determinations of waiver on a case-by-case basis, taking into account, inter alia, whether a party's disclosure was demonstrably prejudicial to the other party.  *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000).

Here, plaintiffs seek to use the privilege as a shield (to prevent the City from inquiring as to the identification procedures used with JD-1's mother), and a sword (to enable them to introduce the identification as affirmative evidence that Santiago is the same man who contacted

JD-1's mother over five years ago).  The Court should not allow them to do so.  We submit that since Wilson's lawyer – whom plaintiffs' lawyers arranged for her – has asserted the privilege over her client's viewing Santiago's photo, Wilson cannot now testify to her supposedly "identifying" the photo as that of the man who visited her.

Allowing Wilson to testify to the identification would be unfairly prejudicial to defendants, and we submit that the identification should be excluded.  *See* Fed. R. Evid. 403.

## VII.   JD-1's Allegations Regarding Sexual Relations with Santiago During 2008-9 Should be Excluded

Fed. R. Evid. 415 and 413 allow admission of prior acts of a similar nature in sexual assault cases, in certain circumstances.  The rules carve out an exception to the general prohibition on propensity evidence in Fed. R. Evid. 404(b).  *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997).  However, "[e]vidence that is offered pursuant to Fed. R. Evid. 415 must still be subject to the hearsay restrictions in Fed. R. 802 and Fed. R. Evid. 403, obliging the Court to weigh the probative value of the evidence against the danger of unfair prejudice and confusion and considerations of undue delay.  *United States v. Barnason*, 852 F. Supp. 2d 367, 371 (S.D.N.Y. 2012) (citing *Morris v. Eversley*, No. 00 Civ. 8166DC, 2004 U.S. Dist. LEXIS 6840, 2004 WL 856301, at *2 (S.D.N.Y. Apr. 20, 2004)).

In applying the balancing test set forth in Fed. R. Evid. 403, the Court must consider the usual factors, including the likelihood of confusing the jury, and whether the probative value is substantially outweighed by prejudice, but courts should also consider probability in the Rule 415 context.   Specifically, in the absence of a prior conviction, the probability that the alleged earlier sexual assault occurred.  *Barnason*, 852 F. Supp. 2d, at 376; *United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (evidence otherwise admissible under Rule 415 may be excluded pursuant to Rule 403 "if the trial judge determines that its probative value is substantially

outweighed by its potential for unfair prejudice") (citing *Huddleston v. United States*, 485 U.S. 681, 687-88 (1988)).

We submit that evidence regarding JD-1's 2008-9 (or earlier) allegations should be excluded.  Unlike in *Barnason*, in the present case, C.O. Santiago was never convicted of a crime that would fall within the ambit of Rules 415 and 413.  JD-1 never reported those allegations when they occurred, and apparently never told anyone about them, ever, until 2013, at the earliest – long after the purported misconduct ended.  In addition, the risk of unfair prejudice and confusion of the issues before the jury is substantial.  The admission of this evidence will be highly confusing to the jury, especially since the jury will have to decide the veracity of the allegations of sexual assault occurring within the statute of limitations.  Because all parties are identical, the risk of the jury assessing liability or damages based on the alleged prior sexual assaults, which are beyond the statute of limitations, is significant.

Thus, "unfair prejudice" resulting from confusion of the issues, and inclusion of low-probability propensity evidence, weighed against the minimal probative value of the evidence of the earlier 2008-2009 allegations by Jane Doe No. 1, render this evidence inadmissible.

## VIII.  Plaintiffs Should be Precluded From Introducing Evidence Regarding Santiago's Disciplinary History

Plaintiff should be precluded from introducing evidence of, or inquiring about, any disciplinary history or civil rights actions which have been filed against Santiago because such questioning is in direct conflict with Federal Rule of Evidence 404(b).  His disciplinary history is irrelevant to the claims in this case, and as such is confusing, a waste of time, and highly prejudicial. Moreover, such questioning is in direct conflict with Federal Rule of Evidence 404(b).  Federal Rules of Evidence 404(b)(1) prohibits evidence of past acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

character." *See*, Fed. R. Evid. 404(b).  Rather, under Rule 404(b)(2), evidence of past acts is only admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*  However, evidence of prior bad acts is not automatically admissible merely because the proponent has articulated some purpose unrelated to character. Even where evidence of past acts is offered for a proper purpose, it is only admissible if the acts are sufficiently similar to the act at issue in the instant matter.  *United States v. Perez*, 325 F.3d 115, 129 (2d Cir. 2003).

The decision to admit evidence under Rule 404(b) also depends on "whether the danger of unfair prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." *Huddleston v, United States*, 485 U.S. 681, 688 (1988). Thus, Rule 404(b) requires a two-part analysis: (1) whether the proposed evidence fits within one of the 'exceptions' provided by the Rule; and (2) if the evidence does fall into an exception, a balancing test under Rule 403 of whether the probative value of the evidence is substantially outweighed by the potential for jury confusion or prejudice. *Lombardo v. Stone*, 99 Civ.4603 (SAS), 2002 U.S. Dist. LEXIS 1267, at *8 (S.D.N.Y, Jan. 28, 2002); *See also,* Advisory Committee Notes to Fed. R. Evid. 404(b).

The Second Circuit has consistently held that evidence of a police officer's prior bad acts is only admissible under Rule 404(b) if the alleged prior act has a close nexus with the acts complained of by Plaintiffs in their complaint. *Berkovich v. Hicks*, 922 F.2d 1018, 1022-1023 (2d Cir. l99l).  In *Berkovich*, a case in which the plaintiff sought to introduce a police officer's past Civilian Complaint Review Board complaints to prove a pattern of conduct on the part of the officer regarding excessive force claims, the Court held that, "[t]o merit admission under this

theory, the extrinsic acts must share 'unusual characteristics' with the act charged or represent a unique scheme." *Id*, citing *United States v. Benedetto*,571 F.2d 1246,1249 (2d Cir. l978).

Here, Plaintiffs should be precluded from introducing Defendant Santiago's disciplinary history as Plaintiffs' cannot show that any potential disciplinary complaints or lawsuit against Defendant Santiago share the requisite unusual characteristics or unique scheme. *Banushi v. Police Officer Alvin L. Palmer*, 08-CV-2937 (KAM) (JO), 2011 U.S. Dist. LEXIS 419, at *4-7 (E.D.N.Y. Jan. 4, 2011) (precluding a plaintiff from inquiring into the officers' disciplinary histories and the contents of their personnel files since plaintiff failed to show sufficient evidence of pattern of misconduct). The one complaint on Defendant Santiago's disciplinary record concerns an incident involving use of force—not alleged sexual misconduct, which forms the basis of Plaintiffs' claims in the instant action. *See* Fed. R. Evid. 403.

Admitting evidence of unrelated complaints would unfairly burden Defendants, who would then be required to explain the particular facts and circumstances of unrelated incidents, which would in turn confuse and distract the jury from the ultimate issue of whether Defendants violated Plaintiffs' constitutional rights *in this case*. Thus, for the reasons stated *supra*, any purported similar act evidence offered by Plaintiffs is inadmissible, and Plaintiffs should be precluded from introducing Defendant Santiago's disciplinary history or inquiring about unrelated allegations of misconduct at trial.

## IX.   The Court May Not Grant Injunctive Relief At This Stage

### A.   JD-1 Lacks Standing to Seek Injunctive Relief, Individually or on Behalf of a Class

#### 1.   JD-1 Fails to Establish an Immediate Threat of Future Harm

A plaintiff has Article III standing to seek injunctive relief where "(1) he has suffered an actual or imminent injury-in-fact, which is concrete and particularized; (2) there is a causal

connection between the injury and the defendant's actions; and (3) it is likely that a favorable decision in the case will redress his injury." *Trowbridge v. Cuomo*, 2016 U.S. Dist. LEXIS 180080, at *17 (S.D.N.Y. Dec. 21, 2016).   For prospective claims of relief, a plaintiff must "allege a case or controversy of "sufficient immediacy and reality." *Id.* (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 104 (1983)).   There must be some evidence suggesting the misconduct that supposedly gave rise to the plaintiff's alleged constitutional injuries will likely recur.   *See Ashcroft v. Mattis*, 431 U.S. 171, 173 ("[S]peculation is insufficient to establish the existence of a present, live controversy"); *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004) (plaintiff must demonstrate an immediate rather than a hypothetical or conjectural threat of injury).

In cases where the plaintiff relies on past violations in addition to an alleged pattern or practice to establish a future probability of harm, the law requires evidence that "there is a likelihood that [he or she] will again be wronged in a similar way." *Nicholas v. City of New York*, 2017 U.S. Dist. LEXIS 26995, at * 26 (S.D.N.Y. Feb. 27, 2017) (quoting *Lyons*, 461 U.S. at 111); *Ligon v. City of N.Y.* 925 F. Supp. 2d 478, 522 (S.D.N.Y. 2013) (quoting *Floyd v. City of N.Y.*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012)) ("Concrete injury is a prerequisite to standing and a 'plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.'").   Plaintiff must demonstrate that "he is realistically threatened by a repetition of [the violation]." *Lyons*, 461 U.S. at 109; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("…such injuries are only cognizable where the plaintiff alleges actual future exposure to [an] increased risk").

JD-1 cannot demonstrate a credible threat of future harm in this action since she is no longer detained in RMSC and there is no indication she will return to RMSC in the immediate

future.   She recently conceded this point in two court filings: (1) "Plaintiffs cannot pursue injunctive relief against the City in their individual capacities" *Plaintiffs' Letter to the Court*, dated Mar. 15, 2017, at page 2, footnote 1; and (2) "There is no dispute that Plaintiffs now lack standing to seek equitable relief because neither is currently detained at RMSC," *Plaintiffs' Renewed Motion for Class Certification Pursuant to Rules 23(C)(1)(C) and 23(B)(2)*, dated Mar. 27, 2017, at page 6.  Courts in the Circuit regularly deny injunctive relief in *Monell* cases when the plaintiff cannot establish an immediate threat of future injury.  *See Soliman v. City of N.Y.*, 2017 U.S. Dist. LEXIS 50599, at *50 (E.D.N.Y. Mar. 31, 2017) (no standing due to plaintiff's "failure to plausibly allege that she will be the victim of the same unlawful conduct on which her…claims are based"); *Trowbridge*, 2016 U.S. Dist. LEXIS 180080, at *19 (plaintiff's past injuries could only serve as basis for their standing to seek monetary damages due to their speculative allegations of future harm); *Martins v. Cnty. of Nassau*, 2016 U.S. Dist. LEXIS 58132, at *11 (E.D.N.Y. Apr. 29, 2016) (plaintiff lacks standing since there was "no substantial likelihood [he] will again be wronged in a similar way"); *Mahon v. Comm'r of N.Y. City Police Dep't*, 2016 U.S. Dist. LEXIS 55039, at *17 (S.D.N.Y. Apr. 25, 20216) (the likelihood plaintiff would suffer the same injury in the future was too speculative).

Moreover, on May 27, 2015, REDACTED was transferred to Bedford Hills, a state correctional facility.  *See Department of Corrections and Community Supervision Printout*, dated Feb. 18, 2016, at page 1; Inmate Movement History Log, dated Jul. 28, 2015, at page 2.  A plaintiff that is no longer detained at the facility in which the alleged constitutional violation occurred lacks standing for injunctive relief.  *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility"); *Newman v. Holder*, 101 F. Supp. 2d 103, 107

(E.D.N.Y. 2000) (injunctive relief claims dismissed because plaintiffs were no longer incarcerated in Brooklyn federal prison); *Inesti v. Hicks*, 2012 U.S. Dist. LEXIS 86642, at *76 (S.D.N.Y. Jun. 22, 2012) (plaintiff lacks standing for injunctive relief since he was no longer in defendant City's custody); *Tonge v. Corizon Health Servs., Inc.*, 2015 U.S. Dist. LEXIS 79573, at *8 (S.D.N.Y.  Jun. 18, 2015) (denying plaintiff's request for injunctive relief since he was no longer in the City's custody).  Like REDACTED, the plaintiff in *Hicks* was transferred to state prison from federal prison and failed to allege facts demonstrating he was likely to be incarcerated in the federal prisons where his alleged constitutional violations occurred.  *Id*.  Without specific facts addressing this issue, REDACTED cannot establish standing for prospective injunctive relief.

## 2.    The Relation Back Doctrine is Inapplicable to this Case

REDACTED cannot seek injunctive relief on behalf of a putative class because she has conceded she never filed an individual claim for injunctive relief.  *See City's Respondent Brief on Class Certification*, dated June 13, 2016, at page 21.  REDACTED contends that the relation-back doctrine precludes mootness in the event the Second Circuit grants class certification for injunctive relief since she had standing at the time this action commenced.  *See Plaintiffs' Renewed Motion for Class Certification Pursuant to Rules 23(C)(1)(C) and 23(B)(2)*, dated Mar. 27, 2017, at page 6.   However, the relation-back doctrine only preserves *existing* claims from mootness.  In discerning whether a plaintiff can continue to serve as a class representative, courts must determine whether a named-plaintiff maintains a "personal-stake" in the action.  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402 (1980) ("[I]n determining whether the plaintiff may continue to press the class certification claim, after the claim on the merits "expires," we must look to the nature of the "personal stake" in the class certification claim"); *Flast v. Cohen*, 392 U.S. 83, 100-101 (1963) ("The "gist of the question of standing" is whether

the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions") (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Geraghty*, 445 U.S. at 396 (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

REDACTED lacks a cognizable interest in the alleged class action because she voluntarily relinquished her individual claims for injunctive relief after the Court denied class certification. *See City's Respondent Brief on Class Certification*, dated June 13, 2016, at page 21.  Although the Supreme Court[9] and this Circuit have yet to squarely address whether a plaintiff that voluntarily dismisses individual claims for injunctive relief loses standing as a class representative, some federal cases strongly suggest this position. *See, e.g., Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) ("the right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims. Should these substantive claims become moot in the Art. III sense, by settlement of all personal claims for example, the court retains no jurisdiction over the controversy of the individual plaintiffs"); *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 100 (4th Cir. 2011) (a putative class representative that voluntarily settles claims case lacks standing to subsequently appeal an adverse class certification ruling); *Muro v. Target Corp.*, 58 F.3d 485, 491 (7th Cir. 2009) (a plaintiff that voluntarily settles claims "no longer retains a community of interests with the prospective class"); *Anderson v. CNH U.S. Pension Plan*, 515 F.3d 823, 826 (8th Cir. 2008) (plaintiff lacked

---

[9] *See Geraghty*, 445 U.S. at 404 n10 ("We intimate no view as to whether a named plaintiff who settles the individual claim after denial of class certification may, consistent with Art. III, appeal from the adverse ruling on class certification. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 393-394, and n. 14 (1977).")

standing since his claims were fully satisfied before the court's adverse class certification ruling). Since REDACTED has conceded that she never filed an individual claim for injunctive relief, she cannot represent a putative class seeking equitable relief.

### B.    The Court May Not Grant Injunctive Relief At This Stage

An actual case or controversy must exist before a court can grant injunctive relief. *MedImmune. Inc. v. Genentech. Inc.*, 549 U.S. 118, 128 (2007) (for a court to exercise jurisdiction, the parties must demonstrate that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("Article III limits the subject matter jurisdiction of federal courts to actual 'cases' or 'controversies'"); *Burkhart v. City of New York*, 933 F. Supp. 2d 416, 424 (E.D.N.Y. 2013) ("Where no "case" or "controversy" exists …courts lack subject matter jurisdiction and may not adjudicate the case.").  If a plaintiff lacks standing to seek injunctive relief no case or controversy exists.  *See, e.g., Esquilin v. Schriro*, 2014 U.S. Dist. LEXIS 84362, at *7 (S.D.N.Y. Jun. 19, 2014) (no remaining case or controversy with respect to plaintiff's claim of injunctive relief after he was transferred from DOC custody to a state prison); *Banchieri v. City of New York*, 2001 U.S. Dist. LEXIS 13448, at *13 (S.D.N.Y.  Aug. 31, 2001) (no case or controversy because plaintiff lacked standing to seek injunctive relief).  Like the plaintiff in *Schriro*, REDACTED lost her standing for injunctive relief when she was transferred to Bedford Hills in 2015.  Therefore, the Court lacks subject matter jurisdiction over any such action and cannot rightfully authorize injunctive relief.

The City also incorporates by reference its arguments in opposition to plaintiffs' motion for an indicative ruling on class certification (*see* Dkt. 325, 326), and will not repeat all of those arguments here.

## CONCLUSION

For the foregoing reasons, defendants submit that their motions *in limine* should be granted in their entirety.

Dated:        New York, New York
              April 17, 2017

                                   Respectfully submitted,


                                   ZACHARY W. CARTER
                                   Corporation Counsel of the City of New York
                                   *Attorney for Defendants*
                                   100 Church Street
                                   New York, New York 10007
                                   (212) 356-2641 or -2650


                                   By:  _____/s/_____
                                        Arthur G. Larkin
                                        Kimberly M. Joyce
                                        Senior Counsels

### LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | JD-1 Deposition excerpts (16, 23-24, 31-44, 57-59, 78, 83-84, 97 |
| Exhibit B | *People v. [Jane Doe 1]* – indictment (redacted) |
| Exhibit C | *People v. [Jane Doe 1]*, guilty plea (redacted) |
| Exhibit D | Plaintiffs' Supplemental Interrogatory Answers |
| Exhibit E | CPL §730 report |
| Exhibit F | Manuel Lopez-Leon expert report |
| Exhibit G | REDACTED Deposition excerpts (62, 82, 95-96, 151, 169) |
| Exhibit H | Julie Heinig expert report (without CV or attachments) |
| Exhibit I | Julie Heinig deposition excerpts (14, 41, 43, 47-48, 58, 65, 74-78) |
| Exhibit J | Timothy Ryan expert report (without CV or attachments) |
| Exhibit K | Timothy Ryan deposition excerpts (23-24, 77-78, 81-82) |
| Exhibit L | Betty Wilson deposition excerpts (34, 40-41, 53-54, 60-63) |