2015-026853₁
SF. to Larkin

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------------------X
     JANE DOE 1 and JANE DOE 2, on behalf of themselves and all
 3   similarly situated women,

 4                                        PLAINTIFFS,

 5                 -against-               Case No.:
                                          15 Civ. 3849( AKH)
 6
     THE CITY OF NEW YORK and BENNY SANTIAGO,
 7
                                          DEFENDANTS.
 8   ------------------------------------------------------------X

 9                               DATE:   June 20, 2016

10                               TIME:   10:09 A.M.

11

12

13            DEPOSITION of the Plaintiff,  ████ █████,

14   taken by the Defendants, pursuant to a Court Order and to

15   the Federal Rules of Civil Procedure, held at the United

16   States District Court, Southern District of New York, 500

17   Pearl Street, Room 9B, New York, New York 10007, before

18   Lenaya Lynch, a Notary Public of the State of New York.

19

20

21

22

23

24

25
```

14

1    Q.    Was Ms. Hamilton present?

2    A.    Yes.

3    Q.    Mr. Lowenthal was present?

4    A.    Yes.

5    Q.    Was anyone else present, to your recollection?

6    A.    No, nobody else.  Just them, the four of them.

7    Q.    Just the four attorneys that are here today?

8    A.    Yes.

9    Q.    About how long was that meeting?

10   A.    Not long.

11   Q.    At that meeting, did you review any documents to

12   refresh your memory about the events related to your

13   lawsuit?

14   A.    No.

15   Q.    What is your date of birth?

16   A.    ███████

17   Q.    What is your Social Security number?

18   A.    ███████

19   Q.    Have you ever used any other Social Security

20   number?

21   A.    No.

22   Q.    Have you ever used any name other than ███████

23   ██████?

24   A.    Yes.

25   Q.    What other names have you used?

```
1     A.      ███████████████████        That's it.

2     Q.      When did you use the name ████████?

3     A.      When I was incarcerated.

4     Q.      You were arrested sometime in January of 2007,

5     right?

6     A.      Yes, and I used that name.  My cousin.

7     Q.      You were arrested in January of 2007, correct?

8     A.      Correct.

9     Q.      You gave the police the name ████████

10    correct?

11    A.      Yes.

12    Q.      Why did you do that?

13    A.      Because I was high.

14    Q.      Who is ████████?

15    A.      My cousin.

16    Q.      On another occasion, you were arrested and gave

17    the name ████████ to the police, is that right?

18    A.      Yes.

19    Q.      Who is ████████?

20    A.      My twin sister.

21    Q.      Is she a fraternal or identical twin?

22    A.      Identical.

23    Q.      Other than those two occasions when you gave the

24    name ████████ and ████████ to the police, have you

25    ever used any other names?
```

```
1      A.      No.

2      Q.      Why did you tell the police your name was ███

3      ████?

4      A.      I told you, because I was high.

5      Q.      Was there a warrant outstanding for your arrest

6   when you told the police that your name was ██████?

7      A.      A warrant? For ███ -- no.

8      Q.      When you gave the police the name ███████, was

9   there a warrant outstanding for your arrest?

10     A.      Yes.

11     Q.      Was that the reason you gave the police that

12  name, ████████?

13     A.      Yeah, and I was high.

14     Q.      Now you've been arrested multiple times, correct?

15     A.      Yes.

16     Q.      You've been on Rikers certainly more than five

17  separate occasions, is that fair to say?

18     A.      Yes.

19     Q.      How many times have you been arrested?

20     A.      30.

21     Q.      On each of those occasions, were you brought to

22  Rikers Island?

23     A.      What?

24     Q.      On most of the occasions when you were arrested,

25  were you then brought to Rikers Island?
```

| | | |
|---|---|---|
| 1 | A. | A couple years ago. |
| 2 | Q. | How many years ago? |
| 3 | A. | I don't remember. |
| 4 | Q. | More than five years ago? |
| 5 | A. | Yes. |
| 6 | Q. | More than ten years ago? |
| 7 | A. | No. |
| 8 | Q. | Were you at Queens General after you first met |

9    Santiago?

| | | |
|---|---|---|
| 10 | A. | After? |
| 11 | Q. | Or before. |
| 12 | A. | I don't know.  I really don't know.  I can't |

13   answer that question.

| | | |
|---|---|---|
| 14 | Q. | You don't recall? |
| 15 | A. | I don't recall.  I can't answer. |
| 16 | Q. | Why can't you answer? |
| 17 | A. | Because I don't remember. |
| 18 | Q. | When were you at Gracie Square, approximately? |
| 19 | A. | This was awhile back. |
| 20 | Q. | More than ten years ago? |
| 21 | A. | My memory is shot. |
| 22 | Q. | Your memory is shot? |
| 23 | A. | Yes. |
| 24 | Q. | Why is your memory shot? |
| 25 | A. | Because I'm just bad with memory. |

1     Q.     Did you ever have a conversation with ████████

2     ████████ about Santiago?

3     A.     No.

4     Q.     Did you ever tell ██████████████ that you and

5     Santiago were having sexual relations?

6     A.     No.

7     Q.     Did ████████████████ ever tell you that she and

8     Santiago had sexual relations?

9                  MS. BODDEN:   Objection, asked and answered.

10    A.     No.

11    Q.     Did you ever tell anyone that you and Santiago

12    had sexual relations when you were on Rikers Island?

13    A.     No.

14    Q.     Did you tell your mother?

15    A.     No.

16    Q.     Did you tell any other inmates?

17    A.     No.

18    Q.     Did you tell any officers?

19    A.     No, I was too scared.

20    Q.     You didn't tell anyone because you were too

21    scared?

22    A.     Yes.

23    Q.     Why were you scared?

24    A.     I was scared because he's an authority figure.

25    Q.     What does that mean, that he's an authority

1    figure?

2        A.      That he would have done something to me or to my

3    family.

4        Q.      What does the expression "authority figure" mean

5    to you?

6        A.      Somebody who has the upper hand.

7        Q.      What do you mean by that?

8        A.      What I mean by that, that got control of

9    everything.

10                   MR. LARKIN:   Give me two seconds.

11                   (Whereupon, a brief recess was taken at

12               12:14 p.m. and the deposition resumed at 12:19

13               p.m.)

14       Q.      On how many occasions did Santiago give you

15    tobacco?

16       A.      Twice.

17       Q.      Were those two occasions when you were living in

18    Dorm 8?

19       A.      Dorm 8, yes.

20       Q.      How much tobacco did he give you?

21       A.      A lot.

22       Q.      How much is a lot?

23       A.      He gave me two (indicating) like circles.   Two

24    balloons.

25       Q.      Were the balloons the same size as the marijuana

```
1    possession of drugs?

2        A.      Yes.

3        Q.      Many times, right?

4        A.      Yes.

5        Q.      Eight or nine times?

6        A.      Yes.

7        Q.      You've been convicted of possessing heroin,

8    right?

9        A.      Heroin, no.

10       Q.      Crack?

11       A.      Yes.

12       Q.      Marijuana?

13       A.      Not that I recall.

14       Q.      On the occasion when you gave the name ███████

15   to the police, you told us there was a warrant outstanding

16   for your arrest, correct?

17       A.      Yes.

18       Q.      Did you offer the police officers money if they

19   would let you go?

20       A.      Yes.

21       Q.      Did you offer them sexual favors if they would

22   let you go?

23       A.      No.

24               (Whereupon, Certificate of Disposition was

25               marked as Defendants' Exhibit B for
```

1          identification as of this date by the Reporter.)

2                    MR. LARKIN:  I'm showing you what we've

3          marked as Exhibit B. ██████████, take a minute

4          and look at it.  If you would please, read the

5          last two pages to yourself and I'll have some

6          questions for you after you read those two pages.

7                    MS. BODDEN:  Just to make the record clear,

8          could you describe the pages that you want her to

9          read.

10    Q.    It's a four-page document, right?

11    A.    Yes.

12    Q.    Could you read the last two pages to yourself and

13   then I'll have some questions for you.

14    A.    All right.

15                   MS. BODDEN:  To make the record clear, I

16         need you to identify exactly what pages.  Since

17         the pages are not numbered, I want you to

18         describe.

19                   MR. LARKIN:  This is Page 1 so let's turn to

20         Page 1 --

21                   MS. BODDEN:  That's not making the record

22         clear.

23                   MR. LARKIN:  This is Page 2.  This is going

24         to help you, Marlen.  Turning to Page 2 --

25                   MS. BODDEN:  No, you're not.  I'm not asking

1     A.     Assault, maybe.

2     Q.     Have you ever been convicted of third degree

3   assault?

4     A.     Not that I recall of.

5     Q.     Did you ever assault a police officer?

6     A.     Yes.

7     Q.     How many times?

8     A.     I don't remember.

9     Q.     More than once?

10    A.     I think so.

11    Q.     More than twice?

12    A.     No.

13    Q.     You've assaulted police officers twice?

14    A.     Yes.

15    Q.     Did you plead guilty on both of those occasions

16   to assaulting a police officer?

17    A.     Yes.

18    Q.     Have you ever pled guilty to resisting arrest?

19    A.     Yes.

20    Q.     Have you ever bitten a police officer?

21    A.     Yes.

22    Q.     How many times have you bitten police officers?

23    A.     I think twice.

24    Q.     Were you ever convicted of criminal possession of

25   stolen property?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | How many times? |
| 3 | A. | Twice, twice or three. |
| 4 | Q. | You were convicted in Nassau County, correct? |
| 5 | A. | Yes. |
| 6 | Q. | Of criminal possession of stolen property? |
| 7 | A. | Yes. |
| 8 | Q. | You stole a credit card? |
| 9 | A. | Yes. |
| 10 | Q. | Who did you steal a credit card from? |
| 11 | A. | It was -- that was a long time ago.  This is |
| 12 | | talking about Nassau? |
| 13 | Q. | Yes. |
| 14 | A. | It was in the car that I stole the car from.  It |
| 15 | | was already in the car. |
| 16 | Q. | I don't understand your answer. |
| 17 | A. | The wallet was already in a stolen vehicle that I |
| 18 | | stole a car from. |
| 19 | Q. | You stole a car? |
| 20 | A. | Yeah, and the wallet was in the vehicle already. |
| 21 | Q. | The wallet was in the car, correct? |
| 22 | A. | Yes. |
| 23 | Q. | You stole a car, right? |
| 24 | A. | Yes, right. |
| 25 | Q. | Did you steal the car in Nassau County or in |

1    Queens?

2    A.    In Queens.

3    Q.    There was a wallet in the car, correct?

4    A.    Yes.

5    Q.    Did you use the credit card?

6         MS. BODDEN:   I'm going to now instruct the

7    Witness not to answer.   I've let you go far off

8    field and you've discussed allegations that you

9    didn't really have a right to discuss but in the

10   interest of the client testifying openly, we have

11   done that, but now you're going far off field and

12   talking about allegations.

13        MR. LARKIN:   Mark it for a ruling.   Let's

14   just call the Court.

15        MS. BODDEN:   I don't think you're allowed to

16   call the Court but you can call if you want to

17   but it's not with our consent.

18        MS. HAMILTON:   Private rules do not allow us

19   to take calls from parties.   We would have to

20   write a joint letter to the Court to get a

21   ruling.   I consulted the rules this morning.

22        MR. LOWENTHAL:   Why don't you finish and

23   then we'll have a conversation.

24        MR. LARKIN:   Fair enough.

25   Q.    The car you stole was a Nissan Sentra, correct?

1     A.      Correct.

2     Q.      You pled guilty to criminal possession of stolen

3     property in or about 2011, correct?

4     A.      Correct.

5     Q.      When the police stopped you, you told them that

6     the owner had sold you the car, isn't that right?

7     A.      Correct.

8     Q.      That was a false statement, wasn't it?

9     A.      Yes.

10    Q.      There was an order of protection entered against

11    you in that case, isn't that right?

12    A.      When was this?

13    Q.      2011.

14    A.      What was the girl named, Tina?

15    Q.      I don't have the name right here.

16    A.      You have everything else.

17    Q.      Would it refresh your memory if I showed you the

18    name?

19    A.      Yes.

20    Q.      Bear with me.  Does the name Laura Dan Clair

21    refresh your memory?

22    A.      Laura?

23    Q.      Laura Dan Clair, D-A-N C-L-A-I-R, does that name

24    refresh your memory?

25    A.      No.

███████

```
 1      Q.    Did you have the keys to that car?

 2      A.    Yes.

 3      Q.    How did you get the keys?

 4      A.    The keys was in the door.

 5      Q.    The key was in the door?

 6      A.    Yeah, in the door.

 7      Q.    Was the car on the street?

 8      A.    Yes.

 9      Q.    You were driving with your niece, weren't you?

10      A.    Okay, now I remember.  My memory is refreshed.  I

11   was with my niece, yes.

12      Q.    You were with your niece and then you saw the

13   keys in the door, is that correct?

14      A.    No.

15      Q.    Was that a different incident?

16      A.    Yes.

17      Q.    So you stole a car on one occasion when you saw

18   keys in the door, correct?

19      A.    There was no keys in the door.  I saw the car --

20   this guy -- something -- I got the car and my niece -- I

21   had my niece in the car.  We was having fun, driving

22   around.

23      Q.    You ran a couple of red lights, didn't you?

24      A.    No, that's not true.

25      Q.    You were driving recklessly with your niece in
```

1    the car, weren't you?

2       A.    I was driving fast but not recklessly.

3       Q.    The police stopped you, correct?

4       A.    Yes.

5       Q.    When they stopped you, you told the police that

6    the owner had sold you the car, correct?

7       A.    I don't remember what I said.

8       Q.    On the occasion when you stole a car and the keys

9    were in the door, were you with your niece or no?

10      A.    I wasn't with my niece.

11      Q.    That was a different occasion, right?

12      A.    Yeah.

13      Q.    Did you plead guilty to anything, any crimes in

14   connection with that incident?

15            MS. BODDEN:   Objection, I'm going to

16            instruct the Witness not to answer.

17            MR. LARKIN:   We'll discuss that later.

18      Q.    Were you arrested in Nassau County after you

19   stole the car when you saw those keys in the door?

20            MS. BODDEN:   Objection as to form.   Compound

21            and I'm going to instruct the Witness not to

22            answer.

23            MR. LARKIN:   Mark that one.

24            MS. BODDEN:   You can laugh all you want.

25      Q.    When you stole the Nissan Sentra, were you with

1    your niece or no?

2        A.    No.  What kind of car is that, black?

3        Q.    Well, I asked you earlier if you stole a Nissan

4    Sentra and you told me that you did.  My question is when

5    you stole a Nissan Sentra, were you with your niece or were

6    you not with your niece?

7        A.    I get mixed up with the cars.  It was a black

8    one, that was the one in Nassau.  No, that was the brown

9    one in Nassau and the one that I got with my niece was the

10   black car, the one that wasn't with the key.

11       Q.    You stole a brown car in Nassau when you saw the

12   keys in the door, correct?

13       A.    What did you say?

14       Q.    You stole a brown car in Nassau County when you

15   saw the keys in the door, correct?

16       A.    No.

17       Q.    You stole a black car in Nassau County when you

18   saw the keys --

19       A.    Nothing was in Nassau County that I stole.  I

20   would never steal in Nassau.

21            MR. LARKIN:  Go back to the answers earlier

22            and read it back.

23            (Whereupon, the referred-to answers were

24            read back by the Reporter.)

25       Q.    So there was a brown car in Nassau County, is

104



1      that correct?

2                      MS. BODDEN:  Objection as to form.  I'm

3              instructing her not to answer.  Asked and

4              answered.  The Reporter just read back the

5              questions and the answers.  They've been answered

6              already.  I'm instructing her not to answer.

7                      MR. LARKIN:  On the grounds that --

8                      MS. BODDEN:  It's asked and answered various

9              times.

10                     MR. LARKIN:  Well, I need to lay a

11             foundation for some further questions.

12                     MS. BODDEN:  That's fine.  You can ask the

13             Court Reporter to read it again if that's what

14             you would like.

15                     MR. LARKIN:  We're not doing that.

16                     MS. BODDEN:  Well, she's not answering the

17             question again, so you can forget that.

18                     MR. LOWENTHAL:  Let's just take a quick

19             break.

20                     (Whereupon, a brief recess was taken at

21             12:54 p.m. and the deposition resumed at 12:58

22             p.m.)

23      Q.     Now Miss ████████ there were two incidents

24      involving stolen cars, am I right?

25      A.     Yes.

1    Q.    One was a brown car, correct?

2    A.    Yes.

3    Q.    Did that incident occur in Nassau County?

4    A.    I drove to Nassau County.

5    Q.    The other incident involved a black car, is that

6  right?

7    A.    Yes.

8    Q.    The incident involving a black car, you were with

9  your niece at the time?

10   A.    Yes.

11   Q.    How did you get the keys to that car?

12   A.    I stoled (sic) it.

13   Q.    Who did you steal the keys from?

14   A.    I stole it from this guy.

15   Q.    What's the guy's name?

16   A.    I don't know his name.

17   Q.    How did you steal the keys from him?

18   A.    He left me in a car with the keys in the car.

19   Q.    Had he been driving you someplace?

20   A.    Yes.

21   Q.    Was he a friend or a neighbor?

22   A.    Yeah, friend.

23   Q.    You just decided to take his car?

24   A.    Yes.

25   Q.    With your niece?

1     A.     No, she wasn't in the car then but I was on drugs

2     then.  I was on heavy drugs.

3     Q.     When you were pulled over, were you under the

4     influence of drugs?

5     A.     Yes.

6     Q.     You were involved in an incident in September

7     where Mr. Bonar was killed, right?

8     A.     Yes.

9     Q.     There was a guy named Spencer Sands involved in

10    that incident, correct?

11    A.     Yes.

12    Q.     Did you know Mr. Sands before the incident

13    occurred?

14    A.     Sort of.

15    Q.     How did you know him?

16    A.     I really don't want to talk about that case.

17    Q.     I'm only going to ask a few questions about it.

18    I'm not going to get into --

19    A.     I really don't want to talk about it.

20    Q.     What was your relationship with Mr. Bonar?

21    A.     He's my boyfriend.

22    Q.     Mr. Sands told you he wanted his car?

23    A.     No, that's not what happened.  That's why I don't

24    like talking about it.  They lied.

25    Q.     Were you in the car when Mr. Sands committed the

1   crime?

2        A.      I was in the car and I didn't know he was going

3   to do anything to him.

4        Q.      Did you make statements to the police about that

5   incident?

6        A.      I made statements because they made me do that.

7   I was high.  I was on drugs.  I was high.  I did what they

8   told me to do.  They said that it needed to sound like it

9   needed to be planned.  Okay, this is what the police told

10  me, they said it needed to be planned.  It need -- it

11  needed to be planned out.  So they told me to write it how

12  it needed to be planned.  So I didn't know that I was going

13  to do time for it.  You understand?  I was thinking that I

14  was going to leave but I ended up not leaving there.  You

15  understand?  Plus, I'm slow so I didn't understand.  I was

16  taking mental medicine, so I really don't understand what

17  was going on.

18       Q.      At the time the incident occurred inside the car,

19  had you been using drugs?

20       A.      Yes.

21       Q.      What drugs had you been using?

22       A.      Crack cocaine.

23       Q.      Anything else?

24       A.      Liquor, weed.

25       Q.      You were arrested a couple of days later, am I

1    right?

2        A.      I was arrested the same -- I don't remember.   I

3    don't want to talk about it.

4        Q.      You were arrested; you had the car, right?

5        A.      Yeah, I had the car.

6        Q.      You're saying you made statements to the police,

7    correct?

8        A.      I did what they told me to do.

9        Q.      Are you saying that the police coerced the

10   statements from you?

11       A.      They told me to write the statements the way they

12   was written.

13       Q.      Did you give any statements to the police

14   voluntarily about the crime?

15       A.      No, they told me to write it.   They told me what

16   to do.

17       Q.      They told you to write the statement, correct?

18       A.      To write the statements how they wanted me to

19   write them.   They told me write it like this.

20       Q.      Before the police told you to write the

21   statement, did you tell them anything orally?

22       A.      No.

23       Q.      Nothing?

24       A.      Nothing.

25       Q.      You recall there was a hearing in that case,