UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE 1 and JANE DOE 2, on behalf of
themselves and all similarly situated women,

          Plaintiffs,

    -against-

THE CITY OF NEW YORK and BENNY
SANTIAGO,

          Defendants.

15 Civ. 3849 (AKH)

---

## PRETRIAL MEMORANDUM OF PLAINTIFFS JANE DOE 1 AND JANE DOE 2

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000

THE LEGAL AID SOCIETY
199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3300

*Attorneys for Plaintiffs Jane Doe 1 and Jane Doe 2*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 3

STATEMENT OF FACTS ................................................................................................. 5

I.     BACKGROUND ................................................................................................ 5

     A.     Jane Doe 1 ......................................................................................... 5

     B.     Jane Doe 2 ......................................................................................... 6

     C.     Santiago ............................................................................................ 6

     D.     The City ............................................................................................ 7

II.     FROM 2008-2012, SANTIAGO REPEATEDLY RAPED AND SEXUALLY ABUSED JANE DOE 1 ..................................................................................... 7

III.     FROM FEBRUARY TO MAY 2013, SANTIAGO REPEATEDLY RAPED AND SEXUALLY ABUSED JANE DOE 2 ..................................................... 10

IV.     SANTIAGO CAN OFFER NO CREDIBLE DEFENSE TO HIS RAPE AND SEXUAL ABUSE OF JANE DOE 1 AND JANE DOE 2 ................................. 13

V.     THE CITY IGNORED ALLEGATIONS STARTING IN 2007 THAT SANTIAGO WAS RAPING AND SEXUALLY ABUSING RMSC DETAINEES ........................................................................................................... 18

VI.     THE CITY'S INVESTIGATION OF JD2'S ALLEGATIONS REVEALS ASTONISHING INDIFFERENCE TO HER ABUSE ....................................... 21

     A.     DOI Investigation .......................................................................... 21

          1.     Initial Interviews ............................................................... 22

          2.     No Further Investigative Steps .......................................... 24

          3.     A Broken Chain of Custody .............................................. 27

          4.     Additional Allegations of Abuse ....................................... 31

          5.     Closing Memorandum ....................................................... 32

     B.     DOC ID Investigation .................................................................... 36

          1.     DOI's Failure to Provide Case Materials .......................... 38

          2.     Statute of Limitations ........................................................ 40

     C.     Deliberate Indifference .................................................................. 41

VII.     THE CITY IS GROSSLY INDIFFERENT TO THE WIDESPREAD AND SYSTEMATIC STAFF-ON-INMATE SEXUAL ABUSE AT RMSC ............. 42

     A.     The Conditions at RMSC Are Unconstitutional and Allowed Santiago To Rape and Sexually Abuse Plaintiffs with Impunity ................................. 43

          1.     PREA Compliance ............................................................ 44

          2.     Sexual Abuse Training ...................................................... 44

|  | 3. | Unannounced Rounds ................................................... | 45 |
|  | 4. | Cross-Gender Guards .................................................... | 46 |
|  | 5. | Code of Silence ............................................................ | 46 |
|  | 6. | Reporting Mechanisms ................................................. | 47 |
|  | 7. | Retaliation .................................................................... | 48 |
|  | 8. | Tainted Investigations ................................................. | 49 |
| B. | The City Concedes the Inadequacy of Policies and Practices at RMSC ... | | 50 |
| C. | Substantiation Rates of Sexual Abuse Allegations at RMSC Are Astonishingly Low ............................................... | | 51 |

ARGUMENT .................................................................................................. 53

| I. | THE 18-MONTH ADMINISTRATIVE STATUTE OF LIMITATIONS IS PRETEXT FOR THE CITY'S INDIFFERENCE ............................... | | 53 |
| II. | THERE IS NO CHAIN OF CUSTODY FOR JANE DOE 2'S JEANS FROM MAY 10 THROUGH MAY 14, 2013 ............................... | | 55 |
| A. | There Is No Chain of Custody Evidence for Jane Doe 2's Jeans .............. | | 56 |
| B. | Testing Has Revealed Male DNA That Is Consistent with Tampering .... | | 59 |
| C. | Trial Time Should Not Be Spent Determining the Non-Existence of Chain of Custody Evidence ............................... | | 60 |
| III. | THE CITY'S LOST OR DESTROYED EVIDENCE WARRANTS ADVERSE INFERENCE SANCTIONS ............................... | | 61 |
| A. | Destroyed Phone Records .................................................... | | 63 |
| B. | Destroyed GENETEC Video .................................................... | | 65 |
| C. | Housing Area Logbook for Building 11 ............................... | | 68 |
| D. | Jane Doe 2's Employment Records ............................... | | 70 |
| E. | Special Observation Logbooks for Building 9 ............................... | | 71 |
| F. | Drafts of DOC ID Closing Memorandum ............................... | | 72 |
| G. | Injury to Inmate Report .................................................... | | 73 |

CONCLUSION .................................................................................................. 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cash v. County of Erie*,
    654 F.3d 324 (2d Cir. 2011)..................................................................... 46

*McCormack v. Cheers*,
    818 F. Supp. 584 (S.D.N.Y. 1993) ........................................................ 58

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002)..................................................................... 62

*Rivera v. Wohlrab*,
    232 F. Supp. 2d 117 (S.D.N.Y. 2002) ................................................... 58

**Rules and Statutes**

Fed. R. Evid. 415 ............................................................................................ 62

N.Y. Civ. Serv. Law § 75(4) (McKinney 2017) ............................................. 40, 53

N.Y. Comp. Codes R. & Regs. tit. 9 § 7501.1 (2017) ................................... 46

N.Y. Comp. Codes R. & Regs. tit. 9 § 7502.1 (2017) ................................... 46

N.Y. Crim. Proc. Law § 30.10 (McKinney 2017) .......................................... 40, 53

N.Y. Penal Law § 130.00 (McKinney 2017).................................................. 21

N.Y. Penal Law § 130.05 (McKinney 2017).................................................. 21

N.Y. Penal Law § 130.25 (McKinney 2017).................................................. 21

Prison Rape Elimination Act of 2003 (PREA), 42 U.S.C. §§ 15601-15609 (2017) .......... 43

**Other Authorities**

Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Victimization Reported by Adult Correctional Authorities, 2007-2008* (2011),
https://www.bjs.gov/content/pub/pdf/svrca0708.pdf ..................................... 52

Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Violence Reported by Correctional Authorities, 2006* (2007), https://www.bjs.gov/content/pub/pdf/svrca06.pdf.................... 52

Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Victimization Reported by Adult Correctional Authorities, 2009-11* (2014),
https://www.bjs.gov/content/pub/pdf/svrca0911.pdf ..................................... 52

Plaintiffs Jane Doe 1 and Jane Doe 2 (collectively, "Plaintiffs") respectfully submit this pre-trial memorandum in advance of the damages trial set to begin on May 9, 2017.

## PRELIMINARY STATEMENT

The trial is about whether Plaintiffs Jane Doe 1 and Jane Doe 2 should be compensated for their repeated rape and sexual abuse by defendant Benny Santiago ("Santiago"), a correction officer ("CO") at Rikers Island, while they were incarcerated at Rose M. Singer Center ("RMSC"), the women's-only jail on Rikers Island.  Santiago is a serial sexual predator. He was the subject of allegations made by, or on behalf of, RMSC women over many years.  But none of those allegations was ever even investigated by defendant The City of New York ("the City"), with the sole exception of an investigation made in May 2013 when Jane Doe 2 reported Santiago's rape and sexual abuse of her.  That investigation was a travesty, and included tampering with physical evidence, failing to document a chain of custody, ignoring material facts, failing to interview relevant witnesses, and purposely delaying the investigation's completion so that nothing would happen to Santiago.  Indeed, that was the result:  Santiago received no discipline whatsoever, and continued as a CO earning full pay, and accruing his pension—which will fully vest later this year.  This inexcusable failure to protect RMSC women, whom the City has a constitutional duty to protect, is part of a widespread practice through which COs are taught that the City's "zero tolerance" policy against rape and sexual abuse is utterly empty:  guards accused of sexual abuse are not investigated, and in the rare instances when they are, the investigators inevitably conclude that the abuse allegations are "unsubstantiated."

The City does not contest its duty to protect the thousands of inmates and detainees in its custody from rape and sexual abuse, nor could it.  Yet, as the evidence at trial

will show, the City has unconstitutionally abrogated this duty.  The City further does not, and indeed cannot, contest that—as a matter of law—inmates are incapable of consenting to sexual contact with staff.  Yet, at RMSC, staff-on-inmate abuse—which ranges from forced, nonconsensual acts and unwanted, sexually abusive touching to voyeurism and verbal harassment—is widespread, and an "open secret" perpetuated by a code of silence among staff. Worse, the City, by exhibiting an astonishing degree of indifference, has made it effectively impossible for victims to avoid abuse or seek meaningful redress.  The City makes little to no effort adequately to screen or train its COs, relies on defunct reporting mechanisms for allegations of sexual abuse, fails to protect from retaliation those with the fortitude to report rape or sexual abuse, and causes the investigations it does undertake to reach indeterminate conclusions, avoiding punishment of sexual predators.  All of this fosters a culture of impunity at RMSC that has allowed women to be sexually abused and raped at significantly higher levels than at virtually all other jails in America.

The City's actions in Plaintiffs' cases exemplify its gross indifference to the safety of the women in its custody.  When Jane Doe 1 filed a notice of claim in 2013 alleging that she was sexually abused and raped by Santiago, the City did not take a <u>single</u> step to investigate her claims.  As for Jane Doe 2, the "investigation" conducted by the City after she reported her abuse accomplished little other than to ensure Santiago would suffer no consequence for raping inmates supposedly under his protection.  As the evidence at trial will show, the City mishandled—and tampered with—incriminatory DNA evidence.  Crucial corroborating evidence—including reports that Santiago had raped <u>multiple</u> other women <u>in addition to</u> Jane Doe 1 and Jane Doe 2, and claims that Santiago smuggled the drug Ecstasy and other contraband into RMSC—was ignored.  Other physical evidence, including audio and video

recordings, was either similarly ignored, or destroyed.  Most incredibly, the investigation was deliberately stonewalled for <u>over a year</u> by the New York City Department of Investigation ("DOI")—a delay done for the purpose of ensuring that the administrative statute of limitations would run so that no discipline would be imposed on Santiago.

Taken separately, each failing confirms the City's disinterest in maintaining a sexually safe environment for the women it is charged with protecting.  Taken together, the City's actions are consistent only with the determination that Santiago was a sexual predator, that the City knew that, and that the City was wholly indifferent to his abusive conduct—and to the unconstitutional practices that pervade RMSC.

## STATEMENT OF FACTS

### I.       BACKGROUND

#### A.       Jane Doe 1

Jane Doe 1 is a 31 year-old woman currently incarcerated at Bedford Hills Correctional Facility.  She was born at the DOC jail located at Elmhurst Hospital, Queens, on January 20, 1985, when her biological mother was incarcerated at Rikers Island,[1] and was adopted (along with her twin sister) at birth.[2]  She has completed approximately the equivalent of a tenth grade education (although she was held back in second and ninth grades for difficulty in school), and has been diagnosed at various points in her life with psychiatric disorders, including bipolar disorder, schizoaffective disorder and depression.[3]

On various occasions between 2006 to 2009 and 2011 to 2015, Jane Doe 1 was a pretrial detainee at RMSC.  At trial, the evidence will show that starting in 2008 through 2009,

---

[1] Expert Report of Karen B. Rosenbaum at 2, Nov. 4, 2016 (Pls.' Ex. 275) ("JD1 Rosenbaum Report"); Jane Doe 1 Decl. in Supp. of Mot. for Class Certification ¶ 4, Oct. 9, 2015, ECF No. 29 ("JD1 Decl.").

[2] JD1 Rosenbaum Report at 2.

[3] *Id.* at 3, 6; JD1 Decl. ¶ 5.

Santiago repeatedly raped and sexually abused Jane Doe 1.  When Jane Doe 1 returned to RMSC in 2011, Santiago resumed raping her, and continued to do so through November 2012.

The rape and sexual abuse suffered by Jane Doe 1 has caused substantial trauma to her.[4]  That trauma has caused post-traumatic stress disorder ("PTSD") and has worsened her other psychiatric conditions.[5]

### B.    Jane Doe 2

Jane Doe 2 is a 26 year-old woman currently residing in Queens, New York. From December 1, 2012 to May 14, 2013 and March 26, 2014 to April 3, 2014, she was a pretrial detainee at RMSC.  The evidence at trial will show that from February to May 2013, Santiago repeatedly raped and sexually abused Jane Doe 2.

As a result of Santiago's rape and abuse, Jane Doe 2 was diagnosed with and continues to suffer from PTSD.[6]

### C.    Santiago

Santiago is a 55 year-old man[7] and has been a CO since October 1997.[8]

At trial, the evidence will show that Santiago repeatedly raped and sexually abused Jane Doe 1 and Jane Doe 2, from 2008 to 2013.  The evidence will also show that beginning in at least 2007, numerous allegations have been reported to the City that Santiago has raped multiple other victims at RMSC.

---

[4] JD1 Rosenbaum Report at 11-12.

[5] *Id.*

[6] Expert Report of Karen B. Rosenbaum at 10-11, Nov. 4, 2016 (Pls.' Ex. 277) ("JD2 Rosenbaum Report").

[7] Santiago Dep. 11:7-8, July 29, 2016.

[8] *Id*. 23:15-20.

Despite the grave nature of the crimes of which he is accused, Santiago remains a CO employed by the New York City Department of Correction ("DOC"),[9] who is expecting to retire with a full pension in October 2017.

      **D.**    **The City**

The City is a municipal corporation organized under the laws of the State of New York and operates a number of detention facilities through DOC, including RMSC, which houses only women.  DOC operates the jails on Rikers Island, including RMSC, in addition to borough jails, court detention facilities and hospital wards, with an average daily population of approximately 10,000 inmates and detainees.  Approximately three-quarters of DOC inmates on Rikers Island are pre-trial detainees.

The evidence at trial will show that the City's deliberate indifference to the safety of women committed to its protection allowed Jane Doe 1 and Jane Doe 2 to be raped, abused, and retaliated against with impunity.

**II.**    **FROM 2008-2012, SANTIAGO REPEATEDLY RAPED AND SEXUALLY ABUSED <u>JANE DOE 1</u>**

At trial, the evidence will show that Santiago raped and sexually abused Jane Doe 1 for more than <u>four years</u>.  Jane Doe 1 was incarcerated at RMSC for several different periods of time beginning in 2006.  In 2008, while she was housed in Dorm 8 of RMSC (a building that has since been torn down) and guarded by Santiago, Santiago began raping her.[10] The rapes took place in the Dorm 8 dayroom during Santiago's night shift, after the captain had completed his rounds.[11]  On several of these occasions, after raping Jane Doe 1, Santiago

---

[9] *Id*. 44:11-12.

[10] Jane Doe 1 Dep. 31:17-20, 135:3-8, June 20, 2016 ("JD1 Dep.").

[11] *Id*. 24:13-27:18, 42:23-44:7, 54:20-55:3.

provided her with balloons filled with marijuana and tobacco.[12]  On one occasion, Santiago instructed Jane Doe 1 to come to his desk, unzipped his pants, exposed himself, and began masturbating.[13]  Santiago continued raping Jane Doe 1 until she was released in the summer of 2009.

       Santiago's abuse did not end there.  When Jane Doe 1 returned to RMSC in September 2011, Santiago immediately resumed raping and sexually abusing her.  He raped her in an abandoned cell area (now torn down) called the sprungs, and in empty rooms at RMSC.  Often, Santiago would tell Jane Doe 1 to complain to the staff in her housing building that she had chest pains and needed to go to the clinic.[14]  Once Jane Doe 1 arrived at the clinic, however, Santiago told her to tell the staff outside the clinic that her pains had gone away, and that she no longer needed to see health care professionals.[15]  Santiago would then arrange to meet her, and escort her to where he would rape her.[16]  On several occasions, Santiago anally raped her as punishment if she did something that displeased him,[17] such as when she asked him to use a condom (which Santiago refused to do).[18]  Santiago was physically rough with Jane Doe 1 when he raped and abused her, often choking her and pulling her hair.[19]  He was particularly rough when Jane Doe 1 tried to defend herself, like when she requested that he use a condom.

       Jane Doe 1 acquiesced to Santiago's demands and did not report his abuse because she believed that she had no choice.  Not only did Santiago repeatedly warn Jane Doe 1

---

[12] *Id.* 23:12-25:6, 50:24-51:3, 53:13-54:4, 80:14-81:7, 116:25-117:14.

[13] *Id.* 137:1-140:13.

[14] *Id.* 82:13-25, 83:23-84:1, 86:13-25.

[15] *Id.* 83:1-4, 84:2-5.

[16] *Id.* 83:5-22, 84:6-11.

[17] *Id.* 83:13-22.

[18] *Id.* 73:8-11.

[19] *Id.* 25:7-26:2.

to keep her mouth shut, but Jane Doe 1 was terrified of Santiago's ability to retaliate, should she report him: she felt that Santiago always had access to her and could physically or sexually harm her at any time.[20] Santiago's rough treatment of Jane Doe 1, and threats, effectively put her in fear of him.[21] Jane Doe 1 also did not think that anyone would believe her allegations because she was an inmate.[22]

Santiago also repeatedly threatened Jane Doe 1's family in order to ensure that Jane Doe 1 submitted to, and did not report, his rape and sexual abuse. For example, on one occasion, Santiago visited B.W., Jane Doe 1's mother.[23] Afterwards, Santiago described the visit in detail to Jane Doe 1, including indicating that he repeatedly went back to her house and was watching it, her family, and her nieces from his car.[24] He made clear to Jane Doe 1 that, if she reported Santiago or caused him any trouble, he would and could take it out on her family. These remarks effectively silenced Jane Doe 1 and made certain that she would not do anything to defend herself from Santiago.

Nevertheless, after being pushed to the brink by Santiago's abuse, and having learned that Santiago was already under investigation as a result of a complaint made by another RMSC woman, on July 29, 2013, Jane Doe 1 finally allowed counsel to file on her behalf a notice of claim with the City, reporting she had been sexually abused and raped by Santiago and that the City failed to protect her from his abuse.[25] To this day, almost four years later, however, the City has made no effort to investigate her claim, further confirming Jane Doe 1's fears of the

---

[20] *Id*. 79:11-80:9; JD1 Decl. ¶¶ 7, 8.

[21] JD1 Dep. 30:11-20, 79:11-80:9; JD1 Decl. ¶¶ 7, 8.

[22] JD1 Dep. 79:11-80:9; JD1 Decl. ¶ 7.

[23] JD1 Dep. 67:7-71:25.

[24] JD1 Decl. ¶ 10.

[25] Jane Doe 1 Personal Injury Claim Form (July 29, 2013) (JANEDOES_00000029-32) (Pls.' Ex. 58).

City's indifference to, and effective complicity in, her rape and sexual abuse.  Thus, Jane Doe 1 did not finally authorize the filing of this lawsuit until immediately prior to when she was about to be removed from RMSC, and placed in a state prison—thereby preventing Santiago from having access to her, although she is still afraid of him and worries about her family.

### III.  FROM FEBRUARY TO MAY 2013, SANTIAGO REPEATEDLY RAPED AND SEXUALLY ABUSED <u>JANE DOE 2</u>

The evidence at trial will also show that Santiago abused Jane Doe 2 from February to May 2013.  In February 2013, while she was housed in Building 11 at RMSC, Jane Doe 2 began working as a Suicide Prevention Aid ("SPA") in Building 9 at RMSC.[26]  As an SPA, she was responsible for monitoring inmates on suicide watch and had to make rounds at night.[27]  At the time, Santiago was the steady officer assigned to the night shift (11 p.m. to 7 a.m.) in Building 11.[28]  Buildings 9 and 11 were physically connected, including by a common "pantry" whose doors opened into Buildings 9 and 11.  Because Jane Doe 2 would repeatedly return to Building 11 during and at the end of her overnight SPA shift (which she served in Building 9), Jane Doe 2 and Santiago came into contact nearly every night Santiago was on duty.

Once Jane Doe 2 became an SPA and came into nightly contact with Santiago, Santiago began making lewd sexual comments to her.[29]  At one point, he told her that he would pay her for oral sex.[30]  Santiago then began repeatedly raping Jane Doe 2 throughout February and until early May 2013.  These rapes took place in an empty cell or in the janitor's closet in

---

[26] Jane Doe 2 Dep. 83:2-84:2; 87:3-16, June 28, 2016 ("JD2 Dep.").

[27] *Id.*; Jane Doe 2 Inmate Movement History Log at DEF_0002262  (Dec. 2, 2012 - May 14, 2013) (DEF_0002260-2264) (Pls.' Ex. 45).

[28] JD2 Dep. 80:24-81:15.

[29] JD2 Dep. 81:19-82:4.

[30] *Id*. 81:19-82:11.

Building 11.[31]  During the period of this abuse, Santiago shared details of his personal life with Jane Doe 2.[32]  He also provided her on multiple occasions with various forms of contraband, including the narcotic Ecstasy.[33]  After the first incident of abuse, Santiago paid Jane Doe 2 $100 in twenty dollar bills.[34]  After the last incident of abuse, Jane Doe 2 spit Santiago's semen into her hand and wiped it on her jeans.[35]

If Jane Doe 2 tried to refuse his demands, Santiago threatened her.  On one occasion, Santiago warned Jane Doe 2 that he would give her "a fake ticket to get [her] put" in punitive segregation if she refused to have sex with him.[36]  When Santiago suspected that Jane Doe 2 might have reported him, he retaliated against her.  On May 4, 2013, for example, Jane Doe 2 was infracted for possession of contraband and moved out of Building 11.[37]  Because she feared retaliation from Santiago, she told investigators that a CO "Taylor"—a name she made up to avoid having to report Santiago—had given her the contraband items.[38]  Jane Doe 2 was then moved back to Building 11.[39]  Upon her return there, she was harassed and threatened by (among others) COs who believed that she had "snitched" on Santiago.[40]  She was also kept locked in her

---

[31] *Id.* 95:13-96:3, 104:7-21, 117:23-118:11, 119:7-22.

[32] *Id.* 98:20-99:12, 129:3-10, 138:1-13, 138:23-139:13; Jane Doe 2 Bible and Diary Entries at DEF_0018263 (DEF_0018259-7) ("JD2 Bible and Diary") (City's Exs. JJ & KK).

[33] JD2 Dep. 111:2-112:10, 130:24-131:6, 156:25-157:9, 185:22-186:19.

[34] *Id.* 95:10-96:7.

[35] *Id.* 190:3-24, 191:14-23.

[36] *Id*. 53:4-54:14, 188:4-14.

[37] DOC, Jane Doe 2 Contraband Infraction Investigation File at DEF_0016140-41 (May 9, 2013) (DEF_0016136-51) (Incident Report Form (May 4, 2013)); DOC ID, Jane Doe 2 Investigation File at DEF_0002498 (DEF_0002479-525) (Santiago's Ex. H) (May 4, 2013 Infraction History Inquiry (June 10, 2015)); Jane Doe 2 Inmate Movement History Log at DEF_0002264 (Dec. 2, 2012 - May 14, 2013) (DEF_0002260-2264) (Pls.' Ex. 45).

[38] JD2 Dep. 210:24-211:9.

[39] Jane Doe 2 Inmate Movement History Log at DEF_0002264 (Dec. 2, 2012 - May 14, 2013) (DEF_0002260-2264) (Pls.' Ex. 45).

[40] JD2 Dep. 152:24-153:21, 161:1-164:24, 178:15-17; JD2 Bible and Diary at DEF_0018266-68 (City's Exs. JJ & KK).

cell—<u>by Santiago</u>—without food,[41] because Santiago believed that she had reported him for giving her contraband.

A few days later, on May 9, 2013, when Jane Doe 2 could no longer stand the retaliation, she reported her sexual abuse to a mental health clinician, and advised the clinician that it was Santiago who had given her contraband, and who had raped and sexually abused her.[42]  That initial report was effectively ignored:  the mental health clinician told her there was nothing that could be done, and Jane Doe 2 was again returned to Building 11.[43]  There, she was <u>again</u> threatened and bullied while COs turned a blind eye.[44]  One day later, on May 10, Jane Doe 2 again reported her abuse to a member of the DOC medical staff.[45]  This time, DOI was notified.[46]  But this report, too, was effectively ignored by the City:  as discussed *infra* Section VI, DOI's resulting investigation into Jane Doe 2's allegations accomplished little more than to ensure Santiago's impunity.

While Jane Doe 2 was transferred out of RMSC in May 2013 and sent to a New York State prison in Orange County, approximately one year later, on March 27, 2014, Jane Doe 2 was transferred back to RMSC because she had a hearing in a New York City court.[47]  Upon returning to RMSC, she was subject to further retaliation and verbal attacks from COs.[48]  She was also transferred to punitive segregation and denied access to legal phone calls and her

---

[41] JD2 Bible and Diary at DEF_0018268 (City's Exs. JJ & KK).

[42] JD2 Dep. 169:13-171:25; JD2 Bible and Diary at DEF_0018268-69 (City's Exs. JJ & KK).

[43] JD2 Dep. 169:13-171:25.

[44] *Id.* 165:23-166:24.

[45] N.Y.C. Corr. Health Servs., Appointment Summary (May 10, 2013) (DEF_0001515-17); E-mail from Jennifer Sculco, Inspector Gen., DOI, to James Christo, Assistant Inspector Gen., DOI (May 10, 2013) (DEF_0001945-46) (Pls.' Ex. 32) (forwarding e-mail from DOC medical staff regarding sexual assault).

[46] E-mail from Jennifer Sculco, Inspector Gen., DOI, to James Christo, Assistant Inspector Gen. & Ferdinand Torres, Investigator, DOI (May 10, 2013) (DEF_0001948-49) (Pls.' Ex. 33) (forwarding e-mail from DOC medical staff regarding sexual assault).

[47] Jane Doe 2 Inmate Movement History Log (Mar. 27 - Apr. 3, 2014) (DEF_0002258) (Pls.' Ex. 66).

[48] JD2 Dep. 203:13-204:25.

medication.[49]  Jane Doe 2's father and her legal counsel (The Legal Aid Society) notified DOI that Jane Doe 2 was being retaliated against,[50] but, for the third time, she was effectively ignored:  DOI failed to do anything to investigate the retaliation charges.

## IV.   SANTIAGO CAN OFFER NO CREDIBLE DEFENSE TO HIS RAPE AND SEXUAL ABUSE OF JANE DOE 1 AND JANE DOE 2

At trial, the evidence will wholly discredit Santiago's defenses to Plaintiffs' allegations.  With respect to Jane Doe 1, Santiago claims that he does not know and has never even heard of her.[51]  But the evidence shows otherwise.  Not only will Jane Doe 1 testify to the contrary, but she will testify to knowledge of specific, personal details about Santiago, including information about his ex-wife, children, car, and food preference.[52]  She will also be able to provide an accurate physical description of Santiago's penis, including its length, both erect and flaccid.  Jane Doe 1's knowledge of these details renders Santiago's contention that he never knew her preposterous.

Santiago will also attempt to deny that he has ever visited B.W., Jane Doe 1's mother.[53]  Again, his denial cannot be credited.  Under examination by Santiago's counsel, B.W. has sworn under oath that she has met Santiago.[54]  She has testified that Santiago came to her home, and that he called her—using the phone number Jane Doe 1 provided him—to ask for

---

[49] *Id.*

[50] Referral Letter No. 14-03623 from Mark Peters, Comm'r, DOI, to Florence Finkle, Deputy Comm'r of Investigations, DOC (Apr. 11, 2014) (NYC_00001483-86) (Pls.' Ex. 67); Referral Letter No. 14-03646 from Mark Peters, Comm'r, DOI, to Florence Finkle, Deputy Comm'r of Investigations, DOC (Apr. 11, 2014) (NYC_00001488) (Pls.' Ex. 68); E-mail from James Christo, Assistant Inspector Gen., DOI, to Rhonda Young, Investigator, DOI (Apr. 2, 2014) (DEF_0001909) (forwarding e-mail from attorney William Gibney, The Legal Aid Society).

[51] Santiago Dep. 243:25-245:12.

[52] JD1 Dep. 63:20-64:11, 118:11-119:12.

[53] Santiago Dep. 245:18-245:25.

[54] B.W. Dep. 29:5-30:4, 36:23-37:5, 37:21-38:24, 60:6-20, July 14, 2016.

directions, claiming that he was lost.[55]  And, not only was B.W. able to provide a physical description of Santiago, but she correctly identified a photograph of him.[56]

As to Jane Doe 2, Santiago admits knowing her, but denies raping her.  Again, the evidence will gut his denial.  Like Jane Doe 1, Jane Doe 2 has testified to knowledge of personal details about Santiago:  his cell phone number and address,[57] that he was a Virgo,[58] information about his ex-wives, daughters, and grandson,[59] what kind of car he drove, the length of his penis and that his penis is uncircumcised.[60]  Santiago himself has confirmed—under oath—the accuracy of each of these pieces of information.[61]  Importantly, Jane Doe 2's recollection of these details is by no means one she constructed after-the-fact:  she relayed these facts to DOI investigators when she reported Santiago's abuse in May 2013, and they are reflected in handwritten notes taken contemporaneously by those investigators when they interviewed her.[62]  Jane Doe 2 also contemporaneously recorded these facts in a notebook that Santiago provided her.[63]  The notebook contains—along with a detailed account of each incident of rape—a list of contacts, including one for Santiago:  labeled "Boo" with a home address, e-mail address and

---

[55] *Id*. 33:23-40:7.

[56] *Id*. 38:25-39:25, 59:20-61:7; B.W. Dep. Ex. 1, July 14, 2016 (Benny Santiago Photograph).

[57] JD2 Dep. 98:20-99:12, 138:1-13, 138:23-139:5; JD2 Bible and Diary at DEF_0018263 (City's Exs. JJ & KK).

[58] JD2 Dep. 129:3-10.

[59]  James Christo, Assistant Inspector Gen., DOI, & Rhonda Young, Investigator, DOI, Jane Doe 2 Interview Handwritten Notes at DEF_0001474, DEF_0001498 (May 13, 2013) (DEF_0001470-500) (Pls.' Ex. 42) ("JD2 DOI Notes").

[60] *Id.* at DEF_0001474, DEF_0001498.

[61] Santiago Dep. 10:18-24, 11:7-8, 45:20-23, 168:8-12; James Christo, Assistant Inspector Gen., DOI, Santiago Interview Memorandum (May 13, 2013) (DEF_0001919-20) (Pls.' Ex. 43) ("Santiago DOI Interview Memorandum").

[62] JD2 DOI Notes at DEF_0001474, DEF_0001498 (Pls.' Ex. 42).

[63] JD2 Dep. 130:24-131:6.

two telephone numbers.[64]  Santiago has also confirmed that the home address, e-mail address and one of the phone numbers are his.[65]

Santiago denies that he told Jane Doe 2 any of this information.  His denials consist solely of post-hoc justifications that are plainly falsehoods.  During his deposition, Santiago first claimed that Jane Doe 2 obtained his personal contact information after stumbling upon a magazine he had misplaced.[66]  But he is unable to construct a coherent explanation for how she so stumbled or how he intuited that she obtained the information from the magazine.[67] Nor can he explain why, in 2013, when investigators asked him how Jane Doe 2 knew details about his personal life, there is no record of Santiago having told the investigators that he had lost a magazine at all, only that Jane Doe 2 must have overheard him talking to other COs.[68] Yet, he testified that he came to the realization that he had lost the magazine "[w]hen [he] was being questioned that night . . . when [the investigators] said that [Jane Doe 2] had my phone number and my information."[69]

Santiago then retreats to the contention that Jane Doe 2 simply overheard these facts, but he is—again—unable to construct a coherent narrative explaining how Jane Doe 2 could have done so.[70]  And he was unable to find a single witness corroborating this assertion. When asked, Santiago initially claimed that Jane Doe 1 might have overheard him speaking to

---

[64] JD2 Bible and Diary at DEF_0018263 (City's Exs. JJ & KK).

[65] Santiago Dep. 10:18-24, 45:20-23, 160:6-13, 168:8-12.

[66] *Id.* 160:21-161:18.

[67] *Id.* 160:21-163:12, 165:18-167:16, 168:3-168:7.

[68] Santiago DOI Interview Mem. (Pls.' Ex. 43).

[69] Santiago Dep. 161:5-162:25.

[70] *Id.* 160:14-163:12, 165:18-167:16, 168:3-168:7, 177:17-184:16, 186:23-187:21, 197:3-199:13, 231:18-232:16, 236:18-237:3.

fellow COs in the corridors after roll call.[71]  According to Santiago, these conversations would have taken place in the corridors "[t]owards Building 11 and going from Building 11 towards the exit."[72]  Upon realizing inmates in their cells <u>cannot hear</u> COs conversing with one another in these corridors,[73] Santiago immediately switched his testimony to claim that Jane Doe 2 overheard him talking to other officers during sick call.[74]  Still later, Santiago claimed that he discussed these details with sanitation workers, but in the same breath acknowledges that sanitation workers would not have accompanied him during sick call.[75]  Santiago's confused and inconsistent testimony makes clear that Jane Doe 2 did not "overhear" Santiago telling these intimate details to any third party:  Santiago told these details to Jane Doe 2 during the period he was abusing her, and cannot now evade that fact.

Nor is it credible that Santiago would have shared such personal information with other COs.  During his deposition, Santiago swore that his conversations with the two COs assigned to the same shift in Building 9—which is adjacent, and connected, to Building 11, where Santiago was stationed for at least a year—were limited to "hello" and "good-bye."[76]  Those officers provided similar testimony.  In fact, one officer testified that he simply <u>never</u> interacted with Santiago.[77]  The other officer testified that he would not describe Santiago as friendly:  Santiago apparently never discussed his personal life, nor did the officer have knowledge of <u>any</u> details as to Santiago's personal life, including his marital status or whether he

---

[71] *Id.* 179:11-181:2.

[72] *Id.* 180:25-181:2.

[73] *Id.* 181:3-9.

[74] *Id.* 181:17-182:17.

[75] *Id.* 197:3-198:25.

[76] *Id.* 126:6-128:18.

[77] Rodriguez Dep. 146:15-148:21, June 9, 2016.

16

had children.[78]  Plainly, Santiago's statement that "[c]oworkers ask me about my daughter at work"[79] is not to be believed.  And, if Santiago did not share facts as basic as his marital status or whether he had children with fellow officers who—for an entire year—were assigned to the adjacent building, it is frankly incredible that he would otherwise be broadcasting intimate details for Jane Doe 2 (or indeed, any inmate) to overhear.

For many additional reasons, Santiago's denials grow bloated with improbability. Both Jane Doe 1 and Jane Doe 2 are able to provide corroborating testimony as to the physical characteristics of Santiago's penis:  its length, both flaccid and erect, and that it is uncircumcised. At least, Santiago does not attempt to argue that Plaintiffs overheard him describing his penis to other officers.  In fact, Santiago has not repudiated Plaintiffs' testimony at all.  When asked, he simply refused to provide any estimate of the length of his penis.[80]  He has also confirmed that his penis is uncircumcised; however, he insists that Plaintiffs' testimony amounts to a "lucky" guess.[81]  But "luck" had nothing to do with it:  Plaintiffs are able to describe Santiago's penis because Santiago raped and sexually abused them, so they saw his penis.  Significantly, Santiago has refused to submit to a medical examination that might rebut Plaintiffs' description.[82]  The explanation why is obvious:  because the examination would no doubt confirm Plaintiffs' description.

Santiago has also sworn that he never gave Jane Doe 2 contraband.[83]  In fact, during his deposition, Santiago stated that he never gave Jane Doe 2 even a stick of gum—but he

---

[78] Harris Dep. 145:10-149:19, 155:20-156:8. June 13, 2016.

[79] Santiago Dep. 179:13-24.

[80] *Id*. 222:5-223:8.

[81] *Id*. 199:17-21.

[82] Joint Letter at 1-2, July 19, 2016, ECF 177.

[83] Santiago Dep. 205:17-19.

told DOI investigators in 2013 that he had done so.[84]  More incredibly, he claims that, with the exception of the content of news reports, he has never—in nearly 20 years of being a CO—even heard of a Rikers Island officer giving an inmate contraband.[85]  Nor, apparently, has he ever heard of inmates being retaliated against for reporting misconduct or being afraid to report misconduct out of fear of retaliation.[86]  These statements stretch the bounds of reason:  the City's own witness has testified that contraband is "rampant" at Rikers, and in 2015, the City's own consultants (the Moss Group, Inc.) issued a Sexual Safety Assessment Report that highlighted widespread retaliation against inmates for reporting abuse.[87]

Finally, Santiago refused to provide a DNA sample to investigators in 2013.[88]  But a DNA sample, if it did not match the DNA on Jane Doe 2's jeans following the last incident of rape, would have been powerful evidence suggesting his innocence.  Of course, Santiago's refusal is not surprising:  there can be no evidence of his innocence, because he is not innocent.

## V.   THE CITY IGNORED ALLEGATIONS STARTING IN 2007 THAT SANTIAGO WAS RAPING AND SEXUALLY ABUSING RMSC DETAINEES

The evidence at trial will show that Santiago raped and sexually abused Jane Doe 1 and Jane Doe 2.  But that is not all.  At trial, the evidence will also show, disturbingly, that the City has now repeatedly ignored significant red flags that Santiago was a sexual predator— and that Jane Doe 1 and Jane Doe 2 were not isolated victims of his abuse.  There is indisputable documentary evidence and testimony that over nearly a decade reports were made to the City

---

[84] *Id.* 232:24-234:8, 235:2-235:9; Santiago DOI Interview Mem. (Pls.' Ex. 43).

[85] *Id.* 215:18-216:8.

[86] *Id.* 227:4-227:11.

[87] Wityak Dep. 149:16-150:3, Mar. 31, 2016; Moss Grp., Inc., Sexual Safety Assessment Report at DEF_0014447-48 (2015) (DEF_0014410-95) (Pls.' Ex, 104) ("Sexual Safety Assessment Report") (report conducted for the N.Y.C. Dep't of Correction and funded by the U.S. Dep't of Justice, Bureau of Justice Assistance); Moss Grp., Inc., RMSC Staff Focus Group Notes at TMGNYC10769 (Jan. 15-16, 2015) (TMGNYC10758-73); Moss Grp., Inc., RMSC Inmate Focus Group Notes at TMGNYC13828-13829 (Jan. 15-16, 2015) (TMGNYC13825-38).

[88] Santiago DOI Interview Mem. at DEF_0001920 (Pls.' Ex. 43).

that Santiago was sexually abusing female inmates.  Yet, other than with respect to Jane Doe 2, the City did <u>nothing</u> to investigate <u>any</u> of these allegations.  For example:

In 2007, a female inmate reported to DOI that Santiago was supplying inmates with contraband, and her husband subsequently informed DOI that COs have oral sex with inmates.[89]  <u>There is no record of DOI following up on these claims.</u>

In 2012, a female detainee at RMSC alleged that Santiago was having sex with two inmates.[90]  Her allegation was recorded during a disciplinary hearing for a charge the inmate alleged was falsely entered against her by Santiago as an implicit threat to prevent her from reporting his sexual abuse.[91]  The DOC captain presiding over the disciplinary hearing reported the allegation to DOI,[92] but again, <u>DOI never bothered to investigate the allegation</u>.

In June 2013, a detective advised DOI (who in turn specifically advised DOI's James Christo, who was then investigating Jane Doe 2's allegations against Santiago), that:

> [H]er female [confidential informant] told her that she knew Dwason [an inmate] has been having sex with CO Santiago and that she is pregnant by him.
>
> Det. Swepson also said that inmate Shannon B/C# [XXX-XX-XXXXX] was recruiting young female inmate[s] for CO Santiago for sex in exchange for cigarettes.[93]

Shockingly, even though Santiago had impregnated an inmate, no investigation was pursued of what Detective Swepson reported.

---

[89] DOI, General Information and Intake Details, at DEF_0001931 (July 30 - Aug. 31, 2007) (DEF_0001931-001934) (Pls.' Ex. 31) documenting notification of allegation by inmate M.F. that CO Santiago was supplying inmates with contraband.

[90] Medina Dep. 114:24-115:4, Apr. 21, 2016.

[91] J.F. Disciplinary Hr'g Tr. 9:13-13:19, July 23, 2012 (Pls.' Ex. 15).

[92] Diane Medina, Assistant Deputy Warden, DOC, Page from Disciplinary Hr'gs Journal (July 23, 2012) (DEF_0014497) (Pls.' Ex. 16).

[93] E-mail from Belarminia Ortiz, Chief Investigator, DOI, to James Christo, Assistant Inspector Gen., DOI (June 3, 2013) (NYC_00007047) (Pls.' Ex. 53).

In July 2013, Jane Doe 1 filed a notice of claim with the City that identified Santiago as having raped and sexually assaulted her.[94]  The City—to this day—has never investigated Jane Doe 1's allegations.  Its failure to do so is particularly disturbing:  Jane Doe 1's notice of claim was filed <u>at the same time</u> the City was ostensibly investigating Jane Doe 2's allegations of sexual abuse against Santiago.  In other words, despite being placed clearly on notice that a rapist was guarding women at RMSC, and the fact that the City was simultaneously investigating Jane Doe 2's claims for sexual abuse against <u>that same officer</u>, the City took <u>no steps</u> to investigate Jane Doe 1's allegations.

It cannot be the City's position that the fact that other allegations of Santiago's abuse have been reported is not significant.  Numerous City witnesses—including DOC Deputy Commissioner Gregory Kuczinski and former DOC Deputy Commissioner Michael Blake—have testified that it is absolutely important to know whether other similar allegations have been made against the same suspect, and that, in particular, City investigators should not have ignored Jane Doe 1's 2013 allegations in the context of their investigation of Santiago's rape and sexual assault of Jane Doe 2.[95]  And yet, all such evidence <u>was</u> ignored.

The City's clear indifference to Santiago's repeated pattern of abuse is shocking.  More troubling, it is not limited to disregarding multiple reports of Santiago's abuse.  As discussed *infra* Section VI, that indifference is made even more obvious by the gross missteps that blighted—from day one—the City's investigation into Jane Doe 2's claims.

---

[94] Jane Doe 1 Personal Injury Claim Form (July 29, 2013) (JANEDOES_00000029-32) (Pls.' Ex. 58).

[95] *See, e.g.*, Kuczinski Dep. 85:5-88:6, June 29, 2016; Blake Dep. 225:17-226:15, July 26, 2016.

## VI.    THE CITY'S INVESTIGATION OF JD2'S ALLEGATIONS REVEALS ASTONISHING INDIFFERENCE TO HER ABUSE

The evidence at trial will show that, after becoming aware of Santiago's abuse of Jane Doe 2, the City manifested no interest in meaningfully investigating Jane Doe 2's allegations.  In fact, the "investigation" accomplished little other than to ensure Santiago would suffer no consequence for raping inmates supposedly under his protection.  Crucial corroborating information—including as to the physical characteristics of Santiago's penis—was withheld from the reports issued, and other material information was also omitted, or affirmatively falsified.  Whole swaths of evidence (as detailed *infra* Argument, Section III) have been destroyed.  Physical evidence was tampered with:  Santiago's semen, which Jane Doe 2 placed on her jeans, was washed off before the jeans were sent to the Office of the Chief Medical Examiner ("OCME") for testing.  Allegations that Santiago was raping other inmates and that he provided Ecstasy, marijuana, and other contraband to them were not investigated at all, let alone referred to criminal authorities.  The City also ignored the criminal statutes that Santiago violated—a list including at least New York Penal Law Sections 130.00 (Sex offenses; definitions of terms), 130.05 (Sex offenses; lack of consent), or 130.25 (Rape in the third degree).  The City stonewalled the investigation for so long that the administrative statute of limitations for taking action against Santiago expired.  As a result, Santiago suffered no punishment whatsoever for having raped and sexually abused Jane Doe 2, Jane Doe 1, and other RMSC women.  None.

### A.    DOI Investigation

On May 10, 2013, DOI was notified of Jane Doe 2's allegations.  Over a year later, on June 25, 2014, DOI closed its investigation and referred the matter to the New York City Department of Correction Investigation Division ("DOC ID").  As detailed below, DOI's

"investigation" can be boiled down to the following: mishandling and tampering with crucial DNA evidence, disregarding or destroying corroborating evidence, inexplicable stonewalling, and little else.

### 1. Initial Interviews

On May 10, 2013, and a second time within the next few days, DOI Investigators James Christo and Rhonda Young interviewed Jane Doe 2 at RMSC.[96] Jane Doe 2 provided them with an extremely detailed account of her abuse, including dates and locations of each incident of rape.[97] As mentioned, and as reflected in the investigators' contemporaneous, handwritten notes, she also relayed identifying, personal information about Santiago, including information about his ex-wives, daughters, vacation, and car, as well as a description of his penis: its length, both erect and flaccid, and that it was uncircumcised.[98]

In addition to the notes Young and Christo took of this interview, there exists a set of unidentified handwritten notes in the DOI case file that belongs to neither Young nor Christo, nor can either of them identify whose they are.[99] The City claimed that it did not know who wrote those notes.[100] But Christo and Young testified that Jane Doe 2 was not interviewed by anyone else.[101] Why, then, would there be an additional set of notes that no one can identify? Someone had to write them. This mystery participant in the investigation has been effectively hidden by the City throughout this case. The jury should be instructed that an additional investigator participated in the investigation of Jane Doe 2's allegation, but the City has failed to

---

[96] JD2 Dep. 200:6-11; Christo Dep. 111:23-112:4, Mar. 24, 2016.

[97] Unidentified Jane Doe 2 Interview Handwritten Notes (May 12, 2013) (DEF_0001423-69) (Pls.' Ex. 41); JD2 DOI Notes (Pls.' Ex. 42).

[98] JD2 DOI Notes at DEF_0001474, DEF_0001498 (Pls.' Ex. 42).

[99] Unidentified Jane Doe 2 Interview Handwritten Notes (May 12, 2013) (DEF_0001423-69) (Pls.' Ex. 41); Christo Dep. 172:7-174:21, Mar. 24, 2016; Young Dep. 167:16-25, Mar. 22, 2016.

[100] City's Resps. & Objs. to Pls.' Third Set of Interrogs. at 4, May 12, 2016 (Pls.' Ex. 121) (Interrogatory No. 14).

[101] Young Dep. 135:14-15.

identify that person's identity.  As a result, Plaintiffs were prevented from deposing that person, and the jury will not hear the testimony of that person.

Further, following the interview of Jane Doe 2, Young evidently began drafting an interview memorandum, but neither she nor anyone else ever completed it.[102]  She testified that she had begun the draft to "help [Christo] out . . . because he had a lot going on with this case."[103]  But Christo never bothered to finish or finalize the draft.  The memo, which is included in the final DOI case file, remains obviously incomplete:  it contains clear inaccuracies and trails off in garbled text halfway through the chronology of events Jane Doe 2 reported.[104]  Again, no explanation has been offered why the memorandum was never finished—which is particularly inexplicable since DOI consumed 13 months before "completing" its investigation.

Also on May 10, Christo and Young interviewed Santiago outside of RMSC when he was on his way into the facility to begin his shift.[105]  They spent all of five minutes with Santiago.  As mentioned, Santiago categorically denied any inappropriate contact with Jane Doe 2 and stated that he knew Jane Doe 2 only because she was the SPA in Building 9.[106] Despite the incredible brevity of the interview, DOI made no attempt to interview Santiago again.  Nor were any notes taken (though investigators did later prepare a brief interview memorandum—apparently solely from memory).[107]  In fact, DOI failed to take notes for any interview other than for their initial interview of Jane Doe 2.  This is directly contrary to DOI policy:  Jennifer Sculco, Inspector General at DOI, has testified that contemporaneous notes

---

[102] Rhonda Young, Investigator, DOI, Draft Jane Doe 2 Interview Memorandum (May 14, 2013) (DEF_0001923-25) (Pls.' Ex. 47).

[103] Young Dep. 170:14-175:25.

[104] Rhonda Young, Investigator, DOI, Draft Jane Doe 2 Interview Memorandum (May 14, 2013) (DEF_0001923-25) (Pls.' Ex. 47).

[105] Young Dep. 265:5-16.

[106] Santiago DOI Interview Mem. (Pls.' Ex. 43).

[107] *See id.*

should be taken of all interviews.[108]  Christo and Young themselves agreed.[109]  Yet, while

Christo claims that he interviewed a few other inmates regarding Jane Doe 2's allegations, he

took no notes and apparently did not otherwise think to memorialize them.[110]

### 2. No Further Investigative Steps

At this point, DOI's investigation effectively ceased.  Numerous, obvious,

investigative steps were disregarded.  First, and as reflected in the investigators' handwritten

notes, Jane Doe 2 informed them that she had called Santiago from RMSC via a three-way

call.[111]  But while Christo requested audio recordings for Jane Doe 2's recorded-line phone calls,

when Christo was notified that the calls had been saved to a CD and were ready for pick up, he—

despite acknowledging the notification—failed to retrieve, let alone review, them.[112]  The CD

has been subsequently lost or destroyed, and the City advised Plaintiffs that the phone recordings

no longer exist.  Nor did Christo ever subpoena Santiago's or any other relevant phone records—

a routine step in investigations.[113]

The indifference—or worse—to the video evidence is even more outrageous.

Jane Doe 2 explained that she walked from Building 9, though the pantry, to Building 11, in the

middle of the night, to rendezvous with Santiago, as Santiago had instructed her.[114]  (Santiago

himself conceded in his deposition that Jane Doe 2 regularly walked between the two buildings

---

[108] Sculco Dep. 114:22-115:6, Dec. 21, 2015.

[109] Christo Dep. 46:14-21, 48:16-49:3, Mar. 24, 2016; Young Dep. 84:12-87:23.

[110] Christo Dep. 351:11-16, 352:6-10, 352:22-353:2, July 27, 2016.

[111] JD2 DOI Notes at DEF_00001489 (Pls.' Ex. 42).

[112] E-mail from James Christo, Assistant Inspector Gen., DOI, to Susan O'Leary, Legal Div., DOC (May 14, 2013) (NYC_00007056) (Pls.' Ex. 48); Christo Dep. 320:10-17, July 27, 2016.

[113] E-mail from Kate Zdrojeski, Investigative Att'y, DOI, to James Christo, Assistant Inspector Gen., DOI, at NYC_00007061 (May 13, 2013) (NYC_00007060-61) (Pls.' Ex. 44).

[114] JD2 Dep. 95:13-104:6, 112:12-113:10.

each night.[115])  The few video cameras in Buildings 9 and 11 in 2013, accordingly, would have

captured Jane Doe 2 leaving Building 9, walking through the pantry, and emerging—with

Santiago—into Building 11.  And, in DOI's closing memorandum, Christo stated that he had

reviewed the videotapes:  "reviewed DOC GENETIC [sic] footage."[116]  But, he claimed in his

deposition, there was no relevant evidence on the videotapes.[117]  That was utterly false.  When

pressed, at one point Christo testified that, despite what he wrote in the closing memorandum, he

did not actually review any video footage; at another point, he said that video footage may have

been reviewed of "corridors," the "hallways," the "intake," and the "clinic."[118]  (Of course, it

makes no sense to review the video footage for these areas, when Jane Doe 2 and Santiago both

testified that Jane Doe 2 used to walk back and forth <u>between Buildings 9 and 11</u> almost every

night while she was working as an SPA.[119])  Either way, contrary to written requirements, no

video footage was preserved, and if any video footage was reviewed, no notes or report were

made of such observations.  The actual video footage would have been critical, as it would have

shown Jane Doe 2 and Santiago, repeatedly together, in the middle of the night.

> DOI's failures multiply:  investigators did not interview other COs from

Buildings 9 or 11, tour supervisors from Buildings 9 or 11, or involved medical staff.  The two

COs who were directly responsible for guarding Jane Doe 2 when she worked as an SPA in

Building 9 were not interviewed, despite the fact that they permitted Jane Doe 2 to move

regularly to Building 11 (in the middle of the night, through the connecting pantry) where she

was repeatedly raped and sexually abused by Santiago.  Investigators also failed to review

---

[115] Santiago Dep. 190:15-192:17.

[116] James Christo, Assistant Inspector Gen., DOI, Jane Doe 2 Closing Memorandum at DEF _0001825 (June 25, 2014) (DEF_0001825-27) (Pls.' Ex. 69) ("JD2 DOI Closing Memorandum").

[117] Christo Dep. 248:20-249:19, Mar. 24, 2016.

[118] *Id*. 164:9-165:25; 247:2-249:19.

[119] JD2 Dep. 95:13-104:6, 112:12-113:10; Santiago Dep. 190:15-192:17.

Santiago's duty records.  Nor did investigators review the logbooks that should have logged Jane Doe 2's movements between Building 9 and Building 11.[120]  Christo failed even to collect those logbooks.[121]  The most critical of these logbooks, like all relevant audio and video recordings, have—unsurprisingly—apparently since been lost.  And those that still exist fail to record Jane Doe 2's movements between Buildings 9 and 11—in violation of DOC procedures.[122]

At one point, Christo requested a camera and digital recorder to take photographs of RMSC,[123] but could not recall whether he ever picked up the equipment or if the request even granted.[124]  Regardless, he never went to take photographs because "other things came up, and it wasn't a priority."[125]  It is difficult to imagine what <u>would</u> have been a priority, if not taking steps to determine whether inmates at RMSC were being raped by a sexual predator.

Christo claims that he stopped work after a few weeks because he was waiting for the results of the semen tests on Jane Doe 2's jeans.[126]  This excuse is pretextual:  the determination whether semen from <u>a single</u> instance of abuse exists should not suspend an investigation into whether <u>any</u> of the multiple incidents of rape and sexual abuse ever occurred.  In other words, the lack of semen, saliva or DNA on Jane Doe 2's jeans does not bear on whether Santiago <u>previously</u> engaged in oral sex or intercourse with Jane Doe 2.  Christo himself acknowledges that rape or sexual abuse may occur without leaving DNA evidence,[127] and his supervisor, Inspector General Sculco, agreed that the lack of semen on Jane Doe 2's jeans after

---

[120] Christo Dep. 153:19-22, 160:12-14, Mar. 24, 2016.

[121] *Id.*

[122] *See* Blenman Dep. 105:15-106:6, Nov. 23, 2016.

[123] Christo Dep. 266:14-268:17, Mar. 24, 2016.

[124] *Id.* 153:15-18, 268:16-269:3, 269:8-11; 271:10-20.

[125] *Id.*

[126] *Id.* 128:6-130:23.

[127] *Id.* 58:16-59:15.

one instance of abuse is not inconsistent with all the incidents of rape alleged by Jane Doe 2.[128]

The pretextuality is not surprising: as discussed in the next section, the results of the testing

conducted by Plaintiffs' DNA expert show that Christo likely halted the investigation because <u>he</u>

<u>knew</u> that Jane Doe 2's jeans would test negative for semen, because the semen had been washed

off the jeans once they were collected from Jane Doe 2's cell.

### 3.  A Broken Chain of Custody

On May 10, 2013, the same day that DOI was notified of Jane Doe 2's allegations

of rape and sexual abuse against Santiago, Inspector Ferdinand Torres collected Jane Doe 2's

jeans from her cell.  Those jeans were vouchered with the New York Police Department

("NYPD") for testing by the OCME on May 14, 2013 at 2:41 P.M.  As to what happened to Jane

Doe 2's jeans in the four days between the time that they were retrieved from her cell by Torres

on May 10, 2013 until the time they were vouchered, late in the afternoon on May 14, there is

neither documentation nor coherent testimony.

With respect to testimonial evidence, Torres, who collected Jane Doe 2's jeans,

and Christo, who received the jeans from Torres, disagree about when Torres gave the jeans to

Christo.  Torres testified that he gave Christo the jeans on May 10; Christo says he did not,

swearing that he did not receive them until May 14.[129]  Neither can explain what happened to

---

[128] Sculco Dep. 320:17-23, July 27, 2016.  DOC Deputy Commissioner Gregory Kuczinski agreed as well. Kuczinski Dep. 113:24-115:20.

[129] *Compare* Christo Dep. 83:2-6, Mar. 24, 2016. ("Q: Were [Jane Doe 2's jeans] collected that day [May 10, 2013]? A: I never saw -- when we went to the trailer, [Torres] was not there. I never met Torres on this day or Ortiz. I did not receive the jeans on this day."); *id.* at 142:3-7 ("Q: What day did Torres give you the jeans? A: I think it was the 14th. He spends most of his time at the trailer, Rikers Island trailer. So he had them secured out there.") *and* Christo Dep. 309:25-310:6, July 27, 2016 ("Q: And you said [the day Torres and Ortiz spoke with Jane Doe 2 about her allegations] wasn't the same day that [Torres] brought [Jane Doe 2's jeans] to your office? A: No. Q: Do you know how many days passed before he brought them to your office? A: No."); *id.* at 314:11-14 ("A: Okay. Because I didn't receive [Jane Doe 2's jeans] in -- in my office until midweek of the [week after the allegation]."), *with* Torres Dep. 228:20-229:3, May 11, 2016 ("Q: When was the last time you remember having the pants in your possession? A: Just before I handed them to Christo. Q: Do you remember what day that was? A: Do not. Q: Do you think it was the same day that you collected them? A: Pretty sure.").

Jane Doe 2's jeans between May 10 and May 14.  More importantly, <u>neither one of them</u>
<u>documented their receipt of the jeans</u>:  both Torres and Christo prepared no chain of custody
documentation, so there is no written evidence of what happened to the jeans once they were
seized and before they were sent to the NYPD four days later.

Nor has the City produced any documentation evidencing what happened to Jane
Doe 2's jeans during this critical four day period.  This is because—as the City has at last
conceded—there is none:  "The earliest date that the City has an invoice, or property voucher for
the jeans, is May 14, even though it appears that  the jeans were picked up four days earlier, viz.,
on or about May 10, 2013."[130]  Further, the City has represented to this Court that it has
"produced all of the documents and other materials that [it has] relating to the chain of custody,"
i.e., "everything [it] ha[s]."[131]  "[E]verything," apparently, amounts to the brown paper bag in
which Jane Doe 2's jeans were sent to Plaintiffs' DNA expert for testing, <u>more than three years</u>
<u>after Torres seized them</u>, on May 17, 2016.  The City claims that this is the bag in which Torres
placed the jeans when he collected them on May 10, 2013, and that it is the same paper bag in
which the jeans were originally vouchered with the NYPD.[132]  Neither claim is true.  Not only
does the paper bag the City sent to Plaintiffs' expert along with Jane Doe 2's jeans for testing
carry the label "NYPD Biological Evidence Bag" and lack any relevant identifying information,
it plainly does not conform to Torres' description of the bag in which he placed the jeans.
According to Torres, he would have placed Jane Doe 2's jeans in either (i) an evidence collection
bag, which would have read "evidence collection," or (ii) a brown paper bag from RMSC that
would have been "really long . . . probably 4 feet long," which he would have had to roll closed

---

[130] Def. City's Mem. in Supp. of Mot. *in Limine*, at 15,  Apr. 18, 2017, ECF No. 352.

[131] Conference Tr. 2:20-21, 6:21-22, Dec. 13, 2016.

[132] Joint Letter Mot. at 7-8, Dec. 8, 2016, ECF No. 234.

due to its length.[133]  Torres also testified that he showed Jane Doe 2 the jeans by "open[ing] the bag like this (indicating) just open the bag, close it, roll it back up," and that he "[p]robably would have written [the] inmate's name and booking [sic] case number" on it.[134]  The brown paper bag that the City sent to Plaintiffs' expert is not four feet long, nor does it bear Jane Doe 2's name or book and case number.[135]

In fact, Torres explicitly swore that he has no recollection of recording any chain of custody information on the bag in which he placed Jane Doe 2's jeans or of creating any separate chain of custody documentation at any time.[136]  Nor were any other investigators aware of Torres preparing any chain of custody documentation.[137]  Neither Christo nor Torres has provided any explanation why something as basic and necessary as a documented chain of custody for the jeans—a piece of critical physical evidence—was never prepared.

On November 4, 2016, Plaintiffs' DNA expert, Dr. Julie Heinig, submitted her report, in which she concluded, in relevant part:

> There is, therefore, no documentary evidence establishing what happened to [Jane Doe 2's jeans] during the critical time period between when they were seized on May 10 and when they were delivered to the NYPD property clerk four days later, on May 14, by AIG Christo.  Similarly, there is no documentary evidence

---

[133] Torres Dep. 147:8-148:10, 221:2-11, 222:22-223:2.

[134] *Id.* 223:3-6, 225:17-22.

[135] Photographs of Brown Paper Bag (Pls.' Ex. 38).

[136] Torres Dep. 222:16-21 ("Q: That paper bag would not have had any markings on it, correct? A: Correct. Q: It wouldn't have had a chain of custody fill in area? A: Correct."); *id.* at 223:7-9 ("Q: Do you recall writing anything [other than Jane Doe 2's initials and book and case number] on the bag that day? A: I do not recall."); *id.* at 226:14-24 ("Q: Do you recall preparing any documentation that you collected the pants? A: Don't recall. Q: Do you remember writing it on the bag that you collected the pants? A: Don't recall writing anything down on the bag. Q: Do you recall writing on any piece of paper that you collected the pants from that cell? A: Do not recall, no."); *id.* at 227:24-228:8 ("Q: Have you ever filled out a chain of custody form for the pants you collected that day? A: I don't recall. Q: Would you have carried a chain of custody form on you? A: No. Q: So when would you have filled it out? A: I don't recall filling it out.").

[137] Christo Dep. 313:17-20, July 27, 2016 ("Q: Did -- did Ferdinand Torres ever submit any write-ups or notes to you about the chain of custody of the jeans? A: No."); Ortiz Dep. 96:25-97:4, May 2, 2016 ("Q: Did you see Mr. Torres with a chain of custody form? A: I don't recall.  I don't know anything he did, so . . .").

establishing where [Jane Doe 2's jeans] were kept during that period nor in what condition they were kept.[138]

That there is no chain of custody for Jane Doe 2's jeans during this critical period is, as Dr. Heinig further concludes, consistent with deliberate tampering. The City's own policies define chain of custody as "an unbroken link that begins at the crime scene and documents that (a) custodial possession, and (b) integrity of evidence has [sic] been maintained."[139] Those policies state:

> Each transfer [of evidence] should be receipted. It is the responsibility of each transferee to ensure that the evidence is accounted for during the time that it is in his possession, that it is properly protected, and that there is a record of the names of the persons from whom he received it and to whom he delivered it, together with the time and date of such receipt and delivery.[140]

Failing to maintain an appropriate chain of custody raises questions about whether the "evidence might have been fabricated or tampered with."[141]

Whether the "evidence might have been fabricated or tampered with" is precisely the question raised by the City's handling of Jane Doe 2's jeans. And, Dr. Heinig's testing provided the answer. Those tests revealed the presence of male DNA, from one man associated with RMSC, on the left, right and crotch areas of Jane Doe 2's jeans.[142] The presence of that male's DNA on the jeans, and the absence of semen, is, as Dr. Heinig's report explains, "consistent with the semen having been washed off [Jane Doe 2's jeans] before [her] and (and

---

[138] Expert Report of Julie A. Heinig, Ph.D. at 8, Nov. 4, 2016 ("Heinig Report") (Pls.' Ex. 276).

[139] DOC ID, Investigation Manual at DEF_0002311 (DEF_0002303-14) (Pls.' Ex. 282) (*Chapter 9.0: Vouchering Procedures and Preserving the Chain of Custody* § 9.2) (emphasis added).

[140] *Id.* at DEF_0002314 (*Chapter 9.0: Vouchering Procedures and Preserving the Chain of Custody* § 9.4) (alteration in original).

[141] *Id.*

[142] Heinig Report at 9 (Pls.' Ex. 276).

OCME's) testing of them."[143]  In other words, the presence of unidentified male DNA (and the absence of semen) is consistent with Jane Doe 2's jeans having been tampered with prior to being sent to the OCME for testing.

Dr. Heinig's opinions stand unrebutted by the report submitted by the City's expert, Sarah Philipps.  Philipps' report does not challenge Dr. Heinig's opinion that the City has no chain of custody for Jane Doe 2's jeans during the period from after they were seized on May 10, 2013 until they were vouchered with the NYPD on May 14, 2013.[144]  Nor does Philipps' report dispute the result of Dr. Heinig's testing, which revealed the presence of male DNA, from one man associated with RMSC, on the left, right and crotch areas of Jane Doe 2's jeans.[145]  Finally, Philipps' report does not contest Dr. Heinig's opinion that her test findings were consistent with semen having been washed off Jane Doe 2's jeans before they were tested by the OCME and Dr. Heinig.[146]  In other words, the City has advanced no challenge to the deliberate cover-up:  that Jane Doe 2's jeans were intentionally tampered with before they could be tested to confirm the presence of Santiago's semen.

4.    Additional Allegations of Abuse

The investigative malfeasance does not end there.  Christo also willfully, and inexcusably, ignored corroborating allegations that Santiago was abusing female inmates in addition to Jane Doe 2.  For a start, the DOI case file contains documentary evidence demonstrating that Christo was aware of the 2007 allegation against Santiago.  But, more alarmingly, in June 2013, while he was ostensibly investigating Jane Doe 2's allegations, Christo

---

[143] Id. at 10.

[144] Expert Report of Sarah N. Philipps, Dec. 9, 2016 ("Philipps Report") (Anderson Decl. Ex. 11 in Supp. of Mot. to Narrow Issues for Trial or for Partial Summ. J., Jan. 19, 2017, ECF No. 278-2).

[145] Id.

[146] Id.

was informed by a detective that a confidential informant had learned that a female inmate—<u>not one of the Plaintiffs</u>—was having sex with CO Santiago <u>and had become pregnant</u>.[147]  In specific, Christo received an e-mail saying that a detective had called to say that "her female CI [confidential informant] told her that she knew [inmate] Dwason has been having sex with CO Santiago and that she is pregnant by him."[148]  The informant also reported that another female inmate was recruiting a young female inmate "for CO Santiago for sex in exchange for cigarettes."[149]  Despite being provided with detailed information—including one of the inmates' book and case numbers—Christo did <u>absolutely nothing</u> with this information.  When asked why he failed to investigate these serious allegations, Christo testified, "I just didn't."[150]  This is an incredible response—and confirms Christo's chilling indifference to Jane Doe 2's suffering.

5.    <u>Closing Memorandum</u>

After more than a year of inactivity, on June 25, 2014, DOI closed its investigation of Santiago's sexual abuse of Jane Doe 2 and referred the case to DOC ID.[151]  At that point, <u>more than 13 months</u> had passed since DOI first learned of Jane Doe 2's allegations.  That delay remains unexplained.

Moreover, the June 25, 2014 closing memorandum submitted by Christo is riddled with misrepresentations and material omissions.  First, the closing memorandum states that the allegations of sexual contact were found "inconclusive" because the semen test was negative and because Jane Doe 2 "could not remember dates or other specific details."[152]

---

[147] E-mail from Belarminia Ortiz, Chief Investigator, DOI, to James Christo, Assistant Inspector Gen., DOI (June 3, 2013) (NYC_00007047) (Pls.' Ex. 53).

[148] *Id.*

[149] *Id.*

[150] Christo Dep. 340:13-17.

[151] JD2 DOI Closing Mem. at DEF_0001827 (Pls.' Ex. 69).

[152] *Id.* at DEF_0001827.

Neither reason justifies DOI's conclusion.  With respect to the negative DNA test, as discussed, the tampering guts any value to the testing.  As to the statement that Jane Doe 2 "could not remember dates or other specific details," that is plainly contradicted by the specific dates and details reported to investigators by Jane Doe 2—reflected not only in Jane Doe 2's notebook, but also in the investigators' own contemporaneous, handwritten notes of their interview with Jane Doe 2.  Those details—which were confirmed under oath by Santiago—included his cell phone number and address, that he was a Virgo, information about his ex-wives, daughters, and grandson, what kind of car he drove, and that his penis was uncircumcised.[153]  The statement that Jane Doe 2 "could not remember dates or other specific details" is simply incorrect—to which numerous City witnesses, including DOC Deputy Commissioner Kuczinski and former DOC Deputy Commissioner Blake, all agreed.[154]  As Deputy Commissioner Kuczinski testified, Jane Doe 2 in fact gave DOI a "pretty detailed" narrative that included "dates, hours, specific dialogue, [and] specific conduct of what happened."[155]

Second, Christo—inexplicably—omitted from the memorandum the fact that Jane Doe 2 also described the length of Santiago's penis, both erect and flaccid (in addition to informing investigators that Santiago's penis was uncircumcised).  These are undeniably material facts in a rape investigation.[156]  As stated by Deputy Commissioner Kuczinski, there is simply no legitimate reason why DOI should not have included Jane Doe 2's specific claims about the length of Santiago's penis in the closing memorandum.[157]  Faced with this "important

---

[153] JD2 Dep. 98:20-99:12, 129:3-10, 138:1-13, 138:23-139:5; JD2 Bible and Diary at DEF_0018263 (City's Exs. JJ & KK); JD2 DOI Notes at DEF_0001474, DEF_0001498 (Pls.' Ex. 42).

[154] Kuczinski Dep. 128:2-130:8;  Blake 88:16-94:25, 93:9-93:15, 188:14-19; Young Dep. 256:19-257:10.

[155] Kuczinski Dep. 128:2-12.

[156] *Id*. 100:9-18; Blake Dep. 75:17-76:4, 77:6-78:6.

[157] Kuczinski Dep. 102:4-11.

information," Deputy Commissioner Kuczinski testified that he would not have "written off [such details] as a lucky guess."[158]

Third, as noted above, the memorandum states that investigators reviewed video footage.  But during his depositions, Christo provided inconsistent testimony on this matter:  at one point he stated that this sentence was simply "boilerplate" and no video footage was reviewed, and at another point he said that relevant video footage may have been reviewed but was not preserved.[159]  DOI and DOC personnel, who had read Christo's closing memorandum, all testified that they read this memorandum to represent that Christo had reviewed the video footage.[160]  Either way, it is clear that crucial evidence was mishandled:  either Christo failed to perform a basic investigative step and misrepresented this in his closing memorandum, or he did so and then lost, misplaced or simply destroyed the damning video evidence.

Fourth, Christo failed to include in the memorandum the fact that Jane Doe 2 also stated that Santiago had provided her with Ecstasy—an allegation, if true, that would have been a felony.  Nor did he include the fact that an inmate witness corroborated that allegation, by also reporting that Santiago provided Jane Doe 2 Ecstasy.[161]  In fact, the inmate's statement regarding Ecstasy is not mentioned <u>anywhere</u> in the case file.  City witnesses—including Deputy Commissioner Kuczinski and former Deputy Commissioner Blake—are unanimous in agreeing that the allegations concerning Ecstasy should have been included.[162]  Deputy Commissioner Kuczinski testified, again, that he could conceive of <u>no legitimate</u> reason why they were not.[163]

---

[158] *Id*. 100:9-18, 101:9-12.

[159] Christo Dep. 164:9-165:25, 247:2-249:24, Mar. 24, 2016.

[160] Kuczinski Dep. 88:7-89:12; Blake Dep. 65:6-67:13; Wityak Dep. 61:25-62:18.

[161] E-mail from James Christo, Assistant Inspector Gen., DOI, to Jennifer Sculco, Inspector Gen., DOI (Nov. 1, 2013) (NYC_00006878) (Pls.' Ex. 64).

[162] Kuczinski 116:10-120:9; Blake Dep. 78:16-79:7.

[163] Kuczinski Dep. 117:6-120:9.

Fifth, the memorandum makes <u>no</u> mention of the fact that Christo had been made aware of allegations that a CO Santiago had <u>impregnated</u> a female inmate, or that in 2007 another inmate had alleged sexual abuse by Santiago.  Multiple City witnesses—including Deputy Commissioner Kuczinski and former Deputy Commissioner Blake—have testified that during a sexual assault investigation it is important—to say the least—to know whether other similar allegations have been made against the same suspect.[164]  And yet, apparently, Christo did not deem it necessary to follow up on or include such reports in the case file.

Worse, DOI—despite all of its efforts at whitewashing the facts—was forced to conclude that Santiago had in fact committed an offense that was punishable by termination:  he was in an "unduly familiar" relationship with Jane Doe 2.  Thus, DOI concluded that "several factors indicate that CO Santiago was in an unduly familiar relationship with inmate [Jane Doe 2]."[165]  These factors included that (1)" Santiago's home and cellular phone numbers (on record with the DOC) are in [Jane Doe 2's] diary;" (2) Jane Doe 2 had "Santiago's name, home address, e-mail address and phone number;" (3) Santiago let Jane Doe 2 "use his I-Phone [sic] to update her Facebook account," and the "dates were consistent with [Jane Doe 2's] Facebook postings which included that she is tired of jail;" and (4) inmates DOI interviewed "all reported" that "CO Santiago was infatuated with [Jane Doe 2]," and that Santiago "only had eyes for [Jane Doe 2]."[166]  According to written DOC policy, if a CO has an unduly familiar relationship with an inmate, he is to be terminated:  "'Undue familiarity' is a direct violation of our Rules and Regulations.  <u>It is the Department's policy to seek termination of those who violate this rule</u>."[167]

---

[164] Kuczinski Dep. 85:5-88:6; Blake Dep. 225:17-226:15.

[165] JD2 DOI Closing Mem. at DEF_0001826 (Pls.' Ex. 69).

[166] *Id*. at DEF_0001826-27.

[167] DOC, Directive 5010R-A: Preventing Inmate Sexual Abuse at DEF 0000014 (effective date Dec. 31, 2008) (DEF_0000001-18) (Pls.' Ex. 10) ("2008 Sexual Abuse Directive") (emphasis added).

Nevertheless, DOI took no steps whatsoever to punish—much less terminate—Santiago. Instead, DOI simply referred the case to DOC ID. It did so knowing that Santiago was a sexual predator. Thus, in an astonishing August 2015 e-mail, Christo told his supervisor (Inspector General Sculco) the following: "Off the record, if [DOC ID] is not recommending termination [of Santiago] then they should put his ass back to work in a male facility."[168]

The gross inaccuracies and material misrepresentations and omissions in Christo's closing memorandum prevented DOC ID from conducting a meaningful investigation. Moreover, DOI purposely delayed its investigation of Santiago for so long that by June 25, 2014 (the date of the DOI closing memorandum), the 18-month statute of limitations for administrative discipline had nearly expired. Once that 18-month period had passed, Santiago could only be prosecuted for criminal activity. Of course, rape and sexual abuse (and providing drugs to inmates) are crimes. Yet, by conducting a sham investigation and omitting, misrepresenting, or refusing to turn over material evidence that supported Jane Doe 2's allegations that those crimes took place, DOI ensured that DOC ID lacked sufficient information to pursue any action against Santiago. Indeed, as discussed below, DOC ID did not even assign an investigator to the Santiago case until February 2015. By then, the 18-month period had long since expired, and DOC ID claimed to be unable to discipline Santiago at all, much less to terminate him, even though DOI had already found that he was in an unduly familiar relationship with Jane Doe 2.

B.   DOC ID Investigation

After DOI closed its investigation on June 25, 2014 and referred the case to DOC ID for action against Santiago on July 8, 2014, DOC ID apparently lost track of the case file and

---

[168] E-mail from James Christo, Assistant Inspector Gen., DOI, to Jennifer Sculco, Inspector Gen., DOI (Aug. 18, 2015) (NYC_00005890) (Pls.' Ex. 113).

was completely unaware of the investigation until at least November 2014.[169]  Then, DOC ID did

not assign an investigator to the case until February 2015.[170]  No explanation for the delay has

been offered; nor can any "good" reason be identified.[171]  By February 2015, nearly <u>two years</u>

had elapsed since Jane Doe 2 initially reported the abuse, and the 18-month administrative

limitations period had already expired.

From February 2015 through May 19, 2015, <u>when this lawsuit was filed</u>, DOC ID

took essentially zero investigative steps.[172]  Alexandra Wityak, the DOC Investigator assigned to

the case, did not interview Jane Doe 2, Santiago, or any other relevant witnesses.  When asked,

Wityak testified that she did not interview Jane Doe 2 because Jane Doe 2 had since been

released from prison and Wityak did not want to visit her at home in what she believed was a

dangerous neighborhood.[173]  Her ultimate supervisor, DOC Deputy Commissioner Kuczinski,

testified that this should not have prevented Wityak from interviewing Jane Doe 2.[174]  As for

Santiago, Wityak did schedule a time to interview him—but only once this lawsuit was filed—

and that interview was later cancelled; it never took place.[175]  This was also error:  former DOC

Deputy Commissioner Blake testified that Wityak should have "absolutely" interviewed

Santiago.[176]

---

[169] E-mail from Jennifer Sculco, Inspector Gen., DOI, to James Christo, Assistant Inspector Gen., DOI, at NYC_00009005 (May 22, 2015) (NYC_00009004-05) (Pls.' Ex. 99).

[170] DOC ID, Jane Doe 2 Investigative Case Log at DEF_0016125 (May 27, 2016) (DEF_0016125-26) (Pls.' Ex. 114) ("JD2 DOC ID Case Log").

[171] Kuczinski Dep. 105:2-23.

[172] *See* JD2 DOC ID Case Log (Pls.' Ex. 114).

[173] Wityak Dep. 57:16-58:4.

[174] Kuczinski Dep. 149:22-150:6.

[175] JD2 DOC ID Case Log at DEF_0016125 (Pls.' Ex. 114); E-mail from Steven Jones, Deputy Dir. Of Investigations, DOC ID, to Alexandra Wityak, Investigator, DOC, at DEF_0002521-22 (May 21, 2015) (DEF_0002521-22) (Pls.' Ex. 98).

[176] Blake Dep. 163:25-166:22.

On August 3, 2015, DOC ID closed its investigation of Jane Doe 2's allegations on two grounds: DOI's failure to provide case information to DOC ID and an expired statute of limitations.[177] Neither ground justified closing the investigation.

1.   DOI's Failure to Provide Case Materials

Inspector General Sculco—Christo's supervisor—testified that when referring cases, it was DOI practice to send the entire case file to DOC ID.[178] Yet, the file given to DOC ID did not include any case information other than the closing memorandum and Jane Doe 2's Bible and notebook.[179] The interview memoranda reflecting investigators' interviews of Jane Doe 2 and Santiago were omitted. Relevant video records (if they were indeed reviewed) were not included. Even though Christo failed to review the audio recordings for Jane Doe 2's recorded-line phone calls, the CD containing those recordings should have been preserved as part of the case file. In fact, Inspector General Sculco testified that there should "be no reason why [the CD is] not preserved."[180] But that CD was not included either.

More troubling, beginning on May 19, 2015, DOC—including Deputy Commissioner Kuczinski—made numerous requests to DOI for the evidence missing from the case file.[181] DOI completely ignored these requests.[182] No one at DOC—including Deputy

---

[177] JD2 DOC ID Case Log at DEF_0016126 (Pls.' Ex. 114); Alexandra Wityak, Investigator, DOC ID, Jane Doe 2 Closing Memorandum at DEF_0002480-82 (Aug. 3, 2015) (DEF_0002480-82) (Pls.' Ex. 111) ("JD2 DOC ID Closing Memorandum").

[178] Sculco Dep. 334:2-338:9, July 27, 2016.

[179] Wityak Dep. 47:19-25.

[180] Sculco Dep. 266:11-268:23, July 27, 2016.

[181] E-mail from Steven Jones, Deputy Dir. Of Investigations, DOC ID, to Alexandra Wityak, Investigator, DOC ID (May 21, 2015) (DEF_0002521-22) (Pls.' Ex. 98); E-mail from Steven Jones, Deputy Dir. Of Investigations, DOC ID, to Alexandra Wityak, Investigator, DOC ID (May 22, 2015) (DEF_0002525) (Pls.' Ex. 100) (regarding request of phone and video records); E-mail from James Christo, Assistant Inspector Gen., DOI, to Alexandra Wityak, Investigator, DOC ID (May 20, 2015 (DEF_0002523-24) (Pls.' Ex. 93) (regarding request of interview memoranda); E-mail from Alexandra Wityak, Investigator, DOC ID, to Jennifer Sculco, Inspector Gen., DOI (DEF_0002513) (May 28, 2015) (Pls.' Ex. 103) ( regarding request of phone and video records); JD2 DOC ID Closing Mem. at DEF_0002481 (Pls.' Ex. 111); E-mail from Steven Jones, Deputy Dir. of Investigations, DOC ID,

Commissioner Kuczinski and former Deputy Commissioner Blake—could make sense of DOI's refusal to give DOC the evidence that it had gathered.[183]  When asked, Christo testified that he did not provide the case materials despite repeated requests because it was DOI policy not to provide evidence to DOC ID.[184]  But as discussed, that is simply untrue.  Not only did his supervisor, Inspector General Sculco, testify to the contrary, but she swore to being certain that she had spoken to Christo about DOC ID's requests, and that Christo told her that he had already provided the information to DOC ID.[185]  That Christo was apparently motivated to deceive Inspector General Sculco is evidence of either abject indifference to his job or intentional malfeasance.  Either way, it is indefensible.

         Thus DOI ensured DOC ID's investigation would cease as well:  DOC ID personnel testified that DOI's refusal to cooperate rendered them unable to properly investigate Jane Doe 2's claims.[186]  In other words, DOC ID was forced to close the investigation into Santiago without being able to determine whether Jane Doe 2's allegations of rape and sexual abuse were substantiated or not.  This was an outcome that Wityak herself described as "troubling" and "horrible."[187]  DOC Deputy Commissioner Kuczinski agreed, stating that he "definitely did not like closing this out.  Especially without a fair shot at trying to substantiate anything."[188]  The opportunity for a "fair shot at trying to substantiate" Jane Doe 2's claims was eliminated by DOI:  the full universe of evidence against Santiago, including that Jane Doe 2 did

---

to Gregory Kuczinski, Deputy Comm'r of Investigations, DOC ID (June 25, 2015) (NYC_00004007-08) (Pls.' Ex. 109).

[182] *See supra* n.181.

[183] Kuczinski Dep. 49:15-51:20; Blake Dep. 130:25-132:23.

[184] Christo Dep. 380:3-381:10.

[185] Sculco Dep. 220:8-223:17, Dec. 21, 2015; Sculco Dep. 334:2-336:10, 339:12-23, July 27, 2016.

[186] *See* Wityak Dep. 149:16-150:10; Kuczinski Dep. 49:23-51:20, 105:13-23, 180:14-181:4.

[187] Wityak Dep. 149:16-150:10.

[188] Kuczinski Dep. 182:10-184:16.

in fact recall specific dates and times of her abuse, that she provided a detailed description of Santiago's penis, that Santiago had been accused of providing Ecstasy to inmates, and that allegations that Santiago was raping inmates in addition to Jane Doe 2 had been reported, should certainly have otherwise prompted criminal charges against Santiago.

      2.    <u>Statute of Limitations</u>

      New York Civil Service Law Section 75(4) prohibits commencement of an administrative action to remove or discipline a City employee for acts of misconduct more than 18 months after those acts occur.[189]  The 18-month period starts from the last allegedly wrongful act.[190]  Here, the last sexual abuse Santiago forced Jane Doe 2 to endure occurred on May 2, 2013.  The administrative statute of limitations would therefore have expired on November 2, 2014.

      However, the 18-month period does not apply if the "misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime."[191]  The allegations against Santiago—rape and sexual abuse—are, if proved in a court of appropriate jurisdiction, of course, <u>crimes</u>.  As such, the statute of limitations applicable to the criminal offense supersedes.  The criminal statute of limitations for rape is, at a minimum, five years,[192] which means that the applicable statute of limitations <u>has not yet expired, and will not do so until May 2018</u>.  In other words, there is nothing—certainly no statute of limitations—that prevents the City from taking action against Santiago today.  Nothing, that is, except indifference.

---

[189] N.Y. Civ. Serv. Law § 75(4) (McKinney 2017).

[190] *Id.*

[191] *Id.*

[192] *See* N.Y. Crim. Proc. Law § 30.10 (McKinney 2017).

Further, Jane Doe 2 and her family made allegations as late as April 2014 that COs at RMSC were retaliating against her.[193]  Neither DOI nor DOC ID even bothered to investigate these allegations.  But the fact of their existence is relevant to the statute of limitations inquiry, because DOC Command Level Order 15-16, Elimination of Sexual Abuse and Sexual Harassment (PREA), "prohibits retaliation against any individual because of his/her involvement in the reporting or investigation of an allegation of sexual abuse or harassment.  It is [RMSC] policy to treat retaliation as a separate actionable offense that is subject to separate administrative sanctions and possible referral for criminal prosecution."[194]  In other words, because retaliation is a separate actionable offense, it would have started the limitations clock anew.  The statute of limitations period—even under the administrative rule—for the retaliation claim <u>has also therefore not yet expired</u>.

### C.      Deliberate Indifference

Plaintiffs' point is not that Jane Doe 2 was entitled to a more thorough investigation.  Plaintiffs' point, which they will prove at trial, is that Santiago is guilty of having perpetrated repeated rape and sexual abuse on multiple women at RMSC—while the City of New York stood by and allowed it to happen.

Santiago is guilty of raping and sexually abusing Jane Doe 1 and Jane Doe 2.  The only reasonable inference to draw from the City's shocking failure to take any meaningful action in response is that, for some reason, the City simply did not wish to prosecute Santiago—or at

---

[193] Referral Letter No. 14-03623 from Mark Peters, Comm'r, DOI,  to Florence Finkle, Deputy Comm'r of Investigations, DOC (Apr. 11, 2014) (NYC_00001483-86) (Pls.' Ex. 67); Referral Letter No. 14-03646 from Mark Peters, Comm'r, DOI, to Florence Finkle, Deputy Comm'r of Investigations, DOC (Apr. 11, 2014) (NYC_00001488) (Pls.' Ex. 68); E-mail from James Christo, Assistant Inspector Gen., DOI, to Rhonda Young, Investigator, DOI (Apr. 2, 2014) (DEF_0001909) (forwarding e-mail from attorney William Gibney, The Legal Aid Society).

[194] DOC, Command Level Order No. 15-16: Elimination of Sexual Abuse and Sexual Harassment (PREA) at DEF_0023760 (effective Aug. 18, 2016) (DEF_0023759-801).

the very least was wholly indifferent to his guilt.  DOC Deputy Commissioner Kuczinski testified that the evidence that Christo willfully ignored and withheld from DOC ID—including allegations that Santiago had brought in Ecstasy, the specific details Jane Doe 2 reported about her abuse and about Santiago's penis, that several other inmates had also alleged that Santiago had abused additional women—all increased the likelihood of success of proving that Santiago raped Jane Doe 2.[195]  But, until this litigation, <u>all</u> of this information had been suppressed.  It is simply implausible that—when additionally considering that Jane Doe 2's jeans were tampered with—these actions were not deliberate or otherwise intended to ensure that no action would be taken against Santiago.

The City's own policy clearly states that even a finding of undue familiarity should result in termination.[196]  Former DOC Deputy Commissioner Blake testified that it was "inappropriate" for DOI to refer the undue familiarity investigation to DOC ID for action rather than bringing charges itself against Santiago.[197]  And yet, the City took <u>no</u> action.  That is inexcusable.  In fact, Santiago, although he was placed on modified duty temporarily, has since been returned to full status.[198]  During his deposition, Santiago testified that he expects to retire in 2017 and expects to receive a full pension.[199]

## VII.   THE CITY IS GROSSLY INDIFFERENT TO THE WIDESPREAD AND SYSTEMATIC STAFF-ON-INMATE SEXUAL ABUSE AT RMSC

At trial, the evidence will show that the City, through its policies and practices, has fostered an institution where COs sexually abuse and rape female detainees at significantly

---

[195] Kuczinski Dep. 132:22-133:11.

[196] Kuczinski Dep. 72:20-73:11; Sculco Dep. 342:1-21, 345:7-17, July 27, 2016.

[197] Blake Dep. 85:23-86:7.

[198] Eliseo Perez Jr., Assistant Chief of Sec., DOC, Teletype Order No. HQ -01070-0: Personnel Orders – Notification of Temporary Assignment to Modified Duty (May 13, 2013) (NYC_00003703-3704); Santiago Dep. 44:11-12.

[199] Santiago Dep. 51:23-52:20.

higher rates than at other jails in the United States.  This is borne out in three respects: (a) the unconstitutional conditions that have pervaded RMSC for years—which the City's expert does not dispute; (b) the astoundingly low substantiation rates for allegations of sexual abuse; and (c) the legion of evidence that the City has ostensibly lost or caused the destruction of prior to and during the course of this litigation.  Each—and all—of these failings have contributed to the culture of impunity and indifference that allowed Plaintiffs to be raped and abused by Santiago while detained at RMSC.

### A.   The Conditions at RMSC Are Unconstitutional and Allowed Santiago To Rape and Sexually Abuse Plaintiffs with Impunity

In an extensive report (the "Ryan Report") detailing the City's numerous failures—for years—to remedy in any way the rape and sexual abuse that pervades RMSC, Plaintiffs' correctional expert, Timothy P. Ryan, concluded that the City's practices show a "callous disregard for legal requirements and correctional professionalism and demonstrate deliberate indifference by the City to the sexual safety and well-being of the female detainees for which it is responsible."[200]  That report cites at least seven interrelated failings:  (i) the City's failure to enact proactive measures to combat sexual abuse, including implementation of the Prison Rape Elimination Act of 2003 ("PREA"); (ii) the City's inadequate hiring practices, which failed to screen for risk factors like criminal histories of domestic violence; (iii) the City's failure to adequately train COs, staff, medical staff, and investigators; (iv) the City's practice of permitting male COs to guard women; (v) the City's defunct reporting mechanisms, including non-functional reporting channels and because staff abide by an informal "code of silence;" (vi) the City's failure to protect inmates and guards from retaliation when they report abuse; and (vii) the City's failure to conduct meaningful investigations and otherwise enforce its "zero

---

[200] Expert Report of Timothy P. Ryan ¶ 2, Nov. 3, 2016 ("Ryan Report") (Pls.' Ex. 274).

tolerance" sexual abuse policy.[201]  The City "knew, or should have known, of the necessity to implement immediate and specific proactive measures to address the issues of sexual abuse at RMSC on or before January 1, 2011, but failed to act."[202]  This failure permitted the rape and abuse of Jane Doe 1 and Jane Doe 2 to take place—with no consequence to Santiago—from 2008 to 2013:

### 1.    PREA Compliance

The City remains out of compliance with PREA:  while PREA was enacted more than a decade ago (in 2003), it was not even until <u>May 2016</u> that DOC finally updated its sexual safety directive purportedly to implement PREA.[203]  And the Board of Correction, which has oversight authority over the DOC and is tasked with "establish[ing] minimum standards for the care, custody, correction, treatment, supervision, and discipline of inmates," has <u>yet</u> to enact regulations implementing PREA.  In fact, during his deposition, DOC Deputy Commissioner Kuczinski admitted that he had <u>no idea</u> when RMSC would become PREA compliant.[204]

### 2.    Sexual Abuse Training

The training provided to the City's COs, supervisors, medical personnel, and investigators to detect, report, and investigate sexual abuse is entirely inadequate.  When asked, DOI and DOC ID investigators could not identify any specialized investigative training, other than "on the job training" during their first weeks on the job.  For example, Christo provided

---

[201] Ryan Report ¶¶ 101-95 (Pls.' Ex. 274).

[202] *Id.* ¶ 101.

[203] *Id.* ¶ 113; DOC, Directive 5011: Elimination of Sexual Abuse and Sexual Harassment (effective May 2, 2016) (DEF_0015078-143) ("2016 Sexual Abuse Directive").

[204] Kuczinski Dep. 21:17-22:18.

such testimony, and he has been an investigator <u>for over 30 years</u>.[205]   At least one other

investigator stated that she had only first received training in sexual abuse cases in early <u>2016</u>.[206]

What little PREA-related training that has been provided is demonstrably

worthless.  The two COs who were directly responsible for guarding Jane Doe 2 when she

worked as an SPA in Building 9 and who permitted Jane Doe 2 to move regularly to Building 11

(in the middle of the night) where she was repeatedly raped and sexually abused by Santiago,

testified in June 2016 that the only training they had ever been given regarding PREA occurred

in 2016; they had received <u>no</u> PREA-related training previously.[207]   Further, that training was

ineffective:  despite being deposed only months after the training, neither CO could remember

what was said in those training sessions.[208]   Even though the training supposedly took eight

hours, all one officer could remember is that captains' inspections were supposed to be surprises,

not announced in advance:  "That's all I can remember."[209]   The other officer said he could not

remember <u>anything</u> from the training—"nothing"—even though he had that training barely a

month before his deposition.[210]

### 3.    Unannounced Rounds

The City did not require captains to conduct unannounced supervisory rounds

until July 2015, when it promulgated a Chief's Order (amended February 2016).[211]   The

---

[205] Christo Dep. 21:9-11, 42:21-43:10, 46:3-9, Mar. 24, 2016.

[206] Ortiz Dep. 63:8-13.

[207] Harris Dep. 184:14-186:12; Rodriguez Dep. 158:2-160:12.

[208] Harris Dep. 184:21-186:2, Rodriguez Dep. 160:3-12.

[209] Harris Dep. 184:14-185:12.

[210] Rodriguez Dep. 158:20-160:9.

[211] Ryan Report ¶ 138 (Pls.' Ex. 274); Joseph Ponte, Comm'r & Martin J. Murphy, Chief of Dep't, DOC, Teletype Order No. HQ -01670-0: PREA Unannounced Rounds (July 21, 2015) (DEF_0014006-07); Joseph Ponte, Comm'r & Martin J. Murphy, Chief of Dep't, DOC, Teletype Order No. HQ -00343-0: PREA Unannounced Rounds (Updated) (Feb. 9, 2016) (DEF_0014004-05) ("2016 PREA Unannounced Rounds Order").

amended order specifically identifies storage areas and closets as places for captains to check due to their being high risk areas—precisely the areas where Jane Doe 2 was raped in 2013.[212]

### 4.   Cross-Gender Guards

The City still allows male COs to guard female inmates unsupervised.  Not only has the unacceptable practice of permitting men to supervise female inmates—without being accompanied by female COs—been known to jail management in New York since at least 2011 as a result of a lawsuit about this very issue, but New York State law prohibits male COs from guarding female inmates without supervision by a female CO.[213]  It is hardly a stretch to argue that had Plaintiffs been guarded solely by female COs, the probability of their rape by Santiago would have been eliminated.

### 5.   Code of Silence

DOC has a "strong and culturally ingrained code of silence among staff and inmates," which prevents COs who are not involved in but who are aware of criminal sexual abuse from coming forward.[214]  In this case, both Santiago and Jane Doe 2 testified that she was allowed to move between Buildings 9 and 11—two RMSC buildings—in the middle of the night.[215]  According to jail policy and procedure, such movements should have been logged.[216]  However, Jane Doe 2's movements were not logged in any produced logbook.  This means that a half dozen COs flaunted policy:  the COs stationed in Building 9 testified that they let Jane Doe 2 move back and forth from Building 9 to Building 11 on a regular basis without logging her movements, in violation of the Inmate Observation Aide Program (also called Suicide Prevention

---

[212] Ryan Report ¶ 138 (Pls.' Ex. 274); 2016 PREA Unannounced Rounds Order at DEF_0014004.

[213] Ryan Report ¶ 153 (Pls.' Ex. 274); N.Y. Comp. Codes R. & Regs. tit. 9 § 7501.1 (2017); N.Y. Comp. Codes R. & Regs. tit. 9 § 7502.1 (2017); *Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011).

[214] Ryan Report ¶ 159 (Pls.' Ex. 274); Sexual Safety Assessment Report at DEF_0014448 (Pls.' Ex, 104).

[215] JD2 Dep. 95:14-104:6, 112:12-113:10; Santiago Dep. 190:15-192:17.

[216] *See* Blenman Dep. 105:15-106:6.

Aide/SPA) directive.[217]  Since it occurred night after night, and only when Santiago was on duty in Building 11, the implications are completely clear.  To not have questioned Jane Doe 2's movements, and/or reported it, violates the 2008 Sexual Abuse Directive,[218] as well as the PREA Standards.  It is unrealistic to assume that this was merely an oversight—those COs' failure to act was and absolutely had to be intentional.

6.     <u>Reporting Mechanisms</u>

As Mr. Ryan's October 2016 inspection of RMSC made disquietingly clear, reporting mechanisms are non-functional and inadequate.[219]  This makes it nearly impossible for victims and staff to report sexual abuse.  As one example, discussed *supra* Section V, in 2012, a female inmate reported that Santiago was sexually abusing two women in RMSC to the DOC captain who was overseeing that inmate's disciplinary hearing.[220]  That DOC captain reported the inmate's allegations to the City's investigative unit.[221]  Nevertheless, the allegation was <u>never</u> investigated.  Had that investigation been properly conducted in 2012, less than a year before Santiago began abusing Jane Doe 2, her risk of being sexually abused by Santiago would also have been eliminated:  if taken seriously, Santiago would have been terminated before he could rape or sexually abuse Jane Doe 2.

---

[217] Ryan Report ¶¶ 164-65 (Pls.' Ex. 274); DOC, Directive 4017R Inmate Observation Aide Program (effective Aug. 8, 1988) (Pls.' Ex. 1); Harris Dep. 198:19-25; Rodriguez Dep. 84:25-86:3.

[218] Ryan Report ¶¶ 164-65 (Pls.' Ex. 274); 2008 Sexual Abuse Directive at DEF_0000002 (Pls.' Ex. 10) ("All staff are responsible for being alert to signs of potential situations in which sexual abuse might occur and signs of victimization.  Any staff member who has either knowledge or reasonable belief or receives an allegation that an incident or threat of sexual abuse has occurred and fails to report such information will be subject to disciplinary action.").

[219] Ryan Report ¶¶ 97-99 (Pls.' Ex. 274).

[220] Medina Dep. 114:24-115:4.

[221] Diane Medina, Assistant Deputy Warden, DOC, Page from Disciplinary Hr'gs Journal (July 23, 2012) (DEF_0014497) (Pls.' Ex. 16).

7.      Retaliation

The City also fails to protect inmates who do successfully report sexual abuse from retaliation, which further suppresses the ability of sexual abuse victims to come forward. Victims of this failure of policy are, sadly, numerous.  They include Jane Doe 1, who was silenced by Santiago's threats of retaliation—against her as well as her family—and who only gained the courage to report years later, after learning that Santiago had been removed from RMSC (as a result of Jane Doe 2's report of her abuse).[222]

Jane Doe 2 also suffered from the City's indifference to the retaliation routinely visited upon those courageous enough to report sexual abuse:  both in May 2013, after Santiago initially thought she had reported him, and in April 2014, when she and her family reported that she was being retaliated against upon returning to RMSC.  The City took not a single step to investigate either instance of retaliation.  But the City would have found her allegations supported had it bothered to investigate.  In particular, Santiago testified during his deposition that when Jane Doe 2 was transferred back to Building 11 in May 2013, she and eight other inmates got into a verbal argument toward the beginning of his shift, and therefore Santiago refused to let Jane Doe 2 come out for breakfast many hours later.[223]  No documentary evidence exists for this claim.  Although Santiago contended that he may have logged this incident, as is required under DOC Directives, the City claims to have lost the logbook.  In addition, no other CO on duty in Building 11 or the Building 9/11 "bubble"—the room bridging both buildings— logged this supposedly substantial inmate fight, nor is there any documentary record of any captain being informed of the purported fight.[224]  Santiago's explanation for what Jane Doe 2

---

[222] JD1 Decl. ¶ 11.

[223] Santiago Dep. 90:6-92:25, 104:12-20, 106:17-107:5.

[224] *See* Blenman Dep. 106:7-21.

perceived as retaliation cannot be credited, and makes the City's failure to take it seriously all the more problematic.

One more example bears mentioning:  the inmate who in 2012 reported Santiago's abuse to the DOC captain overseeing her disciplinary hearing also made an allegation that Santiago had used the disciplinary system as retaliation against her, with the purpose of having her moved because she threatened to expose his sexual abuse.[225]  No investigation of that allegation of retaliation ever occurred, either.

8.      Tainted Investigations

The City has repeatedly demonstrated its utter disinterest in conducting rigorous investigations that meaningfully examine the sexual victimization of female inmates by its employees.  The City's own PREA consultants (the Moss Group, Inc.) found that the City's investigations were "taint[ed]" from the outset.[226]  Jane Doe 2 learned this firsthand:  as a result of the gross negligence displayed by the City—not least in mishandling, and tampering with, DNA evidence, destroying or willfully ignoring other corroborating evidence, and inexcusably delaying its own investigation—Santiago has effectively been guaranteed immunity.

As another example, in a 2013 staff-on-inmate sexual abuse case involving another CO—in which the inmate was impregnated while in custody—the investigators focused only on the date on which the inmate could have had intercourse with the officer, and (mistakenly) determined she could not have been impregnated while in custody.  Again, that a single instance of rape did not result in conception has little bearing on whether any instances of rape occurred.  Yet, neither the fact that the inmate may have had sexual intercourse at any time

---

[225] J.F. Disciplinary Hr'g Tr. 9:13-13:19, July 23, 2012 (Pls.' Ex. 15).

[226] Ryan Report ¶ 191 (Pls.' Ex. 274); Sexual Safety Assessment Report at DEF_0014435 (Pls.' Ex, 104) (emphasis added).

while in custody (a criminal offense), nor the fact that the CO bailed her out of RMSC, were investigated.

**B.      The City Concedes the Inadequacy of Policies and Practices at RMSC**

The City has effectively conceded these failings—and that they permitted Plaintiffs to be raped by Santiago.  The report submitted by the City's correctional expert, Theresa Lantz (the "Lantz Report"), opines on the constitutionality of conditions at RMSC—based upon events that either occurred after the close of fact discovery (August 2016), or events that have not yet occurred.[227]  <u>This is irrelevant to whether Santiago or the City are liable in damages to the Plaintiffs, the only issues now being tried</u>.  As Lantz and the City have both conceded, what is relevant are the conditions <u>during the period of time (2008 to 2013) Jane Doe 1 or Jane Doe 2 were being raped and sexually abused</u>.[228]  The City put it this way at the March 20 conference before the Court:

> The *Monell* proof that's required for the damages claims is proof that as of the date of those incidents [when Plaintiffs were raped and sexually abused], that is, 2012/2013, city policymakers were on notice of misconduct in the jails and did nothing, despite the fact that they were on notice of persistent widespread pattern of misconduct.[229]

But that period of time—up to 2013—is wholly ignored in the Lantz report.

In other words, the City offers <u>no</u> expert opinion defending the adequacy of the policies and practices at RMSC <u>during the period of time in which Jane Doe 1 and Jane Doe 2 were actually being abused</u>.  And rightly so:  those policies and practices are indefensible.  If Lantz could have offered an opinion contradicting Ryan, and defending the City's practices and

---

[227] Expert Report of Theresa Lantz, Dec. 9 , 2016 ("Lantz Report") (Kay Decl. in Supp. of Mot. *in Limine* to Exclude the Expert Report and Proposed Trial Testimony of Theresa Lantz, Apr. 17, 2017, ECF No. 336).

[228] Lantz Dep. 83:4-84:16, 289:13-290:3, Feb. 8, 2017.

[229] Conference Tr. 22:16-21, Mar. 20, 2017.

procedures as being adequate to protect Plaintiffs' constitutional rights <u>at the time they were being raped and sexually abused by Santiago</u>, she undoubtedly would have done so.  That she did not means she could not.

### C.   Substantiation Rates of Sexual Abuse Allegations at RMSC Are Astonishingly Low

The City's rules and regulations prohibiting sexual abuse are meaningless unless they are vigorously enforced.  At RMSC, essentially no enforcement—let alone vigorous enforcement—occurs.  This has created an institution where the number of sexual abuse allegations is "astoundingly high,"[230] while the number of substantiated allegations is astoundingly low.

The City's own records document an alarming number of reported staff-on-inmate sexual abuse allegations:  in 2013, the City logged 17 allegations of reported staff-on-inmate sexual victimization at RMSC; in 2012, 18 allegations; and in 2011, 21 allegations.[231]  The Ryan Report puts these statistics into context—and highlights their extraordinary nature.  RMSC had an average daily population of 815 in 2012 and 785 in 2013.[232]  During the period 2012 to 2013, the Miami-Dade County Jail System in Florida (which Ryan led) had a maximum capacity of 7,000 detainees but only 14 allegations of any type of staff-on-inmate sexual victimization (a number already considered too high by the jail staff).[233]  On a comparison basis, the 18 allegations at RMSC would, given the much larger populations at Miami-Dade, translate to

---

[230] Ryan Report ¶ 107 (Pls.' Ex. 274).

[231] *Id.* ¶¶ 107-8; PREA Spreadsheet: Log of Sexual Abuse Investigations (Updated) (May 31, 2016) (DEF_0016124) (Pls.' Ex. 284).

[232] Ryan Report ¶ 108 (Pls.' Ex. 274); James Decl. in Supp. of Pls.' Mot. for Class Certification ¶ 23, Oct. 9, 2015, ECF No. 32.

[233] Ryan Report ¶ 108 (Pls.' Ex. 274).

approximately <u>150 allegations</u> at Miami-Dade.[234]  During the period 2013 to 2014, the Miami-Dade County Jail System had 15 allegations of staff-on-inmate sexual victimization compared to RMSC's 17.[235]  Again, taking into consideration Miami-Dade's larger population, the 15 allegations would again translate to approximately <u>150 allegations, 10 times</u> Miami-Dade's actual number.[236]

To make it worse, the City's records likely underreport the problem.[237]  As this Court has itself noted, "the reporting of rapes is understated."[238]  Nor is there any reason why female inmates at RMSC would make false allegations at a rate higher than at other jails in America.  Yet, the City's average substantiation rate is between one half and one third the national average substantiation rate.[239]  Of the 56 reports of sexual abuse at RMSC between 2011 and 2013, only 3 (5%) were substantiated, while 31 (55%) were determined to be unfounded, 21 (37.5%) were determined to be unsubstantiated and 1 (2%) was closed for unknown reasons.[240]  Further, the City's records indicate that since 2011, only <u>two</u> employees have been disciplined for sexual abuse (and those persons were not COs, but civilian staff).  To have only two "substantiated" cases that led to discipline is just not credible.[241]  Such statistical discrepancies

---

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Id.* ¶ 109.

[238] Class Certifcation Hr'g Tr. 23:23-24:3, Jan. 4, 2016.

[239] Ryan Report ¶ 187 (Pls.' Ex. 274); Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Violence Reported by Correctional Authorities, 2006* 3 (2007), https://www.bjs.gov/content/pub/pdf/svrca06.pdf; Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Victimization Reported by Adult Correctional Authorities, 2007-2008* 1 (2011), https://www.bjs.gov/content/pub/pdf/svraca0708.pdf; Allen J. Beck et al., U.S. Dep't of Justice, *Sexual Victimization Reported by Adult Correctional Authorities, 2009-11* 1 (2014), https://www.bjs.gov/content/pub/pdf/svraca0911.pdf.  *See, e.g.*, James Decl. in Supp. of Pls.' Mot. for Class Certification ¶ 39, Oct. 9, 2015, ECF No. 32.

[240] Ryan Report ¶ 187 (Pls.' Ex. 274).

[241] *See* Blake Dep. 142:20-143:25.

can be explained only by one variable:  this City's deliberate indifference to the sexual safety of inmates in its care.

## ARGUMENT

### I.   THE 18-MONTH ADMINISTRATIVE STATUTE OF LIMITATIONS IS PRETEXT FOR THE CITY'S INDIFFERENCE

The City blames its failure to prosecute or discipline Santiago on the expiration of the 18-month administrative statute of limitations.  This excuse is pretext.  Not only does the 18-month period not even apply to the allegations of rape at issue here, but even if it did, the City cannot rely on that expiration to justify its inaction when the City itself was the sole cause of the more than two year investigative delay.  And, in any event, Jane Doe 2's allegations—as late as April 2014—that COs were retaliating against her started the 18-month period anew.

First, as rape and sexual abuse—the allegations against Santiago—are undeniably crimes, the 18-month period is not even applicable, much less expired.  *See* N.Y. Civ. Serv. Law § 75(4) (McKinney 2017) (18-month period does not apply if the "misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime.").  Rape is a felony offense with a statute of limitations of at least five years.  *See* N.Y. Crim. Proc. Law § 30.10 (McKinney 2017).  Therefore, the applicable statute of limitations has not yet expired.  Nor will it do so until at least May 2018.

Second, even if the 18-month period did apply, it expired only due to the City's own inexcusable delay.  The 18-month period starts from the last alleged wrongful act.  Here, Jane Doe 2 reported Santiago's sexual abuse of her to jail officials within ten days of the last sexual abuse Santiago forced her to endure, which occurred on May 2, 2013.  DOI then sat on the case until June 2014 (for 13 months).  And DOC ID did not open its own investigation until December 2014—after the 18 months had already run.  Then, nearly another year later and after

53

taking minimal investigative steps, DOC ID closed its case in August 2015 without taking any action against Santiago.  But the reasons cited for closing the investigation—the expiration of the 18-month period, and DOI's inexplicable refusal to provide DOC ID with necessary evidence—was entirely the fault of DOI and DOC ID, the City's own investigative agencies.  The City cannot straight-facedly claim that the expiration of a statute of limitations (or one agency's refusal to cooperate with another) prevented the City from taking action against Santiago while its own stonewalling ensured that the relevant limitations period would expire before any allegations could be substantiated.

The significance is clear:  that the City was and remains indifferent to Santiago's guilt and to the sexual safety of women in its custody.  The City should have continued to investigate Santiago in any event in order to ensure the safety of its female inmate population.  DOC Deputy Commissioner Kuczinski testified that if additional evidence supporting the possibility of rape or sexual abuse were uncovered, he "would have tried to do something to correct that injustice."[242]  Former DOC Deputy Commissioner Blake testified similarly:  that an expired statute of limitations in and of itself is not an acceptable reason to close a case,[243] and not only should the investigation continue given the possibility of uncovering evidence of a crime for referral to a criminal authority, but if additional information were uncovered that "leads [DOC] to believe that these charges . . . should have been substantiated," it would be necessary to "monitor [Santiago] very, very closely."[244]

Third, Jane Doe 2 and her family made allegations as late as April 2014 that COs at RMSC were retaliating against her.  Putting aside the City's complete failure to investigate

---

[242] Kuczinski Dep. 101:22-25.

[243] Blake Dep. 124:24-125:22.

[244] Id. 102:8-20.

54

these allegations, their very existence vitiates the limitations excuse:  allegations of retaliation should be treated as a separate actionable offense that restarts the limitations clock.  *See* DOC Command Level Order 15-16, Elimination of Sexual Abuse and Sexual Harassment (PREA) ("It is [RMSC] policy to treat retaliation as a separate actionable offense that is subject to separate administrative sanctions and possible referral for criminal prosecution.").[245]  This means that even the administrative 18-month statute of limitations period for the retaliation claim had not yet expired.

Plainly, the 18-month limitations period at no point prevented the City from taking action against Santiago.  Nor is there anything that prevents the City from terminating Santiago today.  Yet, it still refuses to do so:  Santiago remains employed and expects to retire with a full pension, and the City remains—astoundingly—deliberately indifferent to Santiago's guilt, and to taking any steps to "correct[ing] [the] injustice" of his abuse.

## II.   THERE IS NO CHAIN OF CUSTODY FOR JANE DOE 2'S JEANS FROM MAY 10 THROUGH MAY 14, 2013

The City has argued at every step of this case that Jane Doe 2 was not raped because the OCME did not find semen on her jeans.  This is a specious argument.  As a threshold matter, the City's argument depends on accepting the fallacy that if there is no semen after a single instance of rape, then no instances of rape occurred.  That is wrong:  whether there is semen on Jane Doe 2's jeans after a single instance of rape does not bear on whether Santiago ever raped Jane Doe 2 on different occasions.  The evidence at trial will show that Jane Doe 2 was raped repeatedly by Santiago, not just on the single instance in which she managed to place his semen on her jeans.

---

[245] DOC, Command Level Order, No. 15-16: Elimination of Sexual Abuse and Sexual Harassment (PREA), at DEF_0023760 (effective Aug. 18, 2016) (DEF_0023759-801).

Even with respect to that one instance, in order for the OCME testing to have any value, Jane Doe 2's jeans had to be preserved intact once they were seized, as only a properly documented chain of custody can attest.  However, the uncontroverted evidence—the City's own statements, the testimony of its employees and its repeated failure to produce any chain of custody documentation—<u>shows that there is no chain of custody for Jane Doe 2's jeans from the time they were seized on May 10 to when they were vouchered with the NYPD on May 14, 2013</u>.  Even more troublingly, testing by Plaintiffs' DNA expert, Dr. Heinig, has since revealed unidentified male DNA all over Jane Doe 2's jeans—which is consistent with the jeans having been tampered with before they were sent to the OCME, and the semen having been washed off them.

In order to conserve time and cost at trial, and given the impracticality of presenting evidence at trial showing the *non-existence* of chain of custody evidence, Plaintiffs request that the Court instruct the jury that the City has no chain of custody documentation for Jane Doe 2's jeans from the time they were seized from Jane Doe 2's cell on May 10, 2013 through the time they were vouchered with the NYPD on May 14, 2013.

## A.      There Is No Chain of Custody Evidence for Jane Doe 2's Jeans

This is not a case where the <u>sufficiency</u> of a chain of custody is in question; it is one where <u>none exists in the first place</u>.

<u>First</u>, with respect to testimonial evidence, the relevant witnesses' testimony is completely contradictory and does nothing to establish a reliable chain of custody.  Neither Torres, who seized Jane Doe 2's jeans, nor Christo, who received the jeans from Torres, is able (or willing) to explain what happened to the jeans from after they were seized on May 10 until

they were vouchered with the NYPD on May 14, 2013.[246]  Even more troubling, Torres and

Christo provided conflicting and uncertain accounts of when Torres gave the jeans to Christo.[247]

Plainly, this testimony does nothing to address the yawning gap in the jeans' chain of custody

between May 10 and May 14.

              <u>Second</u>, as to documentary evidence, the City has consistently failed to identify or

produce any materials whatsoever that document Jane Doe 2's jeans' chain of custody during the

critical four day period.  The City has also represented to this Court that it has produced

"everything [it] ha[s]" relating to the chain of custody of the jeans.[248]  Yet Plaintiffs have

received <u>nothing</u> from the City that indicates what happened to the jeans from the time they were

seized to the time they were vouchered.

              Apparently, "everything [the City] ha[s]" amounts, at most, to the brown paper

bag in which Jane Doe 2's jeans were sent to Dr. Heinig for testing, and which the City asserts is

"the paper bag in which the jeans were originally vouchered" and the same one Torres put the

jeans into when he seized them on May 10.[249]  These assertions are not only made without any

supporting evidence, but what evidence there is makes clear they are simply false.  Most

basically, even if the bag containing Jane Doe 2's jeans that was sent to Dr. Heinig was in fact

---

[246] *Compare* Christo Dep. 83:2-6, Mar. 24, 2016. ("Q: Were [Jane Doe 2's jeans] collected that day [May 10, 2013]? A: I never saw -- when we went to the trailer, [Torres] was not there. I never met Torres on this day or Ortiz. I did not receive the jeans on this day."); *id.* at 142:3-7 ("Q: What day did Torres give you the jeans? A: I think it was the 14th. He spends most of his time at the trailer, Rikers Island trailer. So he had them secured out there.") *and* Christo Dep. 309:25-310:6, July 27, 2016 ("Q: And you said [the day Torres and Ortiz spoke with Jane Doe 2 about her allegations] wasn't the same day that [Torres] brought [Jane Doe 2's jeans] to your office? A: No. Q: Do you know how many days passed before he brought them to your office? A: No."); *id.* at 314:11-14 ("A: Okay. Because I didn't receive [Jane Doe 2's jeans] in -- in my office until midweek of the [week after the allegation]."), *with* Ferdinand Torres Dep. 228:20-229:3 ("Q: When was the last time you remember having the pants in your possession? A: Just before I handed them to Christo. Q: Do you remember what day that was? A: Do not. Q: Do you think it was the same day that you collected them? A: Pretty sure.").

[247] *See supra* n.246.

[248] Conference Tr. 2:20-21; 6:21-22, Dec. 13, 2016.

[249] Joint Letter Mot. at 7-8, Dec. 8, 2016, ECF No. 234.

the same bag used by Torres to collect the jeans on May 10 (a highly dubious assumption, as explained below), it still would not be a chain of custody document, because it has <u>no chain of custody information</u>: that bag has <u>no</u> relevant writing on it whatsoever.[250] Indeed, all of the fields on the bag that would have provided any identifying information are <u>blank</u>.[251] Accordingly, nothing on that bag documents when the jeans were seized, when the jeans were placed in that bag, where the bag was kept and for how long, who had access to it, and so forth— the basic required information to establish a chain of custody, as the City's own manuals concede.[252] In fact, Torres clearly testified that he has <u>no recollection of writing chain of custody information</u> on the bag into which he placed the jeans after seizing them, and Christo similarly denies doing so.

Moreover, the testimony of Torres himself clearly establishes that the bag sent to Dr. Heinig is <u>not</u> the one into which Torres put Jane Doe 2's jeans after seizing them on May 10, 2013. The bag sent to Dr. Heinig is labeled as an "NYPD Biological Evidence Bag," and Torres testified that he would not have put the jeans in an NYPD evidence bag, but in one of either two other types of bags: (i) an evidence collection bag that would be labeled "evidence collection,"

---

[250] Photographs of Brown Paper Bag (Pls.' Ex. 38). Moreover, the numbers on the bottom of the bag are of no known relevance to the chain of custody of Jane Doe 2's jeans between May 10 and May 14, 2013, and the reverse side of the bag is marked solely with an illegible signature.

[251] *Id.*

[252] *See* DOC ID, Investigation Manual at DEF_0002311 (DEF_0002303-14) (Pls.' Ex. 282) (*Chapter 9.0: Vouchering Procedures and Preserving the Chain of Custody* § 9.2) (A chain of custody is "an unbroken link that begins at the crime scene and documents that (a) custodial possession, and (b) integrity of evidence has been maintained"); *id.* at DEF_0002314 (§ 9.4) ("Each transfer [of evidence] should be receipted. It is the responsibility of each transferee to ensure that the evidence is accounted for during the time that it is in his possession, that it is properly protected, and that there is a record of the names of the persons from whom he received it and to whom he delivered it, together with the time and date of such receipt and delivery.") (alteration in original); *see, e.g.*, *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 124 (S.D.N.Y. 2002) (chain of custody forms should "indicate the time and date the samples were taken, the time and date of both tests, and all required signatures indicating who the testers and handlers were."); *McCormack v. Cheers*, 818 F. Supp. 584, 594 (S.D.N.Y. 1993) ("The chain of custody requirement . . . mandates a continuous, physical nexus between the source of the substance in issue, the testing or analytical process to which the substance is subjected, and the proponent of the substance as real evidence.") (citation omitted).

or (ii) a brown paper bag from RMSC that would have been "really long . . . probably 4 feet long," which would need to be rolled closed due to its length.  The bag that was sent by the City to Dr. Heinig neither says "evidence collection," nor is it four feet long.  Moreover, Torres testified that he showed Jane Doe 2 her jeans by "open[ing] the bag like this (indicating) just open the bag, close it, roll it back up," suggesting that he used the longer RMSC bag to collect the jeans.  Finally, Torres also testified that he "[p]robably would have written [the] inmate's name and booking [sic] case number," but there is no inmate name or book and case number written on the bag.[253]

The bag sent to Dr. Heinig therefore cannot constitute chain of custody evidence for Jane Doe 2's jeans between May 10 and May 14, 2013.  As it is the sole piece of "evidence" buttressing the City's refusal to admit that no chain of custody exists, there can be no dispute that there is simply no such evidence.

### B.  Testing Has Revealed Male DNA That Is Consistent with Tampering

That Jane Doe 2's jeans were tampered with is no hypothetical matter.  As Dr. Heinig states in her report, the City has failed to maintain a chain of custody and "there is accordingly no such evidence demonstrating that [Jane Doe 2's jeans] were not tampered with during that time."[254]  The City's <u>own</u> written policies clearly state that failing to maintain an appropriate chain of custody will raise questions about whether the evidence might have been fabricated or tampered with.[255]  Moreover, as Dr. Heinig's report explains, improper tampering with the jeans at some point between May 10 and May 14 would explain the results of her

---

[253] Plaintiffs would have asked Torres whether he could identify the bag during his deposition on May 11, 2016, if the City had produced Jane Doe 2's jeans, and the bag, to them prior to the deposition.  Unfortunately, the City extensively delayed transmittal of the jeans until after the Torres deposition.

[254] Heinig Report at 8 (Pls.' Ex. 276).

[255] DOC ID, Investigation Manual at DEF_0002311-12 (DEF_0002303-14) (Pls.' Ex. 282) (*Chapter 9.0: Vouchering Procedures and Preserving the Chain of Custody* § 9.2) (emphasis added).

testing, which revealed male DNA, <u>from one man associated with RMSC</u>, on the left, right and crotch areas of Jane Doe 2's jeans.  This, according to Dr. Heinig, would be "consistent with the semen having been washed off [Jane Doe 2's jeans] before [Dr. Heinig's] (and OCME's) testing of them."[256]

Although the City was aware of Dr. Heinig's report, it is beyond telling that the report submitted by the City's DNA expert does not take issue with anything that Dr. Heinig states in her report:  about there being evidence of tampering, about the presence of DNA from a single male RMSC employee on Jane Doe 2's jeans, about there being no chain of custody for the jeans, or otherwise.  In fact, the City's expert has conceded under oath that if the jeans were tampered with, then her tests could <u>not</u> prove that there was <u>never</u> semen on them.[257]

Jane Doe 2 <u>voluntarily offered her jeans to DOI when she first reported Santiago's abuse</u>.  Had she fabricated her allegations, there could be no semen on her jeans. Turning the jeans over to DOI for DNA testing would therefore ensure that she was discredited. When considered along with the non-existence of a proper chain of custody, the presence of unaccounted-for male DNA on her jeans, and an unrefuted expert conclusion that these factors are consistent with tampering, the implication is clear:  a deliberate cover-up by the City is no hypothetical matter.

## C. Trial Time Should Not Be Spent Determining the Non-Existence of Chain of Custody Evidence

Trial should focus on the failures of the City:  to protect Plaintiffs and inmates in its custody from rape and sexual abuse, to investigate properly when notified of an allegation of abuse, and to address the unconstitutional conditions that have allowed predators such as

---

[256] Heinig Report at 10 (Pls.' Ex. 276).

[257] Philipps Dep. 114:2-115:5, Feb. 14, 2017.

Santiago to victimize women with impunity.  Trial should <u>not</u> focus on proving the absence of chain of custody evidence.  As explained, there is no chain of custody evidence for Jane Doe 2's jeans from May 10 to May 14, 2013.  But to prove the absence of such evidence to the jury poses significant evidentiary—and logical—challenges.  Plaintiffs must either: (i) introduce at trial literally every document produced by the City so that the jury can sift through and make its own judgment about whether there was a chain of custody for the jeans, which would be an enormous waste of time; (ii) call as a witness a member of Plaintiffs' legal team who has reviewed all of the discovery produced by the City and would therefore be competent to testify as to the absence of chain of custody evidence—an option which would unfairly risk compromising privilege, and would raise lawyer/witness rule issues; or (iii) call one of the City's counsel as a witness to testify as to what the City has produced, to which the City presumably would object.

There is no need to waste the Court's or the jury's time.  Plaintiffs thus respectfully request that the Court instruct the jury that the City has no evidence concerning the chain of custody of Jane Doe 2's jeans from the time they were seized from Jane Doe 2's cell on May 10, 2013 through the time they were vouchered with the NYPD on May 14, 2013.

## III.  THE CITY'S LOST OR DESTROYED EVIDENCE WARRANTS ADVERSE INFERENCE SANCTIONS

As explained, the evidence at trial will show that the City conducted a sham investigation into Jane Doe 2's allegations of sexual abuse.  Part and parcel to that investigation is the repeated destruction of evidence likely to prove Jane Doe 2's claims.  Each of the following items was supposedly lost by the City—and in any event, never produced—without credible explanation:

- Jane Doe 2's phone recordings, which would memorialize calls with Jane Doe 2's friend about Santiago and a three-way call to Santiago, initiated by that same friend;

- GENETEC video, which would show Jane Doe 2 repeatedly moving between Buildings 9 and 11 at night to meet Santiago;

- Housing Area Logbook for Building 11 between March 15, 2013 and May 15, 2013, which would show that Santiago lied under oath by covering up his retaliation against Jane Doe 2;

- Jane Doe 2's inmate file for her 2012 to 2013 incarceration, which contains the only record of her employment as an SPA;

- The special observation logbook for Building 9, which would, *inter alia*, corroborate Jane Doe 2's allegation that she worked double shifts as an SPA at Santiago's request;

- Drafts of the DOC ID closing memorandum for Jane Doe 2's investigation; and

- Jane Doe 2's injury to inmate form, which would likely contain early impressions by DOC staff of Jane Doe 2's allegations.

As described more fully below, the City's actions plainly have prejudiced Jane Doe 2 in putting on her case through no fault of her own.[258]  Under the circumstances, the Court should provide an adverse inference sanction against the City for each of the missing or destroyed items.

An adverse inference instruction is appropriate as a sanction for spoliation when (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed "with a culpable state of mind;" and (3) the destroyed evidence was "relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002).  A culpable state of mind exists if the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently."  *Id.* at 108 (alteration in original) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001)) (holding that the district court erred if it only considered gross negligence and bad faith as

---

[258] Jane Doe 1 is likewise prejudiced by the City's actions:  Jane Doe 2's abuse is relevant and admissible to Jane Doe 1's abuse under Federal Rule of Evidence 415.

bases for giving an adverse inference instruction).  Moreover, "[w]here a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."  *Id.* at 109.

### A.    Destroyed Phone Records

The City and its investigators have lost or intentionally destroyed important phone recordings that were burned onto a CD (the "Recordings").  The Recordings would have corroborated details of Jane Doe 2's allegations, and they have now gone missing without explanation.  Moreover, as set forth more fully below, Christo is the only investigator who Plaintiffs know had access to the Recordings, and he has provided unsatisfying and conflicting explanations for what happened to them.  Christo's initial testimony was that no Recordings ever existed.  When confronted with plain evidence that they did at one point exist, Christo insisted other, identified individuals must have handled them, but personally included no reference to the Recordings' existence in the closing memorandum that he drafted.  At best, this constitutes negligence, and at worst (and when taken in the context of the investigation as a whole) it raises a strong inference of willful misconduct by Christo.  Plaintiffs have been prejudiced by the destruction of the Recordings regardless of which of these explanations prevails, and the Court should provide the jury with an adverse inference instruction concerning the missing Recordings.

The Recordings are relevant to and would have contained key details corroborating Jane Doe 2's allegations.  Specifically, Jane Doe 2 told DOI that she shared details about Santiago's abuse with her friend "Black" over the recorded prison phone line, including that she told Black that Santiago threatened her.[259]  The Recordings would have also shown that Jane Doe 2 provided Santiago's phone number to Black, and that Jane Doe 2 asked Black to call

---

[259] Young Dep. 245:15-246:20; *see also* JD2 DOI Notes at DEF_0001490 (Pls.' Ex. 42).

Santiago's phone number on a three-way call after she was infracted for possessing the

contraband that Santiago provided to her.[260]  Jane Doe 2 told Christo about each of these details.

       Christo—the only City investigator that Plaintiffs know was made aware that the

Recordings existed—gave, at best, misleading testimony on the subject of the Recordings during

his first deposition.  Plaintiffs showed Christo an e-mail that he sent to other DOI investigators

and had saved in the DOI investigative file with subject line "To do list."[261]  The e-mail, in

relevant part, stated as an investigative item:  "request inmate [Jane Doe 2's] recorded calls

(ALREADY DONE)."[262]  Christo testified that this e-mail meant that "[t]he request was

done."[263]  Christo further explained that someone other than him would have put in the request

but claimed not to remember who that would have been.[264]

       Plaintiffs subsequently learned from then-newly produced ESI discovery that

everything Christo testified to about the subject of Recordings was inaccurate.  In an e-mail

obtained after his deposition (and not memorialized anywhere in the DOI investigative file),

Christo personally requested that Susan O'Leary (an employee within the DOC Legal

Department) save the Recordings to a CD and that Ms. O'Leary promptly make the CD available

for him.[265]  Plaintiffs re-deposed Christo after receiving this e-mail,[266] at which point he changed

---

[260] JD2 DOI Notes at DEF_0001489.  Santiago provided Jane Doe 2 with two phone numbers, both of which she gave to DOI when she reported her rape and sexual abuse.  *See* JD2 Bible and Diary at DEF_0018263 (City's Exs. JJ & KK) (entry next to person identified as "Boo").  DOI concluded that both of the numbers were owned by Santiago. JD2 DOI Closing Mem. at DEF_0001826 (Pls.' Ex. 69) (noting that Jane Doe 2 had written down "CO Santiago's home and cellular phone numbers (on record with the DOC)"); *see* City's Resps & Objs. to Pls.' Third Set of Interrogs.at 1-2, May 12, 2016 (Pls.' Ex. 121).

[261] E-mail from Jennifer Sculco, Inspector Gen., DOI, to James Christo, Assistant Inspector Gen., DOI (May 11, 2013) (DEF_0001929) (Pls.' Ex. 40).

[262] *Id.*

[263] Christo Dep. 122:8-11, Mar. 24, 2016; *see also id.* 125:8-11 (Q:  "At some point you came to learn that there were no recorded calls; is that correct?"  A:  "That's my understanding of it, yeah.").

[264] *Id.* 122:14-123:7.

[265] *See* E-mail from James Christo, Assistant Inspector Gen., DOI, to Susan O'Leary, Legal Div., DOC (May 14, 2013) (NYC_00007056) (Ms. O'Leary writes to Christo that the Recordings are "ready for pick up!").

his story about the Recordings.  In his second deposition, Christo confirmed that he did not pick up the Recordings and did not know who (if anyone) had done so.[267]  Christo insisted that he would have identified whomever did pick up the Recordings in an e-mail to the DOC Legal Department, but no such identification is made in Christo's e-mail thread with Ms. O'Leary,[268] or, based on Plaintiffs' review, in any other produced document.  Indeed, there is no memorialization of the fact that the Recordings even existed within the DOI investigative file or the DOI closing memorandum (documents that Christo assembled and authored).

This is investigative malpractice at best.[269]  At worst, the facts raise a strong inference that Christo willfully ignored or destroyed the Recordings and obscured the official record of the investigation to cover up the destruction.  In either case, the City's behavior warrants an adverse inference sanction in light of the prejudice to Jane Doe 2's ability to prove her case.

*Plaintiffs therefore respectfully request that the Court should instruct the jury that the City lost or destroyed the Recordings, and that the jury may infer that the contents of the Recordings would be favorable to Plaintiffs.*

## B.    Destroyed GENETEC Video

The City has either lost or destroyed highly relevant video evidence from cameras mounted in RMSC Buildings 9 and 11.  The video from those cameras would have shown—at a minimum—Jane Doe 2 moving between Buildings 9 and 11 in the middle of the night,

---

[266] As a result of this e-mail and others that contradicted Christo's prior testimony, the Court granted Plaintiffs the right to re-open Christo' deposition.  *See* Order Granting Letter Mot. to Reopen Sculco and Christo Deps., July 21, 2016, ECF No. 183.

[267] Christo Dep. 320:10-17.

[268] E-mail from James Christo, Assistant Inspector Gen., DOI, to Susan O'Leary, Legal Div., DOC (May 14, 2013) (NYC_00007056) (Christo responds, "Okay, thank you.").

[269] DOI Inspector General Sculco, Christo's supervisor, testified that "there should be no reason why [recordings saved to a CD are] not preserved."  Sculco Dep. 268:15-23, July 27, 2016.

repeatedly, when Santiago was working in Building 11, and would have potentially captured Santiago's distribution of contraband to Jane Doe 2, Santiago signaling Jane Doe 2 to come to Building 11, or other suspicious conduct.  Standard investigative procedure required that investigators preserve the video from the housing area where the abuse occurred and to memorialize this in the investigative file for the case.  The City's failure to conduct this basic investigative step yet again falls on Christo.

Nearly every DOI investigator deposed confirmed that DOI standard practice at the time was to request and preserve available video.[270]  Consistent with this intuitive investigative practice, the DOI closing memorandum authored by Christo states that "investigators . . . reviewed DOC GENETIC [sic] footage."[271]  Yet, no GENETEC video footage has been produced to Plaintiffs in this litigation.[272]  When asked about video footage at his deposition, Christo gave incredible and patently conflicting testimony.  First, Christo testified that video evidence was "not collected."[273]  In explaining this, Christo testified about a conversation that he (or, possibly, someone else) had with someone (although Christo could not remember precisely whom that would have been either) confirming that "there were not" cameras in the relevant areas.[274]  Christo went further, claiming that he may have also checked with an IT group at DOC that handles video footage requests to confirm that there were no

---

[270] Inspector General Sculco—Christo's supervisor—testified that it was standard practice for DOI investigators to collect and review video on the DOC's proprietary GENETEC video system.  Sculco Dep. 117:12-14, Dec. 21, 2015.  This was reiterated by DOI CO Investigator Rhonda Young—the investigator that went with James Christo to interview Jane Doe 2.  Young Dep. 191:6-16.  And again by Captain Torres—another DOI investigator who participated in the Jane Doe 2 investigation—who confirmed that he was unaware of any instance when he investigated an allegation of sexual abuse and did not collect video.  Torres Dep. 130:24-131:14.

[271] JD2 DOI Closing Mem. at DEF_0001823-24 (Pls.' Ex. 69).

[272] Video footage is stored in DOC's system for 90 days unless it is specifically preserved.  *See, e.g.*, Kuczinski Dep. 88:13-17.  Video footage covering at least part of Jane Doe 2 's abuse would have been available until August 2013—three months after Jane Doe 2 reported Santiago's rape and sexual abuse.

[273] Christo Dep. 164:9-11, Mar. 24, 2016.

[274] *Id*. 164:12-165:9.

cameras, although Christo acknowledged that there was no memorialization of this conversation in the DOI investigative file.[275]  Each of the purported conversations is premised on a lie:  there were two cameras in RMSC Building 11 and two cameras in Building 9.[276]

Later on in the deposition, Plaintiffs confronted Christo with the line of the closing memorandum, which he drafted, stating that investigators reviewed GENETEC footage.[277]  At that point, Christo for the first time mentioned that someone (he claims not to remember who) reviewed footage of "corridors," the "hallways," the "intake," the "clinic"—areas that have minimal to no relevance to Jane Doe 2's allegations of sexual abuse.[278]  The video footage was apparently not saved to the file[279] in contravention of DOI policy.[280]  When asked what time period the video review covered, Christo explained that the language in the closing memorandum "is kind of a boilerplate closing, where those are just—for most cases, we put that," and confirmed that the DOI closing memorandum that he wrote does not make clear the scope of the video review.[281]

There are only a few reasonable conclusions that one can draw from Christo's testimony.  Either Christo conducted an improbably limited review of video evidence in hallways when additional, highly probative video would have been available and then chose to include the very misleading statement that he reviewed video footage in his closing memorandum, or he

---

[275] Id. 165:17-25.

[276] See Santiago Dep. 120:15-121:5 (testifying to camera coverage in RMSC).

[277] Christo Dep. 246:1-12, 247:2-5, Mar. 24, 2016.

[278] Id. 247:6-22.

[279] Id. 248:3-5.

[280] See Torres Dep. 133:21-134:14 (testifying about memorialization practices of DOI).

[281] Christo Dep. 248:13-19, 249:20-24, Mar. 24, 2016.  Plaintiffs' Interrogatory Nos. 12 and 13 requested that the City identify each video recording reviewed in connection with the City's investigation into Jane Doe 2's allegations.  City's Resps & Objs. to Pls.' Third Set of Interrogs. at 3-4 (Pls.' Ex. 121), May 12, 2016.  The City refused to respond to these interrogatories on the basis that "there is a more practical method of obtaining the information sought, such as at a deposition."  Id. at 3-4.  Plaintiffs have now tried to depose every investigator that they know were involved in the Jane Doe 2 investigation and have not received any additional insight.

67

reviewed the more probative video from the cameras in Buildings 9 and 11, did not memorialize

his review or save the video footage anywhere, and then lied about it under oath.  In either case,

Christo grossly deviated from core investigative standards at best and deliberately ignored or

destroyed video footage that would corroborate Jane Doe 2's allegations.

> *In light of the prejudice to Plaintiffs from the City's actions, Plaintiffs respectfully request that the Court instruct the jury that GENETEC video was available to the City, that it was either lost or destroyed, and that the jury may infer that it would contain evidence favorable to Jane Doe 2.*

### C.   Housing Area Logbook for Building 11

The City lost or intentionally destroyed the housing area logbook for Building

11,[282] covering the period of Jane Doe 2's sexual abuse (March 15, 2013 to May 15, 2013) (the

"Housing Area Logbook").[283]  The Housing Area Logbook would have shown that Santiago lied

during his deposition about an incident involving Jane Doe 2.  Plaintiffs have thus been deprived

of important evidence in this case and request that the Court provide an adverse inference

sanction for the missing Housing Area Logbook.

The Housing Area Logbook is relevant to Jane Doe 2's allegation that Santiago

locked her in her cell in retaliation for her perceived reporting of his misconduct and is also

probative of Santiago's own credibility.  Indeed, Santiago admits that he locked Jane Doe 2 in

her cell, but claims that he did so because Jane Doe 2 was involved in an argument with another

---

[282] DOC requires that COs in each housing area maintain a continuous, chronological record of all of the activities in a logbook.  DOC, Command Level Order No. 52-16: Housing Area Logbook at DEF_0023942-43 (effective Aug. 30, 2016) (DEF_0023942-51) (Pls.' Ex. 132).

[283] The Housing Area Logbook are preserved in the RMSC archives and, at some point, moved to an off-site facility. Ellis Decl. ¶ 3, Sept. 30, 2016 (Pls.' Ex. 134).  The City failed to locate the Housing Area Logbook in either location.  *Id.* ¶ 4; Smalls Decl. ¶¶ 4-5, Jan. 13, 2017, ECF No. 270 (Pls.' Ex. 280).

inmate, whose name he conveniently could not recall.[284]   Later in his deposition, Santiago went

further, increasing the number of inmates involved in this fight from two to as many as nine

inmates,[285] none of whom Santiago could recall—apart from Jane Doe 2.  In Santiago's telling,

all nine inmates were in their respective cells at the time and none were visible to him.[286]

Because of this, Santiago could not remember the names of any of the nine inmates, yet recalled

Jane Doe 2's involvement and repeatedly referred to her by first name while testifying.[287]

Santiago also provided muddled testimony on when the incident began, before settling on the

representation that the incident was already going on when he arrived and that he was informed

about it by the CO whom he relieved.[288]   Santiago also claimed to have reported the incident to

the captain; in his nearly 20 years of service, this is the only incident Santiago had any memory

of ever reporting to a captain, although Santiago could not remember the captain's name.[289]

      Santiago acknowledged that, if this argument occurred as he testified, he should

have memorialized it in the Housing Area Logbook.[290]   In addition to Santiago, several other

individuals should have logged the incident as well, if Santiago is not lying:  (1) the captain,

whom Santiago says he told about the incident, would have had an obligation to inspect the

Housing Area Logbook and mark it with a different color pen;[291] (2) the officer on the shift

preceding Santiago's shift, since Santiago testified that he was aware of it; and (3) the captain

overseeing the preceding shift, for the same reason.  Assuming that the fight was as large as

---

[284] Santiago Dep. 91:11-92:3.

[285] Id. 107:9-17.

[286] Id. 107:18-21.

[287] Id. 108:17-20.

[288] Id. 98:12-99:2.

[289] Id. 97:2-9.

[290] Id. 92:13-25; 96:8-11.

[291] DOC, Command Level Order No. 52-16: Housing Area Logbook at DEF_0023948-49 (effective Aug. 30, 2016) (DEF_0023942-51) (Pls.' Ex. 132).

Santiago claims, it is also reasonable to assume that the COs in the control room with responsibility for monitoring Buildings 9 and 11 would have logged the incident as well.  Based on Plaintiffs' review of that logbook, it contains <u>no notation</u> of any inmate argument during the relevant time period.[292]  As a result, Santiago's explanation of his retaliation against Jane Doe 2 would likely be severely undermined by the Housing Area Logbook, if the City had not destroyed or lost it.

*The Court should therefore instruct the jury that the Housing Area Logbook was lost or destroyed by the City, and that the jury may infer that the Housing Area Logbook would contain notations favorable to Plaintiffs.*

### D.    Jane Doe 2's Employment Records

The City has also lost or destroyed Jane Doe 2's inmate file for her most recent incarceration (the "Inmate File"),[293] which the City represents is the only location where Jane Doe 2's employment information is systematically stored.[294]

Jane Doe 2 worked as an SPA in Building 9.  Santiago used Jane Doe 2's work detail in order to gain access to and sexually abuse Jane Doe 2.[295]  An important detail in Jane Doe 2's testimony is that she was initially assigned to the afternoon shift, but worked through the

---

[292] *See generally* DOC, Building 9/11 Bubble Logbook Pages (May 1, 2013 to July 22, 2013) (DEF_0021797-859) (Pls.' Ex. 57).

[293] E-mail from Arthur Larkin, N.Y.C. Law Dep't, to Mitchell Lowenthal, Cleary Gottlieb Steen & Hamilton LLP, et al. (July 25, 2016) (Pls.' Ex. 129).

[294] *See* E-mail from Arthur Larkin, N.Y.C. Law Dep't, to Mitchell Lowenthal, Cleary Gottlieb Steen & Hamilton LLP, et al. (July 25, 2016) (Pls.' Ex. 126) ("We have been informed that, to the extent any documents concerning jobs held by either plaintiff (while in custody) . . . those documents would be kept in the inmate files . . . .").

[295] JD2 Dep. 83:4-84:2, 87:3-16.

overnight shift at Santiago's request and without objection from any of the COs in Building 9.[296]
Santiago confirms that Jane Doe 2 worked the same shift as he did (the overnight shift).[297]

The City's destruction of records has deprived Plaintiffs of the ability to show the
jury documentary evidence that Jane Doe 2 was assigned to the afternoon shift and that, despite
being so-assigned, worked Santiago's overnight shift instead.  The City has provided no
explanation for its destruction of this record, which Plaintiffs understand should have been sent
off-site into archiving.

*Plaintiffs therefore respectfully request that the Court instruct the jury that the
City destroyed Jane Doe 2's inmate file and that the jury may infer that the records would show
that Jane Doe 2 was assigned to work the SPA afternoon shift.*

### E.    Special Observation Logbooks for Building 9

The City has also lost all special observation logbooks for Building 9—where
Jane Doe 2 worked as an SPA—covering the period of Jane Doe 2's abuse (the "Special
Observation Logbooks").  Special observation logbooks must be maintained for each mental
health housing area.[298]  COs are required to make contemporaneous notations in the special
observation logbook of, *inter alia*, the name and identification number of each SPA on duty at
any given time.[299]  SPAs are also required to make appropriate entries in the special observation
logbook.[300]  The missing Special Observation Logbooks would thus be powerful evidence of

---

[296] *Id.* 87:7-88:15; 90:11-91:10.

[297] Santiago Dep. 137:6-24 ("A:  The only reason I knew who [Jane Doe 2] was because she was the SPA in building nine and she kept coming across from the building nine side to the 11 side to use the bathroom or whatever excuse she would say.").

[298] DOC, *Ch. 7: Supervision of Inmates*, Employee Handbook at DEF_0002190-93 (DEF_0002186-201) (Pls.' Ex. 283).

[299] *Id.*; *see also* Directive, DOC, Classification 4017R Inmate Observation Aide Program at 6 (effective Aug. 8, 1988) (Pls.' Ex. 1).

[300] *Id.* at 9.

when Jane Doe 2 worked the afternoon and overnight shifts back-to-back.  However, the City

has never produced the Special Observation Logbooks; it asserts that they were destroyed in a

flood of the sprungs.[301]  Although the City has not provided much additional information, this

appears to be, at best, negligence on the City's part.[302]

       Together with the loss of Jane Doe 2's employment records in the Inmate File,

Plaintiffs have thus completely been denied the opportunity to corroborate Jane Doe 2's

allegations concerning her employment.

       *As a result, Plaintiffs respectfully request that the Court instruct the jury that the*

*City caused the Special Observation Logbooks to be destroyed by negligence or gross negligence*

*and that the jury may infer that the Special Observation Logbooks would contain notations*

*favorable to Plaintiffs.*

### F.      Drafts of DOC ID Closing Memorandum

       The City also failed to preserve any drafts of the closing memorandum for DOC

ID's administrative investigation into Jane Doe 2's allegations ("600 AR"), despite the fact that

the City was plainly on notice that a lawsuit was pending concerning the very subject of the 600

AR and that the findings of the investigation were therefore plainly relevant.[303]  The first draft of

the 600 AR was finalized on June 7, 2015.[304]  At least four additional iterations of the 600 AR

---

[301] Letter from Arthur Larkin, N.Y.C. Law Dep't, to Josh Anderson, Cleary Gottlieb Steen & Hamilton LLP, at 1 (July 15, 2016) (Pls.' Ex. 128).

[302] If the City's letter is referring to the RMSC sprungs that are the subject of Jane Doe 1's allegations, Plaintiffs are somewhat perplexed by how a building designed to hold people could flood so severely that the City would lose months of records.  This is compounded by the fact that much of Rikers Island is not flood prone.  *See* Independent Comm'n on N.Y.C. Criminal Justice & Incarceration Reform, *A More Just New York City* 102-103 (2017) (Pls.' Ex 281) ("The Island's elevation, with the majority outside of the 100-year and 500-year floodplains can support resilience to climate change for new facilities.").  If by flood, the City instead means a failure of its own water system, Plaintiffs cannot see why the City's failure to construct adequate facilities should be borne by Plaintiffs.

[303] Letter from Arthur Larkin, N.Y.C. Law Dep't, to Josh Anderson, Cleary Gottlieb Steen & Hamilton LLP, at 2 (July 15, 2016) (Pls.' Ex. 128).

[304] *See* JD2 DOC ID Case Log at DEF_0016125 (Pls.' Ex. 114).

are listed in the case log for June 10, 2015: (1) revisions from Captain Gordon, Wityak's supervisor; (2) a revised draft transmitted from Wityak to Captain Gordon; (3) additional revisions from Captain Gordon; and (4) a revised draft submitted to Captain Gordon's supervisor, Deputy Director of Investigations Jones.[305]  Moreover, it is plain from the text of the 600 AR closing memorandum that additional, unaccounted for revisions took place: the text of the final 600 AR, dated August 3, 2015, references events that occurred a month and a half after the initial draft was prepared.[306]

Each of these intermediate drafts should have been preserved. Each was created after this litigation was commenced. None are, or are claimed to be, privileged (even if the City concluded they were privileged, the drafts should have been logged, not destroyed). Moreover, the actual DOC ID investigators writing and revising the drafts of the 600 AR were personally aware of the pending lawsuit at the time that the drafts were created.[307]  The City cannot and has not justified its destruction of these documents.

*Plaintiffs therefore request that the Court instruct the jury that the City destroyed drafts of the 600 AR, and that the jury may infer that the earlier drafts would contain statements favorable to Plaintiffs.*

### G.    Injury to Inmate Report

Finally, the City has also lost or destroyed the second page of a document entitled the "injury to inmate report" that was created on May 10, 2013 by the City's staff after Jane Doe 2 reported her sexual abuse to the City for the second time (the "Injury to Inmate Report"). The

---

[305] *Id.*

[306] JD2 DOC ID Closing Mem. at DEF_0002481 (Pls.' Ex. 111).

[307] *See* E-mail from Alexandra Wityak, Investigator, DOC ID to Michael Blake, Deputy Comm'r, DOC, Steven Jones, Deputy Dir. Of Investigations, DOC ID, Lashawna Gordon, Captain, DOC ID, et al. (May 20, 2015) (DEF_0002507-11) (Pls.' Ex. 92) (sharing New York Times article on Plaintiffs' lawsuit).

City has never produced the second page of the Injury to Inmate Report and denies having a copy in its possession.[308]  The City claims to be unable to locate this second page but has provided no explanation why the document is missing.[309]  This is particularly concerning since the second page of the form report indicates that it should be saved in three separate locations.[310]

   The missing page of the Injury to Inmate Report would contain early impressions by DOC staff of Jane Doe 2's allegations.  Plaintiffs' review of blank reports of the same form shows that it should have contained an area for notations by the "Investigating Officer," labeled the "Investigator's Report."[311]  Below this designated area, there are designated areas for the Tour Commander, Deputy Warden and Commanding Officer to review and sign the form.[312]  These initial individuals would have had a view of Jane Doe 2 untainted by the City's inadequate investigation and may have corroborated details about Jane Doe 2's mental state—for example, her agitation at being retaliated against.  As it stands, Plaintiffs have been deprived of the completed Injury to Inmate Report without justification.

   *The Court should therefore instruct the jury that the City lost or destroyed the Injury to Inmate Report and that the jury may infer that the Report would be favorable for Plaintiffs.*

---

[308] DOC, Jane Doe 2 Injury to Inmate Report at DEF_0001702 (May 10, 2013) (DEF_0001702-05) (Pls.' Ex. 35).

[309] Letter from Arthur Larkin, N.Y.C. Law Dep't, to Josh Anderson, Cleary Gottlieb Steen & Hamilton LLP, at 2 (July 15, 2016) (Pls.' Ex. 128).

[310] DOC, Injury to Inmate Report at TMG_NYC_11751 (TMG_NYC_11750-51) (Pls.' Ex. 291) ("INSTRUCTIONS:  Original Report to Security, One copy to Clinic Lock box, One copy to Inmate Medical File").

[311] *Id.*

[312] *Id.*

## CONCLUSION

In accordance with the evidence, Plaintiffs respectfully maintain that Santiago and the City should be found liable in damages at the upcoming trial.

Dated:  New York, New York
April 24, 2017

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   /s/ James L. Bromley
James L. Bromley
*jbromley@cgsh.com*

One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000
Fax: (212) 225-3999

Of Counsel:
Mitchell A. Lowenthal
*mlowenthal@cgsh.com*
Josh E. Anderson
*jeanderson@cgsh.com*
Sue S. Guan
*sguan@cgsh.com*

William D. Gibney
*wdgibney@legal-aid.org*
Marlen S. Bodden
*mbodden@legal-aid.org*
Barbara P. Hamilton
*bphamilton@legal-aid.org*
THE LEGAL AID SOCIETY
199 Water Street, 6th Floor
New York, New York 10038
Tel: (212) 577-3300

*Attorneys for Plaintiffs*