H4LLJANC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JANE DOE 1 AND JANE DOE 2, et
al.,

                Plaintiffs,

            v.                          15 CV 3849 (AKH)

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    April 21, 2017
                                    11:54 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                    District Judge

                            APPEARANCES

CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Attorneys for Plaintiffs
BY:  MITCHELL A. LOWENTHAL
        JAMES L. BROMLEY
        ABIGAIL MARION
        -and-
THE LEGAL AID SOCIETY
BY:  MARLEN S. BODDEN
        BARBARA P. HAMILTON

KOEHLER & ISAACS LLP
        Attorneys for Defendant Santiago
BY:  LIAM L. CASTRO

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
        Attorneys for City Defendants
BY:  ARTHUR LARKIN
        KIMBERLY M. JOYCE

H4LLJANC

| | |
|---|---|
| 1 | THE COURT:  The purpose of this proceeding is to |
| 2 | evaluate the motion by the defendant Santigo for a 60-day |
| 3 | continuance in the trial.  The trial is supposed to begin |
| 4 | May 8.  The final pretrial conference has been scheduled for |
| 5 | May 1.  So I called this session to deal with the motion for a |
| 6 | continuance. |
| 7 | Mr. Castro. |
| 8 | MR. CASTRO:  Good morning, your Honor. |
| 9 | THE COURT:  You may proceed. |
| 10 | MR. CASTRO:  Thank you, your Honor. |
| 11 | By way of background, none of this should be new to |
| 12 | the Court.  However, for the benefit of the record, I'll begin |
| 13 | at the beginning. |
| 14 | Mr. Santiago had a stroke on January 15.  This we know |
| 15 | is a fact, a medical fact.  Since that time -- |
| 16 | THE COURT:  So it was a what? |
| 17 | MR. CASTRO:  A stroke. |
| 18 | THE COURT:  Yes. |
| 19 | MR. CASTRO:  He suffered a stroke.  It's a medical |
| 20 | fact that he had a stroke on January 15.  He has not returned |
| 21 | to work since and hasn't been cleared by his doctors to return |
| 22 | to work since that time.  There has been no determined date of |
| 23 | return to work in any capacity, light or full duty, as a |
| 24 | correction officer. |
| 25 | THE COURT:  What kind of stroke was it? |

H4LLJANC

1          MR. CASTRO:  Your Honor, I don't know the medical term

2     of the stroke.  I'm not a doctor, respectfully.  I believe it

3     is in my declaration.  It was called a cardiovascular accident,

4     CVA, of the right middle cerebral artery, while at work.  That

5     is my declaration at paragraph 5.

6          THE COURT:  But you don't have a neurologist saying

7     that?

8          MR. CASTRO:  We do.  We have we attached to my

9     declaration medical documents at Exhibit A from Lenox Hill

10    Neurosurgery indicating from Dr. Rafael Alexander Ortiz that he

11    had a stroke on 1/15/2017.

12         In addition to that, your Honor, he underwent

13    treatment, a surgery, to relieve -- to allow for better flood

14    flow into his brain on March 3, 2017, called a femoral cerebral

15    angiogram and carotid artery stenting, again, on March 3.

16    That's my declaration at paragraph 11.

17         We, our firm, I did not receive notice of this until

18    March 23 when I contacted him.  Actually, he returned my call

19    finally after an email to him to discuss the trial date, which

20    had been scheduled very shortly before March 23.  Upon learning

21    that he had a stroke on January 15, I asked him why he did not

22    previously tell us that he had a stroke.  His response to me

23    was I didn't remember about this case.  I asked him then, I

24    don't understand why you did not remember about this case.  He

25    said I just don't remember.  At that moment, I had asked him to

H4LLJANC

1   be prepared to receive HIPAA release forms by me to obtain all

2   the medical records concerning his stroke from all the doctors

3   that he saw regarding it.

4           Shortly after that conversation, we had a conference

5   call with all parties regarding I believe the scheduling of

6   various pretrial deadlines.  I then informed them of what

7   Mr. Santiago had told me.  Our joint letter of I believe

8   April 4, 2017, beginning the process of seeking a 60-day

9   continuance, thereafter followed.  In that letter I informed

10  the Court and all sides, as I did verbally on March 23, that we

11  would share all the medical records that we receive from his

12  doctors concerning the stroke.  To this date we have.

13          Taking a step back.  I then, after that conversation

14  with all sides on March 23, I then recontacted Mr. Santiago

15  that day.  I asked him if I could -- if there was somebody with

16  whom I could speak in his family, someone that he perhaps lived

17  with.  And shortly after that I ended up speaking with Jasmine

18  Santigo.  I asked her if in fact Mr. Santiago suffered a

19  stroke.  She said that he had.  I asked her how he was at that

20  stage in terms of his memory, in terms of his fitness from what

21  she's seen, not necessarily her medical opinion.  She is not a

22  doctor.  She told me -- and this is detailed in her declaration

23  which I provided to the Court -- that he has memory problems

24  that she's personally witnessed.

25          To the extent that this Court wishes to hear from

H4LLJANC

```
1    Ms. Santiago, we have her here today.  However, I will say that

2    except for adding to, adding examples to what's already in her

3    declaration, she would testify precisely what the declaration

4    says.  Given her declaration, which was what she originally

5    told me concerning his memory, his attention span, and the

6    like, we had serious concerns at that point about the

7    preparation for trial.

8            Ms. Santiago told me that she, to refresh

9    Mr. Santiago's memory, told him, father, do you recall being

10   deposed in this case?  And what her words to me were that he

11   said no.

12           THE COURT:  You yourself worked with the client?

13           MR. CASTRO:  I have since December of 2016, Judge.

14           THE COURT:  More recently.

15           MR. CASTRO:  I have spoken to him on a very regular

16   basis.  I had indicated in the joint letter of April 4 that I'm

17   in regular, at that point daily communication with him to not

18   only ensure that he was going to get back to us at that point

19   the HIPAA release forms, which frankly I've entrusted upon

20   Ms. Santiago to do that for me, but also to test how much he

21   can endure prepping.

22           Frankly, your Honor, I have not been able to go longer

23   than about 20 to 25 minutes on the phone with him.  And I have

24   seen --

25           THE COURT:  Say that again.
```

H4LLJANC

| 1 | MR. CASTRO:  I have not been able to go longer than 20 |

1          MR. CASTRO:  I have not been able to go longer than 20

2     to 25 minutes on the phone with Mr. Santiago.

3          THE COURT:  What happens?

4          MR. CASTRO:  In the beginning, middle, and end of the

5     conversations, you could tell he struggles with answering

6     questions.  Not every question, your Honor.  I ask him his

7     name, he'll give it to me immediately.  But when we get to the

8     details of the case, when we get to details of his regular

9     life, I've tested both his day-to-day activities, as well as

10    what the allegations are here.

11         THE COURT:  Was he examined at deposition?

12         MR. CASTRO:  Was he examined at the deposition, yes,

13    he was.  I personally was not present.  Prior counsel, Julie

14    Ortiz, was there, but he was examined in a deposition.

15         THE COURT:  Was he planning to testify?

16         MR. CASTRO:  Yes, he was.

17         THE COURT:  Is he able to testify?

18         MR. CASTRO:  Frankly, I'm not a doctor, your Honor,

19    but I have not seen --

20         THE COURT:  There's no medical indication in the file

21    that indicates he can't.  I'm asking you as his lawyer.

22         MR. CASTRO:  Frankly, I do not think that he can,

23    Judge.  I have seen him myself personally.  I've spoken to him

24    on the phone.  I don't think that the way he presents himself

25    now in terms of ability to understand my question, not all

H4LLJANC

1    questions, your Honor.  I don't want to overstate it that he

2    cannot speak or understand basic questions.  But the reality is

3    that oftentimes I could hear him -- he delays in answering it.

4    I believe he struggles answering questions, not about this case

5    necessarily, but about other things.

6         His daughter has told me -- and this is in her

7    declaration -- that he has gotten lost in areas that should be

8    familiar to him.  She has further told me that they drive him

9    to appointments because they believe that he'll get lost again.

10   For those reasons --

11        THE COURT:  This is not likely to change in 60 days.

12        MR. CASTRO:  I don't know that it will, your Honor,

13   but I do think that -- and I had this discussion with the

14   doctor, doctor staff, not the doctor himself.  It was told to

15   me that at the time of the declaration that they needed time to

16   understand what his present condition was more fully than they

17   do now.  That is the basis of the application, the ability to

18   allow for more time to understand his condition.

19        Ms. Santiago indicated in her declaration and has told

20   me personally that she would stand up for her father and be a

21   guardian ad litem if one were needed.  In our memo of law, we

22   had indicated that with due regard to the Court's questions as

23   to whether it had the authority, which we answered in the

24   affirmative, we don't know that one is necessary yet.

25        THE COURT:  A guardian.

H4LLJANC

```
1              MR. CASTRO:  That's correct.  So there are

2    unfortunately at this point more questions that we have than

3    answers.  But the most important question that we can answer

4    now is that I have personally see him struggle with answering

5    some questions, frankly, many questions in the beginning, the

6    conversations.  I have personally seen him struggle with the

7    length of conversations that I've had with him.  And I have

8    examined myself Ms. Santiago today and discussed on the phone

9    today personally and discussed on the phone with her her

10   declaration.  I have no reason to disbelieve what she has

11   ultimately put in her declaration and what she told me about

12   his day-to-day routines.

13             THE COURT:  I'm looking at the letter from Dr. Antonio

14   Joseph, who apparently is a specialist in nephrology.

15             MR. CASTRO:  Yes, Judge.

16             THE COURT:  He states that Mr. Santiago was a patient

17   of the medical center, NYU Langone Medical Center, for the past

18   six years, mentions the stroke and partial disability.

19             What's of interest here, the letter goes on to say he

20   also has severe memory loss, short term and long term, as a

21   result of his cerebrovascular accident.  His condition is

22   unlikely to improve in the near future and no date can be

23   predicted for improvement.  His ability to participate in a

24   trial or assist in his defense is limited.

25             I have a question because, first of all, this
```

H4LLJANC

1    Dr. Joseph, who may be a wonderful doctor, is a nephrologist.

2              MR. CASTRO:  Yes, Judge, I understand that.

3              THE COURT:  And the medical reports from the

4    neurosurgeon doesn't speak to these issues.

5              MR. CASTRO:  Right.  In our joint letter and as I had

6    promised all sides during our phone conference of March 23 that

7    we would share all the medical records we got related to his

8    stroke.  That was one of them.  I had I believe this week sent

9    to plaintiffs' counsel at their request the medical records.  I

10   searched to see if I received additional records as compared to

11   the ones that were submitted in the declaration.  I believe the

12   initial submission mirrored the one that I emailed to

13   plaintiffs' counsel this week.

14             That is there not as an expert in neurology.

15   Dr. Joseph, respectfully, is not a neurologist.  He is a kidney

16   specialist.  But we included it, frankly, because it was part

17   of our package.

18             THE COURT:  There's nothing else in the record that

19   speaks to a prognosis.

20             MR. CASTRO:  Well, that's why we had the declaration

21   of Ellen Braunstein and not Dr. Joseph.  She is a neurologist

22   and she is treating him for this memory loss, attention.  She's

23   trying to determine, as her declaration indicates, a diagnosis.

24   And to that end she had scheduled several tests.  That's

25   paragraph 2 of her declaration.

H4LLJANC

```
1              THE COURT:  Let me get there.
2              All right.  Let me hear from the plaintiff.
3              MR. CASTRO:  May I mention one more thing, your Honor?
4              THE COURT:  Yes.  I'm sorry, I thought you were
5      finished.
6              MR. CASTRO:  I should have added this in the beginning
7      that to update the Court, and all sides, for that matter, on
8      what it is his status is in terms of tests and treatment.  We
9      understand that he is scheduled for an examination on Monday --
10     excuse me, your Honor, I just have to locate it.
11             THE COURT:  It's okay.
12             MR. CASTRO:  He is scheduled for an appointment on
13     Monday to take more tests that were prescribed by
14     Dr. Braunstein.
15             THE COURT:  April 24.
16             MR. CASTRO:  I believe so, yes, your Honor.  I seem to
17     be missing my note.  I believe it's Monday.  And I have been
18     told that he's in the process of and they're working with him
19     to get involved in this process a neuropsychologist, who, along
20     with the neurologist, could examine and review the tests that
21     he's already taken and that he will be taking, I believe, on
22     Monday.  And I learned of this yesterday evening during my
23     conversation with Mr. Santiago's daughter and, in part,
24     Mr. Santiago.
25             THE COURT:  So I assume from all of this that
```

H4LLJANC

1    Mr. Santiago will not be in a position to testify and his

2    ability to make decisions that clients have to make in the

3    context of a trial would be limited.  I further assume that

4    there is no prognosis that the conditions will be improved in

5    any reasonably short period of time.  So that this condition,

6    although it's possible to be alleviated over a lengthy period

7    of time, is not likely to be alleviated within the next two,

8    three months.

9         I also understand that either you or your predecessors

10   have been able to work with Mr. Santiago in the past and

11   prepare him for deposition, where he must have been asked all

12   the questions that would be pertinent to the issues of

13   liability and what happened.  Of course, if he had plans to

14   testify and plans to contradict the testimony of the

15   plaintiffs, he'd be handicapped.  But given the fact that he

16   testified and it was extensive pretrial discovery of the

17   plaintiffs and of Mr. Santiago and of others, I don't know that

18   we have any problem different from an unavailable important

19   witness.

20        Let me stop there with that and see where other

21   arguments lead.  Does the city want to speak also, Mr. Larkin?

22        MR. LARKIN:  I could just briefly, your Honor.

23   Obviously, I don't have any firsthand knowledge about

24   Mr. Santiago.

25        THE COURT:  Your knowledge is derivative.  To the

H4LLJANC

1    extent that you felt that Mr. Santiago's testimony would have

2    helped the city's case, you're prejudiced by his not being

3    available.  I understand that.  Except that we don't know when

4    he will be available.

5         MR. LARKIN:  The declaration from the neurologist

6    suggests that further tests will at least inform the Court's

7    decision and inform everyone's I guess assessment of what his

8    actual condition is and whether he'll be in a position to

9    participate fully in the trial at some point.

10         I think the Court is correct.  The city's liability is

11   derivative of any finding by the jury that Santigo violated

12   either of the plaintiff's rights.  So to the extent Santigo

13   can't participate in his defense, the city's defense in the

14   case is affected.

15         So we share the same concern that our codefendant

16   shares with regards to proceeding at this point.  He's not just

17   an unavailable witness.  He's the main actor.

18         THE COURT:  You had an opportunity to examine him and

19   cross-examine him at deposition.

20         MR. LARKIN:  We were there, yes.  Of course, we were

21   there and had a few questions at the deposition.  You don't ask

22   every question at a deposition.

23         THE COURT:  You make a calculated decision.

24         MR. LARKIN:  Right.  You don't work on the assumption

25   that the witness is going to be unavailable.  Certainly you

H4LLJANC

1    would not conduct a deposition in this case with there's only

2    one individual defendant and only one officer whose conduct is

3    at issue in the case.  You would assume that person would be

4    available for trial.

5           THE COURT:  I got you.  Let me see what the plaintiff

6    says.  Mr. Lowenthal.

7           MR. LOWENTHAL:  Thank you, your Honor.  We take a very

8    different view of what they claim the facts to be.  Let me

9    start with just a few basics.  As your Honor recounted, we're

10   on the eve of trial.  We're on the eve of trial.  The last

11   pretrial filings are due Monday.  The only thing after that is

12   the final pretrial conference and then we start the trial.  So

13   this is beyond the 11th hour.

14          It is their burden, the city and Mr. Santiago, who are

15   jointly appearing before the Court in seeking this continuance

16   to demonstrate a need at this late hour after counsel, after

17   our experts, after everybody was arranging their schedule.

18          THE COURT:  They demonstrated a need for further

19   medical information.  They've shown that the client is

20   substantially unavailable to them.  I've got to weigh the

21   interest of the plaintiffs in having a trial against the

22   interest of the defendant in being able to testify and act in

23   relation to the defense.  It's a balancing test.

24          MR. LOWENTHAL:  I understand your Honor's position and

25   there's no question that it is a balancing test, it's based

H4LLJANC

1    upon discretion, and there's no question that it's the

2    defendant's burden.  But what you have just heard today is not

3    the facts that are in this case and it's not the facts as

4    demonstrated just by the papers that the defendants put before

5    you.

6            THE COURT:  What are the different facts?

7            MR. LOWENTHAL:  Let me explain.  There's no dispute

8    that Santigo had a stroke on January 15.  But not one medical

9    record produced from that date until March 20, which is the day

10   your Honor set the trial date, not one medical record indicates

11   that he had any memory problem, much less a diagnosis that his

12   cognitive state was in any way impaired.  The only neurological

13   problem that is identified in any of those medical records is

14   that his left hand shook.  That's it.  Nothing about cognition

15   and nothing about memory.

16           In fact, when, as Mr. Castro told you, he had a

17   surgical procedure, a stent was put into his carotid artery.

18   And what the records show is that the doctors explained the

19   risks and rewards to Mr. Santiago and they relied on his

20   consent to do that surgery.  So the neurologists who were

21   treating him not only didn't think he had a memory or cognition

22   problem.  They bet their medical licenses on that fact.

23           THE COURT:  Well, Mr. Lowenthal, this occurred at the

24   time he came in for the stroke.

25           MR. LOWENTHAL:  No.  He had the stent put in on

H4LLJANC

1   March 3.  He came in for the stroke on January 15.  If I can

2   show your Honor.

3           THE COURT:  Show me the exhibit.

4           MR. LOWENTHAL:  For example, if you look -- I don't

5   know whose declaration you have.  We put in one.

6           THE COURT:  I'd rather look at the medical exhibits.

7           MR. LOWENTHAL:  We put in the medical exhibits

8   identical to the ones that Mr. Castro did, but we numbered the

9   pages so it's easier to find where they are.  If, for example,

10  you look in Exhibit 2, at the bottom it says page 4.

11          THE COURT:  Yes.

12          MR. LOWENTHAL:  You'll see that's Mr. Santiago's own

13  signature saying I have read and understand the instructions

14  and I understand it is important to follow these instructions.

15  That's his discharge from the hospital on January 18.  They

16  told him what he could do and what he couldn't do and they had

17  him sign that.

18          Further, if you look in tab one on page 10, it's a

19  letter.  Excuse me, your Honor, have the wrong page.  It's

20  page 6 of tab 1.

21          THE COURT:  Yes.

22          MR. LOWENTHAL:  If you see under the heading

23  procedure, this is the report by the neurologist who did the

24  surgery, an appropriate consent was obtained from the patient.

25  Mr. Santiago is the one who consented to the surgery.  This is

H4LLJANC

1   on March 3, two weeks before your Honor set the trial date.

2   Until that point, if you look in the prior paragraph, there's

3   one example under indications, he, the neurologist who did the

4   surgery, says, and it's the third line from the bottom, it

5   starts he has a slight pronator drift and fix on the left,

6   meaning his hand shakes a little on the left.  Neurological

7   exam is otherwise normal.

8           THE COURT:  If I had to base my determination on

9   Mr. Santiago's cognitive ability at this point in time, I would

10  not feel comfortable relying on any of these papers.  I would

11  need to have an examination myself.

12          MR. LOWENTHAL:  Well, your Honor, let me address that

13  as well, if I could.  There's two more sets.

14          THE COURT:  We have time to do that.

15          MR. LOWENTHAL:  Well, if you want to have -- I

16  understand what you're saying, your Honor, but we're here

17  today.  You issued an order about what they were supposed to.

18          THE COURT:  Go on.

19          MR. LOWENTHAL:  And let me further state, if I may.

20          THE COURT:  I find this a very difficult issue to deal

21  with.  I want to be fair to both sides.  It's my job.  And if I

22  felt that there was a prognosis of recovery within the near

23  frame of time, say 60 days, the argument for postponing it

24  would be very strong.  But we don't have such an indication.

25  And if it was a longer indefinite time, I think the interests

H4LLJANC

1    of the plaintiffs in an early trial outweigh the interest of

2    the defendant at this point.

3         But we're told there are going to be important tests

4    on Monday.  We can certainly wait for that.

5         MR. LOWENTHAL:  Your Honor, if I may, I think

6    Mr. Castro was being candid in saying he really didn't know

7    when these tests were being conducted and he didn't have his

8    notes.  Maybe they're Monday.

9         THE COURT:  I'm assuming they are Monday.

10        MR. LOWENTHAL:  Even if so, your Honor, the stroke was

11   January 15.  What I've just shown you --

12        THE COURT:  I take your point.  It's their burden.

13   What you say is informative, but I've had enough experience

14   with consents in medical procedures not to put the kind of

15   reliance on them for the purposes of showing cognition that you

16   argue.  It's a persuasive point but not a conclusive point.

17        MR. LOWENTHAL:  Let me continue, if I may, your Honor.

18   There is nothing that's submitted to the Court from any of the

19   physicians that actually treated Mr. Santiago in connection --

20   let me continue, your Honor, and deal with the other

21   physicians.  But to close this, there isn't anything that your

22   Honor received from any of the physicians who actually treated

23   Mr. Santiago for his stroke, who treated him for two and a half

24   months.  They saw him on January 15 and last saw him on

25   March 6.  There is, as I said, there's not a word in their

H4LLJANC

1    medical records about any cognitive problems.

2              THE COURT:  The neurosurgeon would be expected to

3    comment about cognition loss.  That's part of the baggage that

4    goes with a stroke.  There is no comment.

5              MR. LOWENTHAL:  No comment whatsoever, except an

6    affirmative comment that aside from a shaking hand, his

7    neurological exam was normal.

8              THE COURT:  Mr. Lowenthal, I take all this.

9              MR. LOWENTHAL:  Let's move on to the next set.

10             THE COURT:  Enough with this.  If there are going to

11   be important tests on Monday, we could assemble on Wednesday

12   and I could have Mr. Santiago come here and make an assessment.

13   I can have Dr. Braunstein come here and testify.

14             She's now the treating neurologist, right, Mr. Castro?

15             MR. LOWENTHAL:  She's just a neurologist.  She's not a

16   neuropsychologist.

17             THE COURT:  I don't know whether I need a

18   neuropsychologist.

19             MR. LOWENTHAL:  They concede, I think, after having

20   read the letter from Dr. Barr, who we submitted from NYU

21   medical school, that in fact a neuropsychologist is the one

22   who's qualified to express opinions.

23             THE COURT:  Where is that?

24             MR. LOWENTHAL:  Dr. Barr is Exhibit 7 to my

25   declaration.

H4LLJANC

1          THE COURT:  Frankly, I discounted the NeuroTrax myself

2     without having read or remembered this.  But Dr. Braunstein, as

3     a neurologist, deals in her everyday practice or may deal in

4     her everyday practice with stroke victims.  And one of the

5     consequences of a stroke victim are losses of memory.

6     Sometimes memory comes back.  Sometimes they don't come back.

7     And sometimes they come back quickly and sometimes they come

8     back after a period of time.  Generally speaking, the wisdom

9     with a stroke is what you get back quickly you have and after

10    that it's problematic.

11         MR. LOWENTHAL:  Your Honor, the only point I'd make

12    and I'd like to look at what in fact Dr. Braunstein has

13    submitted to the Court because I think that is perhaps the most

14    telling of all.  As your Honor pointed out, they put in this

15    letter from Dr. Joseph, who's a kidney specialist.  One can't

16    rely on anything that he says.  But if you do, his position --

17    and his is the only diagnosis -- is Mr. Santiago is permanently

18    disabled.

19         THE COURT:  -- then nobody can.

20         MR. LOWENTHAL:  Let's look, your Honor, if we can, at

21    Exhibit 3 to my declaration, which is Dr. Braunstein's medical

22    report, such as it is.

23         THE COURT:  I'm looking at it.

24         MR. LOWENTHAL:  Look at the top, please.  It says

25    history of present illness.  And further down there's a line,

H4LLJANC

1    if you look six lines.

2              THE COURT:  Let me find it.  Where in your papers is

3    it?

4              MR. LOWENTHAL:  It's my Exhibit 3 and it's the first

5    page to Exhibit 3.

6              THE COURT:  All right.  I've got it.

7              MR. LOWENTHAL:  There's a line, the second bullet,

8    one, two, three, four, five, six.  It states he has not

9    returned to work.  Are you with me, your Honor?

10             THE COURT:  I am.  Give me a moment.

11             MR. LOWENTHAL:  Sure.

12             THE COURT:  I'm reading this.  The patient is

13   concerned because he feels he cannot remember anything.  When

14   he's actually asked questions, it appears that he does have the

15   ability to remember.  But he's having problems with

16   organizational skills.  This may be referable to his stroke.  I

17   therefore would like him to get a neuropsychiatric evaluation

18   and cognitive rehabilitation.  Otherwise, there are no other

19   new complaints.

20             So what we're having here -- I'll anticipate your

21   argument -- on an examination that occurred March 31, two

22   months after the stroke and on the eve of trial, which

23   basically says we need a lot of tests to know anything at all.

24             MR. LOWENTHAL:  No, your Honor, I disagree with that.

25   She concludes that he doesn't have any problem answering

H4LLJANC

1    questions.  And beyond that she sets forth an exam that she did

2    which led her to that conclusion.

3           If you see under the section physical exam, the mini

4    mental status exam shows patient to be awake, alert, and

5    oriented times three, which is the most that you can be.  The

6    patient is aware of where they are in terms of state, county,

7    and place.  The patient is able to repeat three unrelated words

8    and recall them in five minutes.  The patient is able to spell

9    words forward and backwards.  The patient is able to repeat the

10   phrase no ifs, ands or buts.  The patient is able to read

11   without difficulty.

12          So she did a test and her test showed he has no memory

13   problems.  Only because he complained about it she ordered some

14   tests.

15          THE COURT:  Let me.

16          MR. LOWENTHAL:  May I say one final thing, if your

17   Honor will indulge me.  When a letter was written to the Court

18   in which they tried to do this by informal letter, the

19   statement was we should have a hearing because we could examine

20   the doctors at a hearing.  I can get the letter.  That's what

21   the defendants said.  On Monday when we received their papers

22   Friday night -- or at least the Santiagos.  As you know, the

23   city didn't file their papers until late -- I wrote and said

24   I'd like you to bring Dr. Braunstein and Dr. Joseph so I could

25   cross-examine them here.  And I was told --

H4LLJANC

| | |
|---|---|
| 1 | THE COURT:  I didn't order any evidentiary hearing. |
| 2 | MR. LOWENTHAL:  You ordered a hearing, your Honor, not |
| 3 | argument. |
| 4 | THE COURT:  I did not have in mind any evidentiary |
| 5 | hearing at the time. |
| 6 | MR. LOWENTHAL:  If that's the case, that's the case. |
| 7 | But, your Honor, I asked for them.  They didn't bring them. |
| 8 | THE COURT:  All right, Mr. Lowenthal. |
| 9 | MR. LOWENTHAL:  They also didn't bring Santigo here, |
| 10 | which would have allowed you and us to observe him. |
| 11 | THE COURT:  Mr. Lowenthal. |
| 12 | MR. LOWENTHAL:  Yes. |
| 13 | THE COURT:  No. 1, I'm going to make a number of |
| 14 | rulings today, but we're going to reassemble Wednesday at |
| 15 | 4 o'clock to hear anything further from Dr. Braunstein and from |
| 16 | Mr. Santiago.  They both need to be present if you want me to |
| 17 | rely on anything they say. |
| 18 | Given the record that's developed, the medical report |
| 19 | of Dr. Braunstein, as stated by Mr. Lowenthal, and the absence |
| 20 | of any prognosis three months after the stroke of when |
| 21 | Mr. Santiago will recover his faculties, if his faculties have |
| 22 | been appreciably diminished by his stroke, the trial will |
| 23 | proceed as scheduled. |
| 24 | I am not prepared to discount the anecdotal evidence |
| 25 | presented by Mr. Santiago's family and by Mr. Castro, but at |

H4LLJANC

1   this point in time, it is defendant's burden to show that a

2   continuance would be appropriate and that a continuance would

3   bring about an improved state of affairs for Mr. Santiago.  I

4   have not been presented by any evidence that show that any

5   change is expected within any framework of time within the next

6   60 or 90 days, and I think anything beyond that will be

7   prejudicial to the plaintiffs.  So we will be going ahead.

8           MR. LOWENTHAL:  Your Honor, can I ask if any medical

9   records are going to be used that have not been produced to the

10  plaintiffs on Wednesday that they be provided to us by Tuesday

11  so we at least can review them.

12          THE COURT:  By 4 o'clock, Tuesday, Mr. Castro.

13          MR. CASTRO:  I understand, your Honor.

14          THE COURT:  Anything else?  Okay.  Thank you very

15  much.

16          MR. CASTRO:  Thank you, Judge.

17                            o0o

18

19

20

21

22

23

24

25